**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

QUANTUM BIOPHARMA LTD.,

                    Plaintiff,

       - against-

CIBC WORLD MARKETS, INC., RBC DOMINION
SECURITIES INC., and JOHN DOES 1 THROUGH 10,

                Defendants.

Civil Action:

**COMPLAINT**

**JURY TRIAL DEMAND**

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................... 1

II.    THE PARTIES......................................................................................................... 2

    A.     Plaintiff FSD Pharma ................................................................................... 2

    B.     Defendant CIBC............................................................................................ 3

    C.     Defendant RBC ............................................................................................. 3

    D.     Defendants John Does................................................................................... 4

III.   JURISDICTION AND VENUE .............................................................................. 4

IV.    BACKGROUND ..................................................................................................... 5

    A.     FSD Pharma is an Interlisted Security ......................................................... 5

    B.     Defendants' "Direct Market Access" Trading.............................................. 6

    C.     Defendants' "Gatekeeper" Obligations........................................................ 7

    D.     The Mechanics of a Spoofing Scheme......................................................... 9

V.     DEFENDANTS' UNLAWFUL SPOOFING SCHEMES ..................................... 11

    A.     FSD Pharma Succeeded During the Relevant Period ................................. 11

    B.     Each Defendant Has Participated in Spoofing Schemes............................. 13

    C.     The Nature, Effect and Mechanism of Defendants' Unlawful Schemes ............... 14

    D.     The Specifics of Defendants' Unlawful Manipulation of FSD ............................ 15

    E.     Defendants Acted with Scienter.................................................................. 19

    F.     Illustrative Examples of Defendants' Participation in Spoofing Episodes............. 25

        1.   Defendant CIBC......................................................................... 25

            i.   Example – June 3, 2020 ..................................................... 25

            ii.  Example – November 30, 2020 .......................................... 26

            iii. Example – February 1, 2022 ............................................... 29

            iv. Example – June 5, 2024 ...................................................... 30

          v.  Example – June 14, 2024 ............................................................... 32

     2.  Defendant RBC ........................................................................... 34

          i.  Example – August 10, 2020 ......................................................... 34

          ii.  Example – March 17, 2021 .......................................................... 35

          iii.  Example – May 3, 2021 ............................................................... 36

          iv.  Example – September 2, 2021 ...................................................... 37

     3.  John Doe 1 ................................................................................. 38

          i.  Example – June 4, 2020 ............................................................... 39

          ii.  Example – November 30, 2020 .................................................... 41

          iii.  Example – February 9, 2021 ....................................................... 42

  G.     Defendants' Spoofing Caused FSD Pharma to Suffer Significant Losses ............ 44

     1.  The Lingering Effects of Accumulated Spoofing Episodes ............................ 44

     2.  Injury in Fact and Loss Causation ................................................... 49

     3.  Defendants Intentionally Hid Their Manipulative Spoofing Schemes ............ 55

VI.  CLAIMS FOR RELIEF ............................................................................. 56

  A.     First Claim for Relief Against All Defendants for Spoofing in Violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5(a) and (c) Promulgated Thereunder ...................................................................... 56

  B.     Second Claim for Relief Against All Defendants for Spoofing in Violation of Section 9(a)(2) of The Securities Exchange Act of 1934 ....................................... 58

  C.     Third Claim for Relief Against all Defendants for New York Common Law Fraud ....................................................................................... 59

VII.  PRAYER FOR RELIEF ............................................................................. 59

VIII.  DEMAND FOR JURY TRIAL ..................................................................... 60

Plaintiff Quantum BioPharma Ltd. (f/k/a FSD Pharma, Inc.) ("FSD Pharma" or "Plaintiff"), as and for its complaint against CIBC World Markets, Inc. ("CIBC"), RBC Dominion Securities Inc. ("RBC"), and John Does 1 through 10 (collectively, "John Does," and together with CIBC and RBC, "Defendants"), alleges upon personal knowledge, information and belief, and an investigation by counsel, as follows:

## I.    INTRODUCTION

1.    The case arises from Defendants' use of "spoofing," an unlawful trading practice, to manipulate the market price of FSD Pharma's shares between January 1, 2020, and August 15, 2024 (the "Relevant Period").[1]  As explained below, Defendants' trading practices have caused FSD Pharma to suffer significant damages, and it seeks to recover more than $700 million here.

2.    The U.S. Securities and Exchange Commission ("SEC") describes spoofing as "the submission and cancellation of buy and sell orders without the intention to trade in order to manipulate other traders."  In analyzing the impact spoofing can have on the market, the SEC has called spoofing a "harmful strategy" employed by high-frequency traders and carried out by "strategically placing orders to create the impression of substantial order book imbalances in order to manipulate subsequent prices."

3.    During the Relevant Period, Defendants placed thousands of spoofing orders to sell, to create the illusion that the share price of FSD Pharma was declining.  These orders were intended to—and did in fact—"trick" or "bait" other investors into selling their shares at lower prices, which further drove FSD Pharma's share price downward. Having caused the price of FSD Pharma's shares to decrease, Defendants then swooped in and purchased shares at

---

[1] Until August 15, 2024, the stock/ticker symbol for FSD Pharma was "HUGE."

artificially depressed prices, and thus positioned themselves to profit to the extent that the market price of FSD Pharma's shares rebounded.

4.      While Defendants profited from these deceptive practices, many other market participants were harmed, including retail investors and FSD Pharma itself.

5.      Indeed, during the Relevant Period, FSD Pharma relied on the reasonable assumption that United States and Canadian stock exchanges were efficient markets free from manipulation and sold approximately 90 million shares of its stock on those exchanges. That assumption, however, was incorrect. Instead, as a result of Defendants' pervasive spoofing, the price that FSD Pharma received for that stock was artificially depressed. Absent Defendants' spoofing, FSD Pharma would have been able to sell its shares at significantly higher prices.

6.      This lawsuit seeks to hold each Defendant primarily liable for damages arising from either engaging in spoofing for their own proprietary accounts and/or for failing to fulfill their gatekeeping responsibilities by not designing, monitoring, and/or enforcing a system of risk management and supervisory controls, policies, and procedures that ensured their customers and traders did not manipulate the market, and complied with all applicable rules, regulations and laws, including Section 9(a), Section 10(b) and Rule 10(b)(5)(a) and (c) of the Securities Exchange Act of 1934 and the common law.

## II.    THE PARTIES

### A.    Plaintiff FSD Pharma

7.      FSD Pharma is a Canadian biotechnology company, with its principal place of business in Toronto, Ontario.  The Company's securities are currently listed on Nasdaq, and have been traded on Nasdaq, which is located in, and conducts business operations in, New York City.

**B.    Defendant CIBC**

8.    CIBC is a Canadian corporation based in Toronto, Ontario. It is a registered broker-dealer that primarily executes securities transactions for its customers in Canada, including on the CSE, and routes to intermediary broker-dealers in the United States orders to be executed for its customers. Although CIBC cannot directly execute an order on a United States exchange (because it is not a member of any such exchange), it can and does clear and settle trades for its customers that are executed by intermediary broker-dealers on United States exchanges.

9.    CIBC has conducted continuous activity in New York, directly related to these claims, by employing high-speed algorithmic computer systems to disseminate and/or effect orders and execute trades of FSD Pharma shares throughout the United States, including in New York, on stock exchanges in the United States through intermediary U.S. broker-dealers.

**C.    Defendant RBC**

10.    RBC is a Canadian corporation based in Montreal, Quebec, and Toronto, Ontario. It is a registered broker-dealer that primarily executes securities transactions for its customers in Canada, including on the CSE, and routes to intermediary broker-dealers in the United States orders to be executed for its customers. RBC clears and settles trades for its customers that are executed by intermediary broker-dealers on United States exchanges.

11.    RBC has conducted continuous activity in New York, directly related to these claims, by employing high-speed algorithmic computer systems to disseminate and/or effect orders and execute trades of FSD Pharma shares throughout the United States, including in New York, on stock exchanges in the United States through intermediary U.S. broker-dealers.

**D.**    **Defendants John Does**

12.    John Does 1 through 10 are entities—including but not limited to market makers, broker-dealers, subsidiaries, affiliates, and sister companies of the Defendants, and Defendants' customers—whose identities are currently unknown, that unlawfully participated in the scheme to manipulate the trading and market price of FSD Pharma securities through spoofing during the Relevant Period.

13.    John Does 1 through 10 conducted continuous activity in New York County, directly related to these claims, by employing high speed algorithmic computer systems to route orders and execute trades of FSD Pharma shares on exchanges located in New York County.

**III.    JURISDICTION AND VENUE**

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa]; and Title 28 of the United States Code [28 U.S.C. § 1331.  Indeed, as explained below, Defendants engaged in manipulative trading practices, with the intent to manipulate the price of FSD Pharma, on both the United States and Canadian markets, including Nasdaq and the Canadian Stock Exchange ("CSE").

15.    This court has personal jurisdiction over Defendants, who each conducted a substantial part of the events asserted in this Complaint in this District, and/or directed their fraudulent activity into the market by manipulating FSD Pharma stock on Nasdaq, which is located in this District.  The unlawful acts committed by each Defendant have had a direct and substantial impact on the market price of FSD Pharma shares traded in this District.

16.    Specifically, Defendants engaged in cross-border spoofing schemes that were intended to manipulate, and did in fact manipulate, the price of FSD Pharma stock in the United States and Canada. This activity was intended to, and did in fact, send false and misleading pricing signals to the market in order to trick or bait market participants and had a significant

immediate impact on the price of FSD Pharma's shares simultaneously in the United States and

Canadian markets. Further, because FSD Pharma is an interlisted security (as explained in

greater detail below), manipulation of the market price in one market directly and immediately

affects the trading price in the other country's market.

17.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §

1391 and Section 27 of the Exchange Act, in that many of the acts, transactions and occurrences

alleged herein occurred in this District, and Defendants conducted business here in connection

with the events described herein.  Defendants directly or indirectly made use of the means or

instrumentalities of interstate commerce including the mails in connection with the conduct

alleged herein.

## IV.    BACKGROUND

### A.     FSD Pharma is an Interlisted Security

18.     Since 2020, FSD Pharma has been an interlisted security with its shares listed and

traded on, among other exchanges, both Nasdaq and the CSE.

19.     The trading of interlisted securities such as FSD Pharma is facilitated by means of

a security identifier known as a CUSIP. FSD Pharma's CUSIP was 35954B404. Trades on both

US and Canadian exchanges are electronically executed and settled through the CUSIP number

of the security.

20.     A share of FSD Pharma stock that is traded in the United States is exactly the

same share that is traded in Canada. Because shares of interlisted securities, like FSD Pharma,

have identical CUSIP numbers and are fungible in Canada and the United States, they are netted

out in the cross-border clearing and settlement process.

21.     Purchasers and sellers of interlisted securities—unless specifically requested—

have no control over where their broker-dealer disseminates, effects, routes or executes their

orders. As a result of the seamless interconnection between the Canadian and U.S. markets for interlisted securities, and as a result of arbitrage trading, trades in either country's markets directly and immediately affect the trading price in the other country's market.

      **B.**    **Defendants' "Direct Market Access" Trading**

    22.    Customers who are not members of an exchange are prohibited from placing orders directly onto that exchange in their own name. Defendants, acting in their capacity as brokers, place orders and execute trades on their customers' behalf—by directly placing their customers' orders on exchanges pursuant to their customer's instructions with either (i) Direct Market Access ("DMA") under SEC Rule 15c3-5,[2] the Market Access Rule (for U.S. trades), or (ii) Direct Electronic Access ("DEA") under Universal Market Integrity Rule ("UMIR") Direct Electronic Access and Routing Arrangements Rule 7.13 (for Canadian trades). Through these channels, Defendants' customers can enter orders and/or trades, which Defendants then effectuate and disseminate.

    23.    As a matter of general business practice, Defendants provide their customers with access to the exchanges through DMA and DEA systems. Defendants are paid transaction fees for completed customer trades. When Defendants' customers use the DMA or DEA system, they do not place orders on exchanges under their own names; rather, these orders appear to the world as coming from Defendants because they bear Defendants' broker-dealer MPIDs.

---

[2] Rule 15c3-5 recognizes two types of market access arrangements whereby a broker-dealer allows one of its customers to use its marketplace participant identifier ("MPID") to electronically access and enter orders into a market. In a "direct market access" arrangement, the customer's orders flow through the broker-dealer's trading systems, such that the pre- and post-trade processes are administered and controlled solely by the broker-dealer whose MPID is used. In a "sponsored access" arrangement, the customer routes the orders directly to the market, wholly bypassing the sponsoring broker-dealer's systems. Under either type of market access arrangement, the broker-dealers continue to have "gatekeeper" responsibilities. The same is true with respect to Canadian broker-dealers.

