**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                                  :
QUANTUM BIOPHARMA LTD.,                                            :
                                                                  :
                            Plaintiff,                            :
                                                                  :
                   v.                                             :
                                                                  :    Case No.:  1:24-CV-07972 (ER)
CIBC WORLD MARKETS, INC.; RBC                                     :
DOMINION SECURITIES INC., and JOHN                               :    Hon. Edgardo Ramos
DOES 1 THROUGH 10,                                                :
                                                                  :    ORAL ARGUMENT REQUESTED
                            Defendants.                           :
                                                                  :
                                                                  :
                                                                  :
                                                                  :
                                                                  :
                                                                  :
                                                                  :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
TO DISMISS THE COMPLAINT**

January 31, 2025

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT.................................................................................................. 1

BACKGROUND ....................................................................................................................... 4

    A.  The parties.................................................................................................................... 4

    B.  The alleged "spoofing" scheme .................................................................................. 6

    C.  The poor management and performance of FSD .......................................................... 7

    D.  FSD knew about purported manipulation years before the Complaint was filed .............. 8

ARGUMENT ........................................................................................................................... 9

I.  FSD's claims should be dismissed because the litigation is predominantly foreign ............... 9

    A.  FSD fails to plead personal jurisdiction over any Defendant ............................................ 9

    B.  FSD's claims are impermissibly extraterritorial under *Morrison* ..................................... 13

    C.  FSD's claims should be dismissed under *forum non conveniens* ..................................... 15

II.  FSD fails to state a claim under the Exchange Act ........................................................... 18

    A.  FSD fails to plead manipulative conduct by CIBC or RBC ............................................ 19

    B.  FSD fails to plead a strong inference of scienter ......................................................... 22

        1.  FSD fails to plead motive or opportunity ................................................................. 22

        2.  FSD fails to plead conscious misbehavior or recklessness......................................... 25

    C.  FSD fails to plead loss causation .............................................................................. 29

        1.  FSD fails to plead temporal proximity...................................................................... 29

        2.  FSD fails to plead long-term impact ........................................................................ 32

III. FSD's Exchange Act claims are time-barred .................................................................. 38

IV. FSD fails to plead common law fraud ............................................................................ 40

CONCLUSION......................................................................................................................... 41

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
  2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ........................................................................11

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)........................................................................13

*Allen v. Fidelity Brokerage Servs. LLC*,
  711 F. Supp. 3d 219 (S.D.N.Y. 2024)........................................................................28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................18

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)........................................................................ *passim*

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)........................................................................10

*BankUnited, N.A. v. Merritt Envt'l. Consulting Corp.*,
  360 F. Supp. 3d 172 (S.D.N.Y. 2018)........................................................................4

*Baxter v. A.R. Baron & Co.*,
  1995 WL 600720 (S.D.N.Y. Oct. 12, 1995) ........................................................................19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................18

*Berdeaux v. OneCoin Ltd.*,
  561 F. Supp. 3d 379 (S.D.N.Y. 2021) ........................................................................10

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)........................................................................12

*Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*,
  155 F.3d 603 (2d Cir. 1998)........................................................................16, 17

*Cartwright v. D'Alleva*,
  2018 WL 9343524 (S.D.N.Y. Aug. 27, 2018) ........................................................................40

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)........................................................................9, 11, 12

*In re Citigroup Auction Rate Sec. Litig.*,
    700 F. Supp. 2d 294 (S.D.N.Y. 2009)................................................................23

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011)................................................................40

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)................................................................14

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010)................................18, 26, 29, 40

*CP Stone Fort Holdings, LLC v. Doe(s)*,
    2016 WL 5934096 (N.D. Ill. Oct 11, 2016)................................................................20

*CSS Int'l, Ltd. v. ECI Telesys., Ltd.*,
    1998 WL 512951 (S.D.N.Y. Aug. 18, 1998)................................................................18

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)................................................................9

*DeYoung v. Beddome*,
    707 F. Supp. 132 (S.D.N.Y. 1989)................................................................16

*DiMuro v. Clinique Lab'ys, LLC*,
    572 F. App'x 27 (2d Cir. 2014) ................................................................20

*Dulsky v. Worthy*,
    2013 WL 4038604 (S.D.N.Y. July 30, 2013) ................................................................19

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................29

*Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019)................................................................12

*Foundry, A Print Commc'ns Co. v. Trade Secret Web Printing, Inc.*,
    2012 WL 3031149 (S.D.N.Y. July 25, 2012) ................................................................16

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
    41 F. 4th 71 (2d Cir. 2022) ................................................6, 21, 29, 30

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................................24

*Gilstrap v. Radianz Ltd.*,
    443 F. Supp. 2d 474 (S.D.N.Y. 2006)................................................................15

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947).................................................................................................15

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*,
    585 F. Supp. 3d 405 (S.D.N.Y. 2022) ("*Harrington I*")................................... *passim*

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*,
    2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023) ("*Harrington II*")....................................12, 21

*Harris v. TD Ameritrade Inc.*,
    2020 WL 3073235 (S.D.N.Y. June 10, 2020) ........................................................28

*Hausman v. Buckley*,
    299 F.2d 696 (2d Cir. 1962)..................................................................................18

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998)....................................................................................9

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)..................................................................................25

*Kessev Tov, LLC v. Doe(s)*,
    2022 WL 2356626 (N.D. Ill. June 30, 2022) ("*Kessev Tov I*") .........................................27, 31

*Kessev Tov, LLC v. Doe(s)*,
    2023 WL 4825110 (N.D. Ill. July 27, 2023) ("*Kessev Tov II*")..............................................20

*Kitaru Innovations Inc. v. Chandaria*,
    698 F. Supp. 2d 386 (S.D.N.Y. 2010)....................................................................18

*LaSaLa v. UBS, AG*,
    510 F. Supp. 2d 213 (S.D.N.Y. 2007).............................................................15, 18

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..................................................................................35

*In re London Silver Fixing Ltd. Antitrust Litig.*,
    2023 WL 3582198 (S.D.N.Y. May 22, 2023) ........................................................32

*M&N Trading, LLC v. BofA Sec., Inc.*,
    2024 WL 4651857 (N.D. Ill. Nov. 1, 2024) ..........................................................33

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010)..........................................................................................38, 40

*In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*,
    2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) .................................................... *passim*

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)......................................................................................9, 13

*In re Mex. Gov't Bonds Antitrust Litig.*,
    412 F. Supp. 3d 380 (S.D.N.Y. 2019).......................................................................26

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010)...........................................................................................2, 13, 14

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
    2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023) ............................................... *passim*

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)......................................................................................22, 25

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)......................................................................................14, 15

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
    609 F.3d 30 (2d Cir. 2010).........................................................................................9

*Phunware, Inc. v. UBS Sec. LLC*,
    2024 WL 1465244 (S.D.N.Y. Apr. 4, 2024).............................................30, 32, 34

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981).................................................................................................15, 16

*In re Platinum & Palladium Antitrust Litig.*,
    2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) .........................................................11

*Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*,
    2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) ........................................................22

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
    329 F.3d 64 (2d Cir. 2003)........................................................................................17

*Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*,
    2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) ..........................................................25

*Robinson v. Overseas Mil. Sales Corp.*,
    21 F.3d 502 (2d Cir. 1994)........................................................................................9

*In re Royal Grp. Techs. Sec. Litig.*,
    2005 WL 3105341 (S.D.N.Y. Nov. 21, 2005)...........................................15, 16, 17

*Schwab v. E*TRADE Fin. Corp.*,
    258 F. Supp. 3d 418 (S.D.N.Y. 2017)......................................................................23

*Scottish Air Int'l, Inc. v. British Caledonia Grp., PLC*,
  81 F.3d 1224 (2d Cir. 1996)........................................................................17

*Segal v. Gordon*,
  467 F.2d 602 (2d Cir. 1972)........................................................................21

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)..........................................................................4

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017)........................................................12

*Stevenson v. Thornburgh*,
  2024 WL 645187 (S.D.N.Y. Feb. 14, 2024)...............................................13

*Stone Family Tr. v. Credit Suisse AG*,
  2022 WL 954743 (S.D.N.Y. Mar. 30, 2022) ..............................................19

*Sunward Elecs., Inc. v. McDonald*,
  362 F.3d 17 (2d Cir. 2004)............................................................................9

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)........................................................18

*Tellabs v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)....................................................................................22

*United States v. Coscia*,
  866 F.3d 782 (7th Cir. 2017) ......................................................................33

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011).........................................................28

*Weinraub v. Glen Rauch Sec., Inc.*,
  399 F. Supp. 2d 454 (S.D.N.Y. 2005).........................................................28

*Xu v. Direxion Shares ETF Tr.*,
  2023 WL 5509151 (S.D.N.Y. Aug. 25, 2023) ............................................19

**Statutes, Rules, and Regulations**

28 U.S.C. § 1658(b)(1) ............................................................................38, 40

Fed. R. Civ. P. 9(b) ................................................................................ *passim*

Fed. R. Civ. P. 12(b) .....................................................................................1, 13

Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 *et seq*............2, 3, 18, 22

SEC Rule 15c3-3, 17 C.F.R. § 240.15c3-3 ........................................................................28

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b)......................................................18, 19, 40

CIBC World Markets Inc. ("CIBC") and RBC Dominion Securities Inc. ("RBC") (each a "Defendant" and, together with ten unnamed John Doe defendants, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Complaint (Dkt. No. 1) under Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This lawsuit is a transparent attempt by a failed company to blame others for its misguided business decisions and dismal financial performance. Plaintiff Quantum BioPharma Ltd., formerly known as FSD Pharma ("Plaintiff" or "FSD"), is a "medical cannabis"-turned-pharmaceutical-company located in Canada. Plaintiff asserts securities and common law fraud claims against CIBC and RBC, which are two broker-dealers also located in Canada. FSD's claims arise out of the collapse of its share price—a 98% loss in value—between January 1, 2020 and August 15, 2024 (the "Relevant Period").

Relying almost entirely on cherry-picked "order data," available only for Canadian markets, which "track offers and trades made by or through particular brokers," FSD alleges that Defendants engaged in "spoofing"—a specific form of market manipulation involving the rapid placement of sell orders with the intent to cancel those orders before execution—that purportedly drove down FSD's share price. (Compl. ¶¶ 3, 51, 148.) But FSD concedes that the data on which its Complaint relies lumps together all orders placed under a broker-dealer's "unique identifier," and, critically, does *not* distinguish between orders placed by Defendant's traders for their own book and orders placed by or on behalf of the broker-dealers' customers. (*Id.* ¶¶ 23, 51.) In other words, FSD admits that it cannot match orders to the parties that placed them. As a result, FSD cannot plausibly allege that any Defendant placed any particular order, let alone engaged in spoofing. And even if it could, FSD does not plead that it suffered any losses as a result. Spoofing strategies "depend for their profitability on a reversion of prices to the market-level, meaning that

the period of artificiality may be brief" and "last[] only a matter of seconds." *In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021).[1]  But FSD fails to plead that it sold shares within seconds—or even minutes, hours, days or weeks—of any of CIBC or RBC's purported spoofing "examples" described in the Complaint.

