**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                                    :
QUANTUM BIOPHARMA LTD.,                                             :
                                                                    :
                              Plaintiff,                            :
                                                                    :
              v.                                                    :
                                                                    :
CIBC WORLD MARKETS, INC.; RBC                                       :    Case No.:  1:24-CV-07972 (ER)
DOMINION SECURITIES INC., and JOHN                                  :
DOES 1 THROUGH 10,                                                  :    Hon. Edgardo Ramos
                                                                    :
                              Defendants.                           :    ORAL ARGUMENT REQUESTED
                                                                    :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
                                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
TO DISMISS THE AMENDED COMPLAINT**

June 16, 2025

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT....................................................................................... 1

BACKGROUND .......................................................................................................... 5

    A.    The parties.................................................................................................... 5

    B.    The alleged "spoofing" scheme. .................................................................. 7

    C.    The poor management and performance of Quantum. .................................. 8

    D.    Quantum knew about purported manipulation years before filing its
        Complaint.................................................................................................... 9

ARGUMENT ............................................................................................................... 9

I.     Quantum's claims should be dismissed because the litigation is predominantly
     foreign. ........................................................................................................... 9

    A.    Quantum fails to plead personal jurisdiction over any Defendant........................ 10

        1.    Quantum fails to plead direct contacts..................................................... 11

        2.    Quantum fails to plead "causal effects."................................................... 13

    B.    Quantum's claims are impermissibly extraterritorial under *Morrison*. ............... 15

    C.    Quantum's claims should be dismissed under *forum non conveniens*................. 17

II.    Quantum fails to state a claim under the Exchange Act. .................................... 20

    A.    Quantum fails to plead manipulative conduct by CIBC or RBC.......................... 21

    B.    Quantum still fails to plead a strong inference of scienter.................................. 24

        1.    Quantum fails to plead motive or opportunity. ......................................... 25

        2.    Quantum fails to plead conscious misbehavior or recklessness. .............. 28

    C.    Quantum fails to plead loss causation............................................................. 32

        1.    Quantum fails to plead temporal proximity. ............................................. 32

        2.    Quantum fails to plead long-term impact. ................................................ 35

III.   Quantum's Exchange Act claims are time-barred............................................... 40

IV.   Quantum fails to plead common law fraud......................................................... 43

CONCLUSION............................................................................................................ 43

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
    2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ........................................................13

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ...................................................................................15

*Allen v. Fidelity Brokerage Servs. LLC*,
    711 F. Supp. 3d 219 (S.D.N.Y. 2024) ..................................................................31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................20

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ........................................................................ *passim*

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017) ..................................................................10

*BankUnited, N.A. v. Merritt Envt'l. Consulting Corp.*,
    360 F. Supp. 3d 172 (S.D.N.Y. 2018) ....................................................................5

*Baxter v. A.R. Baron & Co.*,
    1995 WL 600720 (S.D.N.Y. Oct. 12, 1995) .........................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..............................................................................................20

*Berdeaux v. OneCoin Ltd.*,
    561 F. Supp. 3d 379 (S.D.N.Y. 2021) ..................................................................11

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ..............................................................................................14

*Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*,
    155 F.3d 603 (2d Cir. 1998) ............................................................................18, 19

*Cartwright v. D'Alleva*,
    2018 WL 9343524 (S.D.N.Y. Aug. 27, 2018) ......................................................43

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ..............................................................................................22

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018)............................................................................10, 13

*In re Citigroup Auction Rate Sec. Litig.*,
    700 F. Supp. 2d 294 (S.D.N.Y. 2009)....................................................................26

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011)....................................................................................43

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
    92 F.4th 381 (2d Cir. 2024) ....................................................................................37

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)....................................................................................16

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010).............................................20, 29, 32, 43

*CP Stone Fort Holdings, LLC v. Doe(s)*,
    2016 WL 5934096 (N.D. Ill. Oct. 11, 2016).........................................................22

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)................................................................................................10

*DiMuro v. Clinique Labs., LLC*,
    572 F. App'x 27 (2d Cir. 2014) ..............................................................................21

*Dulsky v. Worthy*,
    2013 WL 4038604 (S.D.N.Y. July 30, 2013) ........................................................22

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................32

*Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019)....................................................................14

*Foundry, A Print Commc'ns Co. v. Trade Secret Web Printing, Inc.*,
    2012 WL 3031149 (S.D.N.Y. July 25, 2012) ........................................................18

*Friedman v. JP Morgan Chase & Co.*,
    2016 WL 2903273 (S.D.N.Y. May 18, 2016) ........................................................28

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
    41 F.4th 71 (2d Cir. 2022) ............................................................................. *passim*

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................................................................26

*Gilstrap v. Radianz Ltd.*,
    443 F. Supp. 2d 474 (S.D.N.Y. 2006) .................................................................17

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947) ..............................................................................................17

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*,
    585 F. Supp. 3d 405 (S.D.N.Y. 2022) ("*Harrington I*") .................................16, 43

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*,
    2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023) ("*Harrington II*") .........................23

*Harris v. TD Ameritrade Inc.*,
    2020 WL 3073235 (S.D.N.Y. June 10, 2020) .....................................................31

*Hausman v. Buckley*,
    299 F.2d 696 (2d Cir. 1962) ................................................................................19

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ...........................................................................27, 28

*Kessev Tov, LLC v. Doe(s)*,
    2022 WL 2356626 (N.D. Ill. June 30, 2022) ("*Kessev Tov I*") ........................30, 34

*Kessev Tov, LLC v. Doe(s)*,
    2023 WL 4825110 (N.D. Ill. July 27, 2023) ("*Kessev Tov II*") ........................22, 28

*Kitaru Innovations Inc. v. Chandaria*,
    698 F. Supp. 2d 386 (S.D.N.Y. 2010) .................................................................20

*LaSaLa v. UBS, AG*,
    510 F. Supp. 2d 213 (S.D.N.Y. 2007) .............................................................17, 19

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ................................................................................38

*In re London Silver Fixing Ltd. Antitrust Litig.*,
    2023 WL 3582198 (S.D.N.Y. May 22, 2023) .....................................................35

*M&N Trading, LLC v. BofA Sec., Inc.*,
    2024 WL 4651857 (N.D. Ill. Nov. 1, 2024) .......................................................35

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010) ..........................................................................................41, 43

*In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*,
    2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) ..........................................2, 7, 26, 36

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)....................................................................................14

*In re Mex. Gov't Bonds Antitrust Litig.*,
    412 F. Supp. 3d 380 (S.D.N.Y. 2019)...................................................................29

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010)..................................................................................3, 15, 16

*Mullen Automotive Inc. v. IMC Fin. Mkts.*,
    2025 WL 951501 (S.D.N.Y. Mar. 28, 2025) .............................................11, 12, 13

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
    2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023) ("*NWBO I*") ....................................36

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
    2025 WL 934319 (S.D.N.Y. Mar. 26, 2025) ("*NWBO II*")........................35, 36, 37

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...........................................................................24, 28

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014)...........................................................................15, 17

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
    609 F.3d 30 (2d Cir. 2010).................................................................................10

*Phunware, Inc. v. UBS Sec. LLC*,
    2024 WL 1465244 (S.D.N.Y. Apr. 4, 2024)......................................................32, 35

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981).........................................................................................18

*In re Platinum & Palladium Antitrust Litig.*,
    2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) .......................................................14

*Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*,
    2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) .......................................................25

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
    329 F.3d 64 (2d Cir. 2003).................................................................................18

*Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*,
    2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) .........................................................28

*In re Royal Grp. Techs. Sec. Litig.*,
    2005 WL 3105341 (S.D.N.Y. Nov. 21, 2005).......................................17, 18, 19, 20

*Schorr* v. *Dopico*,
   205 F. Supp. 3d 359 (S.D.N.Y. 2016)......................................................................16

*Schwab v. E\*TRADE Fin. Corp.*,
   258 F. Supp. 3d 418 (S.D.N.Y. 2017)......................................................................25

*Scottish Air Int'l, Inc. v. British Caledonia Grp., PLC*,
   81 F.3d 1224 (2d Cir. 1996)....................................................................................19

*Segal v. Gordon*,
   467 F.2d 602 (2d Cir. 1972)....................................................................................23

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)......................................................................................5

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
   277 F. Supp. 3d 521 (S.D.N.Y. 2017)......................................................................14

*Stevenson v. Thornburgh*,
   2024 WL 645187 (S.D.N.Y. Feb. 14, 2024).............................................................15

*Stone Family Tr. v. Credit Suisse AG*,
   2022 WL 954743 (S.D.N.Y. Mar. 30, 2022)............................................................21

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)......................................................................20

*Tellabs v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).................................................................................................24

*United States v. Coscia*,
   866 F.3d 782 (7th Cir. 2017) ..................................................................................36

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011)......................................................................31

*Weinraub v. Glen Rauch Sec., Inc.*,
   399 F. Supp. 2d 454 (S.D.N.Y. 2005)......................................................................31

*Xu v. Direxion Shares ETF Tr.*,
   2023 WL 5509151 (S.D.N.Y. Aug. 25, 2023)..........................................................21

**Statutes, Rules, and Regulations**

28 U.S.C. § 1658(b)(1) ...........................................................................................41, 43

Fed. R. Civ. P. 9(b) ...................................................................................3, 20, 21, 23

Fed. R. Civ. P. 12(b) ................................................................................................1

Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*...............3, 20, 24

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b)................................................20, 21, 22, 43

CIBC World Markets Inc. ("CIBC") and RBC Dominion Securities Inc. ("RBC") (each a "Defendant" and, together with ten unnamed John Doe defendants, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint (Dkt. No. 32) ("AC") under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

## PRELIMINARY STATEMENT

Instead of standing on its initial pleading, Plaintiff Quantum BioPharma Ltd., formerly known as FSD Pharma ("Plaintiff" or "Quantum"), elected to amend its complaint in response to Defendants' initial motion to dismiss. But Quantum's amendment does nothing to cure the pleading deficiencies that doomed the original complaint.

This lawsuit arises out of the collapse of Quantum's share price—a 98% loss in value—between January 1, 2020 and August 15, 2024 (the "Relevant Period"). Quantum is a "medical cannabis"-turned-pharmaceutical company located in Canada. Defendants CIBC and RBC are two broker-dealers, also located in Canada, that executed orders in Quantum's stock on behalf of their customers in Canada. According to Quantum, Defendants' trading in Quantum's stock—either for their own account or at the direction of their customers—amounted to "spoofing," a form of market manipulation involving the rapid placement of sell orders with the intent to cancel those orders before execution, which purportedly drove down Quantum's share price. (¶¶ 3, 51, 148.[1]) On that basis, Quantum asserts securities and common law fraud claims.