6

24.     Defendants may also engage in principal trading of securities, such as FSD Pharma, for their own proprietary purposes.

**C.    Defendants' "Gatekeeper" Obligations**

25.     Broker-dealers in both Canada and the United States are considered by regulatory agencies to be "gatekeepers" of the integrity of trading on the securities exchanges and the stability of the financial system.

26.     When broker-dealers such as Defendants either provide DMA or DEA systems access to customers, it is the broker-dealers' continuing responsibility to ensure that the customers' order flow—which the broker-dealers are disseminating and/or effecting—complies with all applicable rules, regulations, and laws.

27.     Under the SEC Market Access Rule 15c3-5 and the IIROC UMIR 7.13, broker-dealers are required to establish, document, and maintain a system of risk management controls and supervisory procedures that are reasonably designed to manage the financial, regulatory, and other risks of the brokerage industry, and to prevent the disruption of a fair and orderly market.

28.     Under FINRA Rule 3110, brokerage firms are also required to "establish and maintain a system to supervise the activity of each associated person (i.e., customer or internal trading desk) that are reasonably designed to achieve compliance with applicable securities laws and regulations[.]"

29.     In Canada, while there is no national securities regulator comparable to the SEC, all exchanges and Alternative Trading Systems ("ATSs") must be members of IIROC and adhere to UMIR.[3] These rules mirror the SEC and FINRA rules that require that a broker-dealer

---

[3] IIROC is now known as CIRO.

implement and maintain written policies and procedures to be followed by their officers, employees, and customers.

30.     Specifically, UMIR 7.1 requires broker-dealers such as Defendants to supervise all of their customers' trading activity through automated order systems like the DMA or DEA systems. Broker-dealers who provide market access to their customers to use their facilities and systems are held to the highest level of oversight and control and will be sanctioned by IIROC and FINRA for failing to supervise the trading activities of their customers. *See* Reasons for Decision on Acceptance of Settlement, Matter of The Rule of Investment Industry Regulatory Organization of Canada and CIBC World Markets Inc., 2022 IIROC 05 (Apr. 8, 2022).

31.     Registered-broker dealers like Defendants are also required pursuant to FINRA Rule 5210, Supplementary Material .01 and NASDAQ Exchange Rule 575, Disruptive Practices Prohibited, to detect and prevent manipulative or fraudulent trading that originated from algorithmic high-speed trading under the supervision and control of their firm. In addition, pursuant to FINRA rules, broker-dealers must also file an "Annual Certification of Compliance and Supervisory Processes," in which they confirm that they have (1) established, maintained, and reviewed policies and procedures reasonably designed to achieve compliance with applicable FINRA rules, Municipal Securities Rulemaking Board ("MSRB") rules and federal securities laws and regulations; (2) modified such policies and procedures as business, regulatory and legislative changes and events dictate; and (3) tested the effectiveness of such policies and procedures on a periodic basis, the timing and extent of which is reasonably designed to ensure continuing compliance with FINRA rules, MSRB rules and federal securities laws and regulations.

32.    Defendants acknowledged and accepted their role as "gatekeepers" who are legally obligated to monitor their customers' order flow and prevent—rather than give effect to—any unlawful trading practices, such as spoofing, that their customers attempt to carry out under the shield of Defendants' MPIDs. In fact, on information and belief, each Defendant has compliance procedures in which they explicitly confirm and commit to honor their monitoring obligations. Defendants, in short, knew what their "gatekeeping" responsibilities were but, as explained below, nevertheless disregarded those responsibilities.

### D.    The Mechanics of a Spoofing Scheme

33.    In an efficient stock market that is free from manipulation, the price of a security is determined by the natural forces of supply and demand: the greater the demand or lower the supply, the higher the price; and the lower the demand or greater the supply, the lower the price.

34.    The objective of a spoofing scheme is to distort publicly available information concerning the actual supply and demand of a security by injecting false and misleading information about supply and demand into the marketplace.

35.    Specifically, a spoofer creates a false impression of excess supply or demand by placing "Baiting Orders" into the Market Order Book.[4]  These Baiting Orders are not intended to be executed and have no legitimate economic purpose.  Instead, the Baiting Orders are placed solely to create the illusion of market interest, which is intended to generate a response from other market participants to follow the artificial selling or buying trend that the Baiting Orders are intended to create. Thereafter, the spoofing party will cancel the Baiting Orders and take

---

[4] A "Market Order Book" is an electronic list of buy and sell orders for specific securities and other financial instruments that is organized by price levels and lists the number of shares being bid or offered at each price point. The Market Order Book reflects whether the market price for the security is moving upwards or downwards and is visible to every trader on the exchange.

advantage of the price change caused by those Baiting Orders, by either buying shares at an artificially-deflated price or selling shares at an artificially-inflated price. The spoofing party may profit when the market share price partially reverts to pre-spoofing levels and he or she unwinds his or her position.[5]

36.     Spoofing can be used to artificially inflate or lower the price of a security.  If the spoofer's goal is to drive the price down, the spoofer enters Baiting Orders to sell, which are intended to "bait" or "trick" investors into entering their own sell orders to minimize or avoid suffering losses in a downward trending market.  Shortly after the spoofer places the Baiting Orders to sell—and after those Baiting Orders have lured unsuspecting market participants into placing their own sell orders—the spoofer places orders to buy, or "Executing Purchase Orders," on the opposite side of the order book.  These Executing Purchase Orders to buy are intended to be executed at the artificially low prices generated by the Baiting Orders to sell.  Immediately after executing the Executing Purchase Orders to buy in the Market Order Book, the spoofer cancels the Baiting Orders to sell, completing the spoofing cycle.

37.     One of the signs of manipulative spoofing is a rapid reversal of trading direction—for example, where a market participant places many sell orders, followed by a buy order, followed by the cancellation of the sell orders.  This type of behavior strongly indicates that the original sell orders were not intended to be executed, and instead, were merely a ploy to drive the share price downwards to enable the spoofer to "buy low."

38.     If the spoofer's goal is to drive the price up, the spoofer will submit Baiting Orders to buy, which are intended to "trick" or "bait" investors into placing their own orders to

---

[5] Spoofers often use high-frequency trading computer systems that operate algorithmic trading programs to maximize the speed of their market access and the execution of their trading strategies.

buy. The spoofer will then place orders to sell to take advantage of an artificially manipulated upward market and will proceed to cancel his or her Baiting Orders to buy, thus completing the spoofing cycle.

39.     A spoofing scheme, to drive the price either upward or downward, is frequently used multiple times during a trading day and repeated throughout a protracted trading period. While each spoofing event may have a limited impact on the market, the cumulative effect of spoofing that occurs over a prolonged period can have a persistent and significant impact.

## V.     DEFENDANTS' UNLAWFUL SPOOFING SCHEMES

### A.     FSD Pharma Succeeded During the Relevant Period

40.     Founded in 1994, FSD Pharma is a biopharmaceutical company dedicated to building a portfolio of innovative assets and biotech solutions for the treatment of challenging neurodegenerative and metabolic disorders and alcohol misuse disorders. Its current projects include developing Lucid-MS, a unique molecular compound drug candidate for treating neurodegenerative disorders, and "Unbuzzd," a nonprescription formulation to rapidly relieve the negative effects of alcohol consumption.

41.     FSD Pharma has been publicly traded since May 2018. During the Relevant Period, its shares were listed on both Nasdaq and the CSE and traded on US and Canadian stock exchanges.

42.     Over that period, FSD Pharma's financial performance has generally improved. For example, although FSD Pharma lost approximately $39 million in 2019, its losses decreased in almost every subsequent year and, by 2023, were less than half of what they were in 2019.

43.     Consistent with that trend, news for FSD Pharma investors was generally positive during the Relevant Period.

44.    For example, on June 3, 2020, the Company announced that the FDA had granted it permission to submit an Investigational New Drug Application for the use of FSD-201 to treat COVID-19. On June 22, 2020, the Company announced favorable Phase 1 results for that drug; on August 31, 2020, the Company announced that it had submitted its Investigational New Drug Application for FSD-201 to the FDA; and on September 28, 2020, the Company announced that the FDA had authorized Phase 2 clinical trials for FSD-201. Yet the price of FSD Pharma fell from $7.39 to $2.76 over this period.

45.    Similarly, on March 16, 2021, the Company announced that it had entered into a license agreement to develop certain veterinary drugs, and on May 10, 2021, the Company announced that it had submitted to the FDA an Investigational New Animal Drug Application regarding those drugs. Yet, again, the price of FSD Pharma shares fell from $2.07 to $1.58 over this period.

46.    As another example, on August 25, 2021, the Company announced that it had entered into an agreement to acquire Lucid Psycheceuticals Inc. ("Lucid"), a Canadian-based psychedelic pharmaceutical company focused on the development of therapies to treat critical neurodegenerative diseases. The transaction closed on September 21, 2021, and the Company announced positive news regarding Lucid's projects on October 19, 2021 (development contract), January 5, 2022 (pre-clinical data), July 13, 2022 (patent application), January 17, 2023 (submitted application for Phase 1 clinical trial), February 7, 2023 (received regulatory clearance to move forward with clinical trial in Canada), and March 22, 2023 (received regulatory clearance to move forward with clinical trials in Australia). Nevertheless, FSD Pharma's shares fell from $1.84 to $1.56 during this period.

47.    A similar pattern occurred with respect to news about another of FSD Pharma's projects, Unbuzzd. For example, on February 14, 2023, the Company announced a new research and development program focused on unmet medical needs in the alcohol misuse space. The Company subsequently announced, on June 20, 2023, an exclusive license agreement with Celly Nutrition Inc. ("Celly") for recreational applications of FSD Pharma's alcohol misuse technology, and then announced the launch of Unbuzzd on August 25, 2023. The price of FSD Pharma shares fell from $1.74 to $1.25 during this period.

48.    These price decreases were not explained by unfavorable news, industry trends, or macroeconomic trends. Indeed, notwithstanding the fact that markets received plenty of good news about FSD Pharma's prospects during the Relevant Period, the price of FSD Pharma's shares were significantly outperformed by the Nasdaq Index and the Nasdaq Small Cap Biotech Index.

49.    The reason for this, as shown below, is that Defendants have relentlessly manipulated the price of FSD Pharma shares through spoofing.

**B.    Each Defendant Has Participated in Spoofing Schemes**

50.    It is difficult to identify manipulative schemes in listed securities like FSD Pharma on the basis of publicly available data because (i) those who participate in market manipulation schemes often employ a variety of tactics to hide their unlawful conduct, and (ii) most order flow in listed securities is publicly available only in anonymized form.

51.    However, detailed market by order data is available for Canadian markets. This data shows, among other things, not only each order and trade, but also a unique identifier for the broker through which that order or trade was made. Accordingly, with the assistance of an expert, FSD Pharma was able to determine which identifiers were associated with problematic trading activity. That analysis demonstrated that CIBC, RBC, and John Doe 1 each engaged in

widespread spoofing over the Relevant Period. Other Defendants—John Does 2 through 10—may have also participated.

**C.    The Nature, Effect and Mechanism of Defendants' Unlawful Schemes**

52.    Defendants' spoofing was conducted by either their own traders through their proprietary or principal accounts or by their customers who used Defendants' DMA or DEA systems to place orders under Defendants' accounts.  As "gatekeepers" of the integrity of the marketplace, Defendants were required to design, document, and implement a system of supervisory controls, policies and procedures that managed the risks and prevented fraudulent trading by their customers. Either way, Defendants are fully responsible for their traders' own conduct or for knowingly or recklessly ignoring that their customers were injecting false and misleading information into the marketplace in the form of Baiting Orders that had no legitimate financial purpose and were never intended to be executed.

53.    During the Relevant Period, Defendants placed thousands of Baiting Orders that were intended to create the illusion that FSD Pharma shares were declining in value based on the natural forces of supply and demand.

54.    Defendants' spoofing schemes were accomplished through the following three steps:

a) Following the instructions of either their customers or their own proprietary traders, Defendants flooded the Market Order Book with large quantities of Baiting Orders to sell.  The sole purpose for the placement of these Baiting Orders to sell was to deceive and mislead other market participants into believing that the market price of FSD Pharma securities was moving downward based on the natural forces of supply and demand;

14

b) Almost simultaneously, when the Baiting Orders were being placed in the Market Order Book, Defendants also placed their Executing Purchase Orders on the opposite side of the Market Order Book to purchase FSD Pharma shares at the lower stock prices caused by their Baiting Orders to sell; and

c) Immediately after the completion of their Executing Purchase Orders to buy FSD Pharma shares at the lower prices, Defendants cancelled and removed all of their Baiting Orders to sell from the Market Order Books.