To make matters worse, FSD fails to acknowledge or explain the obvious cause of FSD's declining stock price:  its own mismanagement.  During the four-year Relevant Period that FSD claims that spoofing took place, FSD never turned a profit.  Instead, it engaged in a failed attempt to reinvent its entire business, which resulted in FSD losing tens of millions of dollars each year.  More egregiously, FSD severely diluted its shareholders by dumping 90 million shares of its own stock onto the market.

FSD's Complaint is the paradigmatic example of the kind of abusive litigation that courts should check by enforcing the exacting pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  The Court should dismiss Plaintiff's claims for at least five independent reasons.

*First*, the facts and circumstances of this case are overwhelmingly foreign.  The parties are Canadian, and the conduct alleged occurred almost entirely in Canada.  Whether analyzed on the basis of personal jurisdictional, extraterritoriality under *Morrison*, or *forum non conveniens*, the case does not belong in U.S. court.

*Second*, FSD does not adequately allege that CIBC or RBC engaged in any manipulation under the Exchange Act.  Instead, FSD relies entirely on group pleading (never identifying which Defendants, traders, or customers performed what allegedly manipulative acts); pleads only conclusory assertions relating to Defendants' and their customers' trading behavior;

---

[1] Unless otherwise indicated, all internal citations, quotations and alterations are omitted.

and cites cherry-picked data (representing orders placed by dozens if not hundreds of independent market participants who executed through CIBC or RBC) to speculate about purported patterns of behavior attributable to each Defendant. Stripped of labels and conclusions, the "patterns" FSD identifies reflect nothing more than routine, lawful market activity by broker-dealers primarily executing orders, trades and cancellations for their customers. (Compl. ¶¶ 8, 10.)

*Third*, FSD fails to plead a strong inference of scienter. FSD provides no plausible explanation for why CIBC or RBC—who in their broker-dealer capacities would not be taking directional positions on individual stocks—would engage in a scheme to drive down the price of FSD's stock. FSD never explains how any Defendant expected to profit, let alone did profit, from unidirectional spoofing conduct. Nor does FSD plead conscious misbehavior or recklessness on behalf of any Defendant. The aggregated statistics on which the Complaint relies—lumping together orders placed by Defendants and their customers—say nothing about any individual's intent. And FSD does not plead *any* facts to suggest that Defendants failed to implement systems and controls or otherwise ignored red flags suggestive of spoofing activity, whether by Defendants' own traders or their customers.

*Fourth*, FSD does not plead loss causation as to CIBC or RBC. Remarkably, although FSD claims that spoofing was "continuous" throughout the Relevant Period, the only "spoofing episodes" the Complaint describes with any particularity are *four* examples by RBC and *seven* examples by CIBC. Fatally, FSD does not allege that it sold a single share within minutes, hours, days or even weeks—let alone seconds—of any of these examples. Instead, the Complaint lists three other days on which FSD sold shares, and asserts without supporting facts that RBC and CIBC spoofed on those dates, too. Such unsupported claims come nowhere close to meeting the heightened pleading requirements of Rule 9(b) and the PSLRA. And FSD's conclusory contention

that the "cumulative effect" of "continuous[]" spoofing can permanently decrease a stock's price (Compl. ¶ 194) has been rejected by multiple courts and disregards the far more plausible explanation that its own dismal business performance and dilutive 90-million-share sales and issuances caused the decline in FSD's share price.

*Lastly*, FSD's Exchange Act claims are time-barred. Since at least 2021, FSD was investigating share price manipulation and sent multiple letters to CIBC regarding alleged imbalances in its stock. Ex. 20. FSD even announced in a March 2023 SEC filing that it had been working with consultants to "analyz[e] data on a daily basis for over a year," and had, during that time, "sent multiple correspondences with questions, to broker-dealers highlighting an imbalance in trade activity" and "discrepancies between buying and selling of [FSD] stock." Ex. 1 (FSD, Form 6-K, Ex. 99.1 (Mar. 14, 2023)). Despite this, FSD inexplicably waited until October 2024 to sue—well beyond the applicable two-year statute of limitations.

## BACKGROUND[2]

### A. The parties.

CIBC and RBC—the only two Defendants identified by name in the Complaint— are both Canadian "registered broker-dealer[s]" that "primarily execute[] securities transactions for [their] customers in Canada." (Compl. ¶¶ 8, 10.) As broker-dealers, Defendants provide various order-fulfillment services to their respective customers, including by "plac[ing] orders and execut[ing] trades . . . pursuant to their customer's instructions," which trade in accordance with

---

[2] Citations to Ex. 1 – 20 refer to exhibits to the Declaration of Kevin P. Broughel filed herewith. In deciding a motion to dismiss, the Court may consider "documents incorporated into the Complaint by reference," "public disclosure documents filed with the SEC," "documents possessed by or known to the plaintiff and upon which it relied in bringing the suit," *Slayton v. Am. Express Co.*, 604 F.3d 758, 763 n.2 (2d Cir. 2010), and "documents integral to the complaint," or that otherwise contain "facts of which judicial notice may properly be taken." *BankUnited, N.A. v. Merritt Envt'l. Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018).

their own unique strategies and portfolios.  (*Id.* ¶ 22.)  Both CIBC and RBC maintain Direct Market

Access ("DMA") and Direct Electronic Access ("DEA") systems that allow their customers to

directly "enter orders and/or trades."  (*Id.* ¶¶ 22-23.)  Those trades then appear on the exchange

under the broker's name.  (*Id.*)  Both companies charge transaction fees for trades that customers

place directly through these systems.  (*Id.*)  Neither company trades on a U.S. exchange, but,

according to the Complaint, both can "route" orders "to intermediary broker-dealers in the United

States" on behalf of customers.  (*Id.* ¶¶ 8, 10.)  The ten unnamed John Doe defendants "includ[e]

but [are] not limited to market makers, broker-dealers, subsidiaries, affiliates, and sister companies

of the Defendants, and Defendants' customers . . . whose identities are currently unknown."  (*Id.*

¶ 12.)

        Plaintiff FSD is a Canadian "medical cannabis" business that, in March 2020,

"pivoted its focus to pharmaceutical and biotechnology."  Ex. 2 at 29 (FSD, Form 20-F (Apr. 2,

2024)).  As of its most recent SEC filing, FSD has "no pharmaceutical products approved for

commercial sale and [has] not generated any revenue from pharmaceutical products."  *Id.* at 25

(FSD, Form 20-F (2024)).  During the Relevant Period, FSD never turned a profit, and lost tens of

millions of dollars every year since 2019.  *See* Ex. 4 at 7 (FSD, Form 40-F, Ex. 99.3 (Mar. 17,

2021)) ($39.1 USD million loss in 2019); *id.* ($31.8 USD million loss in 2020); Ex. 2 at F-4 (FSD,

Form 20-F (Apr. 2, 2024)) ($35.3 USD million loss in 2021); *id.* ($23.6 USD million loss in 2022);

*id.* ($18.2 USD million loss in 2023); (*see also* Compl. ¶ 42).  Accordingly, FSD's outside

accounting firm has raised "substantial doubt about [FSD's] ability to continue as a going

concern."  *See, e.g.*, Ex. 3 at 1 (FSD, Form 40-F, Ex. 99.2 (Mar. 4, 2020)), Ex. 2 at F-1 (FSD, Form

20-F (Apr. 2, 2024)).

FSD's stock is publicly traded on the Canadian Stock Exchange and interlisted on Nasdaq. (Compl. ¶¶ 18-19.) To continue funding its operations notwithstanding its substantial losses, FSD diluted its own shareholders by selling or issuing approximately 90 million shares of its own stock throughout the Relevant Period. (Compl. ¶ 5; Ex. 5 (Prospectus Supplement, FSD (Feb. 11, 2021)); *see* Ex. 10 at 8-10 (Proxy Solicitation Statement (April 1, 2021)).) During that time, FSD's share price cratered, falling from $7.31 CAD ($5.54 USD) per share on January 2, 2020 to $0.13 CAD ($0.09 USD) per share on August 14, 2024. Ex. 6 (historical price data in CAD); Ex. 7 (historical price data in USD). Facing threatened delisting by Nasdaq, Ex. 8 (FSD, Form 6-K (Apr. 9, 2024)), FSD effected a 65-to-1 reverse stock split and changed its name to Quantum BioPharma Ltd. on August 15, 2024, Ex. 9 (FSD, Form 6-K, Ex. 99.1 (Aug. 15, 2024)); Ex. 12 (FSD, Form 6-K (Aug. 16, 2024)).

## B.    The alleged "spoofing" scheme.

The Complaint alleges that CIBC and RBC "and/or their customers[]," as well as the John Doe defendants, engaged in spoofing throughout the Relevant Period. (Compl. ¶¶ 1, 88.) Spoofing is "a fraudulent practice in which the spoofing traders send false supply and demand signals to the market by placing orders to buy or sell that they never intend to execute." *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F. 4th 71, 75 (2d Cir. 2022). These "fraudulent spoofs" may "last[] only a matter of seconds," long enough for the spoofing traders to execute genuine orders on the opposite side of the market, and then "quickly cancel[]" the fraudulent orders before they are executed. *In re Merrill*, 2021 WL 827190, at *2, *13.

Although the Complaint does not allege that the Defendants conspired with or aided and abetted one another, all of the alleged spoofing purportedly occurred in the same direction, allegedly putting downward pressure on FSD's share price. Specifically, FSD claims that each Defendant (or its customers) spoofed by placing "Baiting Orders" on the sell side of the market in

order to enable the purchase of "Executing Purchase Orders" at slightly lower prices on the buy side. (Compl. ¶ 54.) According to the Complaint, FSD has identified more than 1,400 total spoofing "episodes," but only about half of those "episodes" allegedly are attributable to CIBC, and a mere 38 allegedly are attributable to RBC. (*Id.* ¶¶ 64, 187.) Despite these broad allegations, the only spoofing episodes described with any particularity are a handful of "illustrative examples" based on Canadian order data for CIBC, RBC and John Doe 1. (*Id.* ¶¶ 90-167.)

FSD does not identify any purportedly manipulative trading on Nasdaq (or any other U.S. exchange) by any Defendant. Instead, FSD vaguely asserts that an inference can be drawn that Defendants engaged in spoofing activity on Nasdaq based on market-level data showing sell-side imbalances across the market as a whole. (*E.g., id.* ¶¶ 94, 129, 153.)