Quantum's prior pleading relied almost entirely on cherry-picked "order data" available *only* for Canadian markets that identified the broker-dealer through whom orders are placed in Canada. But a claim brought by a Canadian plaintiff against Canadian defendants alleging manipulation of a Canadian market does not belong in a U.S. court. Quantum apparently

---

[1] All paragraph citations refer to the Amended Complaint.

recognized this in opting to amend: in the AC, Quantum grafted onto its prior pleadings a hodgepodge of new allegations regarding anonymous trades placed on U.S. exchanges, which Quantum claims it can identify as being placed by Defendants through "probabilistic imputation"—a wholly speculative theory that posits that *any orders* placed in the U.S. by unknown market participants around the same time that Defendants placed orders in Canada should be attributed to Defendants. (¶ 60.)

        Quantum's theory fails for a multitude of reasons. As a threshold matter, neither CIBC nor RBC have trading privileges on Nasdaq, and thus could not have placed the orders in the U.S. that Plaintiff attributes to them. Moreover, even if CIBC or RBC could have placed the U.S. orders, Quantum concedes that *none* of the order data it relies on (whether in the U.S. or in Canada) distinguishes between orders placed by Defendants' traders for their own book and orders placed by or on behalf of the broker-dealers' customers. (¶¶ 23, 51, 60, 77.) In other words, Quantum admits that it ***cannot match orders to the actual parties that placed them***. Quantum thus cannot plausibly allege that any Defendant placed any particular order so as to plead a claim of spoofing against any Defendant. And even if it could, Quantum does not plead that it suffered any losses as a result. Spoofing strategies "depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief" and "last[] only a matter of seconds." *In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021).[2] Quantum fails to plead that it sold shares within seconds, hours—or even on the same day—subsequent to any of CIBC or RBC's purported spoofing "examples" described in the AC.

---

[2] Unless otherwise indicated, all internal citations, quotations and alterations are omitted.

To make matters worse, Quantum fails to address the obvious cause of Quantum's declining stock price: its own mismanagement. During the Relevant Period, Quantum never turned a profit, and instead lost tens of millions of dollars each year. More egregiously, Quantum severely diluted its shareholders by dumping 90 million shares of its own stock onto the market.

The AC is the paradigmatic example of the kind of abusive litigation that courts should check by enforcing the exacting pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). The Court should dismiss Quantum's claims for at least five independent reasons.

*First*, the facts of this case are overwhelmingly foreign. The parties are Canadian, and the conduct alleged occurred in Canada. Whether analyzed on the basis of personal jurisdictional, extraterritoriality under *Morrison*, or *forum non conveniens*, the case does not belong in U.S. court.

*Second*, Quantum does not adequately allege that CIBC or RBC engaged in any manipulation under the Exchange Act. Instead, Quantum relies entirely on group pleading (never identifying which Defendants, traders, or customers performed what allegedly manipulative acts); pleads only conclusory assertions relating to Defendants' and their customers' trading behavior; and cites cherry-picked (and in the case of U.S. trading, wholly anonymized) data representing orders placed by dozens if not hundreds of independent market participants. Stripped of labels, the "patterns" Quantum identifies reflect nothing more than routine, lawful market activity by broker-dealers primarily executing orders, trades and cancellations for their customers. (¶¶ 8, 10.)

*Third*, Quantum fails to plead a strong inference of scienter. Quantum provides no plausible explanation for why CIBC or RBC—which in their broker-dealer capacities do not take directional positions on individual stocks—would engage in a scheme to drive down Quantum's

stock.  Quantum never explains how any Defendant expected to profit, let alone did profit, from unidirectional spoofing conduct.  Nor does Quantum plead conscious misbehavior or recklessness on behalf of any Defendant.  The aggregated statistics on which the AC relies—lumping together Canadian orders placed by Defendants and their customers as well as anonymized U.S. orders attributable to no one—says nothing about any individual's intent.  And Quantum does not plead *any* facts to suggest that Defendants knowingly failed to implement systems and controls or otherwise deliberately ignored red flags suggestive of spoofing activity, whether by Defendants' own traders or their customers.

      *Fourth*, Quantum does not plead loss causation as to CIBC or RBC.  Remarkably, although Quantum claims that spoofing was "continuous" throughout the Relevant Period, the only "spoofing episodes" the AC describes with any particularity are *four* examples by RBC and *seven* examples by CIBC.  Fatally, the AC, like its predecessor complaint, does not allege that Quantum sold a single share on the same day subsequent to *any* of those supposed examples, let alone within seconds, minutes, or hours of them.  The AC attempts to rectify this deficiency by including an opaque table that purports to list the dates on which unidentified "Spoofing Episodes" occurred "within one hour" of Quantum's sales.  But the table does not provide any timestamps or other order information, and thus cannot plausibly plead loss causation.  (¶ 211.)  Moreover, the table does not identify a single sale on the same date as *any* of the purported spoofing "examples" attributed to RBC.  And while two of the dates in this table appear to overlap with dates of CIBC alleged "examples," Quantum conspicuously avoids making any claim that the unidentified "Spoofing Episodes" referenced in the table are the same "examples" described elsewhere in the AC.  Quantum's allegations of long-term price impact are even weaker.  Quantum's continued reliance on the conclusory contention that the "cumulative effect" of spoofing can permanently

decrease a stock's price (¶ 213) has been rejected by multiple courts and disregards the far more plausible explanation that its own dismal business performance and dilutive issuances caused the decline in Quantum's share price.

   *Lastly*, Quantum's Exchange Act claims are time-barred. Since at least 2021, Quantum was investigating share price manipulation and sent multiple letters to CIBC regarding alleged imbalances in its stock. Ex. 20 (Letter from Nathan Coyle, FSD CFO to Andrea Nalyzyty, CIBC CCO (Nov. 24, 2021)). Quantum even announced in a March 2023 SEC filing that it had been working with consultants to "analyz[e] data on a daily basis for over a year," and had "sent multiple correspondences with questions, to broker-dealers highlighting an imbalance in trade activity" and "discrepancies between buying and selling of [Quantum] stock." Ex. 1 (Form 6-K, Ex. 99.1 (Mar. 14, 2023)). Despite this, Quantum inexplicably waited until October 2024 to sue— well beyond the applicable two-year statute of limitations.

## BACKGROUND[3]

### A. The parties.

   CIBC and RBC are both Canadian "registered broker-dealer[s]" that "primarily execute[] securities transactions for [their] customers in Canada." (¶¶ 8, 10.) As broker-dealers, Defendants provide various order-fulfillment services, including by "plac[ing] orders and execut[ing] trades . . . pursuant to their customer's instructions," who trade in accordance with their own unique strategies and portfolios. (¶ 22.) Both CIBC and RBC maintain Direct Market

---

[3] Citations to Exs. 1–22 refer to exhibits to the Declaration of Kevin P. Broughel filed herewith. In deciding a motion to dismiss, the Court may consider "documents incorporated into the Complaint by reference," "public disclosure documents filed with the SEC," "documents possessed by or known to the plaintiff and upon which it relied in bringing the suit," *Slayton v. Am. Express Co.*, 604 F.3d 758, 763 n.2 (2d Cir. 2010), and "documents integral to the complaint," or that otherwise contain "facts of which judicial notice may properly be taken." *BankUnited, N.A. v. Merritt Envt'l. Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018).

Access ("DMA") and Direct Electronic Access ("DEA") systems that allow their customers to directly "enter orders and/or trades." (¶¶ 22-23.) Those trades then appear on the exchange under the broker's name. (*Id*.) Neither company trades on a U.S. exchange, but, according to the AC, both can "route" orders "to intermediary broker-dealers in the United States" on behalf of customers. (¶¶ 8, 10.) Neither CIBC nor RBC are registered as Nasdaq Member Firms,[4] and therefore neither have trading privileges on the U.S. exchange where Quantum alleges the spoofing occurred. (¶¶ 14-15, 18.)

Quantum is a Canadian "medical cannabis" business that, in March 2020, "pivoted its focus to pharmaceutical and biotechnology." Ex. 2 at 29 (Form 20-F (Apr. 2, 2024)). During the Relevant Period, Quantum had "no pharmaceutical products approved for commercial sale and [has] not generated any revenue from pharmaceutical products." *Id*. at 25. Indeed, Quantum never turned a profit, and lost tens of millions of dollars every year since 2019. *See* Ex. 4 at 7 (Form 40-F, Ex. 99.3 (Mar. 17, 2021)) ($39.1 USD million loss in 2019); *id*. ($31.8 USD million loss in 2020); Ex. 2 at F-4 (Form 20-F (Apr. 2, 2024)) ($35.3 USD million loss in 2021); *id*. ($23.6 USD million loss in 2022); *id*. ($18.2 USD million loss in 2023); *see* Ex. 21 at F-3 (Form 20-F (Mar. 28, 2025)) ($14.9 USD million loss in 2024). Accordingly, Quantum's outside accounting firm has raised "substantial doubt about [Quantum's] ability to continue as a going concern." Ex. 3 at 1 (Form 40-F, Ex. 99.2 (Mar. 4, 2020)), Ex. 2 at F-1 (Form 20-F (Apr. 2, 2024)).

Quantum's stock is publicly traded on the Canadian Stock Exchange and interlisted on Nasdaq. (¶¶ 18-19.) To continue funding its operations notwithstanding its substantial losses, Quantum diluted its own shareholders by selling or issuing approximately 90 million shares of its own stock throughout the Relevant Period. (¶ 5; Ex. 5 (Prospectus Supplement (Feb. 11, 2021));

---

[4] https://www.nasdaqtrader.com/content/marketregulation/membership/NQXMembers.xlsx

*see* Ex. 10 at 8-10 (Proxy Solicitation Statement (April 1, 2021)).)  During that time, Quantum's share price cratered, falling from $7.31 CAD ($5.54 USD) per share on January 2, 2020, to $0.13 CAD ($0.09 USD) per share on August 14, 2024. Exs. 6-8. Facing threatened delisting by Nasdaq, on August 15, 2024, Quantum effected a 65-to-1 reverse stock split.  Exs. 8-12.  Just days ago, Quantum shifted its business model yet again, and is now marketing a financial instrument that will grant investors a "pro rata portion" of any damages recovered *in this litigation*.  Ex. 22 (Form 6-K, Ex. 99.1 (June 13, 2025)).

**B.    The alleged "spoofing" scheme.**

The AC alleges that CIBC and RBC "and/or their customers[]," as well as the John Doe defendants, engaged in spoofing throughout the Relevant Period.  (¶¶ 51, 86.)  Spoofing is "a fraudulent practice in which the spoofing traders send false supply and demand signals to the market by placing orders to buy or sell that they never intend to execute." *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 75 (2d Cir. 2022).  These "fraudulent spoofs" may "last[] only a matter of seconds," long enough for the spoofing traders to execute genuine orders on the opposite side of the market, and then "quickly cancel[]" the fraudulent orders before they are executed. *Merrill*, 2021 WL 827190, at *2, *13.