55.    The three stages of Defendants' spoofing scheme—which collectively make up a "Spoofing Episode" or "Spoofing Cycle"—were completed sometimes within seconds or milliseconds and were repeated multiple times a day and continuously throughout the Relevant Period.

56.    The continuous placement and cancellation of thousands of Baiting Orders to sell by Defendants was not in furtherance of any legitimate purpose.  Rather, this activity was intended to send a false and misleading pricing signal to the market in order to "trick" or "bait" market participants into executing their own sell orders.  Defendants' activities thus operated as a fraud on the market and created a "pile-on" effect which drove down FSD Pharma's share price even further, thereby enabling Defendants to purchase FSD Pharma's shares at artificially manipulated lower prices for either their customers' accounts or their own proprietary accounts—and resulted in FSD Pharma selling or issuing its shares at artificially low prices.

**D.    The Specifics of Defendants' Unlawful Manipulation of FSD**

57.    Based on the limited data available, during the Relevant Period, Defendants submitted fictitious Baiting Orders totaling at least 16,212,300 shares on Canadian stock exchanges—12,213,000 for CIBC, 267,800 for RBC, and 3,731,500 for John Doe 1.

15

58.     Defendants' Baiting Orders led to substantial sell-side imbalances in Defendants' order flow, which were intended to – and did – send false and misleading pricing signals to the marketplace that interfered with FSD Pharma's share price being determined by the natural forces of supply and demand.

59.     The Baiting Orders were disseminated and/or effected by Defendants on Canadian stock exchanges, with knowledge that such orders were part of a spoofing scheme that was intended to manipulate the price of FSD Pharma stock.

60.     By design, Defendants' Baiting Orders led to a "pile-on" effect, where artificial selling pressure was created, which induced other market participants to submit additional sell orders and artificially drove down the price of FSD Pharma shares. Specifically, over the course of each Spoofing Episode, the Baiting Orders successfully induced the entry of sell orders from other market participants, driving down the price of FSD Pharma shares by an average of 90.52 basis points per episode (86.38 for CIBC, 78.85 for RBC, and 96.25 for John Doe 1).

61.     Almost simultaneously, Defendants executed Executing Purchase Orders to purchase a total of 357,997 shares at these depressed prices (240,710 for CIBC, 11,465 for RBC, and 105,822 for John Doe 1), which were below the prevailing best offer prior to Defendants placing the Baiting Orders.

62.     Shortly thereafter, Defendants cancelled all of the fictious Baiting Orders.

63.     As discussed in further detail below, Defendants' Baiting Orders were intended to function as part of a scheme to defraud the market in FSD Pharma securities rather than be executed.  This intent can be reasonably inferred from, *inter alia*:  (1) the short time period between the continuous and repeated placement and cancellation of the Baiting Orders; (2) the concentration of cancelled Baiting Orders during the limited period when each spoofing event

occurred; (3) the average size of the Baiting Orders that were cancelled, in comparison to the average size of the bona-fide sell orders that were executed; (4) the ratio of cancelled Baiting Orders to sell compared to the executed bona-fide orders to buy that existed; and (5) the reoccurrence of the same trading patterns over an extended period of time.

64.     For each named Defendant, the following table lists the share volume of Baiting Orders that were placed and subsequently canceled, share volume of Executing Purchase Orders which were executed at depressed prices, and the resulting price decline in FSD Pharma shares.[6]

| Defendant | No. of Episodes | Shares in Baiting Orders | Purchase Volume | Ratio of Baiting Orders to Purchase Volume | Average Price Decline |
|---|---|---|---|---|---|
| CIBC | 747 | 12,213,000 | 240,710 | 50.74-to-1 | 86.38 basis points |
| RBC | 38 | 267,800 | 11,465 | 23.36-to-1 | 78.85 basis points |
| JOHN DOE 1 | 618 | 3,731,500 | 105,822 | 35.26-to-1 | 96.25 basis points |

65.     To be clear, Defendants' manipulative conduct was not limited to their trading on the Canadian market. Instead, statistical analysis of United States trading data indicates that, at the same time that Defendants were engaged in spoofing on the Canadian market, similar manipulative trades were placed on United States markets. Although the United States trading data is anonymized, upon information and belief, Defendants and/or their clients were responsible for these trades on United States markets as part of a coordinated effort to suppress the price of FSD Pharma stock.

---

[6] The data contained in this table does not reflect all of the Spoofing Episodes that existed during the Relevant Period.  Only after discovery is taken can a full and complete record of Defendants' proprietary trading and/or their customers trading be determined.

66.    This is confirmed by comparing trading patterns in the United States at times where Defendants were engaged in spoofing in the Canadian Market, with trading patterns in the United States at times where Defendants were not engaged in spoofing in the Canadian market.

67.    For example, Net New Size measures the difference between the total size of buy orders and the total size of sell orders placed during a particular period, divided by the average order size for a given day. Negative values indicate that the total size of sell orders was greater than the total size of buy orders. While Defendants were engaged in spoofing in the Canadian market, Net New Size in the United States was -44.44; it was -0.48 when Defendants were not engaged in spoofing. This difference is statistically significant.

68.    As another example, Pre-Trade Short Order Life Percent measures the percentage of new sell orders with order lifetimes in the bottom quartile. While Defendants were engaged in spoofing in the Canadian market, Pre-Trade Short Order Life Percent in the United States market was 47.52%; it was 27.70% in the United States market when Defendants were not engaged in spoofing. This difference is statistically significant.

69.    As a third example, Post-Trade Net Cancellation Size measures the difference between the sizes of buy order cancellations and sell order cancellations, relative to the average order size for a given day. Negative values indicate that the total size of sell orders canceled was greater than the total size of buy orders canceled. While Defendants were engaged in spoofing in the Canadian market, the Post-Trade Net Cancel Size in the United States market was -36.74; it was 3.09 in the United States when Defendants were not engaged in spoofing. This difference is statistically significant.

70.    Together, these data points show that (i) anomalously large new sell order volume was created in the United States market while Defendants were engaged in spoofing in the

Canadian market, (ii) an abnormally large number of sell orders were cancelled relative to buy

orders in the United States market while Defendants were engaged in spoofing in the Canadian

market; and (iii) those orders were canceled unusually quickly.

71.    That Defendants would simultaneously carry out their spoofing activities in the

United States market comports with common sense. Indeed, the success of Defendants' spoofing

activity in the Canadian market (which is less liquid, and therefore easier to manipulate)

depended on Defendants also engaging in similar manipulative conduct in the United States

market; absent such conduct in the United States, sellers would simply choose to sell at higher

prices on the United States market as opposed to selling at artificially deflated prices on the

Canadian market.

### E.    Defendants Acted with Scienter

72.    As set forth below, each Defendant knowingly or recklessly participated in

spoofing schemes that were intended to—and in fact did—deceive, manipulate and/or defraud

the market for FSD Pharma shares and the participants in that market.

73.    *First*, Defendants submitted Baiting Orders for a median of 5,100 sell-side shares

per Executing Purchase that were subsequently canceled. By contrast, over those same periods,

other market participants submitted orders on median for only 1,300 sell-side shares, which were

subsequently canceled—a difference of 392%.

74.    *Second*, compared to other market participants, Defendants purchased far more

shares at depressed prices during the minutes following the spoofing window. Specifically, over

the five minutes after the spoofing windows, Defendants purchased an average of 2,863 shares

while other market participants purchased an average of 1,394 shares over those same windows.

75.    *Third*, the size of the Baiting Orders that were cancelled—in comparison to the

size of bona fide sell-side orders that were executed by Defendants—is also indicative of

19

scienter. During each Spoofing Episode, Defendants placed and subsequently cancelled a median of 5,100 shares in Baiting Orders (5,900 for CIBC, 7,000 for RBC, and 4,300 for John Doe 1) while executing a median of 0 sell-side orders. The stark contrast between the share volume of Baiting Orders and executed sell-side orders during each Spoofing Episode indicates that Defendants were manipulating the market by using Baiting Orders as tools to generate artificial prices rather than making a genuine attempt to sell FSD Pharma shares. Put differently, the ratio of canceled Baiting Orders compared to executed sell orders strongly indicates that Defendants never intended to execute their Baiting Offers.

76.     *Fourth*, the size of executed sell-side orders compared to Executing Purchases by Defendants is also indicative of scienter. In the median Spoofing Episode, Defendants executed 100 shares each in Executing Purchases, while in contrast executing 0 sell-side orders. The stark contrast between the share volume of Executing Purchases and sell-side orders further indicates that Defendants were manipulating the market by using Baiting Orders as tools to generate artificial prices at which to place Executing Purchases as favorable prices.

77.     *Fifth*, when spoofing the market, Defendants injected significantly more artificial sell-side order flow than non-spoofed orders prior to buying shares, as measured by (1) the volume of sell side order flow and (2) the cancellation of that order flow. Specifically, among the spoofing episodes, during the Baiting Period preceding the execution of Executing Purchases, Defendants submitted new sell-side orders that were canceled for an average of 11,555 shares per Executing Purchase. During the same time window as the Baiting Period prior to non-spoofed purchases, they submitted new sell-side orders for an average of 828 shares per purchase. In addition, during the Cancellation Period following non-spoofed purchases, Defendants canceled an average of 1,296 sell-side orders. That is, on average, there were 13.96

times more sell-side shares created in the Baiting Period prior to Executing Purchases compared to non-spoofed purchases, and 8.9 times more sell-side shares canceled in the Cancellation Period following Executing Purchases compared to non-spoofed purchases.

78.    *Sixth*, Defendants' behavior was inconsistent with bona fide market-making. Over Cancellation Periods, Defendants cancelled 88% of the sell-side orders created during Baiting Periods, but only 69% of the buy-side orders created during Baiting Periods. The asymmetry in order cancellation rates is inconsistent with bona fide market-making, which involves purchases and sales in roughly comparable amounts to provide liquidity to customers or other broker-dealers.

79.    *Seventh*, on information and belief, each Defendant (and/or their customers) specifically designed and implemented algorithmic trading programs that executed the spoofing schemes.  Indeed, nearly 75% of all trades are conducted algorithmically, each Defendant is heavily engaged in algorithmic trading, and Defendants' spoofing trades were executed too quickly to have been manually executed. Consistent with these facts, Defendants placed and cancelled in rapid succession tens of millions of Baiting Orders to sell that were never intended to be executed.  Moreover, on information and belief, Defendants—each of which is a sophisticated entity that uses cutting-edge technology—closely monitored, modeled, and analyzed the performance, impact, and effects of their algorithmic trading programs throughout the Relevant Period, including the spoofing pattern which the algorithm executed again and again on FSD Pharma stock during the Relevant Period with similar effects each time.

80.    *Eighth*, on information and belief, each Defendant's (and/or their customers') trading activities were approved by corporate officials sufficiently knowledgeable about the

trading practices of each Defendant (and/or their customer) such that each Defendant (and/or their customer) knew or recklessly ignored that they were engaging in illegal spoofing.

81.    *Ninth*, as registered broker-dealers, Defendants knew and/or were required to know that it was unlawful to place Baiting Orders to sell that were never intended to be executed in order to trick market participants into selling shares of FSD Pharma stock.

82.    *Tenth*, pursuant to applicable regulations and their own compliance manuals, Defendants were required to have internal policies, procedures, and systems that detected and prohibited manipulative or fraudulent trading devices or schemes. Given these obligations, Defendants either intentionally manipulated the market through their spoofing schemes or were reckless in allowing such behavior to occur.

83.    *Eleventh*, the short time period between the placement and cancellation of their Baiting Orders is further indicative of scienter. During each Spoofing Episode, Defendants placed and then cancelled the Baiting Orders within seconds or even milliseconds. This practice, which occurred thousands of times over the Relevant Period, indicates that Defendants never intended to execute the Baiting Orders.

84.    *Twelfth*, the concentration of Baiting Orders during the limited period when each spoofing event occurred is also indicative of scienter. During each Spoofing Episode, Defendants cancelled all of the Baiting Orders, sometimes amounting to tens of thousands of Baiting Orders, in a matter of seconds and sometimes milliseconds, all of which had been placed by Defendants mere seconds earlier.

85.    *Thirteenth*, Defendants carried out thousands of Spoofing Episodes over the Relevant Period, and often multiple episodes per trading day. The repetition of this pattern of placing fictitious Baiting Orders which created an artificial price, Executing Purchases at the

artificial price, and then cancelling all of the Baiting Orders, is indicative of scienter. An ordinary trader buys when it thinks the price of a security is likely to go higher and sells when it thinks the price of a security will go lower. In contrast, one of the tell-tale signs of manipulative spoofing is rapid, unnatural reversal of trading direction—a large volume of sell orders, followed by buy orders, followed by the cancellation of the original sell orders—which suggests that the original sell orders were merely a ploy to drive the price down to "buy low." Statistically, Defendants exhibited this distinctive pattern again and again—and at multiples of the average trader, demonstrating that Defendants' manipulative trading was intentional.