### C.    The poor management and performance of FSD.

The Complaint omits FSD's contemporaneous admissions and disclosures regarding its failing business and the factors leading to its share price decline. Annual SEC filings and other public statements throughout the Relevant Period show yearly losses in the tens-of-millions, no revenue, shifting business ventures, and costly shareholder litigation, all of which impacted the company's share price—by FSD's own admission. *See* Exs. 2-4; *infra* at 35-36.

Additionally, public court filings show that FSD was embroiled in a proxy battle in 2021 that resulted in the ouster of its CEO, Dr. Raza Bokhari, and subsequent litigation surrounding his termination. *See* Petition, *FSD Pharma Inc. v. Bokhari*, No. 23-cv-150 (E.D. Pa. Dec. 1, 2023). In a March 2021 Proxy Statement, the now-current CEO Zeeshan Saeed and co-founder Anthony Durkacz explained that, since Dr. Bokhari was appointed CEO in October 2018, "the price of FSD's Shares has fallen by over 97%, wiping out over $500 million in market capitalization." *See* Ex. 10 at 8 (Proxy Solicitation Statement (Apr. 1, 2021)). The Proxy Statement attributes this "staggering" decline to several factors, including that FSD's board had

"failed to achieve even the most modest objectives of their business plan" and instead "issue[d] an extraordinary number of Class B Shares at very low prices and awarded themselves excessive and unjustified compensation." *Id.*

Nor has FSD found success in its drug portfolio. Although the Complaint touts the development of a COVID-19 drug as an example of FSD's success (Compl. ¶ 44), the Proxy Statement explains that "[w]hile the Phase 2 Clinical Trial was approved in September 2020, to date only one patient has been enrolled in the trial out of an 'expected' 352 patients." Ex. 10 at 9 (Proxy Solicitation Statement (Apr. 1, 2021)). Similarly, the Complaint touts that, on March 16, 2021, the "Company announced it had entered into a license agreement to develop certain veterinary drugs." (Compl. ¶ 45.) But the Proxy Statement, signed the very next day, describes FSD as a "corporation in crisis." Ex. 10 at 8 (Proxy Solicitation Statement (Apr. 1, 2021)).

## D. FSD knew about purported manipulation years before the Complaint was filed.

FSD has acknowledged that it "first suspected share price manipulation in 2021 when it discovered imbalances between reported shares held by brokers and authorized shares on deposit in both Canadian and U.S. exchanges." Ex. 11 at 10 (FSD, Form 6-K, Ex. 99.2 (Nov. 12, 2024)). On March 14, 2023, FSD announced in public filings that it had been analyzing trading data and investigating potential manipulation for "at least the past 12 months." Ex. 1 at 1 (FSD, Form 6-K, Ex. 99.1 (Mar. 14, 2023)). Beginning as early as November 2021 and throughout 2022, FSD sent CIBC multiple letters and emails concerning those purported share imbalances, Exs. 16-20, including letters in April and November 2022 that copied Wes Christian of Christian Attar, Plaintiff's counsel in this case, Exs. 17-18.

## ARGUMENT

**I.    FSD's claims should be dismissed because the litigation is predominantly foreign.**

This case involves claims by a Canadian Plaintiff against Canadian Defendants regarding trading of a Canadian stock on a Canadian exchange.  The Court should dismiss the Complaint on personal jurisdiction, extraterritoriality, and *forum non conveniens* grounds.

### A.    FSD fails to plead personal jurisdiction over any Defendant.

The Complaint must be dismissed because FSD cannot establish personal jurisdiction over CIBC or RBC.  Plaintiff "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  The inquiry is defendant-specific, *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018), focusing on each defendant's contacts with the forum, *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014), and must proceed claim by claim, *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004).  To survive this motion, Plaintiff must make a "prima facie showing," which includes "an averment of facts" that, if credited, "would suffice to establish jurisdiction over [each] defendant."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996).  The Court need not "draw 'argumentative inferences' in the plaintiff's favor," *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994), or accept as true "a legal conclusion couched as a factual allegation," *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998).

**General Jurisdiction.**  There is no basis to assert general jurisdiction over CIBC or RBC.  Both entities are incorporated in Canada, based in Canadian cities, and "primarily execute[] securities transactions for [their] customers in Canada."  (Compl. ¶¶ 8, 10.)  Unquestionably, neither of their "affiliations with [this forum] are so 'continuous and systematic' as to render [it] essentially at home in the forum State."  *Daimler*, 571 U.S. at 127, 139.

**Specific Jurisdiction.**  FSD also cannot establish specific jurisdiction because none of the alleged misconduct arose out of Defendants' contacts with this District.  To establish minimum contacts necessary to satisfy due process, the plaintiff must show that its "claim arises out of, or relates to, the defendant's contacts with the forum . . . [and that] the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 642 (S.D.N.Y. 2017).

In an attempt to establish specific personal jurisdiction, FSD advances three implausible theories.  *First*, FSD asserts that Defendants "each conducted a substantial part of the events asserted in this Complaint in this District, and/or directed their fraudulent activity into the market by manipulating FSD stock on Nasdaq, which is located in this District."  (Compl. ¶ 15.)  *Second*, FSD alleges that Defendants "engaged in cross-border spoofing schemes that were intended to manipulate," and did in fact impact, FSD's stock price in the United States and Canada.  (*Id.* ¶ 16.)  *Third*, FSD alleges that because FSD "is an interlisted security . . . , manipulation of the market price in one market directly and immediately affects the trading price in the other country's market."  (*Id.*)  None of these theories work.

FSD's conclusory allegations supporting its first two theories—that Canadian Defendants "conducted a substantial part of the events" in this District "and/or directed" activity here (*id.* ¶ 15)—do not establish specific personal jurisdiction over any Defendant because the Complaint does not plead a *single trade* that occurred in or was "directed" at this District.  Plaintiff "must make allegations establishing jurisdiction with some 'factual specificity' and cannot establish jurisdiction through conclusory assertions alone."  *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 395 (S.D.N.Y. 2021).

FSD's third theory—that the alleged "spoofing orders," which were entered on a Canadian exchange by Canadian Defendants, had a "direct[] and immediate[]" impact on the U.S. market (Compl. ¶ 16)—similarly fails.  Where, as here, a plaintiff advances "causal effects" theories of personal jurisdiction, it must plead plausibly that "the defendant expressly aimed its conduct at the forum."  *Charles Schwab*, 883 F.3d at 87.  FSD pleads no "factual allegations demonstrating" that the alleged market manipulation was perpetrated with "the express aim of causing an effect in" this forum, instead premising its claims on allegations regarding purported spoofing by *Canadian* Defendants on *Canadian* markets.  *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 2015 WL 1514539, at *10–11 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir. 2019).

The only connection FSD even tries to make with the United States—and leaving aside that it alleges no connection whatsoever with this District—is FSD's bald assertion that similar trading activity can be observed in the market-wide data for the United States.  (Compl. ¶ 65.)  For example, Plaintiff highlights supposed imbalances that existed across the U.S. market (*i.e.*, Nasdaq) as a whole, which say nothing about Defendants' trading.  (*See, e.g.*, *id.* ¶¶ 92, 94, 129.)  But Plaintiff fails to identify a single trade made by either CIBC or RBC on any U.S. exchange.  And the allegation that acts solely taken in Canada had an impact on the market price of FSD stock traded in this District, without more, is insufficient to establish personal jurisdiction.  "[G]eneral allegations of price manipulation abroad alone do not establish that a foreign defendant expressly aimed its conduct at the U.S."  *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *45 (S.D.N.Y. Mar. 28, 2017).  Without connecting any of the supposedly

manipulative trades in the United States to either Canadian Defendant,[3] FSD cannot plausibly plead that either Canadian Defendant "expressly aimed its conduct at the forum." *Charles Schwab*, 883 F.3d at 87.[4]  Judge Torres refused to exercise personal jurisdiction over CIBC and RBC in similar circumstances.  *See Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 711 (S.D.N.Y. 2019) (dismissing claims against CIBC and RBC for lack of personal jurisdiction in market manipulation case).

Lastly, even if FSD's allegations were sufficient to establish minimum contacts, FSD has not shown that personal jurisdiction is reasonable under the circumstances.  *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 589 (S.D.N.Y. 2017) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).  To determine reasonableness—*i.e.*, whether "the assertion of personal jurisdiction would comport with fair play and substantial justice"—courts evaluate "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in

---

[3] In fact, in one of the "examples" it offers of supposed spoofing, FSD admits that no "significant [sell-side] imbalance" existed in the United States, further reflecting that the alleged conduct was not "expressly aimed" at this forum.  (Compl. ¶ 150.)

[4] The U.S. contacts alleged here are nothing like those alleged in *Harrington*.  *Harrington I* involved claims that Canadian banks "conspired" with their U.S. affiliates to "*simultaneous[ly]*" place spoof orders on both U.S. and Canadian exchanges, *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, 585 F. Supp. 3d 405, 412, 415 (S.D.N.Y. 2022) ("*Harrington I*") (emphasis added), "in order to keep" both exchanges "aligned and avoid being routed to an unmanipulated" exchange.  Am. Compl. ¶ 7, *Harrington*, No. 21-cv-761 (S.D.N.Y. May 6, 2021).  And in *Harrington II*, the Court relied on Defendant's purported U.S. contacts, describing Plaintiff's allegations as referencing "substantial activity by the Canadian Defendants on both sides of the U.S.-Canada border, with the alleged baiting orders placed 'on either Canadian or U.S. Exchanges' and the alleged executing orders placed on U.S. exchanges directly or through intermediary U.S. broker-dealers." *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, 2023 WL 6316252, at *4 (S.D.N.Y. Sept. 28, 2023) ("*Harrington II*").  Here, FSD does not allege that Defendants conspired with U.S. affiliates to simultaneously place spoof orders on the U.S. and Canadian markets, and *all* of the alleged executing purchases (and baiting orders) described in the Complaint were placed in Canada (not the United States).

obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Id.* (quoting *Metro. Life Ins.*, 84 F.3d at 568). Each factor weighs against exercising personal jurisdiction over the Defendants here. The named parties are Canadian, and all relevant witnesses are located in Canada. (Compl. ¶¶ 7-11.) All of the trading actually attributable to Defendants involved Canadian stock and took place on Canadian exchanges. (*Id.* ¶¶ 91-169.) Because the alleged facts of this case are overwhelmingly Canada-centric, and the interests of a New York-based court in resolving this dispute are (at best) minimal, FSD cannot establish personal jurisdiction over CIBC or RBC, and the Complaint should be dismissed under Rule 12(b)(2). *See Stevenson v. Thornburgh*, 2024 WL 645187, at *43 (S.D.N.Y. Feb. 14, 2024) (dismissing claims against Swiss bank and related U.S. entities in part because the United States's interest "pale[d] in comparison" to Switzerland's "interest in regulating the conduct of banks within its borders").