Although the AC does not allege that Defendants conspired with or aided and abetted one another, all of the alleged spoofing purportedly occurred in the same direction, allegedly putting downward pressure on Quantum's share price.  Specifically, Quantum claims that each Defendant (or its customers) spoofed by placing "Baiting Orders" on the sell side of the market in order to enable the purchase of "Executing Purchase Orders" at slightly lower prices on the buy side.  (¶ 55.)  According to the AC, Quantum has identified more than 1,400 total spoofing "episodes," but only about half of those "episodes" allegedly are attributable to CIBC, and a mere 38 allegedly are attributable to RBC.  (¶¶ 69, 201.)  Despite these broad allegations, the only

spoofing episodes described with any particularity are a handful of "illustrative examples" based on Canadian order data for CIBC, RBC and John Doe 1.  (¶¶ 96-197.)

Quantum does not identify any manipulative trading on any U.S. exchange by any Defendant.  Instead, Quantum attempts to link anonymized U.S. trading data to Defendants by positing that all orders placed on U.S. exchanges close-in-time to orders placed by Defendants on Canadian exchanges should be attributed to Defendants. (¶¶ 59-61).

### C.    The poor management and performance of Quantum.

The AC omits Quantum's contemporaneous admissions regarding its failing business and the factors leading to its share price decline.  Annual SEC filings and other public statements show yearly losses in the tens-of-millions, no revenue, shifting business ventures, and costly shareholder litigation, all of which impacted the company's share price—by Quantum's own admission.  *See* Exs. 2-4; *infra* pp. 38-40.

Additionally, public court filings show that Quantum was embroiled in a proxy battle in 2021 that resulted in the ouster of its CEO, Dr. Raza Bokhari, and subsequent litigation surrounding his termination.  *See* Petition, *FSD Pharma Inc. v. Bokhari*, No. 23-cv-150 (E.D. Pa. Dec. 1, 2023).  In a March 2021 Proxy Statement, the now-current CEO Zeeshan Saeed and co-founder Anthony Durkacz explained that, since Dr. Bokhari was appointed CEO in October 2018, "the price of FSD's Shares has fallen by over 97%, wiping out over $500 million in market capitalization."  *See* Ex. 10 at 8.  The Proxy Statement attributes this "staggering" decline to several factors, including that Quantum's board had "failed to achieve even the most modest objectives of their business plan" and instead "issue[d] an extraordinary number of Class B Shares at very low prices and awarded themselves excessive and unjustified compensation."  *Id.*

Nor did Quantum find success in its drug portfolio.  Although the AC touts a COVID-19 drug as an example of Quantum's success (¶ 44), the Proxy Statement explains that,

"[w]hile the Phase 2 Clinical Trial was approved in September 2020, to date only one patient has been enrolled in the trial out of an 'expected' 352 patients." Ex. 10 at 9. Similarly, the AC touts that, on March 16, 2021, the "Company announced it had entered into a license agreement to develop certain veterinary drugs." (¶ 45.) But the Proxy Statement, signed the very next day, describes Quantum as a "corporation in crisis." Ex. 10 at 8.

### D. Quantum knew about purported manipulation years before filing its Complaint.

Quantum has acknowledged that it "first suspected share price manipulation in 2021 when it discovered imbalances between reported shares held by brokers and authorized shares on deposit in both Canadian and U.S. exchanges." Ex. 11 at 10 (Form 6-K, Ex. 99.2 (Nov. 12, 2024)). On March 14, 2023, Quantum announced that it had been analyzing trading data and investigating potential manipulation for "at least the past 12 months." Ex. 1 at 1. Beginning as early as November 2021 and throughout 2022, Quantum sent CIBC multiple letters and emails concerning those purported share imbalances, Exs. 16-20, including letters in April and November 2022 that copied Plaintiff's counsel in this case, Exs. 17-18. Quantum thus knew about the purported manipulation years before it filed its Complaint.

## ARGUMENT

### I. Quantum's claims should be dismissed because the litigation is predominantly foreign.

This case involves claims by a Canadian Plaintiff against Canadian Defendants regarding trading of a Canadian stock on a Canadian exchange. To the extent any trading is alleged to have occurred in the United States, Plaintiff has failed to plead facts to support that those trades were placed, or could have been placed, by Defendants. The Court should dismiss the AC on personal jurisdiction, extraterritoriality, and *forum non conveniens* grounds.

### A.  Quantum fails to plead personal jurisdiction over any Defendant.

The AC must be dismissed because Quantum cannot establish personal jurisdiction over CIBC or RBC.  Plaintiff "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  The inquiry is defendant-specific, *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018), focusing on each defendant's contacts with the forum, *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).

**General Jurisdiction.**  There is no basis to assert general jurisdiction over CIBC or RBC.  Both entities are incorporated in Canada, based in Canadian cities, and "primarily execute[] securities transactions for [their] customers in Canada."  (¶¶ 8, 10.)  Unquestionably, neither of their "affiliations with [this forum] are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler*, 571 U.S. at 127, 139.

**Specific Jurisdiction.**  Quantum also cannot establish specific jurisdiction because none of the alleged misconduct arose out of Defendants' contacts with this District.  To establish minimum contacts necessary to satisfy due process, the plaintiff must show that its "claim arises out of, or relates to, the defendant's contacts with the forum . . . [and that] the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 642 (S.D.N.Y. 2017).

Quantum advances two implausible theories of personal jurisdiction.  *First*, Quantum asserts a *direct contacts theory*, claiming that Defendants "each conducted a substantial part of the events . . . in this District, and/or directed their fraudulent activity into the market by manipulating Quantum stock on Nasdaq, which is located in this District," including by "engag[ing] in cross-border spoofing schemes."  (¶ 15-16.)  *Second*, Quantum alleges an *effects*

*theory*, claiming that, because Quantum "is an interlisted security . . . , manipulation of the market price in one market directly and immediately affects the trading price in the other country's market." (*Id.*)  Neither theory works.

> **1.  Quantum fails to plead direct contacts.**

Quantum's conclusory allegations supporting its first theory—that the Canadian Defendants "conducted a substantial part of the events" in this District "and/or directed" activity here (¶ 15)—do not establish specific personal jurisdiction over any Defendant because the AC does not plead a *single trade* placed by any Defendant that occurred in or was "directed" at this District.  Plaintiff "must make allegations establishing jurisdiction with some 'factual specificity' and cannot establish jurisdiction through conclusory assertions alone." *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 395 (S.D.N.Y. 2021).

Plaintiff cannot salvage jurisdiction by attempting to attribute to Defendants orders placed anonymously on U.S. exchanges.  Relying on a wholly speculative theory of "probabilistic imputation," Plaintiff asks this Court to infer that all orders placed on U.S. exchanges "ten milliseconds or less before Defendants' orders on Canadian exchanges were also placed by Defendants." (¶ 60).  That is wrong.  For starters, Plaintiff's "probabilistic imputation" theory ignores that neither named Defendant had trading privileges on Nasdaq and thus *could not* have executed the anonymized trades on U.S. exchanges that Plaintiff attributes to them.

Plaintiff's reliance on a probabilistic imputation methodology, as described in *Mullen Automotive Inc. v. IMC Financial Markets*, 2025 WL 951501 (S.D.N.Y. Mar. 28, 2025), is misplaced.  Probabilistic imputation methodology entails an assumption that orders placed closely in time are more likely to have been placed by the same party.  Plaintiff alleges that the methodology demonstrates that anonymous trades of Quantum stock in the United States around the same time that Defendants placed Canadian trades should be attributed to Defendants.  But this

ignores that modern financial markets operate at extremely high speeds, with unrelated market participants constantly reacting to each other's trading. A later-in-time order placed shortly after (within "ten milliseconds" of) an earlier-in-time order is just as likely, if not more likely, to have been placed by independent market participants *in reaction* to the earlier-in-time order. When faced with this market reality, Plaintiff's probabilistic imputation theory falls apart. Indeed, the *Mullen* plaintiffs limited their probabilistic imputation methodology to orders placed within the "same nanosecond or millisecond of each other." *Mullen* FAC. ¶ 39. By doing so, they alleged that it would have been "virtually impossible," or at least very unlikely, based on the speed at which "[l]ight travels" through "fiber optic cables" and the speed at which "market participants can engage with financial markets"—for unrelated market participants to react and trade within those time frames. *Id*. ¶ 40.

Quantum's allegations are completely different. Quantum is attempting to use a "ten-millisecond" imputation period (¶ 60), which is ***ten million times longer*** than the nanosecond period used in *Mullen*. The "logic applied by the plaintiffs in *Mullen*" simply does not apply here because ten milliseconds is an *eternity* in high speed trading, where "nearly 75% of all trades are conducted algorithmically" (¶¶ 61, 85), and is more than enough time for unrelated market participants to trade *in reaction* to each other's orders. In fact, the AC itself confirms that unrelated market participants can and do react to each other's orders in well under 10 milliseconds: *Quantum expressly alleges that the purported "Spoofing Cycle"—including the step at which other market participants allegedly react to the Baiting Orders and execute trades—could all occur within "milliseconds."* (¶¶ 55-56.) Thus, Quantum offers no reasonable basis to conclude that all U.S. orders within a "ten-millisecond" imputation period were placed by Defendants at all, as opposed to ordinary activity by other market participants.

Notably, in *Mullen*, the plaintiffs conceded that market participants can react and place orders within the same millisecond, and thus added additional safeguards for their 1-millisecond imputation analysis (which they did not include for the 1-nanosecond analysis) to "make it less likely that orders are mistakenly attributed to other market participants," including by limiting the methodology to orders placed on opposite sides of the book only. *Mullen* FAC ¶ 43. Here, Quantum provides no such safeguards.

To further justify their use of the 1-millisecond imputation period, the *Mullen* plaintiffs performed statistical analyses of a deanonymized control sample and calculated the false positive rate: in *Mullen*, the likelihood of any two deanonymized orders arriving in the same millisecond but being from different sources was 10%, and the average daily likelihood was 14%. *Mullen* FAC ¶ 44. Here, Quantum provides no such analysis. It just asserts that orders placed within a 10-millisecond window "were typically through the same broker." (¶ 61). That is not enough. Quantum cannot plead personal jurisdiction based on anonymous U.S. orders with no connection to Defendants.

### 2. Quantum fails to plead "causal effects."

Quantum's second theory—that the alleged "spoofing orders," which were entered on a Canadian exchange by Canadian Defendants, had a "direct[] and immediate[]" impact on the U.S. market (¶ 16)—similarly fails. Where, as here, a plaintiff advances "causal effects" theories of personal jurisdiction, it must plead plausibly that "the defendant expressly aimed its conduct at the forum." *Charles Schwab*, 883 F.3d at 87. Quantum pleads no "factual allegations demonstrating" that the alleged market manipulation was perpetrated with "the express aim of causing an effect in" this forum, instead premising its claims on allegations regarding purported spoofing by *Canadian* Defendants on *Canadian* markets. *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 2015 WL 1514539, at *10–11 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir.

2019). Under settled law, the allegation that acts taken in Canada had an impact on the market price of Quantum's stock traded in this District, without more, is insufficient: "[G]eneral allegations of price manipulation abroad alone do not establish that a foreign defendant expressly aimed its conduct at the U.S." *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *45 (S.D.N.Y. Mar. 28, 2017). Courts have refused to exercise personal jurisdiction over CIBC and RBC in similar circumstances. *See Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 711 (S.D.N.Y. 2019).