86.    *Fourteenth*, confirming their manipulative intent and motive to engage in spoofing to suppress the price of FSD Pharma shares, upon information and belief, Defendants CIBC and RBC engaged in other potentially problematic trading practices with respect to FSD Pharma shares during the Relevant Period, including naked short selling, which involved selling FSD Pharma shares short without owning, borrowing, or securing the right to borrow those shares. This is evidenced by (i) the remarkably high ratio of trading volume in FSD Pharma to the float of the stock,[7] which is generally indicative of significant short selling;[8] (ii) lending data, which, combined with short selling data, suggests that many short sales were "naked";[9] (iii) significant imbalances between FSD Pharma shares reflected in broker position reports and shares held in United States and Canadian depositories, especially for Defendants, which further

---

[7] Specifically, 2.7x in Canada and 32.3x in the United States, over the period from January 2020 through July 2024.

[8] Consistent with this inference, approximately 38.3% of trading volume in FSD Pharma from January 2020 through October 14, 2024, was short—well above the marketwide average of about 25%.

[9] Indeed, the maximum number of shares on-loan overnight from January 2020 to July 2024 was 1,494,650, while the maximum number shares short according to FINRA were 1,410,263.

suggests that Defendants were involved in naked short selling;[10] and (iv) the surplus of net shares of FSD Pharma sold by CIBC (as measured with CSE market data) over a given period above the decrease in CIBC's inventory of FSD Pharma's shares over that same period (as measured by CDS data), which further supports the inference that CIBC was engaged in trading shares that it did not own.[11]

87.    *Fifteenth*, in March 2023, almost immediately after FSD Pharma's CEO expressed concerns to CIBC that he believed CIBC may be engaged in manipulative trading practices with respect to FSD Pharma's stock, CIBC aggressively and repeatedly shorted FSD Pharma's stock.

88.    When these factors are collectively considered, strong circumstantial evidence exists that Defendants either knew or recklessly ignored that their own conduct and/or their customers' conduct was designed to and did unlawfully manipulate the market in violation of federal securities laws, industry regulations and their own compliance manuals.

89.    Finally, Defendants had a strong motive to spoof shares of FSD Pharma stock. By posting the fictitious Baiting Orders, Defendants were able to purchase hundreds of thousands of FSD Pharma shares at depressed prices, instead of having to purchase shares of FSD Pharma at the prevailing best offer.

---

[10] For example, these imbalances were, on average, 20.4% of the entire float during the period from September 20, 2021, to August 15, 2024.

[11] For example, between December 1, 2022, and February 28, 2023, CIBC sold a net of 1,407,012 shares of FSD Pharma; over that same period, according to CDS data, CIBC's inventory of FSD Pharma's shares decreased by 431,901 shares.

### F.    Illustrative Examples of Defendants' Participation in Spoofing Episodes

90.    This section provides illustrative examples of Defendants' manipulative spoofing activity identified over the Relevant Period. These examples are intended to be illustrative, not exhaustive. Indeed, Defendants engaged in hundreds of additional spoofing episodes.

### 1.    <u>Defendant CIBC</u>

### i.    <u>Example – June 3, 2020</u>

91.    On June 3, 2020, at 15:03:58.406, the best bid and offer for FSD Pharma on the U.S. Markets was $8.09 USD and $8.10 USD, respectively. Between 15:03:58.997 and 15:04:03.934, Defendant CIBC and/or its clients submitted 37 Baiting Orders to sell on the Canadian market, totaling 11,800 shares, at prices ranging from $11.27 CAD down to $10.77 CAD.

92.    Over this Baiting Period, CIBC and/or its clients placed mostly sell-side orders, resulting in significant sell-side imbalances in Canada. Similarly, in the US, there were 61,723 shares in the first twenty levels of the order book on the ask side, and 30,616 shares on the bid side, a significant sell-side imbalance of 2.01.

93.    The Baiting Orders to sell placed by CIBC and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, between 15:04:03.925 and 15:04:05.602, CIBC and/or its clients executed seventeen Executing Orders on the Canadian market to buy a total of 1,700 shares at lower prices ranging from $10.69 CAD to $10.74 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|---|---|---|---|
| 2020-06-03 15:04:03.925 | 10.74 | 100 | CIBC World Markets |
| 2020-06-03 15:04:03.927 | 10.71 | 100 | CIBC World Markets |
| 2020-06-03 15:04:03.927 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 15:04:03.927 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 15:04:03.927 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 15:04:03.927 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 15:04:03.927 | 10.69 | 100 | CIBC World Markets |

| | | | |
|---|---|---|---|
| 2020-06-03 15:04:03.934 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 15:04:03.935 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 15:04:03.946 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 15:04:03.959 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 15:04:03.969 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 19:04:05.067 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 19:04:05.068 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 19:04:05.346 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 19:04:05.359 | 10.69 | 100 | CIBC World Markets |
| 2020-06-03 19:04:05.602 | 10.69 | 100 | CIBC World Markets |

94.    Similarly, in the US, 3,529 shares traded at the bid, while only 964 shares traded at the ask during the pre-trade period, while the ask price in the US declined from $8.10 USD to $8.05 USD, a decline of 62 basis points. This trading imbalance continued as the Baiting Orders in Canada were canceled with 1,900 shares traded at the bid in the US versus only 100 at the ask.

95.    Through the Executing Orders, CIBC and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $10.98 CAD, which was the natural price before CIBC and/or its clients entered the Baiting Orders. Without the Baiting Orders, CIBC and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. Beginning at 15:03:59.005, as it was submitting and executing the Executing Orders, CIBC began cancelling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 15:04:05.849.

96.    These spoofing cycles continued throughout the course of the trading day, with 27 total events by CIBC on June 3, 2020, placing continuous downward pressure on FSD Pharma's share price and thus causing a diminution of that price.

### ii.    Example – November 30, 2020

97.    On November 30, 2020, at 10:33:17.436, the best bid and offer for FSD Pharma on the US markets were $2.27 USD and $2.30 USD, respectively. Between 10:33:17.817 and

10:33:22.436, Defendant CIBC and/or its clients submitted 139 Baiting Orders to sell on the

Canadian market, totaling 71,500 shares, at prices ranging from $3.10 CAD down to $2.80 CAD.

98.      Over this Baiting Period, CIBC and/or its clients placed more sell-side orders than

buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US,

there were 107,650 shares in the first twenty levels of the order book on the ask side, and 89,956

shares on the bid side, a sell-side imbalance of 1.2.

99.      The Baiting Orders to sell placed by CIBC and/or its clients successfully induced

the entry of sell orders from other market participants, driving the price of FSD Pharma shares

downward. As a result, between 10:33:22.399 and 10:33:22.436, CIBC and/or its clients

executed two Executing Orders on the Canadian market to buy a total of 200 shares at $2.80

CAD and $2.81 CAD.

| Time | Price (in CAD) | Shares | Buyer |
|------|----------------|--------|-------|
| 2020-11-30 10:33:22.399 | 2.81 | 100 | CIBC World Markets |
| 2020-11-30 10:33:22.436 | 2.8 | 100 | CIBC World Markets |

100.     Similarly, in the US, 52,640 shares traded at the bid, while only 2,938 shares

traded at the ask during the pre-trade period, while the ask price in the US declined from $2.30

USD to $2.13 USD, a decline of 739 basis points. This trading imbalance continued as the

Baiting Orders in Canada were canceled, with 16,750 shares trading at the bid in the 2 seconds

after the Executing Orders and only 1,519 shares trading at the ask.

101.     Through the Executing Orders, CIBC and/or its clients were able to purchase

shares at prices below the prevailing best offer in Canda of $3.00 CAD, which was the natural

price before CIBC and/or its clients entered the Baiting Orders. Without the Baiting Orders,

CIBC and/or its clients would have been required to pay the prevailing best offer price (or

higher) to buy FSD Pharma shares. Beginning at 10:33:17.943, as it was submitting and

executing the Executing Orders, CIBC began canceling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 10:33:24.260.

102.    On November 30, 2020, at 15:36:36.611298934, the best bid and offer for FSD Pharma on the US markets were $2.19 USD and $2.21 USD, respectively. Between 15:36:43.244 and 15:36:47.379, Defendant CIBC and/or its clients submitted 59 Baiting Orders to sell on the Canadian market, totaling 23,400 shares, at prices ranging from $3.03 CAD to $2.75 CAD.

103.    Over this Baiting Period, CIBC and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US, there were 155,903 shares in the first twenty levels of the order book on the ask side, and 123,628 shares on the bid side, a sell-side imbalance of 1.26.

104.    The Baiting Orders to sell placed by CIBC and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, between 15:36:47.369 and 15:36:47.380, CIBC and/or its clients executed three Executing Orders on the Canadian market to buy a total of 800 shares between $2.71 CAD and $2.78 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|---|---|---|---|
| 2020-11-30 15:36:47.369 | 2.71 | 100 | CIBC World Markets |
| 2020-11-30 15:36:47.379 | 2.75 | 100 | CIBC World Markets |
| 2020-11-30 15:36:47.380 | 2.78 | 600 | CIBC World Markets |

105.    Similarly, in the US, 18,819 shares traded at the bid, while 0 shares traded at the ask during the pre-trade period, while the ask price in the US declined from $2.21 USD to $2.08 USD, a decline of 588 basis points. This trading imbalance continued in the US as the Baiting Orders in Canada were canceled, with 27,474 shares trading at the bid in the 2 seconds after the Executing Orders and only 200 shares trading at the ask.

106.     Through the Executing Orders, CIBC and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $2.89 CAD, which was the natural price before CIBC and/or its clients entered the Baiting Orders. Without the Baiting Orders, CIBC and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. Beginning at 15:36:43.427, CIBC and/or its clients began cancelling all of their Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 15:36:49.241.

### iii.   Example – February 1, 2022

107.     On February 1, 2022, at 10:14:02.772351563, the best bid and offer for FSD Pharma on the US markets were $0.86 USD and $0.89 USD, respectively. Between 10:16:43.953 and 10:16:43.980, Defendant CIBC and/or its clients submitted 12 Baiting Orders to sell on the Canadian market, totaling 16,300 shares, at prices ranging from $1.09 CAD down to $1.07 CAD.

108.     Over this Baiting Period, CIBC and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US, there were 91,595 shares in the first twenty levels of the order book on the ask side, and 24,774 shares on the bid side, a significant sell-side imbalance of 3.7.

109.     The Baiting Orders to sell placed by CIBC and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, between 10:16:43.973400 and 10:16:43.992000, CIBC and/or its clients executed four Executing Orders on the Canadian market to buy a total of 3,500 shares at lower prices ranging from $1.05 CAD to $1.07 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|------|----------------|--------|-------|
| 10:16:43.973400-05:00 | 1.07 | 500 | CIBC World Markets |
| 10:16:43.976000-05:00 | 1.05 | 500 | CIBC World Markets |
| 10:16:43.984600-05:00 | 1.05 | 500 | CIBC World Markets |
| 10:16:43.992000-05:00 | 1.05 | 2000 | CIBC World Markets |

110.    Similarly, in the US, 3,414 shares traded at the bid, while 0 shares traded at the ask during the pre-trade period, while the ask price in the US declined from $0.89 USD to $0.8899 USD, a decline of 1.1 basis point (the mid-price in the US declined from $0.875 USD to $0.86985 USD, a decline of 58.8 basis points, while the ask price in Canada declined from $1.09 CAD to $1.07 CAD, a decline of 183 basis points). This trading imbalance continued as the Baiting Orders in Canada were canceled with 3,400 shares traded at the bid in the US while 0 shares traded at the ask.

111.    Through the Executing Orders, CIBC and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $1.09 CAD, which was the natural price before CIBC and/or its clients entered the Baiting Orders. Without the Baiting Orders, CIBC and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. Beginning at 10:16:43.972, as it was submitting and executing the Executing Orders, CIBC began cancelling all of its Baiting Orders to sell on the Canadian market. The last Baiting Order was canceled at 10:16:43.997.

### iv.    Example – June 5, 2024

112.    On June 5, 2024, at 15:39:42.082000, the best bid and offer for FSD Pharma on the US markets were $0.258 USD and $0.2637 USD, respectively. Between 15:39:46.9850000 and 15:39:47.082000, Defendant CIBC and/or its clients submitted 16 Baiting Orders to sell on the Canadian market, totaling 227,500 shares, at prices ranging from $0.38 CAD down to $0.37 CAD.