### B. FSD's claims are impermissibly extraterritorial under *Morrison*.

For similar reasons, FSD's Exchange Act claims are impermissibly extraterritorial. Under *Morrison v. National Australian Bank Ltd.*, the antifraud provisions of the securities laws apply only to (i) "transactions in securities listed on domestic exchanges" and (ii) "domestic transactions in other securities." 561 U.S. 247, 267 (2010). A transaction not listed on a domestic exchange—like those alleged here—is considered "domestic" only if the parties either (i) incurred irrevocable liability to execute the transaction within the United States, or (ii) transferred title to the underlying securities within the United States. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67-68 (2d Cir. 2012). And even if the transactions alleged here could be considered "domestic" under this analysis, FSD must allege facts demonstrating that its claims are

not "predominantly foreign." *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215-16 (2d Cir. 2014) (per curiam).  FSD cannot meet these strict thresholds.

FSD does not allege a single transaction on a U.S. exchange.  Instead, FSD speculates that, because Defendants purportedly carried out spoofing activities in Canada, "similar manipulative trades were placed on United States markets."  (Compl. ¶¶ 57, 65.)  But FSD does not plead any facts to support that conclusion.  FSD further asserts that Defendants could have routed "to intermediary broker-dealers in the United States orders to be executed for [their] customers" (*id.* ¶¶ 8, 10), but FSD does not identify any orders or transactions that supposedly were routed to a U.S. exchange.  FSD declares that the purported spoofing had an impact on the price of FSD's shares "simultaneously in the United States and Canadian Markets" (*id.* ¶ 16), but provides no examples of actual transactions.  On the contrary, Plaintiff concedes that all of the spoofing "examples" pled in the Complaint took place on a Canadian exchange.  (*Id.* ¶¶ 91-167.)

Because FSD does not plead any transactions by Defendants on a U.S. exchange, its claims fail under *Morrison's* first prong.  *Compare City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014), *with Harrington I*, 585 F. Supp. 3d at 421 (finding spoofing claims fell "within the territorial ambit of the Exchange Act" in part because "Plaintiff [did] not seek to hold any Defendant liable for purchases made on foreign exchanges and instead limits its claims to sales made on U.S. Exchanges").  And its claims fail under *Morrison's* second prong because FSD does not plead that the transactions on Canadian exchanges had any U.S. nexus.  As *City of Pontiac* holds, mere cross-listing on a domestic exchange of foreign-issued shares does not render the transaction "domestic" under *Morrison*.  752 F.3d at 181.

Even if FSD pled one or more "domestic" transactions, which it cannot, its claims are so predominantly foreign that they still must be dismissed.  In the Second Circuit, a domestic

transaction is "necessary" but "not alone sufficient" to state a claim. *Parkcentral Glob. Hub Ltd.*, 763 F.3d at 215. Here, the only placed orders that FSD identifies are on a Canadian exchange, and the only alleged spoofing examples involve Canadian transactions. Because FSD's claims are so predominantly foreign, they must be dismissed. *Id.*

### C.    FSD's claims should be dismissed under *forum non conveniens*.

The doctrine of *forum non conveniens* gives courts broad discretion to dismiss claims better suited for another forum. Here, the factors underpinning the doctrine of *forum non conveniens* uniformly weigh in favor of dismissal.

"District courts have broad discretion in deciding whether to dismiss an action on the ground of *forum non conveniens*." *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 477 (S.D.N.Y. 2006), *aff'd*, 233 F. App'x 83 (2d Cir. 2007). The Second Circuit uses a three-part test. *First*, courts consider "the degree of deference due to plaintiff's choice of forum." *In re Royal Grp. Techs. Sec. Litig.*, 2005 WL 3105341, *1 (S.D.N.Y. Nov. 21, 2005). *Second*, courts decide "whether an adequate alternative forum exists." *Id. Third*, courts "balance the 'private and public interest' factors set forth by the Supreme Court in *Gilbert* to determine, based on 'the relative hardships involved, whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the defendant.'" *Id.* (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507-09 (1947)). "[W]here, on balance, the resolution of the matter in an adequate alternative forum would be more convenient for the parties and courts and more just," the complaint should be dismissed on *forum non conveniens* grounds. *LaSaLa v. UBS, AG*, 510 F. Supp. 2d 213, 221-22 (S.D.N.Y. 2007).

*First*, FSD's apparent desire to shop for the most favorable forum warrants little to no deference. All parties are Canadian, and the claims relate to the trading of a Canadian company's stock on a Canadian exchange. (*See* Compl. ¶¶ 7, 8, 10); *Piper Aircraft Co. v. Reyno*,

454 U.S. 235, 256 (1981) ("foreign plaintiff's choice deserves less deference"); *Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 612 (2d Cir. 1998) (no strong presumption in favor of plaintiff's choice of forum where "real parties in interest are foreign corporations").

   *Second*, Canada is an adequate alternative forum for this dispute.  Courts will accept a foreign forum as an adequate alternative where:  "(1) the defendants are subject to service of process [in the alternative forum]; and (2) the forum permits 'litigation of the subject matter of the dispute.'"  *Cap. Currency Exch.,* 155 F.3d at 609.  "Canada can provide an adequate forum" where defendants are "amenable to service of process in Canada."  *Foundry, A Print Commc'ns Co. v. Trade Secret Web Printing, Inc.*, 2012 WL 3031149, at *9 (S.D.N.Y. July 25, 2012).  As Canadian entities, both CIBC and RBC are subject to service of process there.

   Moreover, Canada is a viable alternative forum for the resolution of securities fraud claims like those at issue here.  *See, e.g.*, *In re Royal*, 2005 WL 3105341, at *2  ("[T]he Second Circuit has concluded that Ontario, Canada is an adequate forum to try class actions based on violations of federal securities laws"); *DeYoung v. Beddome*, 707 F. Supp. 132, 137 (S.D.N.Y. 1989) (finding Canada to be "a sister common law jurisdiction with procedures akin to our own" and Canadian law to "provide[] causes of action that are the same in all significant respects as those available under United States law").

   *Third*, private and public interest factors uniformly counsel towards dismissal in favor of Canada as the more just and convenient forum.  Private interest factors include: (i) "the relative ease of access to sources of proof"; (ii) "availability of compulsory process for attendance of unwilling witnesses," as well as the "cost of obtaining attendance of willing witnesses"; and

(iii) "all other practical problems that make trial of a case easy, expeditious and inexpensive." *See Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003).

Each private interest factor weighs in favor of dismissal. Since FSD and Defendants all reside in Canada, and Defendants carried out their trading in Canada, all evidence relevant to the case, including trading records, would be most easily accessed from each party's offices in Canada. *See Cap. Currency*, 155 F.3d at 611 (dismissal appropriate where "most of the documentary evidence in the case was created[] and is stored" in foreign forum). Relevant witnesses, including FSD and Defendants' employees, similarly reside in Canada, and should not be burdened by trial in the United States. *See id*. This Court's inability to subpoena unwilling witnesses residing in Canada further supports dismissal because FSD brings fraud claims, for which "[l]ive testimony is especially important" and the "factfinder's evaluation of witnesses' credibility is central to the resolution of the issues." *In re Royal,* 2005 WL 3105341, at *2; *Scottish Air Int'l, Inc. v. British Caledonia Grp., PLC*, 81 F.3d 1224, 1233-35 (2d Cir. 1996) (granting dismissal on grounds of *forum non conveniens* where credibility of foreign key witnesses was "crucial").

The public interest factors also favor dismissal. These factors include: (i) administrative difficulties associated with court congestion; (ii) the unfairness of imposing jury duty on a community with no relation to the litigation; (iii) the local interest in having localized controversies decided at home; and (iv) avoiding difficult problems in conflict of laws and the application of foreign law. *Id.* at 1232. Canada has an outsized interest in deciding a Canadian controversy under Canadian law. "[A foreign country's] interest in regulating the conduct of banks within its borders, particularly where the bank is a leading financial services provider in the

country, is great" and the United States' interest "pales in comparison." *See LaSala*, 510 F. Supp. 2d at 229, 232; *see also Hausman v. Buckley*, 299 F.2d 696, 703 (2d Cir. 1962).

Finally, FSD's claims do not justify foisting the administrative burdens of such a foreign dispute on this heavily congested Court where there "is no indication that the Canadian courts 'are any more congested than the busy courts in this District.'" *Kitaru Innovations Inc. v. Chandaria*, 698 F. Supp. 2d 386, 396 (S.D.N.Y. 2010); *see CSS Int'l, Ltd. v. ECI Telesys., Ltd.*, 1998 WL 512951, at *10 (S.D.N.Y. Aug. 18, 1998) (given that "the Southern District of New York is a heavily congested district," there is "a legitimate interest in ensuring that disputes with little connection to the district be litigated elsewhere").

## II.    FSD fails to state a claim under the Exchange Act.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). This requires—under both the PSLRA and Rule 9(b)—that a plaintiff "state with particularity the circumstances constituting fraud." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008).

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101. Similarly, to plead a claim under Section 9(a)(2), a plaintiff must "identify transactions in a security . . . with the intent to deceive or defraud investors." *Cohen v. Stevanovich*,

722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010).  Moreover, "[s]ection 9(f) requires that the violation of Section 9(a) be willful and that the price of the security that is purchased or sold be affected by the violation."  *Xu v. Direxion Shares ETF Tr.*, 2023 WL 5509151, at *6 (S.D.N.Y. Aug. 25, 2023). The analysis of claims under Section 9(a) "'closely parallels' the analysis of claims under Section 10(b)."  *Stone Family Tr. v. Credit Suisse AG*, 2022 WL 954743, at *6 (S.D.N.Y. Mar. 30, 2022).

A.    **FSD fails to plead manipulative conduct by CIBC or RBC.**

FSD fails to establish any manipulative conduct by CIBC or RBC because it fails to "plead with particularity the nature, purpose, and effect of the fraudulent conduct" specifying "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI*, 493 F.3d at 102.