Moreover, even if Quantum's allegations were sufficient to establish minimum contacts, it has not shown that personal jurisdiction is reasonable under the circumstances. *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 589 (S.D.N.Y. 2017) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). To determine reasonableness—*i.e.*, whether "the assertion of personal jurisdiction would comport with fair play and substantial justice"—courts evaluate "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Id.* (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)). Each factor weighs against exercising personal jurisdiction over Defendants. The named parties are Canadian, and all relevant witnesses are located in Canada. (¶¶ 7-11.) All of the trading actually attributable to Defendants involved Canadian stock and took place on Canadian exchanges. (¶¶ 96-197.) Because the allegations are overwhelmingly Canada-centric, and the interests of a New York-based court in resolving this dispute are (at best) minimal, Quantum cannot establish personal jurisdiction over CIBC or RBC.

*See Stevenson v. Thornburgh*, 2024 WL 645187, at *43 (S.D.N.Y. Feb. 14, 2024) (U.S. interest "pale[d] in comparison" to Switzerland's "interest in regulating the conduct of banks within its borders").

**B.     Quantum's claims are impermissibly extraterritorial under *Morrison*.**

It is even more clear that Quantum's Exchange Act claims are impermissibly extraterritorial.  Under *Morrison v. National Australian Bank Ltd*., the antifraud provisions of the securities fraud laws apply only to (i) "transactions in securities listed on domestic exchanges" and (ii) "domestic transactions in other securities."  561 U.S. 247, 267 (2010).  A transaction not listed on a domestic exchange—like those alleged here—is considered "domestic" only if the parties either (i) incurred irrevocable liability to execute the transaction within the United States, or (ii) transferred title to the underlying securities within the United States.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67-68 (2d Cir. 2012).  And even if transactions could be considered "domestic" under this analysis, Quantum must allege facts demonstrating that its claims are not "predominantly foreign."  *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215-16 (2d Cir. 2014) (per curiam).  Quantum cannot meet these strict thresholds.

Quantum does not allege a single transaction on a U.S. exchange by either Defendant.  Instead, Quantum asks the Court to infer that anonymous orders placed in the United States within "ten milliseconds or less" of orders placed by Defendants in Canada must have been placed by the same Defendants.  (¶¶ 58-61.)  Based on that unsupported inference, Quantum alleges three specific spoofing examples where CIBC or RBC placed orders in the U.S. markets.  (*E.g.*, ¶¶ 116, 121, 159.)  But this allegation makes no sense because neither CIBC nor RBC is a

Nasdaq member capable of placing trades on the Nasdaq.[5] (¶ 58); *see also supra* Part I.A.1. Quantum also speculates that, because Defendants purportedly carried out spoofing activities in Canada, "similar manipulative trades were placed on United States markets." (*E.g.*, ¶¶ 70, 76.) But again, Defendants cannot place any trades on Nasdaq, and the Court "need not credit such allegations where they are wholly conclusory or rely on unreasonable inferences and unwarranted deductions." *Schorr v. Dopico*, 205 F. Supp. 3d 359, 363 (S.D.N.Y. 2016), *aff'd*, 686 F. App'x 34 (2017). Quantum further asserts that Defendants could have routed "to intermediary broker-dealers in the United States orders to be executed for [their] customers" (¶¶ 8, 10), but Quantum does not identify any orders or transactions that supposedly were routed to a U.S. exchange, nor does it identify any such "intermediary."

Because Quantum does not plead any transactions by Defendants on a U.S. exchange, its claims fail under *Morrison's* first prong. *Compare City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014), *with Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, 585 F. Supp. 3d 405, 421 (S.D.N.Y. 2022) ("*Harrington I*") (finding spoofing claims fell "within the territorial ambit of the Exchange Act" in part because "Plaintiff [did] not seek to hold any Defendant liable for purchases made on foreign exchanges and instead limits its claims to sales made on U.S. Exchanges"). Its claims also fail under *Morrison's* second prong because Quantum does not plead that the transactions on Canadian exchanges had any U.S. nexus. As *City of Pontiac* holds, mere cross-listing on a domestic exchange of foreign-issued shares does not render the transaction "domestic" under *Morrison*. 752 F.3d at 181.

---

[5] https://www.nasdaqtrader.com/content/marketregulation/membership/NQXMembers.xlsx

Even if Quantum pled one or more "domestic" transactions, which it cannot, its claims are so predominantly foreign that they still must be dismissed. In the Second Circuit, a domestic transaction is "necessary" but "not alone sufficient" to state a claim. *Parkcentral Glob. Hub Ltd.*, 763 F.3d at 215. Here, the only placed orders that Quantum identifies are on a Canadian exchange, and the only alleged spoofing examples involve Canadian transactions. Because Quantum's claims are predominantly foreign, they must be dismissed. *Id.*

**C.    Quantum's claims should be dismissed under *forum non conveniens*.**

The doctrine of *forum non conveniens* gives courts broad discretion to dismiss claims better suited for another forum. Here, the factors underpinning the doctrine of *forum non conveniens* uniformly weigh in favor of dismissal.

"District courts have broad discretion in deciding whether to dismiss an action on the ground of *forum non conveniens*." *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 477 (S.D.N.Y. 2006), *aff'd*, 233 F. App'x 83 (2d Cir. 2007). The Second Circuit uses a three-part test. *First*, courts consider "the degree of deference due to plaintiff's choice of forum." *In re Royal Grp. Techs. Sec. Litig.*, 2005 WL 3105341, *1 (S.D.N.Y. Nov. 21, 2005). *Second*, courts decide "whether an adequate alternative forum exists." *Id. Third*, courts "balance the 'private and public interest' factors set forth by the Supreme Court in *Gilbert* to determine, based on 'the relative hardships involved, whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the defendant.'" *Id.* (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507-09 (1947)). "[W]here, on balance, the resolution of the matter in an adequate alternative forum would be more convenient for the parties and courts and more just," the AC should be dismissed on *forum non conveniens* grounds. *LaSaLa v. UBS, AG*, 510 F. Supp. 2d 213, 221-22 (S.D.N.Y. 2007).

*First*, Quantum's apparent desire to shop for the most favorable forum warrants little to no deference. All parties are Canadian, and the claims relate to the trading of a Canadian company's stock. (*See* ¶¶ 7, 8, 10); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981) ("foreign plaintiff's choice deserves less deference"); *Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 612 (2d Cir. 1998) (no strong presumption in favor of plaintiff's choice of forum where "real parties in interest are foreign corporations").

*Second*, Canada is an adequate alternative forum for this dispute. Courts will accept a foreign forum as an adequate alternative where: "(1) the defendants are subject to service of process [in the alternative forum]; and (2) the forum permits 'litigation of the subject matter of the dispute.'" *Cap. Currency Exch.*, 155 F.3d at 609. "Canada can provide an adequate forum" where defendants are "amenable to service of process in Canada." *Foundry, A Print Commc'ns Co. v. Trade Secret Web Printing, Inc.*, 2012 WL 3031149, at *9 (S.D.N.Y. July 25, 2012). As Canadian entities, both CIBC and RBC are subject to service of process there.

Moreover, Canada is a viable alternative forum for the resolution of securities fraud claims like those at issue here. *See In re Royal*, 2005 WL 3105341, at *2 ("[T]he Second Circuit has concluded that Ontario, Canada is an adequate forum to try class actions based on violations of federal securities laws").

*Third*, private and public interest factors uniformly counsel towards dismissal in favor of Canada as the more convenient forum. Private interest factors include: (i) "the relative ease of access to sources of proof"; (ii) "availability of compulsory process for attendance of unwilling witnesses," as well as the "cost of obtaining attendance of willing witnesses"; and (iii) "all other practical problems that make trial of a case easy, expeditious and inexpensive." *See Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003).

Each private interest factor weighs in favor of dismissal. Since Quantum and Defendants all reside in Canada, and Defendants allegedly carried out their trading in Canada, evidence relevant to the case, including trading records, would be most easily accessed in Canada. *See Cap. Currency*, 155 F.3d at 611 (dismissal appropriate where "most of the documentary evidence in the case was created[] and is stored" in foreign forum). Relevant witnesses, including Quantum's and Defendants' employees, reside in Canada, and should not be burdened by trial in the United States. *See id.* This Court's inability to subpoena unwilling witnesses in Canada further supports dismissal because Quantum brings fraud claims, for which "[l]ive testimony is especially important" and the "factfinder's evaluation of witnesses' credibility is central to the resolution of the issues." *In re Royal*, 2005 WL 3105341, at *2; *Scottish Air Int'l, Inc. v. British Caledonia Grp., PLC*, 81 F.3d 1224, 1233-35 (2d Cir. 1996) (dismissing on *forum non* grounds where credibility of foreign key witnesses was "crucial").

The public interest factors also favor dismissal. *Id.* at 1232. Canada has an outsized interest in deciding a Canadian controversy under Canadian law. "[A foreign country's] interest in regulating the conduct of banks within its borders, particularly where the bank is a leading financial services provider in the country, is great," and the United States' interest "pales in comparison." *See LaSala*, 510 F. Supp. 2d at 229, 232; *see also Hausman v. Buckley*, 299 F.2d 696, 703 (2d Cir. 1962).

Nor does Plaintiff's new attempt to attribute anonymized trades placed in the United States to Defendants based on "probabilistic imputation" change the analysis. (*See, e.g.*, ¶¶ 58-61). As explained *supra* Part I.A.1, Plaintiff does not adequately allege that Defendants placed spoofing trades in the United States. But even accepting those allegations, the conduct in the AC still overwhelmingly relates to Canada, not the United States. Canada thus has a greater interest

and is the more appropriate forum. *See, e.g.*, *In re Royal Group Tech. Sec. Litig.*, 2005 WL 3105341 at *3 (granting dismissal on *forum non conveniens* grounds where the majority of trading occurred outside U.S. exchanges).

Finally, Quantum's claims do not justify foisting the administrative burdens of such a foreign dispute on this heavily congested Court where there "is no indication that the Canadian courts 'are any more congested than the busy courts in this District.'" *Kitaru Innovations Inc. v. Chandaria*, 698 F. Supp. 2d 386, 396 (S.D.N.Y. 2010).

**II.    Quantum fails to state a claim under the Exchange Act.**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). This requires—under both the PSLRA and Rule 9(b)—that a plaintiff "state with particularity the circumstances constituting fraud." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008).

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101. Similarly, to plead a claim under Section 9(a)(2), a plaintiff must "identify transactions in a security . . . with the intent to deceive or defraud investors." *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010). Moreover, "Section 9(f) requires that the violation of Section 9(a) be willful and that the price of the security that is purchased or sold be affected by the

violation." *Xu v. Direxion Shares ETF Tr.*, 2023 WL 5509151, at *6 (S.D.N.Y. Aug. 25, 2023). The analysis of claims under Section 9(a) "'closely parallels' the analysis of claims under Section 10(b)." *Stone Family Tr. v. Credit Suisse AG*, 2022 WL 954743, at *6 (S.D.N.Y. Mar. 30, 2022).