113.    Over this Baiting Period, CIBC and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US,

there were 190,184 shares in the first twenty levels of the order book on the ask side, and 20,691 shares on the bid side, a massive sell-side imbalance of 9.2.

114.    The Baiting Orders to sell placed by CIBC and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, between 15:39:46.990000 and 15:39:47.082000, CIBC and/or its clients executed nine Executing Orders on the Canadian market to buy a total of 5,000 shares at $0.36 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|------|----------------|--------|-------|
| 2024-06-05 15:39:47.082 | 0.36 | 1000 | CIBC World Markets |
| 2024-06-05 15:39:46.989 | 0.36 | 500 | CIBC World Markets |
| 2024-06-05 15:39:46.990 | 0.36 | 500 | CIBC World Markets |
| 2024-06-05 15:39:46.990 | 0.36 | 500 | CIBC World Markets |
| 2024-06-05 15:39:46.990 | 0.36 | 500 | CIBC World Markets |
| 2024-06-05 15:39:46.990 | 0.36 | 500 | CIBC World Markets |
| 2024-06-05 15:39:46.990 | 0.36 | 500 | CIBC World Markets |
| 2024-06-05 15:39:46.990 | 0.36 | 500 | CIBC World Markets |
| 2024-06-05 15:39:46.990 | 0.36 | 500 | CIBC World Markets |

115.    Similarly, in the US, 4,878 shares traded at the bid, while 0 shares traded at the ask during the pre-trade period, while the ask price in the US declined from $0.2637 to $0.26, a decline of 140 basis points. 1,000 shares traded at the ask in the US in the event window after the Executing Orders traded.

116.    Through the Executing Orders, CIBC and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $0.37 CAD, which was the natural price before CIBC and/or its clients entered the Baiting Orders. Without the Baiting Orders, CIBC and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. In the two seconds following the execution of the Executing Orders, CIBC and/or its clients canceled all 227,500 of the shares posted at or above the best ask with the last order canceled at 15:39:48.804.

### v.    Example – June 14, 2024

117.    On June 14, 2024, at 10:02:12.278595867, the best bid and offer for FSD Pharma on the US markets were $0.2041 USD and $0.2099 USD, respectively. Between 10:06:19.947 and 10:06:20.050, Defendant CIBC and/or its clients submitted 16 Baiting Orders to sell on the Canadian market, totaling 282,500 shares, at $0.29 CAD.

118.    Over this Baiting Period, CIBC and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US, there were 160,824 shares in the first twenty levels of the order book on the ask side, and 33,452 shares on the bid side, a massive sell-side imbalance of 4.8.

119.    The Baiting Orders to sell placed by CIBC and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, between 10:06:20.045 and 10:06:20.053, CIBC and/or its clients executed two Executing Orders on the Canadian market to buy a total of 1,000 shares at $0.28 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|------|----------------|--------|-------|
| 2024-06-14 10:06:20.045 | 0.28 | 500 | CIBC World Markets |
| 2024-06-14 10:06:20.053 | 0.28 | 500 | CIBC World Markets |

120.    Similarly, in the US, 11,105 shares traded at the bid, while only 1,500 shares traded at the ask during the pre-trade period, while the ask price in the US declined from $0.2099 USD to $0.1999 USD, a decline of 476 basis points. No shares traded in the US in the event window after the Executing Orders traded.

121.    Through the Executing Orders, CIBC and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $0.29 CAD, which was the natural price before CIBC and/or its clients entered the Baiting Orders. Without the Baiting Orders,

CIBC and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. In the two seconds following the execution of the Executing Orders, CIBC and/or its clients canceled all 282,500 shares posted at or above the best ask.

122.    On June 14, 2024, at 10:25:40.159771299, the best bid and offer for FSD Pharma on the US markets were $0.1939 USD and $0.199 USD, respectively. Between 10:26:48.503 and 10:26:52.666, Defendant CIBC and/or its clients submitted 44 Baiting Orders to sell on the Canadian market, totaling 144,000 shares, at prices ranging from $0.295 CAD down to $0.27 CAD.

123.    Over this Baiting Period, CIBC and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US, there were 194,036 shares in the first twenty levels of the order book on the ask side, and 38,697 shares on the bid side, a massive sell-side imbalance of 5.

124.    The Baiting Orders to sell placed by CIBC and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, between 10:26:52.655 and 10:26:52.666, CIBC and/or its clients executed two Executing Orders on the Canadian market to buy a total of 2,000 shares at $0.26 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|---|---|---|---|
| 2024-06-14 10:26:52.655 | 0.26 | 1500 | CIBC World Markets |
| 2024-06-14 10:26:52.666 | 0.26 | 500 | CIBC World Markets |

125.    Although there was no trading imbalance in the US, the ask price in the US declined from $0.199 USD to $0.196 USD, a decline of 151 basis points. No shares traded in the US in the event window after the Executing Orders traded.

126.    Through the Executing Orders, CIBC and/or its clients were able to purchase shares at price below the prevailing best offer in Canada of $0.285 CAD, which was the natural price before CIBC and/or its clients entered the Baiting Orders. Without the Baiting Orders, CIBC and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. In the two seconds following the execution of the Executing Orders, CIBC and/or its clients canceled all 144,000 shares posted at or above the best ask.

127.    These spoofing cycles continued throughout the course of the trading day, with 20 total events by CIBC on June 14, 2024, placing continuous downward pressure on FSD Pharma's share price and causing a diminution of that price.

### 2.    Defendant RBC

#### i.    Example – August 10, 2020

128.    On August 10, 2020, at 11:08:07.444670187, the best bid and offer for FSD Pharma on the US markets were $2.99 USD and $3.02 USD, respectively. Between 11:09:38.1117021 and 11:09:40.741650, Defendant RBC and/or its clients submitted 9 Baiting Orders to sell on the Canadian market, totaling 3,700 shares at prices ranging from $4.09 CAD down to $4.05 CAD.

129.    Over this Baiting Period, RBC and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US, there were 43,721 shares in the first twenty levels of the order book on the ask side, and 33,255 shares on the bid side, a significant sell-side imbalance of 1.31.

130.    The Baiting Orders to sell placed by RBC and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, at 11:09:40.742, RBC and/or its clients executed one Executing Order on the Canadian market to buy a total of 2,000 shares at $4.00 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|------|----------------|--------|-------|
| 2020-08-10 11:09:40.742000 | 4 | 2,000 | RBC |

131.    In the US, the ask price declined from $3.02 USD to $2.99 USD, a decline of 99 basis points.

132.    Through the Executing Orders, RBC and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $4.05 CAD, which was the natural price before RBC and/or its clients entered the Baiting Orders. Without the Baiting Orders, RBC and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. In the two seconds following the execution of the Executing Orders, RBC and/or its clients canceled all 3,700 of the shares posted at or above the best ask.

### ii.    Example – March 17, 2021

133.    On March 17, 2021, at 15:33:58.766, the best bid and offer for FSD Pharma on the US markets were $2.38 USD and $2.39 USD, respectively. Between 15:33:59.001 and 15:34:02.795, Defendant RBC and/or its clients submitted 14 Baiting Orders to sell on the Canadian market, totaling 9,200 shares at $2.97 CAD.

134.    Over this Baiting Period, RBC and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US, there were 351,604 shares in the first twenty levels of the order book on the ask side, and 319,354 shares on the bid side, a sell-side imbalance of 1.1.

135.    The Baiting Orders to sell placed by RBC and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, at 15:34:03.766, RBC and/or its clients executed five Executing Orders on the Canadian market to buy a total of 2,000 shares at $2.95 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|------|----------------|--------|-------|

| | | | |
|---|---|---|---|
| 2021-03-17 15:34:03.766000 | 2.95 | 800 | RBC |
| 2021-03-17 15:34:03.766000 | 2.95 | 600 | RBC |
| 2021-03-17 15:34:03.766000 | 2.95 | 200 | RBC |
| 2021-03-17 15:34:03.766000 | 2.95 | 200 | RBC |
| 2021-03-17 15:34:03.766000 | 2.95 | 200 | RBC |

136.    Similarly, in the US, 2,960 shares traded at the bid, while only 24 shares traded at the ask during the pre-trade period, while the ask price declined from $2.39 USD to $2.38 USD, a decline of 42 basis points. No shares traded in the event window after the Executing Orders.

137.    Through the Executing Orders, RBC and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $2.97 CAD, which was the natural price before RBC and/or its clients entered the Baiting Orders. Without the Baiting Orders, RBC and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. In the two seconds following the execution of the Executing Orders, RBC and/or its clients canceled 8,800 shares posted at or above the best ask.

### iii.   Example – May 3, 2021

138.    On May 3, 2021, at 11:47:58.992867859, the best bid and offer for FSD Pharma on the US markets were $1.76 USD and $1.77, respectively. Between 11:48:11.967262 and 11:48:14.020900, Defendant RBC and/or its clients flashed 6 Baiting Orders to sell on the Canadian market, totaling 14,100 shares at $2.18 CAD.

139.    Over this Baiting Period, RBC and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US, there were 150,607 shares in the first twenty levels of the order book on the ask side, and 87,728 shares on the bid side, a large sell-side imbalance of 1.72.

140.    The Baiting Orders to sell placed by RBC and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares

downward. As a result, at 11:48:14.123, RBC and/or its clients executed two Executing Orders on the Canadian market to buy a total of 200 shares at $2.16 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|------|----------------|--------|-------|
| 2021-05-03 11:48:14.123 | 2.16 | 100 | RBC |
| 2021-05-03 11:48:14.138 | 2.16 | 100 | RBC |

141.    Similarly, in the US, 10,549 shares traded at the bid, while 0 shares traded at the ask during the pre-trade period, and the ask price in the US declined from $1.77 USD to $1.76 USD, a decline of 56.5 basis points. No shares traded at the bid, and 100 shares traded at the ask in the event window after the Executing Orders traded.

142.    Through the Executing Orders, RBC and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $2.18 CAD, which was the natural price before RBC and/or its clients entered the Baiting Orders. Without the Baiting Orders, RBC and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. During this episode, immediately before the Executing Orders were filled, RBC and/or its clients canceled all 14,100 of the shares posted at or above the best ask.

### iv.   Example – September 2, 2021

143.    On September 2, 2021, at 11:49:50.054930977, the best bid and offer for FSD Pharma on the US markets were $1.80 USD and $1.82 USD, respectively. At 11:50:02.074700 and 11:50:02.119744, Defendant RBC and/or its clients flashed 2 Baiting Orders to sell on the Canadian market, totaling 8,400 shares at $2.28 CAD and $2.29 CAD.

144.    Over this Baiting Period, RBC and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US, there were 63,917 shares in the first twenty levels of the order book on the ask side, and 33,437 shares on the bid side, a large sell-side imbalance of 1.91.

145.    The Baiting Orders to sell placed by RBC and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, starting at 11:50:02.153000, RBC and/or its clients executed four Executing Orders on the Canadian market to buy a total of 495 shares at $2.25 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|------|----------------|--------|-------|
| 2021-09-02 11:50:02.153 | 2.25 | 100 | RBC |
| 2021-09-02 11:50:02.157 | 2.25 | 100 | RBC |
| 2021-09-02 11:50:02.166 | 2.25 | 200 | RBC |
| 2021-09-02 11:50:04.164 | 2.25 | 95 | RBC |

146.    Similarly, in the US, 15,344 shares traded at the bid, while only 546 shares traded at the ask during the pre-trade period, and the ask price in the US declined from $1.82 USD to $1.79 USD, a decline of 165 basis points. 629 shares traded at the bid, and 0 shares traded at the ask in the event window after the Executing Orders traded.

147.    Through the Executing Orders, RBC and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $2.29 CAD, which was the natural price before RBC and/or its clients entered the Baiting Orders. Without the Baiting Orders, RBC and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. During this episode, immediately before the Executing Orders were filled, RBC and/or its clients canceled all 8,400 shares posted at or above the best ask.

### 3.    John Doe 1

148.    As noted above, the Canadian market by order data enables one to track offers and trades made by or through particular brokers. However, individual orders and trades do not have to be identified; instead, brokers can use an anonymous ID to mask their identity (although they lose broker priority if they choose to do so). One or more brokers using Anonymous ID #1

engaged in extensive spoofing during the Relevant Period, as illustrated by the examples below. This broker or these brokers are referred to herein as John Doe 1.