*First*, FSD fails to identify "which defendants" performed what allegedly manipulative acts. *Baxter v. A.R. Baron & Co.*, 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995). Instead, FSD pleads that "Defendants," as a group, engaged in manipulative conduct.  FSD does not, and cannot, identify which specific Defendant—as opposed its customers—initiated any of the purported manipulative trading, much less whether the order activity comprising each alleged "spoof" was initiated by a single customer or multiple customers.  (Compl. ¶¶ 91-167.)[5]  Such group pleading fails to put each Defendant on notice as to its alleged manipulative conduct.  *See Dulsky v. Worthy*, 2013 WL 4038604, at *4 (S.D.N.Y. July 30, 2013) (granting dismissal for failure "to separate these defendants with specific allegations of wrongdoing as to each one of them"); *Baxter*, 1995 WL 600720, at *7 ("Where multiple defendants are asked to respond to allegations

_____

[5] Notably, the Complaint does not allege that CIBC or RBC conspired with, aided and abetted, or is otherwise vicariously liable for the trading of each other or other Defendants.

of fraud, the complaint should inform *each* defendant of the nature of *his* alleged participation in the fraud") (emphases added).[6]

   *Second*, FSD makes a series of conclusory assertions regarding Defendants' trading behavior, including that the purported "Baiting Orders . . . had no legitimate financial purpose and were never intended to be executed," and were placed with intent to "create the illusion that FSD Pharma shares were declining in value." (Compl. ¶¶ 52, 53.) FSD does not, however, plead any facts to support those conclusory claims, which are insufficient to satisfy Rule 9(b). *DiMuro v. Clinique Lab'ys, LLC*, 572 F. App'x 27, 30 (2d Cir. 2014) (affirming dismissal of complaint "riddled with repeated conclusory labels," which are "not facts, and certainly not facts sufficient for Rule 9(b)"). Instead, FSD asks this court to "*infer*[]" from factors such as "the short time period between the continuous and repeated placement and cancellation of the Baiting Orders," that "Defendants' Baiting Orders were intended to function as part of a scheme to defraud the market in FSD Pharma securities." (Compl. ¶ 63 (emphasis added).) FSD is entitled no such inference, because merely alleging that orders were cancelled shortly after they were placed is insufficient to plead manipulative conduct. "[R]apidly placing and cancelling orders, by itself, [does] not amount to market manipulation." *Kessev Tov, LLC v. Doe(s)*, 2023 WL 4825110, at *4 (N.D. Ill. July 27, 2023) ("*Kessev Tov II*"); *see also CP Stone Fort Holdings, LLC v. Doe(s)*, 2016 WL 5934096, at *6 (N.D. Ill. Oct 11, 2016) (granting motion to dismiss for failure to allege a manipulative act where "plaintiff's theory boils down to an allegation that 'if a subset of orders

---

[6] FSD's vague allegations about supposed "imbalance[s]" and "shares traded" "in the U.S." on Nasdaq are even further afield. (*See, e.g.*, Compl. ¶¶ 92, 94, 129.) These allegations are based on market-wide data for *all* participants on the U.S. market (*id.* ¶ 65), which says nothing about CIBC's or RBC's trading.

was ultimately cancelled, those orders, in hindsight, must never have been intended to be executed'").

        *Third,* FSD points to aggregated data, statistics, calculations, and ratios (*see, e.g.*, Compl. ¶ 63), arguing that they reflect "the reoccurrence of the same trading patterns" from which manipulative behavior can be inferred.  Not so.  As FSD concedes, the order flow data on which the Complaint relies combines all orders placed under a broker-dealer's "unique identifier," and does not distinguish between orders placed by Defendants for their own book, and orders placed by or on behalf of customers.  (*Id.* ¶¶ 23, 51.)  Nor does that data match orders to the individuals who placed them.  Indeed, according to the Complaint, Defendants' customers may use the DMA and DEA systems to independently place trades on exchanges under Defendants' names.  (*Id.* ¶ 23 ("When Defendants' customers use the DMA or DEA system, they do not place orders on exchanges under their own names; rather, these orders appear to the world as coming from Defendants because they bear Defendants' broker-dealer MPIDs.").)  Accordingly, the same data FSD relies on as indicative of manipulative conduct by "CIBC," "RBC" or "John Doe" could just as well reflect wholly separate trades, each made by different customers of CIBC, RBC, or John Doe, without a single proprietary trade by any Defendant—much less a trading "pattern" by a single trader.  Allegations of spoofing based solely on comparisons of aggregate buy orders and aggregate sells orders—without matching those orders to the individuals who placed them—is exactly the type of "speculation" that courts have found insufficient to satisfy Rule 9(b).[7]  *See Segal v. Gordon*, 467 F.2d 602, 606 (2d Cir. 1972); *Gamma Traders*, 41 F.4th at 75 (observing that

---

[7] Defendants acknowledge that some courts have reached a different conclusion on different facts. *See, e.g., Harrington II*, 2023 WL 6316252, at *6.  Defendants respectfully submit that, on this issue, those decisions are inconsistent with *ATSI* and similar cases, which require more than speculative inferences to state a market manipulation claim.

"spoofing" involves "suspicious trading activity of *one trader* placing both buy- and sell-side orders in the same market") (emphasis added).

### B.    FSD fails to plead a strong inference of scienter.

The PSLRA requires FSD to "plead with particularity facts giving rise to a strong inference" that CIBC and RBC each "intended to deceive investors." *ATSI*, 493 F.3d at 102.  To qualify as "strong," the inference of scienter "must be more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference," including any "plausible, nonculpable explanations for the defendant's conduct." *Tellabs v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309-10 (2007).  To meet this heightened pleading requirement, FSD must allege, as to each defendant, "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  Recklessness in the securities fraud context refers to "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000).  FSD fails to plead facts to meet either showing.

#### 1.    FSD fails to plead motive or opportunity.

To establish "motive and opportunity," the plaintiff must plead facts showing that the defendant "benefitted in some concrete and personal way from the purported fraud." *Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*, 2024 WL 5089970, at *11 (S.D.N.Y. Dec. 12, 2024).  Here, FSD alleges in conclusory fashion that Defendants had a "strong motive" to spoof in order to "purchase hundreds of thousands of FSD Pharma shares at depressed prices." (Compl. ¶ 89.)  That allegation comes nowhere close to pleading motive.

*First*, FSD's vague allegations of a "motive" to purchase shares "at depressed prices" is exactly the kind of "generic profit motive" that courts routinely hold is "insufficient to

establish scienter." *Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 435 (S.D.N.Y. 2017). FSD provides no plausible explanation for why CIBC and RBC in their broker-dealer capacities would be motivated to drive down the price of FSD's stock when a broker-dealer does not take directional positions on individual stocks.

      *Second*, FSD fails to allege that either CIBC or RBC "benefitted in some concrete and personal way from the purported fraud," *Police & Fire*, 2024 WL 5089970, at *11, because FSD does not plead that either *Defendant* (as opposed to one or more of its customers) actually booked the alleged "purchase[s]" of FSD shares "at depressed prices." (Compl. ¶ 89.) FSD concedes that the order data on which it relies does not distinguish between orders placed by Defendants and orders placed by customers. (*Id.* ¶ 23.) And FSD does not explain how Defendants benefitted concretely and personally from a customer's independent trading strategies in FSD's stock.[8]

      *Third*, FSD does not plead how Defendants—as broker-dealers who buy and sell securities—obtained any net profit from the spoofing scheme alleged here, which supposedly placed "continuous downward pressure on FSD Pharma's share price." (Compl. ¶¶ 96, 127, 155, 161, 167.) A spoofer's profits "depend . . . on a reversion of prices to the market-level," *In re Merrill*, 2021 WL 827190, at *13, but FSD does not plead a reversion and corresponding sale at a net profit to any Defendant. On the contrary, FSD alleges that the "downward pressure" was "continuous." At most, FSD speculates that Defendants "*may* profit" "*to the extent* that the market price of FSD Pharma's shares rebounded." (Compl. ¶¶ 3, 35 (emphasis added).) But that would

---

[8] To the extent FSD is alleging that Defendants had a "motive" to generate "transaction fees" from these customer trades (Compl. ¶ 23), that allegation fails. "Courts have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter." *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009).

only be true if Defendants took a net long position in FSD's stock—something FSD does not allege, and which makes little sense for broker-dealers that buy and sell securities, but generally remain position neutral.  In the absence of factual allegations that Defendants bought and held FSD's stock at depressed prices and sold it after the price rebounded, FSD cannot plead that any Defendant profited from the alleged conduct.  *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 381 (E.D.N.Y. 2013) ("A plaintiff alleging motive and opportunity in connection with stock sales must allege . . . the defendants' net profits rather than their gross proceeds . . . .").  This stands in contrast to *Northwest Biotherapeutics, Inc. v. Canaccord Genuity LLC*, where the court credited the allegation that defendants spoofed for the "specific purpose of generating profits" by buying shares at "artificially depressed prices *and, once the market rebounded, selling it at a higher price*." 2023 WL 9102400, at *24 (S.D.N.Y. Dec. 29, 2023) (emphasis added), *report and recommendation adopted*, 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024).

   *Fourth*, even putting aside FSD's failure to plead net profits, FSD's own allegations show that any pricing benefit Defendants could have obtained from spoofing would have been *de minimis* at best—shaving off a few *pennies* per share.  The examples of supposed spoofs described in the Complaint reflect an average decrease (compared to the "prevailing best offer" before the alleged spoofing episode) of only $0.054 per share (and as low as $0.01 per share).[9]  Even if that average rate were applied to the total alleged purchase volume for each Defendant (Compl. ¶ 64), the total alleged benefit over the more-than-four year Relevant Period would be only

---

[9] FSD alleges that CIBC and RBC purchased a combined total of 18,895 shares "[a]s a result" of the alleged "illustrative example[]" spoofs.  (Compl. ¶¶ 91-147.)  And FSD alleges that the combined total decrease from the illustrative examples was $1,027 (which is the difference between the alleged "prevailing" price and purchase price for each trade, multiplied by the quantity of shares purchased, summed across all trades).  This results in an average alleged decrease of $0.054 per share ($1,027 / 18,895 shares).

approximately $600 for RBC (about $138 per year), and approximately $13,000 for CIBC (about $3,000 per year).

| Defendant | Total Alleged Purchase Volume | Total Alleged Benefit (using $0.054 per share average) |
|---|---|---|
| CIBC | 240,710 shares | $13,080.76 |
| RBC | 11,465 shares | $623.04 |

It "defies economic reason" that any trader employed by Defendants was motivated to engage in a multiyear fraud—and risk criminal prosecution—for such trivial amounts. *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001); *see also Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, 2022 WL 837114, at *20 (S.D.N.Y. Mar. 21, 2022) ("[P]rofits [that] totaled just under four and a half million dollars," albeit a "'handsome' sum," were "in context . . . not a sum sufficient to give rise to an inference of scienter").

### 2. FSD fails to plead conscious misbehavior or recklessness.

Because FSD fails to plead "motive and opportunity," the "strength of the circumstantial allegations" of conscious misbehavior or recklessness "must be correspondingly greater." *Kalnit*, 264 F.3d at 142. This is particularly true in a spoofing market manipulation case.