## A. Quantum fails to plead manipulative conduct by CIBC or RBC.

Quantum fails to establish any manipulative conduct by CIBC or RBC because it fails to "plead with particularity the nature, purpose, and effect of the fraudulent conduct" specifying "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI*, 493 F.3d at 102. Instead, Quantum attaches conclusory labels to ordinary market-making activity; lumps Defendants together without identifying which orders were placed by which Defendant; and aggregates those orders with others placed by unidentified customers and clients—all in an attempt to plead a single spoofing scheme. But stripped of labels, the patterns Quantum identifies reflect nothing more than routine market activity by broker dealers, and the falling prices it attributes to "manipulation" are nothing more than the market's reaction to a failing business.

*First*, Quantum makes a series of conclusory assertions regarding Defendants' trading behavior, including that the purported "Baiting Orders . . . had no legitimate financial purpose and were never intended to be executed," and were placed with intent to "create the illusion that Quantum shares were declining in value." (¶¶ 53-54.) Quantum does not, however, plead any facts to support those assertions, which are insufficient to satisfy Rule 9(b). *DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 30 (2d Cir. 2014) (affirming dismissal of complaint "riddled with repeated conclusory labels," which are "not facts, and certainly not facts sufficient for Rule 9(b)"). Instead, Quantum asks this court to "*infer*[]" from factors such as "the short time period between the continuous and repeated placement and cancellation of the Baiting Orders," that

"Defendants' Baiting Orders were intended to function as part of a scheme to defraud the market in Quantum securities." (¶ 68 (emphasis added).) Quantum is entitled no such inference—"rapidly placing and cancelling orders, by itself, [does] not amount to market manipulation." *Kessev Tov, LLC v. Doe(s)*, 2023 WL 4825110, at *4 (N.D. Ill. July 27, 2023) ("*Kessev Tov II*"); *see also CP Stone Fort Holdings, LLC v. Doe(s)*, 2016 WL 5934096, at *6 (N.D. Ill. Oct. 11, 2016) (granting motion to dismiss for failure to allege a manipulative act where "plaintiff's theory boils down to an allegation that 'if a subset of orders was ultimately cancelled, those orders, in hindsight, must never have been intended to be executed'").

*Second*, Quantum fails to identify "which defendants" performed what allegedly manipulative acts. *Baxter v. A.R. Baron & Co.*, 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995). Instead, Quantum pleads that "Defendants," as a group, engaged in manipulative conduct.[6] Such group pleading fails to put each Defendant on notice as to its alleged manipulative conduct. *See Dulsky v. Worthy*, 2013 WL 4038604, at *4 (S.D.N.Y. July 30, 2013) (granting dismissal for failure "to separate these defendants with specific allegations of wrongdoing as to each one of them"); *Baxter*, 1995 WL 600720, at *7 ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform *each* defendant of the nature of *his* alleged participation in the fraud") (emphases added). Even worse are Quantum's allegations about supposed "imbalance[s]" and "shares traded" "in the U.S." (*See, e.g.*, ¶¶ 98, 100, 145.) These allegations are based on market-wide data for *all* participants in the U.S. market (¶ 70), which says nothing about CIBC's or RBC's trading.

---

[6] Notably, the AC does not allege that CIBC or RBC conspired with, aided and abetted, or is otherwise vicariously liable for the trading of each other or other Defendants. Nor is a private claim for aiding and abetting permissible under Section 10(b). *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).

*Third*, Quantum points to aggregated data, statistics, calculations, and ratios (*see, e.g.*, ¶ 68), arguing that they reflect "the reoccurrence of the same trading patterns" from which manipulative behavior can be inferred. Not so. As Quantum concedes, the order flow data on which the AC relies combines all orders placed under a broker-dealer's "unique identifier," and does not distinguish between orders placed by Defendants for their own book, and orders placed by or on behalf of customers. (¶¶ 23, 51.) Nor does that data match orders to the individuals who placed them. Indeed, according to the AC, Defendants' customers may use the DMA and DEA systems to independently place trades on exchanges under Defendants' names. (¶ 23 ("When Defendants' customers use the DMA or DEA system, they do not place orders on exchanges under their own names; rather, these orders appear to the world as coming from Defendants because they bear Defendants' broker-dealer MPIDs.").) Accordingly, the same data Quantum relies on to allege manipulative conduct by "CIBC," "RBC" or "John Doe" could just as well reflect wholly separate trades, each made by different customers of CIBC, RBC, or John Doe, without a single proprietary trade by any Defendant—much less a trading "pattern" by a single trader. Allegations of spoofing based solely on comparisons of aggregate buy orders and aggregate sell orders—without matching those orders to the individuals who placed them—is exactly the type of "speculation" that courts have found insufficient to satisfy Rule 9(b).[7] *See Segal v. Gordon*, 467 F.2d 602, 606 (2d Cir. 1972); *Gamma Traders*, 41 F.4th at 75 (observing that "spoofing" involves "suspicious trading activity of *one trader* placing both buy- and sell-side orders in the same market") (emphasis added).

---

[7] Defendants acknowledge that some courts have reached a different conclusion on different facts. *See, e.g.*, *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*, 2023 WL 6316252, at *6 (S.D.N.Y. Sept. 28, 2023) ("*Harrington II*"). Respectfully, those decisions are inconsistent with *ATSI* and similar cases, which require more than speculative inferences to state a market manipulation claim.

*Last*, Quantum attempts to plead manipulative conduct by attributing anonymized trades on U.S. exchanges to Defendants through "probabilistic imputation."  Under that theory, Quantum speculates that anonymous orders placed on U.S. exchanges "ten milliseconds or less before Defendants' [deanonymized] orders and trades on Canadian Exchanges" must have been placed by Defendants.  (¶ 60.)  But for all of the reasons explained *supra* Part I.A.1, Plaintiff's probabilistic imputation theory makes no sense and provides no reasonable basis to infer that any of these anonymous U.S. orders were placed by Defendants.  And even if those U.S. orders were somehow attributable to Defendants, stripped of Plaintiff's labels and conclusions, the AC's allegations describe nothing more than ordinary market-making activity, which comes nowhere close to pleading manipulative acts.

## B.    Quantum still fails to plead a strong inference of scienter.

The PSLRA requires Quantum to "plead with particularity facts giving rise to a strong inference" that CIBC and RBC each "intended to deceive investors."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).  To qualify as "strong," the inference of scienter "must be more than merely reasonable or permissible—it must be cogent and . . . at least as compelling as any opposing inference," including any "plausible, nonculpable explanations for the defendant's conduct."  *Tellabs v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314, 324 (2007).  To meet this heightened pleading requirement, Quantum must allege, as to each defendant, "facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI*, 493 F.3d at 99.  Recklessness in the securities fraud context refers to "conscious recklessness— *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000).  The AC fails to plead facts to meet either showing.

1.    **Quantum fails to plead motive or opportunity.**

To establish "motive and opportunity," the plaintiff must plead facts showing that the defendant "benefitted in some concrete and personal way from the purported fraud." *Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*, 2024 WL 5089970, at *11 (S.D.N.Y. Dec. 12, 2024). Here, Quantum alleges in conclusory fashion that Defendants had a "strong motive" to spoof in order to "purchase hundreds of thousands of Quantum shares at depressed prices." (¶ 95.) That allegation comes nowhere close to pleading motive.

*First*, Quantum's vague allegations of a "motive" to purchase shares "at depressed prices" is exactly the kind of "generic profit motive" that courts routinely hold is "insufficient to establish scienter." *Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 435 (S.D.N.Y. 2017). Quantum provides no plausible explanation for why CIBC and RBC in their broker-dealer capacities would be motivated to drive down Quantum's stock price, particularly when a broker-dealer does not take directional positions on individual stocks.

*Second*, Quantum fails to allege that either CIBC or RBC "benefitted in some concrete and personal way from the purported fraud," *Argo*, 2024 WL 5089970, at *11, because Quantum does not plead that either *Defendant* (as opposed to one or more of its customers) actually booked the alleged "purchase[s]" of Quantum shares "at depressed prices." (¶ 95.) Quantum concedes that the order data on which it relies does not distinguish between orders placed by Defendants and orders placed by customers. (¶ 23.) And Quantum does not explain how

Defendants benefitted concretely and personally from a customer's independent trading strategies.[8]

        *Third*, Quantum does not plead how Defendants—as broker-dealers who buy and sell securities—obtained any net profit from the spoofing scheme alleged here, which supposedly placed "continuous downward pressure on Quantum's share price." (¶¶ 102, 143, 172, 183, 193.) A spoofer's profits "depend . . . on a reversion of prices to the market-level," *Merrill*, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021), but Quantum does not plead a reversion and corresponding sale at a net profit to any Defendant. On the contrary, Quantum alleges that the "downward pressure" was "continuous." (¶ 102.) At most, Quantum speculates that Defendants "*may* profit" if "the market price of Quantum's shares rebounded to some extent." (¶¶ 3, 35 (emphasis added).) But that would be true only if Defendants took a net long position in Quantum's stock—not, as Quantum equivocates, if Defendants were *either* "short" *or* "long." (¶ 3.) In the absence of factual allegations that Defendants bought and held Quantum's stock at depressed prices and sold it after the price rebounded, Quantum cannot plead that any Defendant profited from the alleged conduct. *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 381 (E.D.N.Y. 2013) ("A plaintiff alleging motive and opportunity in connection with stock sales must allege . . . the defendants' net profits rather than their gross proceeds . . . .").

        *Fourth*, even putting aside Quantum's failure to plead net profits, Quantum's own allegations show that any pricing benefit Defendants could have obtained from spoofing would have been *de minimis* at best—shaving off a few *pennies* per share. The examples of supposed

---

[8] To the extent Quantum is alleging that Defendants had a "motive" to generate "transaction fees" from these customer trades (¶ 23), that allegation fails. "Courts have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter." *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009).

spoofs described in the AC reflect an average decrease (compared to the "prevailing best offer" before the alleged spoofing episode) of only $0.054 CAD per share (and as low as $0.01 CAD per share) in Canada, and only $0.043 USD per share (and as low as $0.01 USD per share) in the United States.[9]  Even if that average rate were applied to the total alleged purchase volume for each Defendant (¶ 66), the total alleged benefit in Canada over the more-than-four-year Relevant Period would be only $614 CAD for RBC (about $133 CAD per year), and $12,891 CAD for CIBC (about $2,787 CAD per year).

| Defendant | Total Alleged Purchase Volume in Canada | Total Alleged Benefit (using $0.054 CAD per share average) |
|---|---|---|
| CIBC | 240,710 shares | $12,891.64 CAD |
| RBC | 11,465 shares | $614.03 CAD |

The total alleged benefit in the United States over the Relevant Period would be only $146 USD total (about $31.66 USD per year) split between *all Defendants* (including John Doe 1).  (*Id.*)

| Defendant | Total Alleged Purchase Volume in United States | Total Alleged Benefit (using $0.043 USD per share average) |
|---|---|---|
| All Defendants combined (including John Doe 1) | 3,371 shares | $146.43 USD |

It "defies economic reason" that any trader employed by Defendants was motivated to engage in a multiyear fraud—and risk criminal prosecution—for such trivial amounts.  *Kalnit*

[9] Quantum alleges that CIBC and RBC purchased a combined total of 19,695 shares in Canada, and 8,225 in the United States, "[a]s a result" of the alleged "illustrative example[]" spoofs. (¶¶ 97-164.)  And Quantum alleges that the combined total decrease from the illustrative examples was $1,054.80 CAD in Canada, and $357.29 USD in the United States (which is the difference between the alleged "prevailing" price and purchase price for each trade, multiplied by the quantity of shares purchased, summed across all trades). Where the AC does not specify the prevailing best offer prior to the illustrative example (*see* ¶¶ 113-22), Defendants use the price of the lowest alleged Baiting Order as a proxy.  This results in an average alleged decrease of $0.054 CAD per share ($1,054.80 CAD / 19,695 shares) in Canada, and an average alleged decrease of $0.043 USD per share ($357.29 USD / 8,225 shares) in the United States.