### i.    Example – June 4, 2020

149.    On June 4, 2020, at 10:28:47.164, the best bid and offer for FSD Pharma on the US markets were $6.46 USD and $6.55 USD, respectively. Between 10:28:46.621 and 10:28:57.131, Defendant John Doe 1 and/or its clients submitted 269 Baiting Orders to sell on the Canadian market, totaling 56,100 shares at prices ranging from $8.95 CAD down to $8.63 CAD.

150.    Over this Baiting Period, John Doe 1 and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. While in the US there was no significant imbalance (34,795 shares at the ask and 36,044 shares at the bid), there was a distinct pattern starting at 10:28:45.074436. At that time, waves of 100-share orders were repeatedly placed and canceled within milliseconds on BATS and Nasdaq:

| Side | Price (in USD) | Size | Timestamp (UTC) | Action | Exchange |
|------|------|------|------|------|------|
| ASK | 6.61 | 100 | 10:28:45.074436 | INSERT | BATS |
| ASK | 6.61 | 100 | 10:28:45.075464694 | INSERT | XNAS |
| ASK | 6.56 | 100 | 10:28:45.082645 | INSERT | BATS |
| ASK | 6.56 | 100 | 10:28:45.082699241 | INSERT | XNAS |
| ASK | 6.57 | 100 | 10:28:45.083082 | INSERT | BATS |
| ASK | 6.57 | 100 | 10:28:45.083349865 | INSERT | XNAS |
| ASK | 6.58 | 100 | 10:28:45.083505 | INSERT | BATS |
| ASK | | | 10:28:45.083679 | REMOVE | BATS |
| ASK | | | 10:28:45.083686 | REMOVE | BATS |
| ASK | | | 10:28:45.083816090 | REMOVE | XNAS |
| ASK | | | 10:28:45.083943 | REMOVE | BATS |
| ASK | | | 10:28:45.084556859 | REMOVE | XNAS |
| ASK | | | 10:28:45.106112 | REMOVE | BATS |
| ASK | | | 10:28:45.106146209 | REMOVE | XNAS |

151.    This pattern repeated itself over 20 times in the next 5 seconds with 10,300 shares being flashed on the "ask" and then almost immediately canceled.

152.    The Baiting Orders to sell placed by John Doe 1 and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, starting at 10:28:51.618, John Doe 1 and/or its clients executed fourteen Executing Orders on the Canadian market to buy a total of 1,400 shares at prices ranging from $8.755 CAD to $8.62 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|------|------|------|------|
| 2020-06-04 10:28:51.618 | 8.755 | 100 | Anonymous |
| 2020-06-04 10:28:51.702 | 8.71 | 100 | Anonymous |
| 2020-06-04 10:28:51.702 | 8.71 | 100 | Anonymous |
| 2020-06-04 10:28:53.733 | 8.7 | 100 | Anonymous |
| 2020-06-04 10:28:53.766 | 8.7 | 100 | Anonymous |
| 2020-06-04 10:28:53.796 | 8.7 | 100 | Anonymous |
| 2020-06-04 10:28:53.825 | 8.7 | 100 | Anonymous |
| 2020-06-04 10:28:53.858 | 8.7 | 100 | Anonymous |
| 2020-06-04 10:28:53.888 | 8.7 | 100 | Anonymous |
| 2020-06-04 10:28:53.917 | 8.7 | 100 | Anonymous |
| 2020-06-04 10:28:55.879 | 8.69 | 100 | Anonymous |
| 2020-06-04 10:28:55.881 | 8.68 | 100 | Anonymous |
| 2020-06-04 10:28:56.125 | 8.63 | 100 | Anonymous |
| 2020-06-04 10:28:57.164 | 8.62 | 100 | Anonymous |

153.    Similarly, in the US, 979 shares traded at the bid, while 0 shares traded at the ask during the pre-trade period, and the ask price in the US declined from $6.55 USD to $6.46 USD, a decline of 137 basis points. No shares traded at the bid or the ask in the event window after the Executing Orders traded.

154.    Through the Executing Orders, John Doe 1 and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $8.81 CAD, which was the natural price before John Doe 1 and/or its clients entered the Baiting Orders. Without the Baiting Orders, John Doe 1 and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. While executing the Executing Orders, starting

10:28:46.678, John Doe 1 and/or its clients canceled all of the Baiting Orders posted at or above the best ask, with the last order canceled at 10:28:58.212.

155.    These spoofing cycles continued throughout the course of the trading day, with 158 total events under the Anonymous ID #1 on June 14, 2020, placing continuous downward pressure on FSD Pharma's share price and causing a diminution of that price.

## ii.    Example – November 30, 2020

156.    On November 30, 2020, at 11:03:59.436780223, the best bid and offer for FSD Pharma on the US markets were $2.01 USD and $2.03 USD, respectively. Between 11:04:00.014 and 11:04:04.698, Defendant John Doe 1 and/or its clients submitted 22 Baiting Orders to sell on the Canadian market, totaling 28,500 shares at prices ranging from $2.68 CAD down to $2.60 CAD.

157.    Over this Baiting Period, John Doe 1 and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US, while there was not an ask-side imbalance in the first twenty levels of the order book, there was when additional levels were considered. At 25 levels, there were 133,467 shares on the ask and 123,509 shares on the bid, a sell-side imbalance of 1.08. At 40 levels, there were 243,493 shares on the ask and 205,055 shares on the bid, a sell-side imbalance of 1.21.

158.    The Baiting Orders to sell placed by John Doe 1 and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, from 11:04:04.501 to 11:04:04.705, John Doe 1 and/or its clients executed seven Executing Orders on the Canadian market to buy a total of 700 shares at prices ranging from $2.59 CAD down to $2.53 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|------|----------------|--------|-------|
| 2020-11-30 11:04:04.501 | 2.59 | 100 | Anonymous |
| 2020-11-30 11:04:04.501 | 2.59 | 100 | Anonymous |

| | | | |
|---|---|---|---|
| 2020-11-30 11:04:04.503 | 2.59 | 100 | Anonymous |
| 2020-11-30 11:04:04.685 | 2.53 | 100 | Anonymous |
| 2020-11-30 11:04:04.690 | 2.53 | 100 | Anonymous |
| 2020-11-30 11:04:04.700 | 2.53 | 100 | Anonymous |
| 2020-11-30 11:04:04.705 | 2.53 | 100 | Anonymous |

159.     Similarly, in the US, 14,099 shares traded at the bid, while 0 shares traded at the ask during the pre-trade period, and the ask price in the US declined from $2.03 USD to $2.00 USD, a decline of 150 basis points. 27,345 shares traded at the bid, and only 100 shares traded at the ask in the event window after the Executing Orders traded.

160.     Through the Executing Orders, John Doe 1 and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $2.68 CAD, which was the natural price before John Doe 1 and/or its clients entered the Baiting Orders. Without the Baiting Orders, John Doe 1 and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. Starting at 11:04:01.743, John Doe 1 and/or its clients canceled all of the Baiting Orders posted at or above the best ask, with the last order canceled at 11:04:06.526.

161.     These spoofing cycles continued throughout the course of the trading day, with 30 total events under the Anonymous ID #1 on November 30, 2020, placing continuous downward pressure on FSD Pharma's share price and causing a diminution of that price.

### iii.   Example – February 9, 2021

162.     On February 9, 2021, at 12:32:21.897683711, the best bid and offer for FSD Pharma on the US markets were $3.28 USD and $3.20 USD, respectively. Between 12:32:22.431 and 12:32:26.889, Defendant John Doe 1 and/or its clients submitted 20 Baiting Orders to sell on the Canadian market, totaling 9,800 shares at prices ranging from $4.12 CAD down to $4.24 CAD.

163.    Over this Baiting Period, John Doe 1 and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada. Similarly, in the US, there were 77,761 shares in the first twenty levels of the order book on the ask side, and 60,111 shares on the bid side, a sell-side imbalance of 1.29.

164.    The Baiting Orders to sell placed by John Doe 1 and/or its clients successfully induced the entry of sell orders from other market participants, driving the price of FSD Pharma shares downward. As a result, at 12:32:26.935, John Doe 1 and/or its clients executed four Executing Orders on the Canadian market to buy a total of 800 shares at $4.06 CAD as follows:

| Time | Price (in CAD) | Shares | Buyer |
|------|------|------|------|
| 2021-02-09 12:32:26.935 | 4.06 | 400 | Anonymous |
| 2021-02-09 12:32:26.935 | 4.06 | 100 | Anonymous |
| 2021-02-09 12:32:26.935 | 4.06 | 200 | Anonymous |
| 2021-02-09 12:32:26.935 | 4.06 | 100 | Anonymous |

165.    Similarly, in the US, 10,647 shares traded at the bid, while only 2,487 shares traded at the ask during the pre-trade period, and the ask price in the US declined from $3.30 USD to $3.19 USD, a decline of 333 basis points. 100 shares traded at the bid, and 1,026 shares traded at the ask in the event window after the Executing Orders traded.

166.    Through the Executing Orders, John Doe 1 and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $4.22 CAD, which was the natural price before John Doe 1 and/or its clients entered the Baiting Orders. Without the Baiting Orders, John Doe and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy FSD Pharma shares. Starting at 12:32:22.440, John Doe 1 and/or its clients canceled all of the Baiting Orders posted at or above the best ask, with the last order canceled at 12:32:27.346.

167.    These spoofing cycles continued throughout the course of the trading day, with 19 total events under the Anonymous ID #1 on February 9, 2021, placing continuous downward pressure on FSD Pharma's share price and causing a diminution of that price.

**G.    Defendants' Spoofing Caused FSD Pharma to Suffer Significant Losses**

168.    During the Relevant Period, FSD Pharma sold or issued for value approximately 90 million FSD Pharma shares.  As set forth below, many of the Defendants' Spoofing Episodes occurred immediately prior to FSD Pharma's sales or issuances.  Because FSD Pharma sold or issued for value FSD Pharma shares during the Relevant Period at times when the prices of those shares were artificially deflated due to Defendants' spoofing, FSD Pharma was directly damaged by Defendants' unlawful conduct.

169.    Each Spoofing Episode was intended to and had a significant immediate impact on the price of FSD Pharma's shares.  The after-effects of each Spoofing Episode could be felt most strongly within five minutes of the cancellation of the Baiting Orders, but the cumulative impacts of Defendants' manipulative trading practices lingered far longer.

**1.    The Lingering Effects of Accumulated Spoofing Episodes**

170.    According to the leading economic literature on the impact of spoofing, discussed further below, even after 60 minutes, spoofing can have a lingering impact on the price of a security.  And when the volume of spoofing is high enough, those effects can aggregate to a substantial price impact.

171.    Thus, the impact of the collective spoofing activity extended beyond each specific Spoofing Episode, because the market neither immediately nor fully rebounded from the manipulated prices once each of the spoofing events were completed.

172.    This effect—the persistence of the price impact of manipulation—is well-established in the market microstructure literature.  As Nobel prize-winning economist Professor

44

Milgrom has explained, "[b]ecause manipulative trades are viewed by the market participants as potentially informed, and potentially informed trades can result in permanent price impact, manipulative trades can lead to permanent price impact."[12]

173.    Based on an extensive review of applicable literature, Dr. Milgrom provides two reasons for why market participants cannot readily identify manipulative trades.

174.    *First*, it is highly improbable that manipulative trades can immediately be identified as manipulative and uninformed by market participants.  For any agent in the market, the incentive to gather private information—and thus to become an informed trader—is directly related to the volume of its trades and the size of its positions. Defendants are among the largest market participants and have powerful incentives to be well-informed.  Other participants would likely expect this, and therefore have good reason to treat Defendants' trades as potentially informed.  This tendency of large traders to be well informed is also observed by others in the market microstructure literature.

175.    *Second*, it is also improbable that the public will eventually come to know which trades were manipulative and uninformed.

176.    The Milgrom Report also discusses the extensive economic literature establishing that the price impact of all forms of trade-based manipulation, including spoofing, is not likely to fully reverse.

177.    As to spoofing, this is so for at least two reasons. First, peer-reviewed research demonstrates that order cancellations drive the price up by less than new orders drive the price

---

[12] Expert Report of Professor Paul Milgrom at ¶ 21, *Alaska Electrical Pension Fund v. Bank of America*, No. 14-cv-7126 (JMF) (S.D.N.Y. Jan. 22, 2018) (the "Milgrom Report").

down.[13] Accordingly, the impact of Baiting Orders is not likely to dissipate merely because those orders were subsequently cancelled. Second, manipulative spoofing causes the execution of "trades," not only the placement of orders, because Baiting Orders induce other market participants to sell shares at artificially depressed transaction prices.