The Second Circuit has made clear that recklessness in the securities fraud context refers to "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak* , 216 F.3d at 308, 312 (recklessness requires "conduct [that] is 'highly unreasonable,' and which represents 'an extreme departure from the standards of ordinary care'"). FSD must "specifically allege[] defendants' knowledge of facts" and show that "defendants knew or . . . should have known" of the alleged spoofing by Defendants' traders or their customers. *Id.* at 308. FSD's vague allegations do not even approach this high pleading standard.

*First*, FSD puts forward a series of cherry-picked statistics and other ratios of trading and order activity in an attempt to bolster its speculation that orders were placed with fraudulent intent.  (*See* Compl. ¶¶ 73-78, 83-85.)  But these aggregate statistics are meaningless because they are based on the combined order and trading activity of numerous independent actors, and do not distinguish Defendants from their customers, or individual Defendants (or their traders) from each other.  *See supra* at 20-21.  FSD's own allegations make clear that both CIBC and RBC maintain DMA and DEA systems that allow customers to directly "enter orders and/or trades," which "appear to the world as coming from Defendants because they bear Defendants' broker-dealer MPIDs."  (Compl.  ¶¶ 22-23.)  Defendants' customers may choose to buy or sell a security for any number of reasons, based on their own unique strategies and portfolios.  And FSD does not even attempt to allege that any individual traders employed by CIBC or RBC—let alone their customers—worked in concert to further any coordinated spoofing strategy.  By lumping all of these orders together, and relying on "average[s]" and "median[s]" (*id.* ¶¶ 73-77), FSD's statistics obscure the actions and intentions of dozens if not hundreds of independent decision makers.  Such blatant group pleading is plainly insufficient to plead a strong inference of scienter.  *Cohen*, 722 F. Supp. 2d at 428 ("[G]eneralized allegations of scienter against groups of defendants will not state a claim for securities fraud"); *see also In re Mex. Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 390 (S.D.N.Y. 2019) (statistical analyses relying on "averages and medians among market makers . . . obscure any given Defendant's contribution" and amount to nothing more than "group pleading in another form").

FSD's attempts to compare the volume of Defendants' trading activity to other market participants (Compl. ¶¶ 73-74) fare no better.  For starters, these comparisons rely on the same meaningless aggregated averages discussed above, and should be rejected for the same

reasons.  But even accepting FSD's calculations at face value, they do not plead fraudulent intent.  FSD concedes that "Defendants are among the largest market participants" (*id.* ¶ 174), so it should come as no surprise that "large" players in the market sometimes placed larger sell-side orders and purchased larger buy-side orders compared to other (smaller) traders in the market.  Similarly, allegations regarding the speed at which certain sell-side orders were cancelled (*id.* ¶¶ 83-84) add nothing because the Complaint does not provide a baseline for comparison or plead any other facts establishing that such cancellations are unusual.[10]  FSD cannot transform routine broker-dealer activities, including executing orders and cancellations at the direction of customers, merely by attaching labels to them.

For similar reasons, FSD's allegation that Defendants were "heavily engaged in algorithmic trading" (Compl. ¶ 79) is insufficient.  Allegations of ordinary course activities by a broker-dealer, including the use of algorithms, do not plead scienter.  *See ATSI*, 493 F.3d at 104 (finding no scienter where the plaintiff alleged merely standard trading activity); *Kessev Tov, LLC v. Doe(s)*, 2022 WL 2356626, at *9 (N.D. Ill. June 30, 2022) ("*Kessev Tov I*") ("placing rapid orders and cancelling them does not necessarily evince illegal market activity" and "[o]ther courts have recognized the ubiquity of rapid trading across securities platforms").

*Second*, FSD vaguely alleges, based on nothing more than "information and belief," that the "trading activities" of Defendants' traders and customers "were approved by" unidentified

---

[10] FSD's failure to plead how Defendant's cancellations compare to any market baseline is particularly noteworthy given FSD's acknowledgement that "75% of all trades" in the market "are conducted algorithmically" (Compl. ¶ 79), and publicly available data show that the vast majority of all orders placed on equities exchanges are cancelled (typically within seconds).  *The Speed of the Equity Markets*, SEC. EXCH. COMM'N (Oct. 9, 2013) ("at most, only a few percent of all orders and quotes . . . result in trade executions"); *id.* (more than 42% of order cancellations occur within one second of placement, and more than 56% of cancellations occur within five seconds of placement), https://www.sec.gov/about/speed-equity-markets.

"corporate officials" of the Defendants who "knew or recklessly ignored" alleged spoofing. (Compl. ¶ 80.)  This conclusory allegation comes nowhere close to adequately pleading scienter. FSD does not identify any "red flag" that any "corporate official" ignored; does not identify any specific traders or customers that engaged in the alleged spoofing scheme; and does not give any indication that any regulator or government agency (in the United States or Canada) has ever suggested that FSD's stock price was manipulated.  FSD cannot bridge these gaps by referencing "gatekeeper" obligations that require broker-dealers to implement "policies, procedures, and systems" that are "reasonably designed" to detect and prohibit manipulative trading.  (Compl. ¶¶ 25-32, 81-82.)[11]  Such generic facts can be said of *any* broker-dealer, and thus cannot possibly support a strong inference of scienter.

FSD does not allege that any Defendant failed to implement or maintain reasonably designed trade surveillance and compliance system.  Instead, FSD alleges that Defendants were "required" to have such "systems" in place.  (Compl. ¶ 82.)  But the mere "existence of risk management structures is insufficient to create a strong inference of scienter."  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 366 (S.D.N.Y. 2011).  Nor does FSD plead facts to show that the alleged spoofing was so frequent or severe that it must have been caught by any reasonably designed surveillance system.  That is particularly true for RBC, for whom the Complaint alleges a total of only *38* spoofing episodes (by RBC's customers and/or its own traders) over a period of

---

[11] To the extent FSD seeks to hold Defendants liable under some "gatekeeping" theory of scienter (*see, e.g.*, Compl. ¶¶ 25-32), that theory fails.  None of the U.S. rules and regulations that Plaintiff cites provide private causes of actions.  *Harris v. TD Ameritrade Inc.*, 2020 WL 3073235, at *2 (S.D.N.Y. June 10, 2020) ("SEC Rule 15c3-3 . . . does not create a private cause of action"); *Allen v. Fidelity Brokerage Servs. LLC*, 711 F. Supp. 3d 219, 224 n.5 (S.D.N.Y. 2024) ("no private cause of action for violations of FINRA Regulations"); *Weinraub v. Glen Rauch Sec., Inc.*, 399 F. Supp. 2d 454, 462 (S.D.N.Y. 2005) (no cause of action based on violations of NYSE and NASD rules and guidelines).  And the Canadian regulations that Plaintiff cites only demonstrate Canada's superior interest over this dispute.

more than four and a half years.  (Compl. ¶ 64.)  Rather than base its claims on any factual allegations of compliance failures, it appears that FSD named CIBC and RBC as Defendants solely because they are two of "the largest market participants" (*Id.* ¶ 174) and thus frequently posted bids/offers in FSD's stock.

Last, FSD asserts that CIBC and RBC separately engaged in other "potentially problematic trading practices" unrelated to spoofing, including making "naked" or "aggressive" short sales of FSD's stock.  (Compl. ¶¶ 86-87.)  These allegations, which have nothing to do with spoofing, are barely even described, let alone pled with specificity.

### C.     FSD fails to plead loss causation.

To satisfy the loss causation requirement, FSD must plead "facts supporting [a] legally cognizable loss" and a "causal connection between the alleged manipulation . . . and the loss."  *Cohen*, 722 F. Supp. 2d at 430 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).  Under the Second Circuit's controlling decision in *Gamma Traders*, to plead loss causation in a spoofing case, a plaintiff must allege (i) *temporal proximity*, meaning that plaintiff "traded 'so close in time to Defendants' spoofing' as to permit the court to 'infer as a matter of common sense that the market prices were artificial' when plaintiff traded"; or (ii) *long-term price impact*, meaning "a factual basis indicating that the effects of the spoof lasted for a protracted period so as to 'justify an inference that the market price was still artificial' when plaintiff traded." *Nw. Biotherapeutics*, 2023 WL 9102400, at *29 (quoting *Gamma Traders*, 41 F.4th at 80-81).  FSD fails to plead either theory.

### 1.     FSD fails to plead temporal proximity.

To plead loss causation based on temporal proximity, FSD must allege that it sold shares "so close in time to Defendants' spoofing" to permit the commonsense inference that prices were still depressed at the time of the sale.  *Gamma Traders*, 41 F.4th at 80.  The Second Circuit

has made clear that this is a stringent requirement: "[e]ven pleading same-day, post-spoof trades" is not enough absent "factual allegations to support the inference" that FSD's trade was impacted by the spoof. *Id.*; *see also Phunware, Inc. v. UBS Sec. LLC*, 2024 WL 1465244, at *7 (S.D.N.Y. Apr. 4, 2024) (allegation that plaintiff traded "two hours" after spoof was "insufficient to establish harm"). FSD fails to plead loss causation on this basis.

Remarkably, although FSD devoted nearly 20 pages (78 paragraphs) of the Complaint to describing "illustrative examples" of Defendants' supposed spoofing conduct, FSD does not claim that it sold or issued stock within seconds—or even hours, days, or weeks—of *any* of those purported "examples." (*See* Compl. ¶¶ 90-167.) That alone is fatal to FSD's claims. *See Gamma Traders*, 41 F.4th at 80.

Unable to connect a single sale to any of the "illustrative examples," FSD instead added a vague and opaque table to the Complaint, without further elaboration, that purports to list the sales and stock issuances that FSD made "within five minutes" of a date and time window that FSD labels a "Spoofing Episode." (Compl. ¶ 192.) The table reflects two dates on which FSD claims it sold or issued stock shortly after an alleged CIBC "Spoofing Episode" (February 27, 2021 and March 2, 2021), and one date on which FSD claims it sold or issued stock shortly after an alleged RBC "Spoofing Episode" (July 24, 2020). This table does not plead loss causation for at least two reasons.

*First*, although the table in paragraph 192 describes FSD's sales, it provides next to no information about any of the purported spoofs, which are not described anywhere else in the Complaint. It says nothing about:

- how many orders (and for how many shares) the Defendant placed on the sell side and buy side during each alleged spoofing episode;
- how long the Defendant left those orders in the market;

- how many orders the Defendant cancelled on the sell side and buy side, and when those cancellations occurred;

- how many orders were filled on the sell side and buy side and when those fills occurred;

- what each Defendant's order imbalance was during the alleged spoof; or

- what the prevailing best bid and offer price were before and after each alleged spoof.