*v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001); *see also Rice as Tr. of Richard E. & Melinda Rice*

*Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, 2022 WL 837114, at *20 (S.D.N.Y. Mar. 21,

2022) ("[P]rofits [that] totaled just under four and a half million dollars," albeit a "'handsome'

sum," were "in context . . . not a sum sufficient to give rise to an inference of scienter"); *Friedman*

*v. JP Morgan Chase & Co.*, 2016 WL 2903273, at *12 (S.D.N.Y. May 18, 2016) ("[R]outine and

general benefits that are derived in the ordinary course of business do not constitute the type of

'concrete benefit' necessary to raise an inference of fraudulent intent."); *Kessev Tov II*, 2023 WL

4825110, at *6 ("[I]t would be difficult to prove intent to deceive if Defendants did not make

money off their alleged spoofing.").

### 2. Quantum fails to plead conscious misbehavior or recklessness.

Because Quantum fails to plead "motive and opportunity," the "strength of the

circumstantial allegations" of conscious misbehavior or recklessness "must be correspondingly

greater." *Kalnit*, 264 F.3d at 142. The Second Circuit has made clear that recklessness in this

context refers to "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and

not merely a heightened form of negligence." *Novak*, 216 F.3d at 308, 312. Quantum must

"specifically allege[] defendants' knowledge of facts" and show that "defendants knew or . . .

should have known" of the alleged spoofing by Defendants' traders or their customers. *Id.* at 308.[10]

Quantum's vague allegations do not even approach this high pleading standard.

---

[10] While Plaintiff fails to plead either conscious misbehavior or recklessness, CFTC guidance
suggests that mere "recklessness" is insufficient to sustain a spoofing claim. *See* CFTC
*Interpretative Guidance and Policy Statement on Disruptive Practices* at 2 ("Because CEA section
4c(a)(5)(C) requires that a person intend to cancel a bid or offer before execution, the Commission
believes that reckless trading, practices, or conduct will not constitute a 'spoofing' violation."),
https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/
file/dtp_factsheet.pdf.

*First*, Quantum puts forward a series of cherry-picked statistics and other ratios in an attempt to bolster its speculation that orders were placed with fraudulent intent. (*See* ¶¶ 79-84, 89-91.) But these aggregate statistics are meaningless because they are based on the combined order activity of numerous independent actors, and do not distinguish Defendants from their customers, or individual Defendants (or their traders) from each other. *See supra* Part II.A. Quantum's own allegations make clear that both CIBC and RBC maintain DMA and DEA systems that allow customers to directly "enter orders and/or trades," which "appear to the world as coming from Defendants." (¶¶ 22-23.) Defendants' customers may choose to buy or sell a security for any number of reasons, based on their own unique strategies and portfolios. And Quantum does not even attempt to allege that any individual traders employed by CIBC or RBC—let alone their customers—worked in concert to further any coordinated spoofing strategy. By lumping all of these orders together, and relying on "average[s]" and "median[s]" (¶¶ 79-81, 83), Quantum's statistics obscure the actions and intentions of dozens if not hundreds of independent decision makers. Such blatant group pleading is plainly insufficient to plead a strong inference of scienter. *Cohen*, 722 F. Supp. 2d at 428 ("[G]eneralized allegations of scienter against groups of defendants will not state a claim for securities fraud"); *see also In re Mex. Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 389-90 (S.D.N.Y. 2019) (statistical analyses relying on "averages and medians among the market makers . . . obscure any given Defendant's contribution" and amount to nothing more than "group pleading in another form").

Quantum's attempts to compare the volume of Defendants' trading activity to that of other market participants (¶¶ 79-80) fare no better. For starters, those comparisons rely on the same meaningless aggregated averages discussed above, and should be rejected for the same reasons. But even accepting Quantum's calculations at face value, they do not plead fraudulent

intent. Quantum's allegations regarding the speed at which certain sell-side orders were cancelled (¶¶ 89-90) add nothing because the AC does not provide a baseline for comparison or plead any other facts establishing that such cancellations are unusual.[11] Quantum cannot transform routine broker-dealer activities, including executing orders and cancellations at the direction of customers, merely by attaching labels to them.

For similar reasons, Quantum's allegation that Defendants were "heavily engaged in algorithmic trading" (¶ 85) is insufficient. Allegations of ordinary course activities by a broker-dealer, including the use of algorithms, do not plead scienter. *See ATSI*, 493 F.3d at 104 (finding no scienter where the plaintiff alleged merely standard trading activity); *Kessev Tov, LLC v. Doe(s)*, 2022 WL 2356626, at *9 (N.D. Ill. June 30, 2022) ("*Kessev Tov I*") ("placing rapid orders and cancelling them does not necessarily evince illegal market activity" and "[o]ther courts have recognized the ubiquity of rapid trading across securities platforms").

*Second*, Quantum vaguely alleges, based on nothing more than "information and belief," that the "trading activities" of Defendants' traders and customers "were approved by" unidentified "corporate officials" of the Defendants who "knew or recklessly ignored" alleged spoofing. (¶ 86.) This conclusory allegation comes nowhere close to adequately pleading scienter. Quantum does not identify any "red flag" that any "corporate official" ignored, does not identify any specific traders or customers that engaged in the alleged spoofing scheme, and does not give

---

[11] Quantum's failure to plead how Defendant's cancellations compare to any market baseline is particularly noteworthy given Quantum's acknowledgement that "75% of all trades" in the market "are conducted algorithmically" (¶ 85), and publicly available data show that the vast majority of all orders placed on equities exchanges are cancelled (typically within seconds). *The Speed of the Equity Markets*, SEC. EXCH. COMM'N (Oct. 9, 2013) ("[A]t most, only a few percent of all orders and quotes . . . result in trade executions."); *id.* (more than 42% of order cancellations occur within one second of placement, and more than 56% of cancellations occur within five seconds of placement), https://www.sec.gov/about/speed-equity-markets.

any indication that any regulator or government agency (in the United States or Canada) has ever suggested that Quantum's stock price was manipulated. Quantum cannot bridge these gaps by referencing "gatekeeper" obligations that require broker-dealers to implement "policies, procedures, and systems" that are "reasonably designed" to detect and prohibit manipulative trading. (¶¶ 25-32, 87-88.)[12] Such generic facts can be said of *any* broker-dealer, and thus cannot possibly support a strong inference of scienter. Quantum does not allege that any Defendant failed to implement or maintain reasonably designed trade surveillance and compliance systems. Instead, Quantum alleges that Defendants were "required" to have such "systems" in place. (¶ 88.) But the mere "existence of risk management structures is insufficient to create a strong inference of scienter." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 366 (S.D.N.Y. 2011). Nor does Quantum plead facts to show that the alleged spoofing was so frequent or severe that it must have been caught by any reasonably designed surveillance system. That is particularly true for RBC, for whom the AC alleges a total of only *38* spoofing episodes (by RBC's customers and/or its own traders) over a period of more than four and a half years. (¶ 69.)

    *Last*, Quantum asserts that CIBC and RBC separately engaged in other "potentially problematic trading practices," including making "naked" or "aggressive[]" short sales of Quantum's stock. (¶¶ 92-93.) But Quantum never explains what such trading practices have to do with spoofing. Moreover, Quantum does not plead a single instance in which any Defendant

---

[12] To the extent Quantum seeks to hold Defendants liable under some "gatekeeping" theory of scienter (*see, e.g.*, ¶¶ 25-32), that theory fails. None of the U.S. rules and regulations that Plaintiff cites provide private causes of actions. *Harris v. TD Ameritrade Inc.*, 2020 WL 3073235, at *2 (S.D.N.Y. June 10, 2020) ("SEC Rule 15c3-3 . . . does not create a private cause of action"); *Allen v. Fidelity Brokerage Servs. LLC*, 711 F. Supp. 3d 219, 224 n.5 (S.D.N.Y. 2024) ("no private cause of action for violations of FINRA Regulations"); *Weinraub v. Glen Rauch Sec., Inc.*, 399 F. Supp. 2d 454, 462 (S.D.N.Y. 2005) (no cause of action based on violations of NYSE and NASD rules and guidelines). And the Canadian regulations that Plaintiff cites only demonstrate Canada's superior interest over this dispute.

ever sold Quantum stock without the reasonable expectation that sufficient securities would be available to settle the trade, and does not claim that any Defendant in fact ever failed to deliver on a short sale.

### C. Quantum fails to plead loss causation.

To satisfy the loss causation requirement, Quantum must plead "facts supporting [a] legally cognizable loss" and a "causal connection between the alleged manipulation . . . and the loss." *Cohen*, 722 F. Supp. 2d at 430 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). Under the Second Circuit's controlling decision in *Gamma Traders*, to plead loss causation in a spoofing case, a plaintiff must allege (i) *temporal proximity*, meaning that the plaintiff traded "so close in time to Defendants' spoofing as to permit [the court] to infer as a matter of common sense that the market prices were artificial when [the plaintiff] traded"; or (ii) *long-term price impact*, meaning the plaintiff "traded *after* the spoofs" and pleaded "a factual basis that would justify an inference that the market price was still artificial by the time [the plaintiff] traded." *Gamma Traders*, 41 F.4th at 80. The AC fails to plead either theory.

### 1. Quantum fails to plead temporal proximity.

To plead loss causation based on temporal proximity, Quantum must allege that it sold shares "so close in time to Defendants' spoofing" to permit the commonsense inference that prices were still depressed at the time of the sale. *Id.* The Second Circuit has made clear that this is a stringent requirement: "[e]ven pleading same-day, post-spoof trades" is not enough absent "factual allegations to support the inference" that Quantum's trade was impacted by the spoof. *Id.*; *see also Phunware, Inc. v. UBS Sec. LLC*, 2024 WL 1465244, at *7 (S.D.N.Y. Apr. 4, 2024) (allegation that plaintiff traded "two hours" after spoof was "insufficient to establish harm"). Quantum fails to plead loss causation on that basis.