178.    In particular, the economic literature recognizes that in modern securities markets, every transaction occurs between a liquidity maker and a liquidity taker. The term "liquidity maker" refers to the party who places an order to buy or sell shares that is non-marketable. A "non-marketable" order has a price that is too low (for a purchase) or too high (for a sale), relative to the current willingness of other market participants to transact. For example, suppose the last trading price of a security was $9.99 and the best bid—*i.e.*, the highest price that buyers are willing to pay—is $9.98, and the best offer—*i.e.*, the lowest price that sellers are willing to accept—is $10.00 per share. If a market participant places a buy order at a price of $9.99 (or less) per share, that order will be non-marketable because there is no seller who is willing to sell at $9.99 per share at that point in time. That buy order will, however, remain in the Market Order Book, ready to transact with a seller who is willing to sell shares at a price of $9.99 (or less) per share.

179.    By contrast, the term "liquidity taker" refers to the party who places an order to buy or sell shares that is "marketable." A "marketable" order has a price that is high enough (for a purchase) or low enough (for a sale), relative to the current willingness of other market participants to transact. Returning to the prior example, a buy order at a price of $10.00 (or more) per share would be a marketable order because a market participant had previously submitted an

---

[13] Jonathan Brogaard, Terrence Hendershott & Ryan Riordan, *Price Discovery Without Trading: Evidence from Limit Orders*, 74 J. Fin. 1583, 1635 (2019) (magnitude of price impact of order placement exceeds magnitude of price impact of order cancel).

existing sell order at a price of $10.00 per share. Every transaction in the market occurs between a marketable and a non-marketable order, but prices generally move in the direction of marketable orders. In the preceding example, a marketable buy order at $10.00 per share would execute against a non-marketable sell order at $10.00 per share, causing the price to increase from $9.99 to $10.00 per share.[14]

180.    Every Executing Purchase identified in this Complaint consists of a non-marketable buy order executing against a marketable sell order by another market participant, leading to a decline in FSD Pharma's share price. For this reason, Executing Purchases reflect the execution of aggressively priced sell orders which were induced by the Baiting Orders. Accordingly, the spoofing activity identified in this Complaint consists of trade-based manipulation whereby Baiting Orders induced market participants to place marketable sell orders that executed against Defendants' non-marketable Executing Purchases.

181.    Moreover, the Milgrom Report explains that manipulative trading like spoofing can cause a permanent price impact to persist even after the manipulative trades are "unwound" through subsequent trades to realize profits. This is because of asymmetry in the nature of the manipulative trades and the nature of unwinding trades:

> There is, however, no symmetry in the manipulative trade and its unwinding. A manipulative trader who wants, for example, to raise a price will buy in a way that maximizes the price impact. However, when unwinding the trade, that same trader will seek to minimize the price impact to avoid losses. Therefore, the upward effect

---

[14] In general, non-marketable buy and sell orders typically are placed on either side of the last transaction price. Thus, if the last transaction price was $9.99 (as in this example), a non-marketable buy order typically would be placed at $9.98 (or less) and a non-marketable sell order typically would be placed at $10.00 (or more). *See, e.g.*, Lawrence R. Glosten & Paul R. Milgrom, *Bid, Ask & Transaction Prices in a Specialist Market with Heterogeneously Informed Traders*, 14 J. Fin. Econ. 71 (1985) (deriving bid/ask spread). Transaction prices generally move in the direction of marketable orders because marketable buy (or sell) orders execute against non-marketable sell (or buy) orders which are above (or below) the previous transaction price.

can be expected to exceed the downward effect from unwinding—and that difference may represent a permanent effect.

182.    Defendants engaged in asymmetric behavior that yielded an asymmetric price impact between manipulative Spoofing Episodes and the unwinding of their manipulative conduct. The total share volume of sell-side Baiting Orders exceeded the share volume of buy-side Executing Purchases by over 45,286%, and the median share volume of new sell-side orders, 5,100, significantly exceeded the median share volume of new buy-side orders placed during Spoofing Episodes, 800. As such, the price impact of spoofed Baiting Orders was not fully unwound: the downward pressure applied by sell-side orders exceeded the upward pressure applied by buy-side orders. As Professor Milgrom explains, this difference between the sell-side and buy-side pressure yields a persistent and permanent price impact.

183.    The "permanent price impact" that Professor Milgrom discussed as resulting from manipulative trading is established in the economic literature and is not limited to same-day effects.[15] For example, one heavily-cited, peer-reviewed study shows that "both ask and bid tend to significantly increase (decrease) after the arrival of a buy (sell) limit order," "quotes converge to a (new) permanent level," and "large volumes overbidding the prevailing quote cause a long-term upward movement of the bid."[16]

184.    Thus, while each Defendant's Spoofing Episodes had a negative impact on the price of FSD Pharma's shares that may have been small, the placement and cancellation of

---

[15] Dr. Milgrom used the term "permanent price impact" to discuss an expert report previously submitted in that litigation by Dr. Craig Pirrong, which described peer-reviewed literature *that found the price impact of market manipulation lasted for more than one day*. Expert Report of Dr. Craig Pirrong, *Alaska Electrical Pension Fund v. Bank of America*, No. 14-cv-7126 (JMF) (S.D.N.Y. Aug. 2, 2017), Dkt. No. 503-4 (citing Carole Comerton-Forde & Talis J. Putnins, *Measuring Closing Price Manipulation*, 20 J. Fin. Intermediation 135 (2011)).

[16] Nikolaus Hautsch & Ruihong Huang, *The Market Impact of a Limit Order*, 36 J. Econ. Dyn. & Cntrl. 501, 511-14 (2012).

48

Baiting Orders throughout the Relevant Period had the cumulative effect of driving FSD

Pharma's share price down on a persistent basis throughout the Relevant Period.

185.    This wrongful conduct proximately caused Plaintiff's losses.

### 2.    Injury in Fact and Loss Causation

186.    As set forth more fully above, Defendants' fraudulent trading activities had both a

temporary and long-term adverse effect on the market price of FSD Pharma's securities.

187.    During the Relevant Period, the Spoofing Events occurred on at least 159 out of

1,129—or 14%—of trading days. These events are summarized by the table below:

| Date | Total |
| --- | --- |
| 8-Jan-20 | 3 |
| 9-Jan-20 | 8 |
| 10-Jan-20 | 4 |
| 13-Jan-20 | 13 |
| 15-Jan-20 | 9 |
| 21-Jan-20 | 4 |
| 22-Jan-20 | 3 |
| 29-Jan-20 | 2 |
| 28-Feb-20 | 9 |
| 5-Mar-20 | 1 |
| 6-Mar-20 | 1 |
| 10-Mar-20 | 4 |
| 11-Mar-20 | 1 |
| 24-Mar-20 | 1 |
| 25-Mar-20 | 5 |
| 26-Mar-20 | 8 |
| 2-Apr-20 | 8 |
| 15-Apr-20 | 2 |
| 21-Apr-20 | 1 |
| 8-May-20 | 2 |
| 19-May-20 | 9 |
| 3-Jun-20 | 151 |
| 4-Jun-20 | 227 |
| 5-Jun-20 | 15 |
| 8-Jun-20 | 9 |
| 9-Jun-20 | 1 |

| | |
|---|---|
| 10-Jun-20 | 9 |
| 11-Jun-20 | 3 |
| 12-Jun-20 | 6 |
| 23-Jun-20 | 3 |
| 25-Jun-20 | 21 |
| 26-Jun-20 | 6 |
| 30-Jun-20 | 2 |
| 2-Jul-20 | 20 |
| 22-Jul-20 | 1 |
| 24-Jul-20 | 3 |
| 30-Jul-20 | 214 |
| 31-Jul-20 | 4 |
| 4-Aug-20 | 15 |
| 5-Aug-20 | 1 |
| 7-Aug-20 | 4 |
| 10-Aug-20 | 9 |
| 11-Aug-20 | 3 |
| 12-Aug-20 | 3 |
| 13-Aug-20 | 4 |
| 20-Aug-20 | 22 |
| 1-Sep-20 | 1 |
| 4-Sep-20 | 5 |
| 30-Sep-20 | 1 |
| 1-Oct-20 | 2 |
| 20-Oct-20 | 3 |
| 22-Oct-20 | 14 |
| 6-Nov-20 | 4 |
| 9-Nov-20 | 2 |
| 10-Nov-20 | 10 |
| 13-Nov-20 | 2 |
| 18-Nov-20 | 1 |
| 24-Nov-20 | 2 |
| 30-Nov-20 | 45 |
| 1-Dec-20 | 9 |
| 6-Jan-21 | 2 |
| 20-Jan-21 | 3 |
| 1-Feb-21 | 1 |
| 3-Feb-21 | 13 |
| 8-Feb-21 | 4 |
| 9-Feb-21 | 24 |
| 10-Feb-21 | 19 |

| | |
|---|---|
| 11-Feb-21 | 27 |
| 16-Feb-21 | 4 |
| 17-Feb-21 | 3 |
| 18-Feb-21 | 4 |
| 19-Feb-21 | 2 |
| 22-Feb-21 | 2 |
| 23-Feb-21 | 3 |
| 24-Feb-21 | 3 |
| 1-Mar-21 | 1 |
| 2-Mar-21 | 4 |
| 15-Mar-21 | 1 |
| 16-Mar-21 | 7 |
| 17-Mar-21 | 30 |
| 18-Mar-21 | 12 |
| 19-Mar-21 | 8 |
| 22-Mar-21 | 2 |
| 23-Mar-21 | 4 |
| 24-Mar-21 | 3 |
| 25-Mar-21 | 7 |
| 26-Mar-21 | 5 |
| 29-Mar-21 | 2 |
| 30-Mar-21 | 6 |
| 5-Apr-21 | 2 |
| 6-Apr-21 | 3 |
| 7-Apr-21 | 2 |
| 8-Apr-21 | 11 |
| 19-Apr-21 | 3 |
| 23-Apr-21 | 1 |
| 26-Apr-21 | 3 |
| 28-Apr-21 | 7 |
| 30-Apr-21 | 5 |
| 3-May-21 | 2 |
| 9-Jun-21 | 3 |
| 6-Jul-21 | 1 |
| 26-Aug-21 | 4 |
| 2-Sep-21 | 4 |
| 15-Sep-21 | 3 |
| 16-Sep-21 | 4 |
| 20-Sep-21 | 9 |
| 4-Oct-21 | 18 |
| 5-Oct-21 | 1 |

| | |
|---|---|
| 6-Oct-21 | 11 |
| 5-Nov-21 | 1 |
| 10-Nov-21 | 3 |
| 16-Nov-21 | 2 |
| 22-Nov-21 | 3 |
| 26-Nov-21 | 1 |
| 6-Jan-22 | 1 |
| 28-Jan-22 | 1 |
| 1-Feb-22 | 2 |
| 28-Mar-22 | 4 |
| 15-Jun-22 | 3 |
| 24-Jun-22 | 5 |
| 15-Jul-22 | 1 |
| 31-Oct-22 | 7 |
| 23-Nov-22 | 1 |
| 20-Jan-23 | 1 |
| 25-Jan-23 | 1 |
| 9-Feb-23 | 4 |
| 13-Feb-23 | 1 |
| 14-Feb-23 | 1 |
| 22-Feb-23 | 1 |
| 23-Feb-23 | 2 |
| 6-Mar-23 | 17 |
| 7-Mar-23 | 1 |
| 15-Mar-23 | 1 |
| 10-Apr-23 | 5 |
| 13-Apr-23 | 1 |
| 18-Apr-23 | 2 |
| 19-Apr-23 | 3 |
| 1-Jun-23 | 11 |
| 15-Jun-23 | 3 |
| 29-Jun-23 | 14 |
| 2-Aug-23 | 3 |
| 3-Aug-23 | 1 |
| 15-Aug-23 | 1 |
| 27-Sep-23 | 1 |
| 2-Nov-23 | 11 |
| 17-Nov-23 | 1 |
| 1-Dec-23 | 1 |
| 9-Jan-24 | 1 |
| 29-Jan-24 | 1 |

| | |
|---|---|
| 21-Feb-24 | 1 |
| 11-Mar-24 | 1 |
| 14-Mar-24 | 1 |
| 15-Apr-24 | 4 |
| 26-Apr-24 | 4 |
| 2-May-24 | 1 |
| 31-May-24 | 1 |
| 7-Jun-24 | 5 |
| 14-Jun-24 | 5 |
| 9-Aug-24 | 16 |
| **Total** | **1,422** |

188.    Those events had lasting impacts. On average, during the spoofing period, the price of FSD Pharma shares decreased by between 64 and 122 basis points, compared to an average decrease of 1.38 basis points during non-spoofing periods. Prices generally remained at suppressed levels (compared to non-spoofing periods) for at least five minutes after each Executing Purchase.