Without pleading these basic facts, there is no reasonable basis for the Court to infer that Defendants engaged in spoofing on these dates, which makes the allegation that FSD sold shares "within five minutes" afterward irrelevant. *See Kessev Tov I*, 2022 WL 2356626, at *10 (dismissing complaint alleging spoofing because it was "simply too light on facts" and did not "allege[] any facts to establish what the 'prevailing market price' would have been").[12]

    *Second*, the paucity of information in paragraph 192 undermines any claim that FSD suffered losses because of alleged spoofs by CIBC or RBC. For the two alleged CIBC spoofing episodes, FSD does not claim that the ask price declined at all: instead, the "Ask Decline to Episode" is alleged to be 0.00 basis points. FSD does not explain how it could have suffered a loss from its sales if the ask price was not impacted. As to RBC, the table shows that the price at which FSD sold its shares actually stayed the same or went *up* after nearly all of the alleged Spoofing Episodes on that date.[13] That undermines a basic assumption of FSD's loss causation

---

[12] The minimal information that is alleged in paragraph 192 is too vague to allow a reasonable inference that Defendants placed or cancelled orders on the given dates at all, let alone that Defendants engaged in spoofing activity. For example, the column labeled "Time of Spoofing Episode" does not appear to reflect any information about the time at which Defendants placed or cancelled the alleged Baiting Orders. Instead, it is a carbon copy of the timestamps (down to the exact second) listed in the "Sale Time" column, and thus appears to reflect FSD's own activity.

[13] Plaintiff alleges that the average price at which it sold its shares went from $3.775 to $3.75 after the first two alleged spoofing episodes (at 10:41:39 and 10:42:03); the price stayed at $3.75 after the next two alleged spoofing episodes (at 10:42:54 and 10:44:55); and the price went back up to $3.76 after the final alleged spoofing episode (at 10:45:05).

theory—that "[p]rices generally remained at suppressed levels . . . for at least five minutes" after each spoof. (Compl. ¶ 188.) FSD does not offer any explanation for how it suffered any cognizable loss when the price of its shares remained the same or went up (not down).

### 2. FSD fails to plead long-term impact.

Unable to plead temporal proximity, FSD speculates that spoofing also had a "long-term cumulative effect" because "the market neither immediately nor fully rebounded from the manipulated prices once each of the spoofing events were completed." (Compl. ¶¶ 171, 186, 194-96.) On that basis, FSD asserts that it suffered losses "regardless of whether that spoofing occurred in close proximity to [its] sales." (*Id.* ¶ 195.) But FSD's long-term impact allegations are conclusory, unsupported by the "economic literature" that FSD cites, and contradicted by the Complaint's other allegations. FSD's allegations should be rejected.

*First*, courts in this District have rejected allegations nearly identical to those FSD asserts here. For example, the plaintiff in *Northwest Biotherapeutics* alleged that "the market neither immediately nor fully rebounded" from alleged spoofs and thus "the prices at which FSD sold its stock throughout the Relevant Period were negatively affected." 2023 WL 9102400, at *31. Magistrate Judge Stein's decision (adopted in full by Judge Woods) held that these "conclusory" allegations "do not plead 'facts' sufficient to justify an inference that the impact of Defendants' spoofing extended" to plaintiff's sales that were "not in close proximity to the spoofing." *Id.*

Likewise, in *Phunware*, Judge Ho held that similar allegations—including that there was a long-term impact because "the market neither immediately nor fully rebounded" and the spoof orders "had the cumulative effect of driving [plaintiff's] share price down"—were "conclusory" and thus "insufficient on a motion to dismiss." 2024 WL 1465244, at *7; *see also In re London Silver Fixing Ltd. Antitrust Litig.*, 2023 WL 3582198, at *11 (S.D.N.Y. May 22, 2023)

(complaint's "vague[]" allegation that "prices never *fully* recovered" not enough for "the Court plausibly to infer . . . the endurance of artificial prices caused by manipulation").

Those rulings make sense.  "[S]poofing is a form of manipulation that occurs in short periods of time," *M&N Trading, LLC v. BofA Sec., Inc.*, 2024 WL 4651857, at *4 (N.D. Ill. Nov. 1, 2024), which means the "period of artificiality may be brief," lasting "only a matter of seconds."  *In re Merrill*, 2021 WL 827190, at *13; *see also United States v. Coscia*, 866 F.3d 782, 787 (7th Cir. 2017) ("[T]he large [spoof] orders will be on the market for incredibly short periods of time (fractions of a second)").  Indeed, the short-term impact of spoofing is one of the core assumptions underlying the strategy—the "profitability" of spoofing depends on the swift "reversion of prices to the market-level" after the baiting orders are cancelled.  *In re Merrill*, 2021 WL 827190, at *13.  FSD's conclusory allegation that the spoofing in this case somehow caused a "period of artificiality" lasting for *years*, rather than seconds or minutes, flies in the face of these core assumptions, and reflects a fundamental misunderstanding of how spoofing works.

*Second*, none of the "economic literature" on which the Complaint relies supports FSD's speculation about the long-term impact of spoofing.  According to FSD, an expert report filed in an unrelated price-fixing case, and the "literature" discussed therein, establish that "the price impact of all forms of trade-based manipulation, including spoofing, is not likely to fully reverse."  (Compl. ¶¶ 172, 176 (citing Expert Report of Professor Paul Milgrom, *Ala. Elec. Pension Fund v. Bank of Am.*, No. 14-cv-7126 (S.D.N.Y. Jan. 26, 2018), ECF No. 557-7 (the "Milgrom Report")).)  But those sources say no such thing.

The Milgrom Report never mentions spoofing at all.  *See Nw. Biotherapeutics*, 2023 WL 9102400, at *32 ("[N]othing in the FAC suggests that the Milgrom report concerned spoofing").  Rather, the report was filed in an antitrust case involving an alleged scheme by banks

to "manipulate the U.S. Dollar ISDAfix, a benchmark interest rate." *Id.*  Unlike spoofing, "the profitability of [benchmark interest rate manipulation] d[oes] not depend on subsequent trading or a subsequent movement of the manipulated price in the opposite direction." *Id.*  Thus, Professor Milgrom's opinion that "*some* forms of market manipulation, such as ISDAfix manipulation, may have a 'permanent impact' does not justify a reasonable inference that *spoofing* has such an impact." *Id.*; *see also Phunware*, 2024 WL 1465244, at *7 ("[T]he relevance of Prof. Milgrom's report is minimal in the context of spoofing").

The other academic articles cited by FSD fare no better.  Indeed, only one of the articles mentions spoofing at all, in a paragraph, which FSD does not cite, that discusses the results of another study.[14]

*Third*, FSD's conclusory assertions of "long-term" impact are contradicted by the Complaint's other factual allegations.  FSD asserts that spoofing caused a long-term impact here because Defendants spoofed "continuously through the day . . . without interruption over a protracted period of time."  (Compl. ¶ 194.)  FSD attempts to support this assertion with a two-column table listing dates on which FSD claims spoofing occurred.  (*Id.* ¶ 187.)  But with the exception of the handful of "illustrative examples" described elsewhere in the Complaint, FSD never specifies which of those supposed spoofs (if any) are attributable to CIBC or RBC.  Nor does it provide any other information about how the trading patterns on those dates gave rise to any inference of spoofing.  But even if FSD could attribute all of the purported spoofs listed in

---

[14] *See* Nikolaus Hautsch & Ruihong Huang, *The Market Impact of a Limit Order*, 36 J. Econ. Dynamics & Control 501, 514 (2012) ("Hautsch & Huang") (Ex. 15).  In the context of discussing the results of a different article, Hautsch & Huang make the uncontroversial statement that manipulation from spoofing is "possible." Ex. 15 at 514.  But they explicitly do not express any opinion on "whether [spoofing] is economically profitable" in practice because, as they explain, successful spoofing requires the trader to "submit rather big limit orders close to the market," which increases the "risk that these orders may be picked up." *Id.*

paragraph 187 to CIBC and RBC (it cannot), the Complaint concedes that the alleged spoofing occurred on only 14% of the trading days during the Relevant Period. (Compl. ¶ 187.) That is a far cry from "continuous[]" spoofing "without interruption." (¶ 194.) By comparison, *Harrington I* found long-term impact adequately pleaded where the alleged spoofing occurred on 94% of the trading days. 585 F. Supp. 3d at 419 ("193 of 205 trading days"). FSD's allegations come nowhere close. *See Nw. Biotherapeutics*, 2023 WL 9102400, at *33 & n.34 (rejecting long-term impact theory where alleged spoofing occurred on 34% of trading days).

   *Fourth*, FSD claims that "sharp price decreases in FSD Pharma" during the Relevant Period are "[c]onsistent" with its theory that the alleged spoofing events had "lasting impacts." (Compl. ¶¶ 188-89.) But FSD completely fails to account for—or even address—how its own contemporaneous admissions and disclosures regarding its failing business impacted its stock price. "[A] plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by" the defendant's conduct "as opposed to intervening events." *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). If Plaintiff's claims are allowed to proceed, it will open the door for every failing company with a plummeting stock price—and therefore more sellers than buyers in the market—to cherry pick data and bring baseless claims against large broker-dealers.

   Most notably, notwithstanding that FSD warned its shareholders in SEC filings that they "will suffer dilution" as a result of "any additional sale or issuance" of FSD stock, Ex. 5 at S-34 (FSD, Prospectus Supplement (Feb. 11, 2021)), the Complaint never addresses the negative impact that FSD inflicted on its own stock price by dumping "*90 million shares*" onto the market (Compl. ¶ 191 (emphasis added)). Nor does the Complaint address FSD's failure to ever turn a profit, except for making the absurd contention that losing tens of millions of dollars each year

"was generally positive" for the company because the *rate* at which those losses accumulated went down "almost every" year.  (*Id.* ¶ 42.)

Indeed, nearly all of the "sharp price decreases in FSD Pharma" stock described in the Complaint (*id.* ¶ 189), coincided with FSD announcing large sales or issuances of new shares and/or predated the alleged spoofing.  For example, FSD highlights that, over the 18-day period beginning on February 9, 2021, its share price dropped 29%, which FSD suggests "correlate[s] with Defendants' spoofing activities."  (*Id.*)  But neither CIBC nor RBC are alleged to have engaged in any spoofing activity during that period.  (*Id.* ¶¶ 162-167 (alleging spoofs solely by John Doe 1).)  Moreover, FSD ignores that about half of the alleged misconduct during this period (43 out of 91 alleged spoofing episodes) occurred on February 9 and 10 (*id.* ¶ 187), during which time the price of FSD's stock moved *up*.  Ex. 7 at 7.  FSD's price then began to drop (and fell more than 20%) on February 11 (*id.*)—that is, on the same day that FSD announced that it planned to sell "US$20,000,000" worth of stock in at-the-market distributions.  Ex. 5 at i & S-34.  FSD also disclosed on February 11 that this $20 million issuance created a "*risk of dilution* resulting in *downward pressure on the price*" of FSD shares and "could contribute to *progressive declines in the prices*" of such shares.  *Id.* (emphasis added).