Quantum devotes more than 20 pages of the AC to describing the "illustrative examples" of Defendants' supposed spoofing conduct, but Quantum fails to plead that it sold or issued stock within seconds, minutes, hours—or even on the same day—after *any* of those purported "examples." (¶¶ 97-197.)[13]  Quantum's failure to plead a single sale that occurred "close in time" and subsequent to any of the alleged illustrative examples is fatal to any "common sense" inference of loss causation.  *Gamma Traders*, 41 F.4th at 80.

Unable to connect the "illustrative examples" to alleged sales, Quantum relies on vague and opaque tables that purport to list the sales and stock issuances that Quantum made "within five minutes" (the "5-Minute Table") (¶ 209) and "within one hour" of completely unidentified "Spoofing Episodes" (the "1-Hour Table") (¶ 211).  These tables fail to plead loss causation for at least two reasons.

*First*, the tables provide next to no information about any of the purported spoofs, which are not described anywhere else in the AC.[14]  The tables say nothing about:

- how many orders (and for how many shares) the Defendant placed on the sell side and buy side during each alleged spoofing episode;

- how long the Defendant left those orders in the market;

- how many orders the Defendant cancelled on the sell side and buy side, and when those cancellations occurred;

- how many orders were filled on the sell side and buy side and when those fills occurred;

---

[13] Although Quantum now claims that it sold stock on the same date as two of the CIBC illustrative examples—February 10, 2021 and March 19, 2021 (¶¶ 113-22, 211)—Quantum provides zero indication as to which event came first on those dates (the sale or the illustrative example) or how much time passed between those two events.

[14] None of the CIBC or RBC "illustrative examples" are even on the same day as the sales listed in the 5-Minute Table.  Two of the CIBC illustrative examples (none of the RBC illustrative examples) occur on the same *date* as sales listed in the 1-Hour Table, but Quantum does not allege that either of those illustrative examples occurred within one hour before the alleged sale.

- what each Defendant's order imbalance was during the alleged spoof; or
- what the prevailing best bid and offer price were before and after each alleged spoof.

Without pleading these basic facts, there is no basis for the Court to infer that Defendants engaged in spoofing within five minutes or one hour of any alleged sale. *See Kessev Tov I*, 2022 WL 2356626, at *10 (dismissing complaint alleging spoofing because it was "simply too light on facts" and did not "allege[] any facts to establish what the 'prevailing market price' would have been").

*Second*, the paucity of information in the 5-Minute Table and 1-Hour Table undermines any claim that Quantum suffered losses because of alleged spoofs by CIBC or RBC. For the two alleged CIBC spoofing episodes in the 5-Minute Table, Quantum does not claim that the ask price declined at all: instead, the "Ask Decline to Episode" is alleged to be 0.00 basis points for both episodes. (¶ 209.) Quantum does not explain how it could have suffered a loss from its sales if the ask price was not impacted. As to RBC, the 5-Minute Table shows that the price at which Quantum sold its shares actually stayed the same or went *up* after nearly all of the alleged Spoofing Episodes on that date.[15] That undermines a basic assumption of Quantum's loss causation theory—that "[p]rices generally remained at suppressed levels . . . for hours" after each spoof. (¶ 202.) Quantum does not offer any explanation for how it suffered any cognizable loss when the price of its shares remained the same or went up (not down). The 1-Hour Table contains no allegations at all regarding the price impact of any alleged spoof, and does not even allege that a single share listed in the table was sold *at depressed prices*. (¶ 211.) Again, Quantum offers no

---

[15] Quantum alleges that the average price at which it sold its shares went from $3.775 to $3.75 after the first two alleged spoofing episodes (at 10:41:39 and 10:42:03); the price stayed at $3.75 after the next two alleged spoofing episodes (at 10:42:54 and 10:44:55); and the price went back up to $3.76 after the final alleged spoofing episode (at 10:45:05).

explanation for how it suffered any cognizable loss when it does not claim that there was a price impact that affected its sales.

### 2. Quantum fails to plead long-term impact.

Unable to plead temporal proximity, Quantum speculates that, although "each Spoofing Episode had a small negative impact," the "cumulative effect" of spoofing, which allegedly occurred on only 14% of trading days, nonetheless had a "persistent long-term negative impact on the price of Quantum's shares." (¶¶ 201, 203-04.) Because the AC is devoid of any "*factual basis* that would justify an inference that the market price was still" depressed at the time that it sold or issued its shares, *Gamma Traders*, 41 F.4th at 80 (emphasis added), Quantum fails to plead loss causation through long-term impact.

*First*, as an initial matter, courts in this District have rejected claims of long-term impact where, as here, they are based on "conclusory statements." *Phunware*, 2024 WL 1465244, at *7. In *Phunware*, Judge Ho held that various allegations, including that spoof orders "had the cumulative effect of driving [plaintiff's] share price down," were "conclusory" and thus "insufficient on a motion to dismiss." *Id.* Similarly, in *Northwest Biotherapeutics Inc. v. Canaccord Genuity LLC*, Judge Woods held that the allegation of "continuous[]" spoofing "without interruption over a protracted period of time" was not enough to plead "long-term impact" because it was "not supported by plausible factual allegations that this actually occurred." 2025 WL 934319, at *14 (S.D.N.Y. Mar. 26, 2025) ("*NWBO II*"); *see also In re London Silver Fixing Ltd. Antitrust Litig.*, 2023 WL 3582198, at *11 (S.D.N.Y. May 22, 2023) (complaint's "vague[]" allegation that "prices never *fully* recovered" not enough for "the Court plausibly to infer . . . the endurance of artificial prices caused by manipulation").

Those rulings make sense. "[S]poofing is a form of manipulation that occurs in short periods of time," *M&N Trading, LLC v. BofA Sec., Inc.*, 2024 WL 4651857, at *4 (N.D. Ill.

Nov. 1, 2024), which means the "period of artificiality may be brief," lasting "only a matter of seconds." *Merrill*, 2021 WL 827190, at *13; *see also United States v. Coscia*, 866 F.3d 782, 787 (7th Cir. 2017) ("[T]he large [spoof] orders will be on the market for incredibly short periods of time (fractions of a second) . . . ."). The short-term impact of spoofing is one of the core assumptions underlying the strategy—the "profitability" of spoofing depends on the swift "reversion of prices to the market-level" after the baiting orders are cancelled. *Merrill*, 2021 WL 827190, at *13. Indeed, "the entire point of spoofing a stock" is for the "stock price to increase after a Spoofing Episode." *NWBO II*, 2025 WL 934319, at *14. Quantum's conclusory allegation that the spoofing in this case somehow caused "persistent and long-lasting price impact[s]" flies in the face of these core assumptions, and reflects a fundamental misunderstanding of how spoofing works. (¶ 203.)

Notably, Quantum attempted to bolster the long-term price impact theory in its prior complaint by citing to "leading economic literature" and an expert report that supposedly shows that "spoofing can have a lingering impact on the price of a security." (Dkt. No. 1 ¶¶ 170-185.) Apparently recognizing that this "economic literature" and expert report said *nothing* about the long-term price impact of spoofing, Quantum has jettisoned any discussion of those academic sources in the AC. *See* Dkt. No. 28 at 33-34 ("[O]nly one of the articles [cited by Quantum] mentions spoofing at all . . . ."); *Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, 2023 WL 9102400, at *31 (S.D.N.Y. Dec. 29, 2023) ("*NWBO I*") ("[N]othing in the FAC suggests that the Milgrom report concerned spoofing."), *report and recommendation adopted*, 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024).

*Second*, in support of its claim that the "continuous stream of Defendants' spoofing had a persistent long-term negative impact," Quantum provides two charts showing that, *on*

*average*, the price of Quantum's stock decreased during the 300-minute period and the 60-day period following an alleged spoofing event, while the price of the Invesco/Nasdaq QQQ index generally stayed the same or increased over those periods.  (¶ 203.)  But there is nothing surprising or unusual about the disparity between those two averages:  Quantum's stock price *decreased 98%* over the course of the relevant period, while the price of Invesco/Nasdaq QQQ *more than doubled*. Ex. 6; Ex. 15.  Accordingly, the charts say absolutely nothing about the purported price impact of spoofing.  All those charts suggest is that Quantum's stock price would have generally decreased (on average) over time, while Invesco/Nasdaq QQQ would have generally increased (on average) over time, irrespective of any alleged spoofing.  Notably absent from the AC is any allegation about how the returns during these alleged post-spoofing periods compare to the returns on the 86% of days on which Quantum does not allege that spoofing occurred.  (*See* ¶ 201.)  For example, Quantum does not allege that its stock price generally went up or stayed the same following those non-spoofing dates.

In *NWBO II*, Judge Woods held that a similar 60-day chart—which compared the average stock price decline to the average increase in certain market indices over that time—was insufficient to plead loss causation under a long-term impact theory.  2025 WL 934319, at *15-16. The court explained that the plaintiff's "60-day chart" "depicts nothing more than a price decline" over that period, and "improperly relies on averages spread over a long span of time," which can be "finessed by shifting the time periods being averaged" and "can flatten or hide trends that might tell a different story."  *Id.* (quoting *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 396 (2d Cir. 2024)).  Quantum's two charts also fail because they rely on averages spread over a long span of time, which does nothing more than depict a price decline across the relevant period.

*Second*, Quantum claims that "sharp price decreases in Quantum share prices" during the Relevant Period are "[c]onsistent" with its theory that the alleged spoofing events had "lasting impacts." (¶¶ 202, 206.) But the AC fails to account for—or even address—how Quantum's own contemporaneous admissions and disclosures regarding its failing business impacted its stock price. "[A] plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by" the defendant's conduct "as opposed to intervening events." *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). If Plaintiff's claims are allowed to proceed, it will open the door for every failing company with a plummeting stock price—and therefore more sellers than buyers in the market—to cherry pick data and bring baseless claims against large broker-dealers.

Most notably, the AC does not address the negative impact that Quantum inflicted on its own stock price by dumping "*90 million shares*" onto the market (¶ 208 (emphasis added)), notwithstanding that Quantum warned its shareholders in SEC filings that they "will suffer dilution" as a result of "any additional sale or issuance" of Quantum stock, Ex. 5 at S-34 (Quantum, Prospectus Supplement (Feb. 11, 2021)). The AC also does not address Quantum's failure to ever turn a profit, except for making the absurd contention that losing tens of millions of dollars each year "was generally positive" for the company because the *rate* at which those losses accumulated went down "almost every" year. (¶¶ 42-43.)