189.    Consistent with this, sharp price decreases in FSD Pharma share prices correlate with Defendants' spoofing activities. For example, from June 3, 2020, to June 12, 2020, the price of FSD Pharma dropped from $910 to $273; over that period, there were 550 spoofing episodes. From February 9, 2021, to February 26, 2021, the price of FSD Pharma dropped by over 29%; over that period, there were 136 spoofing episodes. From March 16, 2021, to April 6, 2021, the price of FSD Pharma dropped by over 10%; over that period, there were 304 spoofing episodes. From April 10, 2023, to April 19, 2023, the price of FSD Pharma dropped by nearly 20%; over that period, there were 21 spoofing episodes.

190.    In total, during the Relevant Period, at least 5% of all trading in FSD Pharma shares occurred at artificially depressed levels. In addition, 3.72% of all trading days have trading volume where over 10% of all volume was traded at artificially depressed levels. The

numbers are, of course, higher on some days: on thirteen days, more than 25% of all volume was traded at artificially depressed prices, including on July 30, 2020, where over 64% of volume was traded at artificially depressed prices.

191.    Based on records maintained by FSD Pharma, approximately 90 million shares were sold or issued for value by FSD Pharma during the Relevant Period on US and Canadian markets.  Many of these sales were at-the-market sales at secondary market prices artificially depressed by Defendants' manipulative spoofing.

192.    The following table presents a list of Spoofing Episodes immediately prior (*i.e.*, within five minutes) to FSD Pharma's sales or issuances for value of shares at artificially depressed prices:

| Date | Shares Sold | Volume Weighted Average Sale Price | Sale Time | Time of Spoofing Episode | Defendant | Time Difference (seconds) | Ask Decline to Episode (bps) | Bid Decline to Episode (bps) | Mid Decline to Episode (bps) |
|---|---|---|---|---|---|---|---|---|---|
| 7/22/20 | 100 | 3.9 | 11:57:12 | 11:57:12 | John Doe 1 | 86 | -152.96 | -132.83 | -142.86 |
| 7/22/20 | 100 | 3.79 | 11:56:41 | 11:56:41 | John Doe 1 | 55 | -152.96 | -132.83 | -142.86 |
| 7/24/20 | 100 | 3.76 | 10:45:05 | 10:45:05 | RBC | 270 | -39.84 | -59.52 | -49.70 |
| 7/24/20 | 300 | 3.75 | 10:42:03 | 10:42:03 | RBC | 88 | -39.84 | -59.52 | -49.70 |
| 7/24/20 | 100 | 3.775 | 10:41:39 | 10:41:39 | RBC | 64 | -39.84 | -59.52 | -49.70 |
| 7/24/20 | 2 | 3.75 | 10:44:55 | 10:44:55 | RBC | 260 | -39.84 | -59.52 | -49.70 |
| 7/24/20 | 5 | 3.75 | 10:42:54 | 10:42:54 | RBC | 139 | -39.84 | -59.52 | -49.70 |
| 2/3/21 | 100,000 | 2.32595 | 15:27:07 | 15:27:07 | John Doe 1 | 217 | 0.00 | -94.04 | -47.69 |
| 2/3/21 | 100,000 | 2.51831 | 15:23:26 | 15:23:26 | John Doe 1 | 92 | 0.00 | -124.61 | -63.19 |
| 2/8/21 | 6,000 | 2.3005 | 10:24:25 | 10:24:25 | John Doe 1 | 236 | -67.11 | -99.34 | -83.33 |
| 2/10/21 | 180,793 | 3.62347 | 10:29:59 | 10:29:59 | John Doe 1 | 273 | -24.21 | -71.26 | -47.96 |
| 2/11/21 | 50,000 | 3.58406 | 9:41:23 | 9:41:23 | John Doe 1 | 103 | -116.28 | -45.45 | -80.46 |
| 2/11/21 | 150,000 | 3.46217 | 9:55:10 | 9:55:10 | John Doe 1 | 168 | -147.68 | -61.22 | -103.73 |
| 2/11/21 | 75,000 | 3.21813 | 10:08:03 | 10:08:03 | John Doe 1 | 119 | -49.75 | -97.80 | -73.98 |
| 2/17/21 | 3,000 | 2.72021 | 9:38:31 | 9:38:31 | CIBC | 181 | 0.00 | -28.99 | -14.60 |
| 3/2/21 | 25,300 | 2.13513 | 10:48:56 | 10:48:56 | CIBC | 284 | 0.00 | -36.90 | -18.59 |

193.    Each of these sales by FSD Pharma were conducted at prices that were artificially depressed by Defendants' manipulative trading. Put differently, FSD Pharma suffered pecuniary harm in connection with each of the sales listed above because, absent Defendants' manipulative conduct, those sales would have occurred at higher prices.

194.    Defendants' fraudulent trading activities had both a temporary and long-term adverse effect on the market price of FSD Pharma shares.  As discussed above, the artificially depressed price resulting from any given Spoofing Episode may not fully recover to the price that existed prior to the Spoofing Episode.  And when spoofing events occur continuously throughout the day and continue without interruption over a protracted period of time, the long-term cumulative effect of spoofing places enormous downward pressure on the market price of a security, which is persistent and long-lasting.

195.    Because the price impact of Defendants' spoofing activity was not limited to the time period immediately following each individual spoofing episode, Plaintiff's sales and issuances for value of its stock throughout the Relevant Period were negatively affected by Defendants' spoofing, regardless of whether that spoofing occurred in close temporal proximity to Plaintiff's sales.

196.    While each Spoofing Episode had a small negative impact on the price of FSD Pharma shares, the placement and cancellation of Baiting Orders throughout the Relevant Period had the cumulative effect of driving FSD Pharma share price down during the Relevant Period. Defendants' wrongful conduct proximately caused the losses that FSD Pharma suffered when it sold and/or issued for value shares at times during which the market price of FSD Pharma shares was being driven downward.

### 3.    Defendants Intentionally Hid Their Manipulative Spoofing Schemes

197.    As described above, the manipulative process and spoofing requires that the true intent of the spoofer be hidden from the market.  If other market participants knew that the Baiting Orders were not bona fide orders—but instead entered solely to induce other traders to move the price of the stock—those other traders would naturally ignore the Baiting Orders when making trading decisions.

198.    Defendants intentionally hid their manipulative spoofing scheme in order to achieve their illegal and improper goal of depressing the price of FSD Pharma shares, and their success in manipulating that price demonstrates that their spoofing activity was concealed from the market.

## VI.    CLAIMS FOR RELIEF

### A.    First Claim for Relief Against All Defendants for Spoofing in Violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5(a) and (c) Promulgated Thereunder

199.    FSD Pharma incorporates by reference paragraphs 1 to 198 as if more fully set forth herein.

200.    During the Relevant Period, Defendants participated in a scheme that was intended to – and did – manipulate the market price of FSD Pharma shares by placing Baiting Orders on the CSE and, on information and belief, Nasdaq.  Defendants' Baiting Orders were used to further a market manipulation scheme that had a direct and immediate adverse impact on the market price of FSD Pharma securities being traded on the CSE and Nasdaq.

201.    Rules 10b-5(a) and (c) make it unlawful for any party to "(a) employ any device, scheme or artifice to defraud" and "(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit."

202.    Defendants are liable for (i) placing Baiting Orders on CSE and, on information and belief, Nasdaq that had no legitimate or economic purpose, were never intended to be executed, and were part of a spoofing scheme; and (ii) placing Executing Purchase Orders that completed the Spoofing Episode that operated as a scheme to manipulate the market price of FSD Pharma securities.

203.     As set forth more fully above, <u>strong</u> circumstantial evidence exists that Defendants' conduct reflects the intentional or reckless nature of their unlawful scheme and course of conduct to defraud the market in FSD Pharma securities.

204.     FSD Pharma's securities were intended to be traded in an efficient market, in which all market participants had access to information that was relevant to the fair and orderly trading of a security.  Defendants' scheme to manipulate was structured in a manner that concealed Defendants' unlawful intentions and made it extremely difficult for a reasonably diligent market participant—like FSD Pharma—to discover the operative facts constituting the market manipulation scheme, much less the identities of the perpetrators of these schemes.

205.     During the Relevant Period, despite FSD Pharma's diligence, it did not discover—nor could a reasonably diligent plaintiff have discovered—the facts constituting the market manipulation claims or the identities of the perpetrators of these market manipulation schemes.  Thus, when FSD Pharma sold and/or issued for value shares of FSD Pharma, the market prices of FSD Pharma shares were not being determined by the natural forces of supply and demand but, rather, by the false and misleading pricing information injected into the market by the Defendants.

206.     As set forth more fully above, Defendants' fraudulent trading activities had both a temporary and long-term adverse effect on the market price of FSD Pharma shares.

207.     During the Relevant Period, FSD Pharma sold and/or issued for value approximately 90 million FSD Pharma shares.  As a direct and proximate result of Defendants' wrongful conduct, FSD Pharma suffered damages in that it sold and/or issued for value FSD Pharma shares at manipulated prices, in reliance on an assumption of an efficient market free of manipulation.

208.    Each Defendant used the means or instrumentalities of interstate commerce, the facilities of a national securities exchange, and the mail, to trade FSD Pharma's securities by placing, routing, filling, and executing these orders.

209.    Defendants each knowingly employed devices, schemes, or artifices to defraud and engaged in acts, practices, and a course of conduct which operated as a fraud upon FSD Pharma and the market in violation of Section 10(b) and Rule 10b-5 promulgated under the Exchange Act.

**B.    Second Claim for Relief Against All Defendants for Spoofing in Violation of Section 9(a)(2) of The Securities Exchange Act of 1934**

210.    FSD Pharma incorporates by reference paragraphs 1 to 209 as if more fully set forth herein.

211.    Based upon the conduct described above, Defendants' manipulative schemes violated Section 9(a)(2) of the Securities Exchange Act of 1934, which makes it unlawful to engage in a series of manipulative transactions "in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

212.    By reason of the conduct described above, Defendants directly used the mails, or instrumentalities of interstate commerce, or a facility of a national securities exchange, to: effect—alone or with one or more other person—a series of transactions in FSD Pharma shares that created actual or apparent trading in such securities or raising or depressing the price of such securities for the purpose of inducing the purchase or sale of such securities by others; and engage in the market manipulation strategy of spoofing which artificially affected the prices of FSD Pharma shares that FSD Pharma sold and/or issued for value.

213.    Defendants' conscious misbehavior or recklessness artificially affected the price of FSD Pharma shares that FSD Pharma sold and/or issued for value during the Relevant Period. Defendants' conscious misbehavior or recklessness thus caused injury to FSD Pharma.

**C.    Third Claim for Relief Against All Defendants for New York Common Law Fraud**

214.    FSD Pharma incorporates by reference paragraphs 1 to 213 as if more fully set forth herein.

215.    By placing and then cancelling Baiting Orders in their abusive spoofing scheme, Defendants each knowingly or recklessly injected into the market false and misleading information concerning the supply of FSD Pharma shares that appeared available for trading. This interfered with the natural market forces of supply and demand and artificially drove the price of the shares downward. When FSD Pharma sold its stock during the Relevant Period, it suffered damages that were directly and proximately caused by Defendants' fraud.

216.    When FSD Pharma sold its shares during the Relevant Period, it did not possess any specific facts demonstrating that the market price of FSD Pharma's share was being manipulated and therefore, it relied on the efficiency of the market that had been unlawfully manipulated.

**VII.    PRAYER FOR RELIEF**

WHEREFORE, FSD Pharma respectfully requests that this Court enter a judgment:

A.    Finding that Defendants violated the federal securities laws as alleged in this Complaint;

B.    Ordering Defendants to pay damages as a result of their unlawful conduct in an amount to be determined at trial;

C.      Enjoining Defendants from engaging in any further manipulation of the share

price of FSD Pharma, whether on their own behalf or on their customers' behalf;

D.      Awarding reasonable attorney's fees and costs together with all available pre- and

post-judgment interest; and

E.      Granting such other and further relief as the Court deems just and appropriate.

## VIII.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, FSD Pharma demands trial

by jury in this action of all issues so triable.


Dated:  October 20, 2024
        New York, NY

Respectfully submitted,

By: */s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman
Kyle Roche
Stephen Lagos
**Freedman Normand Friedland LLP**
10 Grand Central
155 E. 44th Street, Suite 905
New York, New York 10017
Tel: (646) 350-0527
vel@fnf.law
kroche@fnf.law
slagos@fnf.law

James Wes Christian
**Christian Levine Law Group, LLC**
2302 Fannin, Suite 205
Houston, TX 77002
Tel: (713) 659-7617
jchristian@christianattarlaw.com

*Counsel for Plaintiffs*