As a further example, FSD cites the 70% drop in FSD's share price over the 10-day period beginning June 3, 2020 as support for its loss causation theory.  (Compl. ¶ 189.)  FSD alleges that CIBC began spoofing on June 3 at 15:03:58.997, at which time the best offer was $8.09 USD, and then "continued [spoofing] throughout the course of the trading day."  (*Id.* ¶¶ 91, 96.)  But the opening price (and daily high) on June 3 was $14.00 USD, Ex. 7 at 3,[15] meaning that the

---

[15] Paragraph 189 of the Complaint states that the price dropped from "$910," which appears to refer to the opening price (in USD) on June 3, 2020, when adjusted for the subsequent 1-for-65 reverse stock split (*i.e.*, $910.00 divided by 65 equals $14.00, which was the opening price on June

price had already dropped 40% (more than half of the total alleged 70% decline) by the time that CIBC allegedly began spoofing. Moreover, FSD announced the very next day (on June 4) that it had agreed to sell 1.5 million shares at a *30% discount* to the prior day's closing price,[16] along with warrants to purchase another 1.5 million shares. Ex. 14 (FSD, Form 6-K, Ex. 99.1 (June 4, 2020)). In light of FSD's announcement that it was selling significant shares substantially below market prices, FSD cannot plausibly suggest that prices declines were caused by spoofing.

FSD's invocation of a 10% price drop over the 22-day period beginning on March 16, 2021 fails for similar reasons. FSD alleges that RBC began placing Baiting Orders on March 17 at 15:33:59.001, when the best offer price was $2.97 CAD. (Compl. ¶¶ 133, 137.) The opening price on March 17 was $3.31 CAD, meaning the price already had dropped more than 10% that day by the time that FSD alleges the spoofing episode began. That substantial stock price drop coincided with FSD's March 16, 2021 release of its annual report for the year 2020, which included the disclosure that it had suffered a nearly $32 million net loss in 2020. Ex. 4 at 7 (FSD, Form 40-F, Ex. 99.3 (March 17, 2021)).[17] FSD's total failure to account for these intervening events renders their loss causation allegations entirely non-credible.

---

3). *See* Ex. 12 (Form 6-K, FSD (Aug. 16, 2024) (announcing reverse stock split)); Ex. 7 at 3 (unadjusted prices in USD); Ex. 13 at 3 (adjusted prices in USD). For consistency with the rest of the Complaint (*see, e.g.*, Compl. ¶¶ 91-96), this memorandum uses unadjusted prices.

[16] The closing price on June 3, 2020 was $9.65 CAD. Ex. 6 at 3. On June 4, 2020, Plaintiff announced that it had agreed to sell 1.5 million shares for $6.75 CAD per share. Ex. 14 (FSD, Form 6-K, Ex. 99.1 (June 4, 2020).) The stock price closed at $7.00 CAD on June 4. Ex. 6 at 3.

[17] FSD's allegation that the stock price dropped nearly 20% during the 10-day period beginning April 10, 2023 (Compl. ¶ 189) is irrelevant because FSD does not allege that CIBC or RBC engaged in spoofing during that time period.

### III.  FSD's Exchange Act claims are time-barred.

Because FSD's Exchange Act claims are based on purported market manipulation that it has been investigating, analyzing, and identifying for years, they must be dismissed as time-barred.

The statute of limitations for FSD's Exchange Act claims is two years after the "discovery of the facts constituting the violation."  *See* 28 U.S.C. § 1658(b)(1).  "[D]iscovery" refers to either a plaintiff's "actual discovery of certain facts," or to "the facts that a reasonably diligent plaintiff would have discovered."  *Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010). Here, FSD's own pronouncements, as well as the public information upon which FSD bases its claims, reveals it had discovered, or as a reasonably diligent plaintiff should have discovered, the supposed market manipulation of FSD stock by mid-2022 at the latest.[18]

*First*, in an SEC filing detailing its "Market Manipulation Investigation," FSD publicly admitted that it "*first suspected share price manipulation in 2021* when it discovered imbalances between reported shares held by brokers and authorized shares on deposit in both Canadian and U.S. exchanges."  *See* Ex. 11 at 10 (FSD, Form 6-K, Ex. 99.2 (Nov. 12, 2024)) (emphasis added).[19]  Also in 2021, FSD's current counsel filed spoofing claims against CIBC on behalf of another client.  *See Harrington*, No. 21-cv-761 (S.D.N.Y.) (case filed on January 28, 2021).  In that case, the spoofing allegations were based on "trading data collected and analyzed from U.S. and Canadian exchanges," which plaintiff hired a third-party to analyze from July 2019 through May 2020, allowing plaintiff in its own words to have "sufficient information to file this

---

[18] Although FSD alleges some spoofing episodes occurred after February 2022, FSD does not identify any sales it made of its own stock (which is necessary for loss causation) after March 2021.  (Compl. ¶ 192; *see also supra* Part II.C.1.)

[19] The Court may take notice of these publicly filed documents and statements.  *See supra* note 2.

complaint against the Defendants."  Am. Compl. ¶¶ 48, 52, 66, *Harrington*, No. 21-cv-761 (S.D.N.Y. May 6, 2021).

Second, on February 16, 2022, FSD's CFO sent a letter to CIBC stating that it was contacting CIBC "for a third time" regarding a shareholder position "imbalance," identified by a "third-party service provider engaged by my company."  *See* Ex. 16.  This letter noted the "original correspondence" to CIBC regarding this issue was "dated 11/24/2021."  *Id*.; *see also* Ex. 20.  In connection with the same issue, FSD sent two follow-up letters to CIBC on April 27, 2022, and November 21, 2022, identifying additional stock holding imbalances.  *See* Exs. 17-18.  Both letters copied FSD's current counsel, Wes Christian.

Third, in a March 14, 2023 SEC filing, FSD admitted it had been working with "consultants and contractors" to "analyz[e] data on a daily basis *for over a year now*, including that of broker-dealers, clearing firms, and shareholder position management."  Ex. 1 (FSD, Form 6-K, Ex. 99.1 (Mar. 14, 2023)) (emphasis added).  FSD added that, "[i]n light of the data analyzed, the Company's management, *for at least the past 12 months*, has sent multiple correspondences . . . to broker-dealers highlighting an imbalance in trade activity."  *Id.* (emphasis added).  The very next day, FSD advised CIBC that it had "been sending letters to [CIBC's] compliance department *for over 12 months now* asking for explanation in the discrepancy of the numbers reported."  Ex. 19 (emphasis added).  FSD stated that it thought "CIBC [was] being used by nefarious short sellers to short FSD stock naked, or by other means which may not constitute the proper definition of short selling."  *Id.*

When viewed collectively, these facts show that FSD:  (i) was aware of potential market manipulation of its stock in 2021; (ii) engaged the same counsel that filed a spoofing case against CIBC in 2021 using accessible Canadian market trading and order data, analyzed over a

10-month period; and (iii) had consultants and contractors that understood market manipulation and had, since at least early 2022, analyzed the relevant data on a daily basis. FSD nonetheless waited years, until October 2024, to file this Complaint.

Even affording Plaintiff every reasonable inference, it is evident that FSD's Complaint is time-barred. FSD was on inquiry notice of its claim in 2021, had access during the ensuing time to the same publicly available market data that now underpins its Complaint, and analyzed that data on a daily basis with consultants and contractors as far back as early 2022. Under no plausible scenario could FSD not have had sufficient information as early as 2021—and certainly with reasonable diligence by mid-2022—to adequately plead its spoofing claims against CIBC and RBC. *See City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc*., 637 F.3d 169, 175 (2d Cir. 2011) (holding a fact is "deemed 'discovered' [when] a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint"). This includes enough information for FSD to plead Defendants' intent. *Merck*, 559 U.S. at 649. Because FSD failed to assert its claims within two years of the date it discovered the violation or within two years of when a reasonably diligent investor would have discovered the facts constituting the alleged violation, its claims are barred by the applicable statute of limitations. 28 U.S.C. § 1658(b)(1).

**IV. FSD fails to plead common law fraud.**

"The elements of common-law fraud are 'essentially the same' as those for a violation of Section 10(b) of the Exchange Act." *Cohen*, 722 F. Supp. 2d at 436. FSD's common law fraud claim (Compl. ¶¶ 214-16)—which "essentially track[s]" its Exchange Act claims— should be dismissed for the reasons discussed above. *Cartwright v. D'Alleva*, 2018 WL 9343524, at *6 (S.D.N.Y. Aug. 27, 2018), *aff'd*, 782 F. App'x 77 (2d Cir. 2019); *see also Harrington I*, 585 F. Supp. 3d at 424.

-40-

In addition, FSD's common law fraud claim fails for the separate and independent reason that FSD does not allege that Defendants made any material misstatements or omissions. FSD alleges that Defendants placed orders that "sen[t] false and misleading pricing signals to the market" (Compl. ¶¶ 16, 215), but such trading activity does not constitute a misrepresentation or omission under New York law. *See Harrington I*, 585 F. Supp. 3d at 424.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  January 31, 2025          Respectfully submitted,
        New York, New York


/s/ Kevin P. Broughel                      /s/ Alexander J. Willscher
Kevin P. Broughel                          Alexander J. Willscher
Brian L. Muldrew                           Matthew J. Porpora
Zoe Lo                                     Jonathan S. Carter
KATTEN MUCHIN ROSENMAN LLP                 SULLIVAN & CROMWELL LLP
50 Rockefeller Plaza                       125 Broad Street
New York, New York  10020                  New York, New York  10004
Telephone:  (212) 940-8800                 Telephone:  (212) 558-4000
Facsimile:  (212) 940-8776                 Facsimile:  (212) 558-3588
kevin.broughel@katten.com                  willschera@sullcrom.com
brian.muldrew@katten.com                   porporam@sullcrom.com
zoe.lo@katten.com                          carterjo@sullcrom.com


Charles A. DeVore (admitted *pro hac vice*)  David N. Whalen (admitted *pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP                 SULLIVAN & CROMWELL LLP
525 W. Monroe Street                       1700 New York Avenue, N.W., Suite 700
Chicago, Illinois  60661                   Washington, D.C. 20006
Telephone:  (312) 902-5200                 Telephone:  (202) 956-7500
Facsimile:  (312) 902-1061                 Facsimile:  (202) 293-6330
charles.devore@katten.com                  whalend@sullcrom.com


*Counsel for CIBC World Markets Inc.*       *Counsel for RBC Dominion Securities Inc.*

**CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(C)**

Pursuant to Local Civil Rule 7.1(c), I hereby certify that this Memorandum contains 13,449 words, which complies with the word-count limitation that the Court granted on January 27, 2025.


 /s/ Kevin P. Broughel
Kevin P. Broughel

*Counsel for CIBC World Markets Inc.*