Indeed, nearly all of the "sharp price decreases in Quantum" stock described in the AC (¶ 206) coincided with Quantum announcing large sales or issuances of new shares and/or predated the alleged spoofing. For example, Quantum cites the 70% drop in its share price over the 10-day period beginning June 3, 2020 as support for its loss causation theory. (¶ 206.) Quantum alleges that CIBC began spoofing on June 3 at 15:03:58.997, at which time the best offer

was $8.10 USD, and then "continued [spoofing] throughout the course of the trading day." (¶¶ 97, 102.) But the opening price (and daily high) on June 3 was $14.00 USD, Ex. 7 at 3,[16] meaning that the price had already dropped 40% (more than half of the total alleged 70% decline) by the time that CIBC allegedly began spoofing. Moreover, Quantum announced the very next day (on June 4) that it had agreed to sell 1.5 million shares at a *30% discount* to the prior day's closing price,[17] along with warrants to purchase another 1.5 million shares. Ex. 14 (Form 6-K, Ex. 99.1 (June 4, 2020)). In light of Quantum's announcement that it was selling significant shares substantially below market prices, Quantum cannot plausibly suggest that these price declines were caused by spoofing.

      As a further example, Quantum highlights that its share price dropped 29% over the 18-day period beginning on February 9, 2021. (¶ 206.) Quantum ignores that nearly half of the alleged misconduct during this period (43 of 91 episodes) occurred on February 9 and 10 (¶ 201), during which time the price of Quantum stock moved *up*. Ex. 7 at 7. Quantum's price then began to drop (and fell more than 20%) on February 11 (*id.*)—that is, on the same day that Quantum announced that it planned to sell "US$20,000,000" worth of stock in at-the-market distributions. Ex. 5 at i & S-34. Quantum also disclosed on February 11 that this $20 million

---

[16] Paragraph 206 of the AC states that the price dropped from "$910," which appears to refer to the opening price (in USD) on June 3, 2020, when adjusted for the subsequent 1-for-65 reverse stock split (*i.e.*, $910.00 divided by 65 equals $14.00, which was the opening price on June 3). *See* Ex. 12 (Form 6-K, Quantum (Aug. 16, 2024) (announcing reverse stock split)); Ex. 7 at 3 (unadjusted prices in USD); Ex. 13 at 3 (adjusted prices in USD). For consistency with the rest of the AC (*see, e.g.*, ¶¶ 97-102), this memorandum uses unadjusted prices.

[17] The closing price on June 3, 2020 was $9.65 CAD. Ex. 6 at 3. On June 4, Plaintiff announced that it had agreed to sell 1.5 million shares for $6.75 CAD per share. Ex. 14 (Quantum, Form 6-K, Ex. 99.1 (June 4, 2020).) The stock price closed at $7.00 CAD on June 4. Ex. 6 at 3.

issuance created a "*risk of dilution* resulting in *downward pressure on [its stock] price*" and "could contribute to *progressive declines in [its] price[]*." *Id.* (emphasis added).

Quantum's invocation of a 10% price drop over the 22-day period beginning on March 16, 2021 fails for similar reasons. Quantum alleges that RBC began placing Baiting Orders on March 17, at 15:33:59.001, when the best offer price was $2.97 CAD. (¶¶ 149, 153.) The opening price on March 17, was $3.31 CAD, meaning the price already had dropped more than 10% that day by the time that Quantum alleges the spoofing episode began. Ex. 6 at 8. That substantial stock price drop coincided with Quantum's release of its annual report for the year 2020, which disclosed that Quantum suffered a nearly $32 million net loss in 2020. Ex. 4 at 7 (Form 40-F, Ex. 99.3 (March 17, 2021)). Similarly, Quantum alleges that CIBC began placing Baiting Orders on March 19 at 1:55:13.648000, when the best offer was $2.78 CAD. (¶ 118.) But Quantum's stock price *increased* after this alleged spoof, closing at $2.82 CAD on March 19, Ex. 6 at 8, which completely undermines any suggestion that this alleged spoof caused a 10% decrease in Quantum's stock price.

Quantum's total failure to account for these intervening events renders their loss causation allegations entirely non-credible.[18]

## III.    Quantum's Exchange Act claims are time-barred.

Because Quantum's Exchange Act claims are based on purported market manipulation that it has been investigating, analyzing, and identifying for years, they must be dismissed as time-barred.

---

[18] Quantum's allegation that the stock price dropped nearly 20% during the 10-day period beginning April 10, 2023 (¶ 206) is irrelevant because the AC does not allege that CIBC or RBC engaged in spoofing during that time period.

The statute of limitations for Exchange Act claims is two years after the "discovery of the facts constituting the violation." *See* 28 U.S.C. § 1658(b)(1). "[D]iscovery" refers to either a plaintiff's "actual discovery of certain facts," or to "the facts that a reasonably diligent plaintiff would have discovered." *Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010). Here, Quantum's own pronouncements, as well as the public information upon which Quantum bases its claims, reveals it had discovered, or as a reasonably diligent plaintiff should have discovered, the supposed market manipulation of Quantum stock by mid-2022 at the latest.[19]

*First*, in an SEC filing detailing its "Market Manipulation Investigation," Quantum publicly admitted that it "*first suspected share price manipulation in 2021* when it discovered imbalances between reported shares held by brokers and authorized shares on deposit in both Canadian and U.S. exchanges." *See* Ex. 11 at 10 (Form 6-K, Ex. 99.2 (Nov. 12, 2024)) (emphasis added). Also, in 2021, Quantum's current counsel filed spoofing claims against CIBC on behalf of another client. *See Harrington*, No. 21-cv-761 (S.D.N.Y.) (case filed on January 28, 2021). In that case, the spoofing allegations were based on "trading data collected and analyzed from U.S. and Canadian exchanges," which plaintiff hired a third-party to analyze from July 2019 through May 2020, allowing plaintiff in its own words to have "sufficient information to file this complaint against the Defendants." (¶¶ 48, 52, 66); *Harrington*, No. 21-cv-761 (S.D.N.Y. May 6, 2021).

*Second*, on February 16, 2022, Quantum's CFO sent a letter to CIBC stating that it was contacting CIBC "for a third time" regarding a shareholder position "imbalance," identified by a "third-party service provider engaged by my company." *See* Ex. 16 (Letter from Nathan Coyle, FSD CFO, to Andrea Nalyzyty, CIBC CCO (Feb. 16, 2022)). This letter noted the "original

---

[19] Although Quantum alleges some spoofing episodes occurred after February 2022, Quantum does not identify any sales it made of its own stock after March 2021. (¶¶ 209-11; *see also supra* Part II.C.1.)

correspondence" to CIBC regarding this issue was "dated 11/24/2021." *Id.*; *see also* Ex. 20. Quantum sent two follow-up letters to CIBC on April 27, 2022, and November 21, 2022, identifying additional stock holding imbalances. *See* Exs. 17-18. Both letters copied Quantum's current counsel, Wes Christian.

        *Third*, in a March 14, 2023 SEC filing, Quantum admitted it had been working with "consultants and contractors" to "analyz[e] data on a daily basis *for over a year now*, including that of broker-dealers, clearing firms, and shareholder position management." Ex. 1 at 1 (emphasis added). Quantum added that, "[i]n light of the data analyzed, the Company's management, *for at least the past 12 months*, has sent multiple correspondences . . . to broker-dealers highlighting an imbalance in trade activity." *Id.* (emphasis added). The very next day, Quantum advised CIBC that it had "been sending letters to [CIBC's] compliance department *for over 12 months now*" on this topic. Ex. 19 (E-mail from Zeeshan Saeed, FSD President, to CIBC (Mar. 15, 2023)) (emphasis added). Quantum stated that it thought "CIBC [was] being used by nefarious short sellers to short Quantum stock naked, or by other means which may not constitute the proper definition of short selling." *Id.*

        When viewed collectively, these facts show that Quantum: (i) was aware of potential market manipulation of its stock in 2021; (ii) engaged the same counsel that filed a different spoofing case against CIBC in 2021 using accessible Canadian market trading and order data, analyzed over a 10-month period; and (iii) had consultants and contractors that understood market manipulation and had, since at least early 2022, analyzed the relevant data on a daily basis. Quantum nonetheless waited years, until October 2024, to file this case.

        Even affording Plaintiff every reasonable inference, it is evident that Quantum's claim is time-barred. Quantum was on inquiry notice of its claim in 2021, had access to the same

publicly available market data that now underpins its AC, and analyzed that data on a daily basis with consultants as far back as early 2022. Quantum had sufficient information as early as 2021—and certainly with reasonable diligence by mid-2022—to adequately plead its spoofing claims against CIBC and RBC. *See City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc*., 637 F.3d 169, 175 (2d Cir. 2011) (holding a fact is "deemed 'discovered' [when] a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint"). This includes enough information for Quantum to plead Defendants' intent. *Merck*, 559 U.S. at 649. Because Quantum failed to assert its claims within two years of discovery, its claims are untimely. 28 U.S.C. § 1658(b)(1).

## IV.    Quantum fails to plead common law fraud.

"The elements of common-law fraud are 'essentially the same' as those for a violation of Section 10(b) of the Exchange Act." *Cohen*, 722 F. Supp. 2d at 436. Quantum's common law fraud claim (¶¶ 231-33)—which "essentially track[s]" its Exchange Act claims—should be dismissed for the reasons above. *Cartwright v. D'Alleva*, 2018 WL 9343524, at *6 (S.D.N.Y. Aug. 27, 2018), *aff'd,* 782 F. App'x 77 (2d Cir. 2019); *see also Harrington I*, 585 F. Supp. 3d at 424.

In addition, Quantum's common law fraud claim fails for the separate and independent reason that Quantum does not allege that Defendants made any material misstatements or omissions. Quantum alleges that Defendants placed orders that "sen[t] false and misleading pricing signals to the market" (¶¶ 16, 232), but such trading activity does not constitute a misrepresentation or omission under New York law. *See Harrington I*, 585 F. Supp. 3d at 424.

## CONCLUSION

For the foregoing reasons, the AC should be dismissed with prejudice.

Dated:  June 16, 2025
        New York, New York

Respectfully submitted,


/s/ Kevin P. Broughel
Kevin P. Broughel
Brian L. Muldrew
Zoe Lo
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, New York  10020
Telephone:  (212) 940-8800
Facsimile:  (212) 940-8776
kevin.broughel@katten.com
brian.muldrew@katten.com
zoe.lo@katten.com


Charles A. DeVore (admitted *pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, Illinois  60661
Telephone:  (312) 902-5200
Facsimile:  (312) 902-1061
charles.devore@katten.com

*Counsel for CIBC World Markets Inc.*

/s/ Alexander J. Willscher
Alexander J. Willscher
Matthew J. Porpora
Jonathan S. Carter
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
willschera@sullcrom.com
porporam@sullcrom.com
carterjo@sullcrom.com


David N. Whalen (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone:  (202) 956-7500
Facsimile:  (202) 293-6330
whalend@sullcrom.com

*Counsel for RBC Dominion Securities Inc.*

**CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(C)**

Pursuant to Local Civil Rule 7.1(c), I hereby certify that this Memorandum contains 13,978 words, which complies with the word-count limitation that the Court granted on March 14, 2025.

/s/ Kevin P. Broughel
Kevin P. Broughel

*Counsel for CIBC World Markets Inc.*