**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

QUANTUM BIOPHARMA LTD.,

                    Plaintiff,

        v.

CIBC WORLD MARKETS, INC., RBC DOMINION
SECURITIES INC., and JOHN DOES 1 THROUGH 10,

                 Defendants.

Case No.: 1:24-CV-07972-ER

---

**PLAINTIFF QUANTUM BIOPHARMA LTD.'S MEMORANDUM OF LAW IN**
**<u>OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 3

ARGUMENT ..................................................................................................................... 7

I.      DEFENDANTS' JURISDICTIONAL ARGUMENTS FAIL ........................................... 7

        A.      This Court Has Personal Jurisdiction.................................................... 7

        B.      Quantum's Claims Are Not Impermissibly Extraterritorial................... 13

        C.      This Forum Is Not Inconvenient ......................................................... 15

II.     DEFENDANTS' EXCHANGE ACT ARGUMENTS FAIL ........................................... 18

        A.      Quantum Sufficiently Pleads Manipulative Acts................................. 18

        B.      Quantum Sufficiently Pleads Scienter ................................................ 23

                1.      Conscious Misbehavior or Recklessness ................................. 23

                2.      Motive and Opportunity........................................................... 26

        C.      Quantum Sufficiently Pleads Loss Causation...................................... 29

                1.      Temporal Proximity ................................................................ 29

                2.      Long-Term Impact .................................................................. 32

        D.      Quantum's Claims Are Not Time-Barred............................................ 35

III.    QUANTUM STATES A CLAIM FOR COMMON LAW FRAUD............................... 41

CONCLUSION................................................................................................................. 43

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
  2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ......................................................... 9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)............................................................... 12, 18, 42

*Braddock v. Braddock*,
  871 N.Y.S.2d 68 (App. Div. 2009) ......................................................... 42

*Campanelli v. Flagstar Bancorp, Inc.*,
  2020 WL 5350245 (S.D.N.Y. Sept. 4, 2020)......................................................... 11

*Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*,
  155 F.3d 603 (2d Cir. 1998) ......................................................... 16

*City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011).......................................................... 36, 40

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)......................................................... 13

*DiRienzo v. Philip Servs. Corp.*,
  294 F.3d 21 (2d Cir. 2002).......................................................... 15, 16, 17, 18

*Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*,
  368 F. Supp. 3d 681 (S.D.N.Y. 2019) ......................................................... 10

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
  41 F.4th 71 (2d Cir. 2022) ......................................................... 32, 42

*Glob. Art Exhibitions, Inc. v. Kuhn & Bulow Italia Versicherungsmakler GmbH*,
  607 F. Supp. 3d 421 (S.D.N.Y. 2022) ......................................................... 15, 18

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*,
  2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023)......................................................... passim

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Mkts. Corp.*,
  585 F. Supp. 3d 405 (S.D.N.Y. 2022) ......................................................... passim

*In re Blech Sec. Litig.*,
  961 F. Supp. 569 (S.D.N.Y. 1997) ......................................................... 43

*In re CINAR Corp. Sec. Litig.*,
  186 F. Supp. 2d 279 (E.D.N.Y. 2002) ......................................................... 16

*In re Commodity Exch., Inc.*,
  213 F. Supp. 3d 631 (S.D.N.Y. 2016) ........................................................ 11

*In re Hub Cyber Sec. Ltd.*,
  2025 WL 872078 (S.D.N.Y. Mar. 20, 2025) ........................................... 17, 18

*In re iAnthus Capital Holdings, Inc. Sec. Litig.*,
  2022 WL 4539119 (S.D.N.Y. Sept. 28, 2022) ........................................ 14, 17

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  2023 WL 3582198 (S.D.N.Y. May 22, 2023) ............................................... 35

*In re Merrill, BofA & Morgan Stanley Spoofing Litig.*,
  2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) .................................................. 35

*In re Platinum & Palladium Antitrust Litig.*,
  2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ............................................... 10

*In re Platinum & Palladium Antitrust Litig.*,
  61 F.4th 242 (2d Cir. 2023) ...................................................................... 12

*In re Poseidon Concepts Sec. Litig.*,
  2016 WL 3017395 (S.D.N.Y. May 24, 2016) .......................................... passim

*Kessev Tov, LLC v. Doe(s)*,
  2022 WL 2356626 (N.D. Ill. June 30, 2022) ............................................... 31

*Kessev Tov, LLC v. Doe(s)*,
  2023 WL 4825110 (N.D. Ill. July 27, 2023) ............................................... 21

*Lalonde v. City of Ogdensburg*,
  662 F. Supp. 3d 289 (N.D.N.Y. 2023) .................................................. 36, 38

*LaSala v. UBS, AG*,
  510 F. Supp. 2d 213 (S.D.N.Y. 2007) ....................................................... 16

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005) ...................................................................... 35

*Minpeco, S.A. v. ContiCommodity Servs., Inc.*,
  552 F. Supp. 332 (S.D.N.Y. 1982) ....................................................... 42, 43

*Moon Joo Yu v. Premiere Power LLC*,
  2018 WL 456244 (S.D.N.Y. Jan. 17, 2018) ................................................ 35

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ................................................................................ 13

*Mullen Auto., Inc. v. IMC Fin. Mkts.*,
  2025 WL 951501 (S.D.N.Y. Mar. 28, 2025) ................................................................. passim

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
  416 F.3d 146 (2d Cir. 2005) ................................................................................................. 16

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
  2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023) ............................................................. passim

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
  2024 WL 620648 (S.D.N.Y. Feb. 14, 2024) ......................................................................... 20

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
  2025 WL 368717 (S.D.N.Y. Jan. 31, 2025) ......................................................................... 31

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
  2025 WL 934319 (S.D.N.Y. Mar. 26, 2025) ................................................................ passim

*Parkcentral Glob. Hub Ltd. v. Porsche Automotive Holdings SE*,
  763 F.3d 198 (2d Cir. 2014) ................................................................................................. 13

*Petersen Energia Inversora S.A.U. v. Argentine Republic*,
  2020 WL 3034824 (S.D.N.Y. June 5, 2020) ....................................................................... 17

*Phunware, Inc. v. UBS Sec. LLC*,
  2024 WL 1465244 (S.D.N.Y. Apr. 4, 2024) ...................................................... 19, 21, 23, 25

*Phunware, Inc. v. UBS Sec. LLC*,
  2024 WL 4891891 (S.D.N.Y. Nov. 26, 2024) ......................................................... 29, 30, 35

*Scales v. N.Y. Hotel & Motel Trades Council, Local 6*,
  2023 WL 1779617 (S.D.N.Y. Feb. 6, 2023) ....................................................................... 36

*Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*,
  81 F.3d 1224 (2d Cir. 1996) ................................................................................................. 18

*SEC v. Morrone*,
  997 F.3d 52 (1st Cir. 2021) ................................................................................................. 13

*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) ................................................................................................. 23

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017) .............................................................................. 9, 12

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) .................................................................. 15, 17

**Other Authorities**

28 U.S.C. § 1658(b) ............................................................................................... 35, 36

MISREPRESENTATION, Black's Law Dictionary (12th ed. 2024).......................................... 42

Plaintiff Quantum BioPharma Ltd. (f/k/a FSD Pharma, Inc.) ("Quantum") respectfully submits this memorandum of law in opposition to the joint motion to dismiss filed by Defendants CIBC World Markets Inc. ("CIBC") and RBC Dominion Securities Inc. ("RBC").

## INTRODUCTION

In its 233-paragraph amended complaint, Quantum alleges that Defendants engaged in a cross-border spoofing scheme to manipulate the price of Quantum's stock on both American and Canadian stock exchanges. Indeed, expert analysis of trading data demonstrates that, over a four-year period, Defendants submitted and cancelled thousands of sell-side orders to sell tens of millions of shares of Quantum stock in the United States and Canada, that those sell-side orders were anomalous compared to Defendants' trading during non-spoofing periods and compared to other market participants' trading during Defendants' spoofing periods, that Defendants' sell-side orders did in fact drive the price of Quantum's stock down in both the United States and Canada, that Defendants capitalized on those price decreases by purchasing hundreds of thousands of shares of Quantum's stock at artificially deflated prices in both the United States and Canada, and that Quantum was harmed by those price decreases when it sold stock shortly after Defendants' spoofing episodes. Quantum provides specific examples of Defendants' pervasive spoofing on both sides of the border—including the precise date, time, and price of the relevant trades, as well as the price impacts of those trades. Under applicable law, these allegations are more than sufficient to survive a motion to dismiss.

Recent, on-point authority from this district—which Defendants largely ignore—makes this clear. Indeed, although one would never know from reading Defendants' 43-page motion to dismiss, almost all of Defendants' arguments for dismissal were considered and rejected in four recently filed spoofing cases, which have each survived motions to dismiss: *Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Corp.*, No. 1:21-cv-00761 (S.D.N.Y.); *Northwest*

*Biotherapeutics, Inc. v. Canaccord Genuity LLC*, No. 1:22-cv-10185 (S.D.N.Y.); *Mullen Automotive, Inc. v. IMC Financial Markets*, No. 1:23-cv-10637 (S.D.N.Y.); and *Phunware, Inc. v. UBS Securities LLC*, No. 1:23-cv-06426 (S.D.N.Y.).

For example, Defendants argue that this case belongs in Canada because the parties are foreign and some of the relevant trading occurred in Canada; rejected in *Harrington* both times that Defendant CIBC raised it. Defendants argue that Quantum has failed to plead that Defendants engaged in manipulative conduct because the data on which Quantum relies does not distinguish between Defendants and their clients; rejected in *Harrington*, *Northwest Biotherapeutics*, *Mullen*, and *Phunware*. Defendants argue that their status as broker-dealers renders Quantum's claims implausible; the court in *Harrington* denied two motions to dismiss brought by Defendant CIBC. Defendants argue that Quantum cannot rely on aggregated statistics to show scienter; rejected in *Northwest Biotherapeutics* and *Phunware*. Defendants argue that Quantum failed to allege loss causation because the illustrative spoofing examples did not occur in close temporal proximity to Quantum's own trades; rejected in *Northwest Biotherapeutics* (and factually wrong here). Defendants argue that Quantum cannot plausibly allege that Defendants' spoofing had a lasting price impact because other facts may explain the decline in Quantum's share price; rejected in *Phunware*. Defendants argue that Quantum should have discovered its claims earlier; rejected in *Harrington*. And Defendants argue that a common-law fraud claim cannot be predicated on spoofing; rejected in *Mullen*.

Rather than address this precedent, which is fatal to its motion, Defendants suggest that Quantum cannot state a claim because its losses may have been caused by "its own

mismanagement." Even if that were true (and it is not), it is not a motion to dismiss argument.[1]

Quantum has plausibly alleged that, over a four-year period, Defendants repeatedly spoofed its

stock, that these spoofing episodes drove down the price of Quantum's stock for (at minimum)

hours, that Defendants profited from those price decreases by purchasing Quantum stock at

artificially depressed prices, and that Quantum was harmed by those price decreases when it sold

stock in close temporal proximity to Defendants' spoofing. These allegations are not conclusory

or cursory; instead, they are informed by sophisticated expert analysis of terabytes of trading data.

In short, and as explained further below, Defendants' motion is meritless and should be denied.

## FACTUAL BACKGROUND

Quantum is a biotechnology company, with a registered office in Delaware. Dkt. No. 33

("AC") ¶ 7. Since 2020, its stock has been "interlisted" on Nasdaq and the Canadian Stock

Exchange. *Id.* ¶ 18. Canadian and American markets for interlisted stocks like Quantum are

seamlessly interconnected, such that trades in either country's market directly and immediately

affect the trading price in the other country's market. *Id.* ¶ 21. Quantum's stock is traded at far

higher volumes on American than Canadian markets. *Id.* ¶ 62.

With affiliates located in New York and throughout the world, CIBC and RBC are based

in Toronto and Montreal, respectively. *Id.* ¶¶ 8, 10. As registered broker-dealers, they execute

securities transactions for their customers in Canada and route to intermediary broker-dealers in

the United States other customer orders, including through high-speed trading algorithms. *Id.* ¶¶

9, 11. Although Defendants' customers may place orders through Defendants' DMA and DEA

---

[1] Somewhat ironically, if Defendants were correct, that would make Quantum an even more likely target for spoofing. *See Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, 2023 WL 9102400, at *28 (S.D.N.Y. Dec. 29, 2023) (citing authority for the proposition that "stocks targeted for spoofing had higher return volatility, lower market capitalization, lower price level, and lower managerial transparency").

3

systems, Defendants are obligated to act as "gatekeepers" with respect to those orders—an obligation that includes monitoring customer orders to ensure that Defendants' systems are not being used for unlawful trading. *Id.* ¶¶ 25–32, 53. Defendants also engage in trading on their own behalf (*i.e.*, proprietary trading). *Id.* ¶ 24.

During the period from January 1, 2020, through August 15, 2024 (the "Relevant Period"), Defendants engaged in cross-border spoofing schemes that were intended to manipulate, and did in fact manipulate, the price of Quantum stock in the United States and Canada. *Id.* ¶ 16. Specifically, to create the illusion that Quantum stock was declining in value, Defendants placed thousands of "Baiting Orders" to sell Quantum stock on Canadian and American stock exchanges. *Id.* ¶¶ 52, 54. Almost simultaneously, Defendants placed "Executing Orders" to purchase Quantum stock on Canadian and American stock exchanges at lower prices caused by the Baiting Orders. *Id.* ¶ 55. Once those buy-side orders were filled, Defendants immediately cancelled the sell-side Baiting Orders. *Id.* ¶¶ 55, 57.

Over the Relevant Period, Defendants completed hundreds of such "Spoofing Episodes." For example, in Canada alone, CIBC conducted at least 747 Spoofing Episodes, during which it submitted Baiting Orders to sell more than 12 million shares of Quantum stock and purchased nearly 250,000 shares of Quantum stock at deflated prices. *Id.* ¶ 69. CIBC similarly flooded American markets with sell-side Baiting Orders, including for hundreds of thousands of shares in the hour immediately preceding Quantum's own sales. *Id.* ¶ 58. RBC likewise engaged in spoofing in both Canada and the United States, albeit with less frequency. *Id.* ¶¶ 58, 69.

In addition to providing aggregate data and summary statistics regarding Defendants' Spoofing Episodes, the operative complaint also contains "illustrative examples" of Defendants' spoofing in both the United States and Canada. *Id.* ¶ 96. These examples specify the responsible

Defendant; the date, time, and volume of that Defendant's Baiting Orders; the date, time, and volume of that Defendant's Executing Orders; the date, time, and volume of cancelled Baiting Orders; and the price impact of the episode. *See, e.g.*, *id.* ¶¶ 97–102 (CIBC spoofing episode from June 3, 2020, at 15:03:58.9997), 144–48 (RBC spoofing episode on August 10, 2020, at 11:09:38.1117021). For example, on June 3, 2020, when the prevailing best offer was $10.98, CIBC submitted 37 Baiting Orders between 15:03:58.997 and 15:04:03.934 to sell 11,800 shares for prices between $11.27 and $10.77; CIBC then placed 17 Executing Orders between 15:04:03.925 and 15:04:05.602 to buy 1,700 shares at prices ranging from $10.69 to $10.74; and then cancelled all Baiting Orders by 15:04:05.849. *Id.* ¶¶ 97–102.

Defendants' Baiting Orders were not placed for any legitimate purpose; rather, they were placed to create to send a false and misleading pricing signal to the market in order to "trick" or "bait" market participants into executing their own sell orders, which would drive the price of Quantum stock down and enable Defendants to purchase that stock at artificially depressed prices. *Id.* ¶ 57. Indeed, during Spoofing Episodes, Defendants placed and cancelled far more sell-side orders than they executed (median of 5,100 shares cancelled and median of 0 executed), purchased far more stock than they sold (median of 100 shares purchased, and median of 0 sold), and cancelled significantly more sell-side orders than buy-side orders (88% sell-side, and 69% buy-side). *Id.* ¶¶ 81, 82, 84. This behavior was not a function of marketwide dynamics: during these same periods, compared to other market participants, Defendants submitted far more sell-side orders that were cancelled (392% more) and purchased far more shares at prices depressed by those sell-side orders (more than twice as much). *Id.* ¶¶ 79, 80. Even for Defendants, these trading patterns stick out: during Spoofing Episodes, compared to non-spoofing periods, Defendants submitted and cancelled far more sell-side orders per an executed buy-side order (11,555 shares

submitted and cancelled while spoofing, and 828 shares submitted and 1,296 cancelled while not spoofing). *Id.* ¶ 83.

Defendants' Baiting Orders were successful: during Spoofing Episodes, the price of Quantum's stock decreased by between 64 and 122 basis points, compared to an average decrease of 1.38 basis points during non-spoofing periods. *Id.* ¶ 202. Making matters worse, prices generally remained at suppressed levels for hours or more. *Id.* Indeed, empirical analysis of Quantum's stock price before and after each Spoofing Episode indicates that, although the price of Quantum stock was not typically falling before the Spoofing Episode, the price sharply decreased after Defendants submitted Baiting Orders and remained below pre-spoofing prices for days. *Id.* ¶¶ 203–04.

Quantum, which sold approximately 90 million shares of its stock during the Relevant Period, was thus harmed. *Id.* ¶ 198. For example, Quantum sold hundreds of thousands of shares mere minutes after Defendants engaged in spoofing. *Id.* ¶ 209. It sold another 10 million shares in the United States and Canada within an hour of Defendants' Spoofing Episodes. *Id.* ¶¶ 211–12. Each of these sales occurred at artificially depressed prices. *Id.*

It bears emphasizing that Quantum has not identified the full extent of Defendants' spoofing, especially in the United States. *Id.* ¶¶ 62, 69 n.7. Indeed, although Canadian trading data is partially deanonymized, United States trading data is fully anonymized, making it particularly difficult to identify spoofing. *Id.* ¶¶ 58–59. Nevertheless, with the help of an expert, Quantum has identified more than 700 Spoofing Episodes in the United States that occurred less than five minutes before Quantum's sales during the Relevant Period. *Id.* ¶ 62. Using an imputation methodology that other courts have accepted (and that Quantum's experts tested for reliability), Quantum has found that Defendants were responsible for at least some of those episodes. *Id.* ¶¶ 59–61. Given that trading volume is significantly higher in the United States and that Defendants

were by far the most frequent spoofers identified in Canadian trading data, Quantum infers that

Defendants are responsible for extensive spoofing in the United States. *Id.*

## ARGUMENT

### I. DEFENDANTS' JURISDICTIONAL ARGUMENTS FAIL

#### A. This Court Has Personal Jurisdiction

This Court has specific personal jurisdiction over CIBC and RBC, both of which are

accused of participating in a cross-border spoofing scheme intended to manipulate the price of

Quantum's stock in the United States and Canada. "In analyzing specific personal jurisdiction,

'[c]ourts typically require that the plaintiff show some sort of causal relationship between a

defendant's U.S. contacts and the episode in suit, and the plaintiff's claim must in some way arise

from the defendants purposeful contacts with the forum.'" *Harrington Glob. Opportunity Fund,*

*Ltd. v. CIBC World Mkts. Corp.*, 585 F. Supp. 3d 405, 414 (S.D.N.Y. 2022) (quoting *Charles*

*Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018)). These requirements are

readily met here, as demonstrated by recent, on-point authority that Defendants ignore.

In *Harrington*, the plaintiff alleged that Canadian brokers and their affiliates—including

CIBC—engaged in spoofing on American and Canadian markets. *Harrington Glob. Opportunity*

*Fund, Ltd. v. CIBC World Mkts. Corp.*, 2023 WL 6316252, at *1 (S.D.N.Y. Sept. 28, 2023). In

particular, the plaintiff alleged that "the Canadian Defendants 'conducted continuous activity in

New York state . . . by employing high speed algorithmic computer systems to disseminate and/or

effect orders and execute trades of Concordia shares throughout the U.S.,'" and that those

defendants "routed orders to intermediary broker-dealers in the U.S. to be executed for their

customers." *Id.* at *3. The court held that "these allegations are sufficient to make out a prima facie

case for a causal relationship between the Canadian Defendant's U.S. contacts and Plaintiff's

claims" and denied the defendants' motion to dismiss the spoofing claims on personal jurisdiction grounds. *Id.*; *see also Harrington*, 585 F. Supp. 3d at 414 (same on prior motion to dismiss).

Similarly, here, Quantum alleges that CIBC and RBC "engaged in manipulative trading practices, with the intent to manipulate the price of Quantum, on both United States and Canadian markets" and "engaged in cross-border spoofing schemes that were intended to manipulate, and did in fact manipulate, the price of Quantum stock in the United States and Canada." AC ¶¶ 14, 16. Quantum further alleges that, as to their manipulative trading, CIBC and RBC have "conducted continuous activity in New York, directly related to [Quantum's] claims, by employing high-speed algorithmic computer systems to disseminate and/or effect orders and execute trades of Quantum shares throughout the United States," and "route[d] to intermediary broker-dealers in the United States orders to be executed for [their] customers." AC ¶¶ 8–11. Quantum has thus met its burden.

Defendants nevertheless claim (at 11) that the Court lacks personal jurisdiction over them because, in Defendants' view, Quantum failed to "plead a *single trade* placed by any Defendant that occurred in or was 'directed' at this District." (emphasis added). But even if Defendants were correct (they aren't, as explained below), that would not mean that the Court lacked personal jurisdiction. *See Harrington*, 585 F. Supp. 3d at 414–15 (finding personal jurisdiction "even if none of the Canadian Defendants traded on a U.S. exchange"). Indeed, the *Harrington* defendants—a group that included CIBC—made the *same argument*, Defs.' MTD at 2–3, *Harrington*, No. 1:21-cv-00761 (S.D.N.Y. Jan. 27, 2023), Dkt. No. 136, but it was rejected.

Specifically, under the "'effects' theory of jurisdiction," where "conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff," a court may exercise jurisdiction over defendants that "expressly aimed [their] conduct at the forum." *Harrington*, 2023

WL 6316252, at *3. In *Harrington*, the court found this test was satisfied because the operative complaint "allege[d] that the purpose and intent of the cross-border spoofing scheme was to manipulate the price of Concordia shares in the U.S." 2023 WL 6316252, at *3; *see also Harrington*, 585 F. Supp. 3d at 414–15 (effects test satisfied where plaintiff alleged "that the conduct of the Canadian Defendants on Canadian exchanges was intended to manipulate the price of Concordia shares which were listed and traded on the NASDAQ").

So too here. Quantum alleges that Defendants' "cross-border spoofing schemes" were "intended to manipulate" the price of Quantum "in the United States and Canada" (including by sending "false and misleading pricing signals to the market") and "had a significant immediate impact on the price of Quantum's shares simultaneously in the United States and Canadian markets." AC ¶ 16; *see also Harrington*, 2023 WL 6316252, at *3 (discussing similar allegations). Indeed, Quantum explains that "because Quantum is an interlisted security," "manipulation of the market price in one market directly and immediately affects the trading price in the other country's market." AC ¶ 16; *see also Harrington*, 2023 WL 6316252, at *3 (discussing similar allegations). In light of this dynamic, the "the success" of Defendants' spoofing scheme "*depended*" on Defendants engaging in similar manipulative trades on both sides of the border. AC ¶ 76 (emphasis added). Thus, in contrast to Defendants' cited authority, Quantum plausibly alleges that Defendants *aimed* their conduct at this jurisdiction. *See Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 595 (S.D.N.Y. 2017) (distinguishing *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015), on the grounds that, in that case, there was "no clear allegation that the purpose of defendants' manipulation was to increase its profits from transactions in that type of municipal bond also in New York"); *In re*

*Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *44–45 (S.D.N.Y. Mar. 28, 2017) (plaintiff did not allege that defendants' "conduct was aimed at the United States").[2]

In any event, contrary to Defendants' argument, Quantum identifies *specific* manipulative trades made by Defendants in the United States. AC ¶¶ 113–17 (trades placed by CIBC on February 10, 2021, between 09:37:39 and 10:29:59), 118–22 (trades placed by CIBC on March 19, 2021, between 11:55.13 and 12:12:28), 154–59 (trades placed by RBC on May 3, 2021, at around 11:48:14), 173–77 (trades placed by John Doe 1 on July 22, 2020, between 11:55:45 and 12:54:47), 184–87 (trades placed by John Doe 1 on February 1, 2021, between 09:57:41 and 10:43:56), 194–97 (trades placed by John Doe 1 on February 11, 2021, between 1:13:10 and 15:59:58). Although United States trading data is anonymized, Quantum was able to identify these trades using a methodology sometimes known as "probabilistic imputation," where trades placed on American exchanges within 10 milliseconds of Defendants' trades on Canadian exchanges are attributed to Defendants. *Id.* ¶¶ 59–61; *see also Mullen Auto., Inc. v. IMC Fin. Mkts.*, 2025 WL 951501, at *4 (S.D.N.Y. Mar. 28, 2025) (accepting similar methodology). Quantum "independently verified the reliability of this methodology by testing it on a sample of deanonymized Canadian trading data" and concluded that "trades placed within ten milliseconds" were "typically placed through the same broker." AC ¶ 61.

Defendants take issue with this methodology (at 11–12) on the grounds that "modern financial markets operate at extremely high speeds," such that "[a] later-in-time order placed

---

[2] Defendants cite (at 14) *Fire & Police Pension Association of Colorado v. Bank of Montreal*, 368 F. Supp. 3d 681, 711 (S.D.N.Y. 2019), for the proposition that "[c]ourts have refused to exercise personal jurisdiction over CIBC and RBC in similar circumstances." The "circumstances" at issue in that case, where the defendants' contacts with the jurisdiction were unrelated to the claims, are far less similar to this case than those in *Harrington*, which similarly involved allegations of a cross-border spoofing scheme.

shortly after (within 'ten milliseconds' of) an earlier-in-time order is just as likely, if not more likely, to have been placed by independent market participants *in reaction* to the earlier-in-time order." (emphasis in original). That empirical assertion is based on nothing more than Defendants' say-so and is irrelevant for purposes of a motion to dismiss. *See Campanelli v. Flagstar Bancorp, Inc.*, 2020 WL 5350245, at *8 (S.D.N.Y. Sept. 4, 2020) ("Flagstar's argument that its say-so on these points must be credited on a motion to dismiss is plainly improper."); *cf. In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 670 (S.D.N.Y. 2016) ("[A]t the pleading stage, the Court may not pick and choose among plausible explanations and must assume that Plaintiffs' well-pled allegations are true, regardless of whether they are probable."). Setting that aside, Quantum expressly alleges that it tested its imputation methodology and found—contrary to Defendants' unsupported assertion—that trades placed sufficiently close in time are "typically" placed by or through the same actor. AC ¶ 61.

Further supporting Quantum's allegations that Defendants placed manipulative trades on American markets, as explained in the operative complaint, "[t]hat Defendants would simultaneously carry out their spoofing activities in the United States market comports with common sense." *Id.* ¶ 76. Indeed, "the success of Defendants' spoofing activity in the Canadian market . . . depended on Defendants also engaging in similar manipulative conduct in the United States market." *Id.* That is because "absent such conduct in the United States, sellers would simply choose to sell at higher prices on the United States market as opposed to selling at artificially deflated prices on the Canadian market." *Id.*[3]

---

[3] Defendants further argue (at 11) that they "*could not* have executed the anonymized trades on U.S. exchanges that Plaintiff attributes to them." (emphasis added). Even crediting Defendants' factual argument on a motion to dismiss, Quantum expressly alleges that Defendants "route[] to intermediary broker-dealers in the United States orders to be executed" for their customers and

For these reasons, Quantum's allegations are "sufficient to draw a reasonable inference" that Defendants engaged in the trades identified by Quantum's methodology. *Mullen*, 2025 WL 951501, at *4.[4] Such a finding is particularly appropriate because much of the relevant information "is uniquely in the Defendants' knowledge." *Id.* (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007)). Indeed, given that United States trading data is anonymized, it is unclear what more Quantum could do to identify the parties responsible for extensively spoofing its stock on American markets during the Relevant Period. *See* AC ¶ 62 ("[T]he available data suggests that market participants frequently spoofed Quantum's stock during the Relevant Period. For example, a preliminary analysis of US trading data indicates that there were more than 700 spoofing *episodes* with respect to Quantum stock over the Relevant Period when the data is limited to trading within *five minutes* before Quantum's share sales." (emphases in original)).

In addition, because Quantum has sufficiently alleged that Defendants aimed their conduct at American markets, Defendants' argument (at 14–15) that it would be "unreasonable" for the Court to exercise jurisdiction over them, falls flat. "Where a plaintiff makes the threshold showing of the minimum contacts required," "a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002)). It takes an "exceptional situation" for the defendant to satisfy that burden. *Id.* at 274. Defendants' own cited authority makes clear that this is not such a case. *See Sonterra Capital*, 277 F. Supp. 3d at 598 ("To the extent that defendants

---

"employ[] high-speed algorithmic computer systems to disseminate and/or effect orders and execute trades of Quantum shares throughout the United States." AC ¶¶ 8–11.

[4] Defendants emphasize (at 12) that, in *Mullen*, the imputation period used was shorter. Data limitations prevented Quantum from using a 1-millisecond or nanosecond period here.

are alleged to have purposefully availed themselves of the forum by manipulating CHF LIBOR in order to wrongfully profit from CHF LIBOR-based derivatives, including in the forum, their answering for that alleged misconduct in the forum clearly comports with fair play and substantial justice.").

### B.    Quantum's Claims Are Not Impermissibly Extraterritorial

Quantum's claims are not impermissibly extraterritorial under *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010). Defendants' argument to the contrary ignores the same recent, on-point authority that Defendants ignored in connection with their personal jurisdiction argument. Specifically, in *Harrington*, the court found that the plaintiffs' spoofing claim against Canadian brokers did not run afoul of *Morrison*, because the plaintiffs alleged that "the Canadian Defendants engaged in trading on U.S. exchanges in relation to the spoofing scheme, with the intent to manipulate the price of Concordia stock on U.S. exchanges." 2023 WL 6316252, at *4. As shown above, Quantum makes substantially similar allegations here.[5]

Defendants nevertheless argue (at 17) that Quantum's claims should be dismissed because they are "predominantly foreign" under *Parkcentral Global Hub Ltd. v. Porsche Automotive Holdings SE*, 763 F.3d 198 (2d Cir. 2014).[6] Courts in this circuit have construed *Parkcentral* narrowly. *See, e.g.*, *In re Poseidon Concepts Sec. Litig.*, 2016 WL 3017395, at *12–13 (S.D.N.Y. May 24, 2016) (distinguishing *Parkcentral* on grounds that it "was tied to the derivative security

---

[5] Defendants' cited authority, *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014), which stands for the proposition that Section 10(b) does not necessarily apply to "claims by a foreign purchaser of foreign-issued shares on a foreign exchange simply because those shares are also listed on a domestic exchange," is inapposite. As shown, Quantum alleges more than that its shares were cross-listed on domestic exchanges.

[6] It bears noting that other circuits have rejected *Parkcentral*. *See, e.g.*, *SEC v. Morrone*, 997 F.3d 52, 60 (1st Cir. 2021) ("Like the Ninth Circuit, we reject *Parkcentral* as inconsistent with *Morrison*."). Quantum respectfully agrees with those other circuits.

it addressed"). In *Harrington*, the court rejected the defendants' *Parkcentral* argument on the grounds that the plaintiffs alleged that the "Canadian Spoofing Defendants engaged in at least some conduct in the United States in their purported effort to manipulate Concordia's stock on U.S. exchanges," and that "[i]t would require an inference in favor of Canadian Defendants to view the Complaint as alleging the predominance of foreign conduct over conduct within the United States by the Canadian Defendants." 585 F. Supp. 3d at 421. So too here.

Indeed, not only does Quantum allege that Defendants engaged in manipulative trading of Quantum stock on American exchanges (and that Defendants did so with the intent of manipulating the price of that stock), but it also explains why "there are reasons to believe that Defendants engaged in far more extensive spoofing on United States exchanges than Quantum has detected to date." AC ¶ 62. For example, (i) "analysis of Canadian trading data indicated that Defendants repeatedly engaged in spoofing on Canadian exchanges"—and did so "far more than other market participants for which data is available"; (ii) "a preliminary analysis of" limited and anonymized American trading data indicates that currently-unidentified "market participants frequently spoofed Quantum's stock during the Relevant Period" (with "more than 700 spoofing *episodes*" occurring "within *five minutes* before Quantum's share sales" during the Relevant Period); and (iii) "trading volume is far higher on US exchanges than on Canadian exchanges." *Id.* It is thus reasonable to infer that Defendants' cross-border spoofing scheme was primarily executed on this side of the border. Defendants cite no authority that suggests dismissal under *Parkcentral* is appropriate under these circumstances. *See In re iAnthus Capital Holdings, Inc. Sec. Litig.*, 2022 WL 4539119, at *9 (S.D.N.Y. Sept. 28, 2022) (rejecting argument that claims should be dismissed under *Parkcentral* because they arose out of "Canadian securities filings by a Canadian company

whose securities are listed on a Canadian exchange" and were "the subject of several Canadian actions and a Canadian restructuring process").

### C.    This Forum Is Not Inconvenient

Quantum's claims—which arise out of Defendants' manipulative trading in this district in violation of federal securities laws—should not be dismissed on *forum non conveniens* grounds. As the Second Circuit has emphasized, "the plaintiff's choice of forum should rarely be disturbed." *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 28 (2d Cir. 2002) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Accordingly, "[a] defendant who invokes *forum non conveniens* generally bears 'a heavy burden' in opposing plaintiff's chosen forum." *Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *5 (S.D.N.Y. Mar. 28, 2017) (quoting *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007)). Indeed, "[d]ismissal is warranted 'only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable.'" *Glob. Art Exhibitions, Inc. v. Kuhn & Bulow Italia Versicherungsmakler GmbH*, 607 F. Supp. 3d 421, 436 (S.D.N.Y. 2022) (quoting *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 74–75 (2d Cir. 2001)). Defendants cannot make that showing here.

First, underscoring that Quantum's selection of this forum is entitled to deference, this action has a "'bona fide' connection to the United States." *DiRienzo*, 294 F.3d at 28. Specifically, Quantum asserts claims under federal securities law in connection with Defendants' manipulative trading of its stock *on Nasdaq*, a major stock exchange located in this district. AC ¶¶ 14–16; *see also DiRienzo*, 294 F.3d at 28 ("In fact, plaintiffs offered a quite valid reason for litigating in federal court: this country's interest in having United States courts enforce United States securities laws."); *Poseidon*, 2016 WL 3017395, at *9 ("The Lead Plaintiff's choice of this district is entitled to significant deference. The claims arise under U.S. securities laws. Securities litigation is regularly litigated in New York, which is the nation's financial center."). In addition, there is no

basis to conclude that Quantum has selected this forum for purposes of "harassment." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 155 (2d Cir. 2005). Indeed, Defendants are major corporations that can easily travel to the United States and that have corporate affiliates with offices in Manhattan. *See DiRienzo*, 924 F.3d at 30 ("Willing witnesses can easily travel from Toronto to New York by a direct 90 minute flight . . . ."); *Poseidon*, 2016 WL 3017395, at *9 ("As a transportation hub, travel to New York is relatively convenient for both the Floridian Lead Plaintiff and the Canadian defendants."). And although Quantum cannot know with certainty without discovery, Quantum reasonably believes that the bulk of Defendants' spoofing activity occurred on American exchanges, where "trading volume is far higher." AC ¶ 62.[7]

Second, even if Canada is an adequate alternative forum, Defendants cannot establish, as they must, that "the balance of the private and public convenience factors 'tilt[s] strongly in favor of the foreign forum.'" *Poseidon*, 2016 WL 3017395, at *9 (quoting *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 479 (2d Cir. 2002)) (alterations in original). As to private factors, it would not be burdensome or oppressive for Defendants to litigate this matter in New York (where CIBC is already litigating a similar case, *Harrington*). *See id.* at *10 ("While KPMG correctly notes that evidence and witnesses are located in Canada, the costs of proceeding with the case in New York will not be unduly burdensome to KPMG."); *DiRienzo*, 294 F.3d at 29–31 (finding "balance of the private interest factors is close," where "the bulk of relevant documents" and "most of the potential witnesses with direct knowledge of the alleged fraud" were in Ontario). Defendants do not suggest otherwise. *See In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 301 (E.D.N.Y. 2002) ("[N]one

---

[7] Accordingly, in contrast to Defendants' cited authority, Defendants' forum-directed conduct here is not immaterial to Quantum's claims. *See Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 611–12 (2d Cir. 1998) (alleged connections to the United States were a "red herring"); *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 232 (S.D.N.Y. 2007) (describing contacts between United States and events giving rise to case as "minimal").

of the defendants has indicated that it will be too expensive or inconvenient for them to appear if the trial is in New York."). In addition, many potential non-party witnesses and subpoena targets are likely located in New York, not Canada, including exchanges that possess trading data and "intermediary broker-dealers" through which Defendants routed orders in the United States. AC ¶¶ 8, 10.[8] As a result, litigating this matter in New York will likely be more efficient.

Nor do the public interest factors strongly support dismissal. As the Second Circuit has explained, "[a] strong public interest favors access to American courts for those who use American securities markets." *DiRienzo*, 294 F.3d at 33; *see also In re Hub Cyber Sec. Ltd.*, 2025 WL 872078, at *6 (S.D.N.Y. Mar. 20, 2025) (same); *iAnthus Capital Holdings*, 2022 WL 4539119, at *13 ("The public interest of the United States in adjudicating federal law claims such as these is strong."); *Villella*, 2017 WL 1169629, at *9 (noting that the United States "has a strong interest in upholding its federal securities laws"); *Poseidon*, 2016 WL 3017395, at *10 ("[T]here is a strong interest in having American courts interpret and apply U.S. securities law[s]."). Those interests are particularly strong in this forum, where Nasdaq is based. *See Petersen Energia Inversora S.A.U. v. Argentine Republic*, 2020 WL 3034824, at *13 (S.D.N.Y. June 5, 2020) ("New York clearly has a strong interest in policing activities directed toward its stock markets." (quoting *Cyberscan Tech., Inc. v. Sema Ltd.*, 2006 WL 3690651, at *6 (S.D.N.Y. Dec. 13, 2006))); *accord DiRienzo*, 294 F.3d at 31 ("[T]he Southern District of New York, home to the American stock exchanges

---

[8] This case is thus factually distinguishable from Defendants' cited authority. *See In re Royal Grp. Techs. Sec. Litig.*, 2005 WL 3105341, at *3 (S.D.N.Y. Nov. 21, 2005) ("This action will hinge in large part on the testimony and evidence of non-party witnesses, including Royal Group's auditors, the banks involved in the underlying transactions, and the independent directors and outside consultants who investigated the alleged fraud. None of these entities or individuals may be compelled to testify in this Court.").

through which Philip sold shares, has a local interest in this lawsuit.").[9] In addition, although this district "may have one of the nation's busiest dockets," "its administration is very efficient," and "there is no basis to assume" that Canadian courts are more efficient or less "congested." *Glob. Art Exhibitions*, 607 F. Supp. 3d at 440; *see also Hub Cyber Sec.*, 2025 WL 872078, at *7 ("there is no issue with court congestion"); *Poseidon*, 2016 WL 3017395, at *10 (same); *cf. DiRienzo*, 294 F.3d at 31 (Ontario courts "suffer from congestion").

## II. DEFENDANTS' EXCHANGE ACT ARGUMENTS FAIL

### A. Quantum Sufficiently Pleads Manipulative Acts

Quantum has sufficiently pleaded that Defendants engaged in manipulative acts. Because a claim for manipulation "can involve facts solely within the defendant's knowledge," "at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI*, 493 F.3d at 102. "Accordingly, a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *Id.* "This test will be satisfied if the complaint sets forth, to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id.*

The operative complaint has done so. First, Quantum explains the nature, purpose, and effect of Defendants' spoofing scheme—namely, repeatedly placing Baiting Orders to artificially drive down the price of Quantum stock, purchasing Quantum stock at those artificially-deflated prices, and then cancelling those Baiting Orders. AC ¶¶ 53–57. Second, Quantum specifically

---

[9] This case thus stands in contrast to Defendants' cited authority. *See Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1233–34 (2d Cir. 1996) ("[I]t was also appropriate to take into account that Great Britain has a more substantial interest because the litigation involves the right to a seat on the board of directors of a Scottish corporation.").

identifies which manipulative acts were performed by which Defendant and when, as well as the impact of those manipulative acts. Indeed, Quantum provides detailed examples of each Defendant's spoofing trades and the price impact of that manipulative trading. *See, e.g.*, *id.* ¶¶ 97–102 (describing CIBC's spoofing trades on June 3, 2020, between 15:03:58.406 and 15:04:05.849, which led to the price of Quantum stock declining from $10.98 to $10.69), 144–48 (describing RBC's spoofing trades on August 10, 2020, between 11:08:07.444670187 and 11:09:40.742, which led to the price of Quantum stock declining from $4.05 to $4.00). Quantum further provides aggregate information concerning each Defendant's spoofing trades during the Relevant Period, *see id.* ¶¶ 58, 65, 66, 69 (summarizing incidents), and detailed information about each Defendant's spoofing activity that occurred in close temporal proximity to Quantum's own share sales, *see id.* ¶¶ 209, 211.

Recent, on-point authority from this circuit—which, again, Defendants ignore—demonstrates that these allegations are sufficient. *See Phunware, Inc. v. UBS Sec. LLC*, 2024 WL 1465244, at *4–5 (S.D.N.Y. Apr. 4, 2024) (rejecting argument that plaintiff failed to adequately plead manipulative act in spoofing case, where plaintiff alleged "that Defendant engaged in a spoofing scheme to artificially depress the price of PHUN, which had the effect of lowering PHUN's trading price[s]," and provided "specific examples of six episodes of Defendant engaging in spoofing behavior"); *Mullen*, 2025 WL 951501, at *3–4 (same, where plaintiff outlined "Defendants' efforts to artificially depress the price of Mullen securities and the subsequent effects on the market" and provided "eight illustrative examples of spoofing episodes by the Defendants"); *Harrington*, 2023 WL 6316252, at *5–6 (same, where plaintiff provided "seven illustrative examples of specific Defendants engaged in spoofing cycles involving Concordia shares"); *Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, 2023 WL 9102400, at *13–20 (S.D.N.Y. Dec.

29, 2023), *report and recommendation adopted*, 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024) (same, where plaintiff provided "sixteen Example Episodes, each of which details, *inter alia*: the date and time of the Spoofing Episode, the timing and price range of the Baiting Orders, the make-up of the Defendant's order book after the Baiting Orders, the timing and price of an Executing Purchase, and the amount of time that elapsed between the Executing Purchase and the cancellation of the Baiting Orders").

None of Defendants' arguments to the contrary suggest otherwise. Although Defendants incredibly claim (at 21–22) that Quantum's spoofing allegations are "conclusory," the operative complaint contains extensive factual allegations that support the inference that each Defendant engaged in spoofing. For each Defendant, in addition to providing detailed examples of spoofing incidents, AC ¶¶ 96–164, Quantum summarizes the number of Spoofing Episodes, the number of Baiting Orders, the price impact of those Baiting Orders, the number of Executing Orders (which were placed almost "instantaneously" with the Baiting Orders), the ratio of Baiting Orders to Executing Orders, and the ratio of Baiting Orders to executed sell-side orders during Spoofing Episodes, *id.* ¶¶ 58, 65, 66, 69, 81. Quantum further highlights other data points demonstrating that Defendants' Baiting Orders were placed to create the false impression of increased supply. *Id.* ¶¶ 79–84. For example, during Spoofing Episodes, (i) Defendants submitted and cancelled far more sell-side orders than other market participants, (ii) Defendants purchased far more shares at depressed prices than other market participants, (iii) Defendants placed and cancelled far more sell-side orders than they executed, (iv) Defendants executed far more buy-side orders than sell-side orders, (v) Defendants placed and cancelled far more sell-side orders per executed buy-side order than during non-spoofing periods, and (vi) Defendants cancelled far more sell-side orders than buy-side orders. *Id.* Courts have found that similar factual allegations are sufficient at this

stage to distinguish spoofing from legitimate market activity. *See Nw. Biotherapeutics*, 2023 WL 9102400, at *15–20 (citing similar allegations); *Mullen*, 2025 WL 951501, at *3 (same); *Phunware*, 20224 WL 1465244, at *5 (same); *Harrington*, 2023 WL 6316252, at *6 (same).

Relying on out-of-circuit authority, Defendants assert (at 22) that "rapidly placing and cancelling orders, by itself, does not amount to market manipulation." (cleaned up). Although that may be true, as in Defendants' cited case, Quantum alleges "something more" than merely the placement and cancellation of orders. *Kessev Tov, LLC v. Doe(s)*, 2023 WL 4825110, at *3–4 (N.D. Ill. July 27, 2023) (plaintiff adequately pleaded manipulative acts). Indeed, consistent with applicable precedent, Quantum alleges that many of the "indicia" or "hallmarks" of spoofing are present here, including (i) "placing large orders on one side of the market—so-called 'baiting orders'—opposite smaller orders on the other side," (ii) "cancelling the baiting orders after the spoofer's legitimate smaller orders are filled," (iii) "a very brief passage of time between the placement and cancellation of the baiting orders," and (iv) "conduct that is contradictory to that of ordinary market making behavior." *Nw. Biotherapeutics*, 2023 WL 9102400, at *14–15; *see* AC ¶¶ 58 (baiting orders), 63 (order-flow imbalance), 65 (price impact), 66 (near-instantaneous buy-side orders and purchases), 67 (prompt cancellation), 69 (comparison of sell-side and buy-side activity), 79–80 (comparisons to other market participants' activity), 81–83 (comparisons to Defendants' non-spoofing activity), 84 (comparison to legitimate market-making activity).

Defendants further claim (at 22) that "Quantum fails to identify 'which defendants' performed what allegedly manipulative acts." Again, Quantum specifically identifies manipulative trades by each Defendant, including the precise date and time of those trades and the identity of the responsible Defendant. AC ¶¶ 96–164 (providing specific examples). Accordingly, just as when CIBC made the same argument in *Harrington*, Defendants' argument is "unfounded" here.

585 F. Supp. 3d at 416–17; *see also Mullen*, 2025 WL 951501, at *3 ("Defendants also argue that 'Plaintiffs improperly aggregate the trading of each broker-dealer and its many customers.' However, Plaintiffs separately their list of spoofing episodes by each individual Defendant." (internal citations omitted)).

Defendants also argue (at 23) that Quantum impermissibly relies on trading data that "combines all orders placed under a broker-dealer's 'unique identifier,' and does not distinguish between orders placed by Defendants for their own book, and orders placed by or on behalf of customers." Courts in this district have repeatedly rejected that exact argument. *See Harrington*, 585 F. Supp. 3d at 416 ("That the Complaint mentions that Defendants trade for their own proprietary accounts and the accounts of their customers does not undercut the Complaint's numerous allegations that Defendants designed and operated the algorithms that spoofed Concordia['s] stock."); *Nw. Biotherapeutics*, 2023 WL 9102400, at *18 ("NWBO need not allege that Baiting Orders were placed and cancelled by clients, let alone the same client, for its theory to survive. Such an allegation is not relevant to Plaintiff's theory of the case, which focuses on *Defendants'* control over the high-speed trading algorithms and *Defendants'* responsibility to monitor such algorithms." (emphases in original)); *Mullen*, 2025 WL 951501, at *3 ("Courts in this District have held that claims based on similar allegations adequately state a claim, rejecting arguments akin to Defendant[s'], that a complaint must tie trading activity to particular clients or accounts." (quoting *Phunware*, 2024 WL 1465244, at *4)). As in those cases, Quantum alleges that the manipulative trades were executed by Defendants' algorithms and that Defendants had an obligation to monitor trading through their platforms. AC ¶¶ 6, 9, 11, 32, 53, 85. Quantum thus plausibly alleges that Defendants were *responsible* for the trades, whether Defendants placed them on their own behalf or simply failed to monitor customer trading. *See Harrington*, 2023 WL

6316252, at *7 ("The SAC details a pattern of spoofing activity that strongly suggests Defendants shirked these [gatekeeping] duties.").

### B.    Quantum Sufficiently Pleads Scienter

Quantum has sufficiently pleaded scienter. "To establish scienter, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021) (cleaned up). Scienter is evaluated "holistically, considering *all* of the facts alleged, taken collectively, rather than any individual allegation, scrutinized in isolation." *Id.* (cleaned up) (emphasis in original). "Even when applying the PSLRA's heightened pleading standard for scienter, courts must accept the facts alleged in the complaint as true, and draw all reasonable inferences in the plaintiff's favor." *Nw. Biotherapeutics*, 2023 WL 9102400, at *28 (cleaned up).

### 1.    Conscious Misbehavior or Recklessness

Quantum has sufficiently pleaded conscious misbehavior or recklessness. "In a market manipulation case, the scienter and manipulative acts inquiries overlap." *Nw. Biotherapeutics*, 2023 WL 9102400, at *26. "In the context of spoofing, which consists of otherwise permissible market activity, courts look[] to various indicia differentiating market manipulation from legitimate trading for purposes of scienter, including (1) a short period of time, often milliseconds, between placing and cancelling orders and between executing transactions and cancelling orders on the other side of the market, (2) the cancellation of orders when some orders on the same side of the market are partially or completely fulfilled, (3) 'parking' baiting orders behind legitimate orders placed by other traders to ensure they are not fulfilled, (4) large disparities between volume of alleged baiting orders on one side of the market and executed orders on the other, and (5) other conduct unlike ordinary market making activity." *Phunware*, 2024 WL 1465244, at *5.

Quantum plausibly alleges that each of these indicia are present here. First, Quantum alleges that Defendants placed and cancelled sell-side Baiting Orders within milliseconds and similarly placed buy-side purchase orders and cancelled sell-side Baiting Orders in close temporal proximity. *See* AC ¶¶ 55–56 (summarizing scheme), 66–67 (same), 97–143 (specific examples for CIBC), 144–64 (specific examples for RBC). Second, Quantum alleges that Defendants cancelled sell-side Baiting Orders immediately after their buy-side orders were filled. *See id.* Third, Quantum alleges that Defendants priced their sell-side orders above the prevailing best offer and thus parked their orders. *See, e.g.*, *id.* ¶¶ 97–112 (CIBC), 144–46 (RBC). Fourth, Quantum alleges that Defendants placed far more sell-side Baiting Orders than executed buy-side orders. *See id.* ¶¶ 69 (summary data for each Defendant), 79 (similar), 81 (similar). And fifth, Quantum points to several facts that further distinguish Defendants' trading from ordinary market making activity, including that Defendants' order books were imbalanced during Spoofing Episodes and that Defendants cancelled far more sell-side orders than buy-side orders during those episodes. *See id.* ¶¶ 63 (order books imbalanced), 84 (higher rate of cancellation on sell-side), 98 (CIBC example), 145 (RBC example). Quantum further distinguishes Defendants trading by comparing it to other market participants' behavior during the same periods and to Defendants' own behavior during non-spoofing episodes. *See id.* ¶¶ 79 (higher ratio of cancelled sell-side orders per purchase compared to other market participants), 80 (purchased more shares at deflated prices after sell-side Baiting Orders compared to other market participants), 81 (cancelled more sell-side Baiting Orders per share sold during Spoofing Episodes than during non-Spoofing Episodes), 83 (cancelled more sell-side Baiting Orders per share purchased during Spoofing Episodes than during non-Spoofing Episodes).

24

Courts have repeatedly found that similar allegations were sufficient to plead conscious misbehavior or recklessness, including against CIBC. *See Harrington*, 585 F. Supp. 3d at 417–18 (summarizing similar allegations); *Harrington*, 2023 WL 6316252, at *6–7 (same); *Nw. Biotherapeutics*, 2023 WL 9102400, at *26–28 (same); *Phunware*, 2024 WL 1465244, at *5 (same); *Mullen*, 2025 WL 951501, at *4–5 (same). Indeed, Defendants are sophisticated registered broker-dealers and were well aware of their obligations with respect to market manipulation and spoofing. AC ¶¶ 6, 32, 87–88. It is reasonable to infer that they not only knew that they (or their customers) were repeatedly spoofing Quantum's stock on Canadian and American stock exchanges, but that they also knew that it was unlawful to do so. Defendants cite no authority that suggests otherwise.

Opting to ignore *Harrington*, *Northwest Biotherapeutics*, *Phunware*, and *Mullen*, Defendants instead argue (at 29) that Quantum cannot show scienter because some of the data points referenced in the operative complaint "are based on the combined order activity of numerous independent actors, and do not distinguish Defendants from their customers, or individual Defendants (or their traders) from each other." For the same reasons that this argument failed in the manipulative-act context, it fails here. *See Nw. Biotherapeutics*, 2023 WL 9102400, at *26 ("As in *Harrington*, the possibility that Defendants may have traded for clients does not undercut the FAC's numerous allegations that Defendants designed and operated the algorithms that spoofed Plaintiff's stock." (cleaned up)); *Phunware*, 2024 WL 1465244, at *6 ("Defendant also argues that its trading activity should not be aggregated to determine a pattern from which to infer scienter. This fails for the reasons discussed above—namely, that the Complaint alleges a course of conduct by Defendant and does not include allegations suggesting Defendant was acting on the instructions of clients." (internal citations omitted)). Indeed, Defendants designed and managed

their own trading algorithms and were obligated to ensure that their platforms were not used for manipulative trading. AC ¶¶ 6, 32, 53, 85, 87. To the extent that Defendants mean to argue that aggregated data creates the false impression that Defendants (or entities trading through Defendants) engaged in spoofing, it bears emphasizing that Quantum's analysis of trading data indicates that Defendants (or entities trading through Defendants) engaged in spoofing "*far more than other market participants for which data is available.*" *Id.* ¶ 62 (emphasis added).

Defendants further argue (at 30–31) that Quantum has failed to allege with sufficient particularity that Defendants approved of or were otherwise aware of the spoofing described in the operative complaint. This argument was addressed and rejected in *Harrington*:

> Defendants argue that the Complaint needs to plead additional facts regarding Defendants' algorithmic trading programs and the corporate officials who designed or oversaw those programs. Defendants' argument is unfounded because "[a] claim of manipulation . . . can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI Commc'ns*, 493 F.3d at 102; *accord In re Tether & Bitfinex Crypto Asset Litig.*, No. 19 Civ. 9236, 2021 WL 4452181, at *33 (S.D.N.Y. Sept. 28, 2021). If Defendants' argument were correct, it is hard to fathom how any plaintiff could plead a market manipulation claim based on spoofing through high-frequency trading algorithms.

585 F. Supp. 3d at 418; *see also Harrington*, 2023 WL 6316252, at *8 (rejecting argument that "Plaintiff's allegations that 'each Defendant's trading activities were approved by corporate officials'" was "conclusory," as "unfounded" because information regarding manipulation was in defendants' possession); *Nw. Biotherapeutics*, 2023 WL 9102400, at *27 (similar). Defendants' argument should be rejected for the same reason here.

## 2.    Motive and Opportunity

Quantum has also sufficiently pleaded motive and opportunity. In the context of spoofing, courts hold that allegations of "a scheme to take advantage of depressed prices" are sufficient "to plead scienter under a motive-and-opportunity theory." *Nw. Biotherapeutics*, 2023 WL 9102400,

at *24; *see also Mullen*, 2025 WL 951501, at *4 (same). That is precisely what Quantum has alleged here.

Indeed, Quantum alleges that the purpose of Defendants' spoofing schemes was to artificially depress the price of Quantum's stock, *so that* Defendants could purchase that stock at artificially depressed prices. AC ¶¶ 3, 55–57, 63–68. Quantum further alleges that, as a result of the spoofing scheme, Defendants were repeatedly able to purchase Quantum shares at such artificially depressed prices. *Id.* ¶¶ 97–143 (citing specific examples as to CIBC), 144–64 (same for RBC). This constitutes a concrete benefit for Defendants regardless of whether they were short or long Quantum stock. *Id.* ¶ 3; *see also Nw. Biotherapeutics*, 2023 WL 9102400, at *24–26 (finding that plaintiff sufficiently alleged motive and opportunity).

Defendants assert (at 26) that Quantum failed to allege that Defendants benefitted from the scheme because Quantum does not allege that the price of Quantum stock rebounded after Defendants' Spoofing Episodes. Setting aside that Defendants benefited from purchasing Quantum stock at artificially depressed prices, Quantum does not allege that the price did not rebound *at all* after Defendants' Spoofing Episodes. AC ¶ 202. In addition, to the extent that Defendants were short Quantum stock (Quantum alleges they were), *id.* ¶¶ 92–93, Defendants would profit from spoofing regardless of whether Quantum's stock price rebounded, *id.* ¶ 3.

Rehashing an argument that was raised and rejected in *Northwest Biotherapeutics* and *Mullen*, Defendants further assert (at 26–28) that it is implausible that they would engage in spoofing because their profits "would have been *de minimis* at best—shaving off a few *pennies* per share." (emphases in original). But that is true with respect to any spoofing scheme, and it does not establish that Defendants' aggregate profit from spoofing would be *de minimis*. *See Nw. Biotherapeutics*, 2023 WL 9102400, at *25 ("While profits from any single episode may be

miniscule, spoofers can generate substantial returns by repeating the scheme thousands of times across the same and different issuers' securities."). In addition, although Defendants claim that their profits from the spoofing alleged in the complaint are modest, even assuming that Defendants' calculations are correct (a point that Quantum does not concede), that does not mean that Defendants' aggregate profits from spoofing were *de minimis* either. Indeed, the operative complaint repeatedly emphasizes that it does not identify "all of the Spoofing Episodes that existed during the Relevant Period," AC ¶ 69 n.7, especially in the United States, where "there are reasons to believe that Defendants engaged in far more extensive spoofing" than "Quantum has detected to date," *id.* ¶ 62. Further, it is plausible to infer—as courts have in other cases—that Defendants spoofing efforts were not limited to a single security (here, Quantum). *See Mullen*, 2025 951501, at \*4–5 ("However, Plaintiffs allege that the Defendants are market makers who are active in a large number of securities, meaning that the accumulation of profits due to spoofing activity may be substantial, because rapid placement and cancellation allows the strategy to be repeated over and over and applied to numerous securities on an industry- or even market-wide basis." (cleaned up)). Underscoring that point, notwithstanding that spoofing is difficult to detect, AC ¶ 50, CIBC has recently been sued for spoofing another security in the United States and Canada, Concordia. *See Harrington*, 2023 WL 6316252, at \*9 (denying motion to dismiss). In any event, "[w]hether Defendants' alleged misconduct was ultimately economically rational is a matter to be explored at summary judgment or trial." *Id*. at \*8.

Defendants also argue (at 25–26) that *they* did not benefit from the spoofing schemes to the extent that *their customers* engaged in the unlawful trading. But again, Quantum alleges that Defendants designed and managed their own trading algorithms and were obligated to ensure that their platforms were not used for manipulative trading. AC ¶¶ 6, 9, 11, 32, 53, 85, 87. Defendants'

argument thus fails for the same reasons the same argument failed in prior spoofing cases. *See, e.g.*, *Nw. Biotherapeutics*, 2023 WL 9102400, at \*26 ("As in *Harrington*, the possibility that Defendants may have traded for clients does not undercut the FAC's numerous allegations that Defendants designed and operated the algorithms that spoofed Plaintiff's stock." (cleaned up)). In addition, Defendants *would* benefit from customer trading because, among other benefits, they would receive transaction fees from those trades. AC ¶ 23; *see Harrington*, 2023 WL 6316252, at \*8 (receipt of fees provided "plausible economic rationale for the alleged misconduct").

### C.    Quantum Sufficiently Pleads Loss Causation

Quantum sufficiently pleads loss causation, both under a temporal proximity theory and under a long-term impact theory. "The Second Circuit has not determined whether Rule 9(b)'s heightened pleading standard applies to allegations of loss causation, but it has explained that, regardless of which pleading standard applies, the plaintiff's pleading burden is not a heavy one." *Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, 2025 WL 934319, at \*6 (S.D.N.Y. Mar. 26, 2025) (cleaned up). "The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss" and "the alleged manipulative acts." *Id.* (cleaned up).

#### 1.    Temporal Proximity

Quantum sufficiently pleads loss causation under a temporal proximity theory. Under such a theory, the plaintiff alleges that "its trades occurred so close in time to [Defendant's] spoofing as to permit [the court] to infer as a matter of common sense that the market prices were artificial when [Plaintiff] traded." *Phunware, Inc. v. UBS Sec. LLC*, 2024 WL 4891891, at \*2 (S.D.N.Y. Nov. 26, 2024) (quoting *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022)) (alterations in original). Although "there is no bright-line rule for temporal proximity in this district," courts have found that a common-sense inference is appropriate where

the plaintiff's trades occurred within an hour of the defendants' spoofing episodes. *Mullen*, 2025 WL 951501, at *5; *see also Phunware*, 2024 WL 4891891, at *2 (citing *Northwest Biotherapeutics* for the proposition that trades within an hour were temporally proximate, and holding that "sales within seconds of Defendant's spoofing activity are sufficient to plead loss causation under the temporal proximity theory using a common-sense inference").

Here, Quantum specifically identifies sales it made at artificially depressed prices within minutes of Defendants' Spoofing Episodes. *See* AC ¶¶ 117 (identifying sales within 10 minutes of CIBC's Spoofing Episode), 122 (identifying sales within 17 minutes of CIBC's Spoofing Episode), 209 (identifying sales within between 181 and 284 seconds of CIBC's Spoofing Episodes and within between 64 and 270 seconds of RBC's Spoofing Episodes). These sales are significantly closer in time to Defendants' Spoofing Episodes than those that other courts have deemed sufficient. *See Mullen*, 2025 WL 951501, at *5 (describing trades made within times ranging from three minutes to 2 hours and 21 minutes as "temporally proximate"); *Nw. Biotherapeutics*, 2025 WL 934319, at *8 (one hour); *accord Phunware*, 2024 WL 4891891, at *2 (three minutes). For this reason alone, dismissal on loss causation grounds is inappropriate.

In addition, Quantum specifically identifies further sales it made at artificially depressed prices within an hour of Defendants' Spoofing Episodes. AC ¶ 211. Quantum alleges that, following Defendants' Spoofing Episodes, "[p]rices generally remained at suppressed levels (compared to non-spoofing periods) for hours—or more." *Id.* ¶ 202. Quantum supports that allegation with empirical analysis, including a chart that indicates that, on average, the price of Quantum stock remained suppressed for at least 300 hours following a Spoofing Episode (even though the price was level or even increasing prior to those episodes). *Id.* ¶ 203. As other courts have found, these allegations are sufficient at this stage to plead that Quantum suffered harm in

30

connection with sales it made within an hour of Defendants' Spoofing Episodes. *See Nw. Biotherapeutics*, 2025 WL 934319, at *11–13 (relying on similar evidence to conclude that similar chart "alleges plausible factual support for Plaintiff's contention that the effects of Defendants' spoofing endured for the remainder of the trading day"); *Mullen*, 2025 WL 951501, at *8 (similar).

Defendants nevertheless argue (at 33) that Quantum's allegations are insufficient because Quantum does not allege that it sold stock in temporal proximity to the *illustrative example* Spoofing Episodes included in the operative complaint. Defendants misread the operative complaint: Quantum alleges, for instance, that it sold stock minutes after CIBC's Spoofing Episodes on February 10, 2021, and March 19, 2021. AC ¶¶ 117 (ten minutes), 122 (seventeen minutes). But more fundamentally, Quantum is not required to allege that it sold stock in temporal proximity to any of the illustrative examples. *See Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, 2025 WL 368717, at * 20 (S.D.N.Y. Jan. 31, 2025), *report and recommendation adopted*, 2025 WL 934319 (S.D.N.Y. Mar. 26, 2025) (rejecting argument that plaintiff failed to plead loss causation because "none of the Example Episodes involved spoofing during the final hour of trading on a Pricing Date"); *cf. Harrington*, 2023 WL 6316252, at *6 ("The SAC alleges the occurrence of over 900 spoofing episodes. It would be both unwieldy and unreasonable to require Plaintiff to proffer detailed descriptions of each alleged episode in order to plead a sufficient claim."). Instead, Quantum need only allege—as it has—that it sold stock in temporal proximity to an alleged Spoofing Episode.[10]

---

[10] Defendants cite *Kessev Tov, LLC v. Doe(s)*, 2022 WL 2356626 (N.D. Ill. June 30, 2022), but that decision does not even address loss causation. *See id.* at *10 ("Because the complaints fail to allege manipulative conduct, Plaintiffs' manipulation claims under Section 10(b) and the ISL fail. The Court thus need not assess whether scienter or loss causation have been met or reach Defendant John Does A and D's additional arguments regarding Plaintiffs' ISL claims.").

Defendants further argue (at 34) that Quantum failed to allege that the temporally proximate sales were made at *depressed* prices. But Quantum specifically alleges that CIBC's Spoofing Episodes on February 10, 2021, and March 19, 2021, led to Quantum selling shares at depressed prices, AC ¶¶ 117, 122, and that it sold shares within five minutes of Defendants' Spoofing Episodes that depressed the midpoint between the bid and ask by between 14.60 and 49.70 basis points, *id.* ¶ 209. In addition, Quantum alleges, consistent with common sense, that Defendants' Spoofing Episodes typically drove prices down by more than 50 basis points. *See id.* ¶¶ 69 (86.38 basis points on average for CIBC, and 78.85 basis points on average for RBC), 202 ("On average, during the spoofing period, the price of Quantum shares decreased by between 64 and 122 basis points, compared to an average decrease of 1.38 basis points during non-spoofing periods.").

### 2.    Long-Term Impact

Quantum sufficiently pleads loss causation under a long-term impact theory. Courts in this district have recognized that the issue of whether "spoofing events actually had a long-term price impact is a factual question better left for later stages of litigation." *Mullen*, 2025 WL 951501, at *6; *accord Gamma Traders*, 41 F.4th at 80 (explaining that "the effects of spoofing pose questions of fact"). That is especially so where, as here, the plaintiff provides "additional factual allegations" to support the inference that the impacts of spoofing persisted beyond the trading day. *Mullen*, 2025 WL 951501, at *6; *cf.* AC ¶ 205 ("The precise amount of time that the impacts of Defendants' spoofing episodes lasted is an empirical question that will be resolved after discovery.").

Indeed, Quantum alleges that Defendants spoofed its stock hundreds of times over the Relevant Period, with Spoofing Episodes occurring on at least 159 different trading days (or 14% of all days) over that period. AC ¶ 201. To further support that Defendants' spoofing had a persistent price impact, Quantum includes two tables in the complaint: one shows that prices

dropped precipitously (compared to a control group) and remained suppressed for at least 300 minutes following Spoofing Episodes, while the other shows that prices remained suppressed for 60 days following Spoofing Episodes (with the sharpest decline occurring over the first seven trading days). *Id.* ¶¶ 203–04. Relying on nearly identical tables, the court in *Mullen* held that the plaintiff had adequately alleged loss causation under a long-term impact theory. 2025 WL 951501, at *6 ("[T]hey provide additional factual allegations to support their conclusions, including two tables showing a consistent decrease in the average cumulative return across spoofing episodes from thirty minutes prior to the end of the trading day, along with the average change in Mullen share prices from two minutes prior to the trading days thereafter. At this stage, those factual allegations are sufficient . . . .").

Defendants attack Quantum's charts (at 36–37) on the grounds that they fail to isolate the impact of spoofing and instead only suggest "that Quantum's stock price would have generally decreased (on average) over time, while Invesco/Nasdaq QQQ would have generally increased (on average) over time." As to the first chart, Defendants' argument fails because the chart shows that the price of Quantum's stock, on average, *did not* decline during the 30-minute period preceding Defendants' spoofing but sharply declined thereafter. AC ¶ 203. This plausibly suggests that Defendants' spoofing *caused* the price of Quantum stock to decline for at least 300 minutes. Indeed, Defendants' own cited authority *accepted* a substantially similar chart as sufficient to support a pleading-stage inference that the impacts of spoofing persisted for at least a trading day. *See Nw. Biotherapeutics*, 2025 WL 934319, at *11 ("The Court agrees with the R&R that, drawing all inferences in Plaintiff's favor, this chart alleges plausible factual support for Plaintiff's contention that the effects of Defendants' spoofing endured for the remainder of the trading day.").

To be sure, as Defendants emphasize, the court in *Northwest Biotherapeutics* found that a chart similar to Quantum's other chart (*i.e.*, the 60-day chart) was not sufficient to support an inference that the defendant's spoofing "caused a permanent decline in the price of NWBO's stock" because, the court concluded, it "merely" alleged "that the average Spoofing Episode took place while NWBO's stock price was already falling." *Id.* at *15–16. Such a finding would be inappropriate here, however, because, in contrast to *Northwest Biotherapeutics*, the charts provided by Quantum *do not* indicate that the relevant stock's price "was already falling before the average Spoofing Episode." *Id.* at *15; *see Mullen*, 2025 WL 951501, at *6 (accepting similar chart). In addition, even if Quantum's charts are not sufficient to show that Defendants' spoofing had a *permanent* impact, they still support an inference that the impact of spoofing lasted beyond the trading day on which the spoofing occurred. Whether those impacts lasted seven days (consistent with the precipitous price decline over that period as shown in Quantum's 60-day chart, AC ¶ 204), longer, or shorter is a factual issue that cannot be resolved at this point.

Defendants suggest (at 35–36) that any longer-term price impact is irreconcilable with the nature of a spoofing scheme, the success of which, according to Defendants, "depends on the swift reversion of prices to the market-level after the baiting orders are cancelled." (cleaned up). But as Defendants' cited authority explained in rejecting a similar argument, there is "no bright-line legal rule that the effects" of spoofing "must be corrected within a day." *Nw. Biotherapeutics*, 2025 WL 934319, at *13; *see also Mullen*, 2025 WL 951501, at *6 (rejecting defendants' argument "that the lack of a price reversion is plainly inconsistent with spoofing," and noting that "another court in this district recently rejected a very similar argument"). In addition, Defendants would benefit from the spoofing scheme even if the price of Quantum stock never reverted to pre-spoofing levels, regardless of whether they were long or short Quantum stock. AC ¶ 3. Accordingly, there is

34

nothing inconsistent between the alleged spoofing scheme and the notion that Quantum's stock price did not fully recover after Defendants' spoofing.

Defendants further argue (at 38–40) that Quantum fails to account for alternative explanations for the decline of its stock price during periods following Defendants' Spoofing Episodes. Defendants posit, for example, that Quantum's own share sales caused the price declines shown in the operative complaint. As in *Phunware*, Defendants' "proposed alternative explanations for [the relevant stock's] share price decline poses a fact question, and a plaintiff need not disprove alternative theories at this stage." 2024 WL 4891891, at *3. Indeed, for all of the reasons above, Quantum plausibly alleges that at least some of that price decline was attributable to Defendants' pervasive spoofing.[11]

### D.    Quantum's Claims Are Not Time-Barred

Defendants argue (at 41) that Quantum's Exchange Act claims are time-barred because "Quantum's own pronouncements, as well as the public information upon which Quantum bases its claims, reveals it had discovered, or as a reasonably diligent plaintiff should have discovered, the supposed market manipulation of Quantum stock by mid-2022 at the latest." "Securities fraud claims brought under Section 10(b) of the Securities Exchange Act of 1934 are subject to the earlier of a two-year statute of limitations or a five-year statute of repose." *Moon Joo Yu v. Premiere Power LLC*, 2018 WL 456244, at *5 (S.D.N.Y. Jan. 17, 2018) (citing 28 U.S.C. § 1658(b)). The "limitations period commences not when a reasonable investor would have *begun*

---

[11] As a result, Defendants' cited authority is inapposite. *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005) ("However, plaintiffs do not allege that the subject of those false recommendations . . . , or any corrective disclosure regarding the falsity of those recommendations, is the cause of the *decline* in stock value that plaintiffs claim as their loss."); *In re London Silver Fixing, Ltd., Antitrust Litig.*, 2023 WL 3582198, at *11 (S.D.N.Y. May 22, 2023) (conclusory allegations of long-term impact not supported); *In re Merrill, BofA & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. Mar. 4, 2021) (same).

*investigating*, but when such a reasonable investor conducting such a timely investigation would have *uncovered the facts constituting a violation*." *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011) (emphases added). A "fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id.* at 175.

"'The lapse of the statute of limitations is an affirmative defense that a defendant must plead and prove' under Federal Rule of Civil Procedure 8(c)(1)." *Scales v. N.Y. Hotel & Motel Trades Council, Local 6*, 2023 WL 1779617, at *3 (S.D.N.Y. Feb. 6, 2023) (quoting *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008)). "[B]ecause on a motion to dismiss a court must accept all of the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor, dismissal on statute of limitations grounds at the motion to dismiss stage is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (cleaned up). In addition, because statute of limitations is an affirmative defense, it "need not be addressed in the complaint, and plaintiffs are not required to allege facts in their complaint to rebut" it. *Lalonde v. City of Ogdensburg*, 662 F. Supp. 3d 289, 334 (N.D.N.Y. 2023) (cleaned up).

Measured against this standard, Defendants' argument fails. The operative complaint alleges that "[t]he case arises from Defendants' use of 'spoofing,' an unlawful trading practice, to manipulate the market price of Quantum's shares between January 1, 2020, and August 15, 2024." AC ¶ 1. Quantum filed this action on October 20, 2024, well within the five-year statute of repose. *See* 28 U.S.C. § 1658(b). Accordingly, based on the filing date, Quantum's Exchange Act claims are timely so long as it discovered "the facts constituting the violation" on or after October 21,

2022. Quantum did not discover facts sufficient for its Exchange Act claims to survive a Rule 12(b)(6) motion to dismiss until shortly before it filed the complaint. AC ¶¶ 221–22.

Specifically, Quantum alleges that "[d]uring the Relevant Period," which extended until August 15, 2024, Quantum "did not discover—nor could a reasonably diligent plaintiff have discovered—the facts constituting the market manipulation claims or the identities of the perpetrators of these market manipulation schemes." *Id.* ¶ 222. Indeed, spoofing schemes are "difficult to identify," including because participants in those schemes "often employ a variety of tactics to hide their unlawful conduct" and "most order flow in listed securities is publicly available only in anonymized form." *Id.* ¶ 50. Both were true with respect to the scheme alleged here, *id.* ¶¶ 215, 221, which Quantum could not uncover without "the assistance of an expert," *id.* ¶ 51. Even still, given that most trading data is anonymized, Quantum does not know—and cannot know at this time—the identity of every entity that spoofed its stock (*e.g.*, John Doe 1), nor can Quantum directly identify (*i.e.*, without using a methodology like probabilistic imputation) those who spoofed its stock on Nasdaq. Similarly, Quantum does not know the full extent to which Defendants spoofed its stock during the Relevant Period. *Id.* ¶¶ 62, 69 n.7.

Defendants nevertheless argue (at 41) that Quantum should have discovered that its stock was being spoofed, and that it was being spoofed by *Defendants*, "by mid-2022 at the latest," less than two years after the first temporally-proximate spoofing episode alleged in the operative complaint. AC ¶¶ 209, 211. Defendants cite no authority to suggest that it would take a reasonably diligent plaintiff such little time to identify the details and mechanics of a spoofing scheme—a task that requires sophisticated expert analysis of reams of mostly-anonymized trading data. *See, e.g.*, Expert Report of Jonathan Brogaard ¶¶ 1–2, 5–6, *Harrington*, No. 1:21-cv-00761 (S.D.N.Y. July 9, 2025), Dkt. No. 518-1 (report from market microstructure expert on "whether, during the

Relevant Period, the trading systems of [CIBC] were used by CIBC or its customers to conduct order-and-trade activity that was consistent with" spoofing). To the contrary, in *Harrington*, the court found no issue with the plaintiff taking *more than four years* from CIBC's first spoofing episode to complete its investigation. 585 F. Supp. 3d at 420–21.[12]

In addition, nothing in the pleadings suggests that Quantum failed to act with reasonable diligence. Instead, Quantum expressly alleges that it was diligent and that it retained and worked with experts to analyze trading data and detect spoofing. AC ¶¶ 51, 221, 222. Specifically, among other things, Quantum hired outside counsel and industry experts, obtained terabytes of Canadian and American trading data for those experts to analyze, and worked extensively with those experts—who developed sophisticated algorithms to detect market manipulation—to understand what that data showed. That Quantum diligently pursued its claims is further supported by the outside-the-pleadings materials that Defendants rely on in connection with their motion to dismiss.[13] *See* Broughel Decl. Ex. 1 (describing retention of ShareIntel to investigate potential short selling); *id.* Ex. 11 (describing retention of counsel and nature of investigation), Exs. 16–20 (correspondence with CIBC regarding trading information).

---

[12] Quantum did not include all relevant information about its investigation in the operative complaint. *See Lalonde*, 662 F. Supp. 3d at 334. If necessary, Quantum is prepared to submit a declaration to the Court or, if needed, further amend the complaint, to elaborate on the timing of its investigation.

[13] Defendants suggest that the Court can consider a number of exhibits, including exhibits 16-20 filed in connection with the motion to dismiss, because those are purportedly "documents possessed by or known to [Quantum] and upon which it relied in bringing the suit." MTD at 5 n.3. Exhibits 16-20, which are each letters or emails from Quantum to CIBC, are not documents on which Quantum relied in bringing this suit and should not be considered by the Court on a motion to dismiss. In any event, the documents do not support Defendants' position and can be disregarded on the merits, as addressed herein.

Indeed, read together, the documents submitted by Defendants indicate that (i) Quantum conducted an investigation into potential naked short selling by market participants beginning in late 2021; (ii) the investigation was stymied throughout 2022 and early 2023, including because CIBC refused to provide relevant information; (iii) Quantum subsequently expanded its investigation to cover manipulative trading more broadly; and (iv) this broader investigation was still underway as of mid-2023. For example:

- <u>November 2021 through November 2022</u>: Quantum requests clarification from CIBC of "shareholder positions reported by you to the Depository Trust Company (or CDS) and Broadridge (a proxy servicing company) in which there is an imbalance between the data provided by these entities . . . ." Broughel Decl. Exs. 16–18, 20.

- <u>March 2023</u>: Quantum explains to CIBC that it "had been asking these questions [about imbalances] because we suspect that CIBC is being used by nefarious short sellers to short FSD stock naked . . . ." Broughel Decl. Ex. 19 at 3; *see also* AC ¶ 92 (alleging that "significant imbalances between Quantum shares reflected in broker position reports and shares held in United States and Canadian depositories" suggest "that Defendants were involved in naked short selling").

- <u>March 2023</u>: Quantum also indicates that CIBC has refused to provide responsive information. *See* Broughel Decl. Ex. 1 ("[T]he Company's management, for at least the past 12 months, has sent multiple correspondences with questions, to broker-dealers highlighting an imbalance in trade activity, for which management has received either no response or a generic, unsatisfactory reply."), Ex. 19 at 2 ("So far, we have not been able to reach the right person for a satisfactory response despite trying for over a year and several months now."). In light of that refusal, Quantum disclosed that it has no choice but "to pursue additional avenues in order to provide clarity on this situation as part of its fiduciary responsibility to shareholders." Broughel Decl. Ex. 1.

- <u>June 2023</u>: Quantum had retained counsel for advice "concerning possible naked short selling and market manipulation"; its "investigation was ongoing" and "preliminary" at that time, "with the Law Firms reviewing documents, trading data, and interviewing witnesses"; "it was premature to identify any parties or individuals who might be implicated in the matter"; "the Law Firms were unable to provide an accurate timeline for the completion of their investigations at that point"; and "any decision regarding potential litigation against third parties would depend on the investigation's findings and could not be determined until the inquiry was concluded." Broughel Decl. Ex. 11 at 10.

To be sure, as Defendants emphasize, these documents suggest that Quantum has *suspected* since 2021 that some market participants were manipulating the price of its stock. But the relevant

issue is not when Quantum was "on inquiry notice"; it is when Quantum's investigation was complete and it had discovered enough information to assert its claims with particularity. *City of Pontiac*, 637 F.3d at 174–75. Far from demonstrating that Quantum was aware of, should have been aware of, or was even on inquiry notice of *spoofing*, the documents indicate that Quantum *suspected*—based on imbalances between reported shares held by brokers and authorized shares on deposit—that CIBC may have been engaged in *naked short selling*, a separate type of unlawful manipulation. Indeed, all of the correspondence that Defendants cite concerns that issue. *See* Broughel Decl. Ex. 16 ("We are contacting your organization for a third time to clarify shareholder positions reported by you to the Depository Trust Company (or CDS) and Broadridge (a proxy service company) in which there is an imbalance between the data provided by these entities . . . ."); *id.* Exs. 17–18, 20 (similar). In fact, Quantum's CEO expressly told CIBC in 2023 that it was writing to CIBC "*because we suspect that CIBC is being used by nefarious short sellers to short FSD stock naked*, or by other means which may not constitute the proper definition of short selling." *Id.* Ex. 19 at 3 (emphasis added); *accord id.* Ex. 1 ("FSD Pharma (Symbol: HUGE) Renews Shareholder Intelligence Services to Investigate Possible Naked Short Selling and Appeals to The Regulators and Oversight Bodies to Look Into The Short Selling Activity Of Its Stock.").

Defendants further suggest (at 41–42) that Quantum should have known about Defendants' spoofing earlier because Quantum's *counsel*, Mr. Christian, filed a *separate* spoofing action against CIBC on behalf of a *separate client* based on a *separate investigation* covering a *separate time period* and *separate security*. It is unclear how another plaintiff's investigation of spoofing of a different security over a different time period would put Quantum on notice that Defendants subsequently spoofed Quantum's stock too. Nor could such information conceivably obviate the need for a thorough investigation conducted by experts on behalf of Quantum. In any event,

40

Defendants' cited documents suggest that Quantum did not engage Mr. Christian for purposes of investigating market manipulation more broadly until June 29, 2023, which is a year after Defendants claim that Quantum's investigation should have concluded. Broughel Decl. Ex. 11 at 10 ("The Board of Directors discussed naked short selling and market manipulation in a meeting on June 29, 2023, and decided to retain Christian Attar.").

Defendants also suggest (at 42–43) that Quantum had "analyzed the relevant data on a daily basis" since "at least early 2022." That is simply false. To the extent that the cited communications reference "data" and "imbalances," they are referring to data on the number of Quantum shares held and circulating, which, in Quantum's view, suggested that CIBC and others were engaged in naked short selling. *See* Broughel Decl. Exs. 1 (referencing "correspondences with questions, to broker-dealers highlighting an imbalance in trade activity"), Exs. 16–18 (correspondence regarding "imbalance" between "shareholder positions reported by you to the Depository Trust Company (or CDS) and Broadridge (a proxy servicing company)"). This is not the same data that Quantum's experts subsequently analyzed to detect Defendants' spoofing activity.

In short, to the extent that Defendants' outside-the-pleadings evidence can be considered at this stage, it *supports* a motion-to-dismiss inference that Quantum acted diligently, not an inference that Quantum knew for years, or should have known for years, that Defendants had been spoofing its stock.

## III.    QUANTUM STATES A CLAIM FOR COMMON LAW FRAUD

Quantum sufficiently pleads common-law fraud claims against Defendants. Indeed, as in *Mullen*, "[b]ecause the elements of a claim for common law fraud are essentially the same as for a claim under Section 10(b)," and because Quantum has sufficiently pleaded a spoofing claim under Section 10(b), Quantum also adequately states fraud claims. 2025 WL 951501, at *6.

41

Defendants cite *Harrington* (at 43) for the proposition that spoofing activity "does not constitute a misrepresentation or omission under New York law." In *Harrington*, the court dismissed a fraud claim because (i) it was based "in part" on a naked short selling claim "which itself is not plead sufficiently" and (ii) the plaintiff "fail[e]d to respond to Defendants' argument that trading activity cannot constitute a misrepresentation or omission for purposes of common law fraud under New York law." 585 F. Supp. 3d at 423–24. Here, in contrast, Quantum's fraud claim is not based on an insufficiently pleaded federal securities claim, and Quantum does not concede that Defendants are correct that spoofing does not constitute fraud.

Indeed, the Second Circuit has described spoofing as "a *fraudulent* practice in which the spoofing traders send false supply and demand signals to the market by placing orders to buy or sell that they never intend to execute." *Gamma Traders*, 41 F.4th at 75 (emphasis added); *see also ATSI*, 493 F.3d at 101–02 (explaining that "a claim for market manipulation is a claim for fraud"); *accord* AC ¶¶ 57 ("placement and cancellation" of Baiting Orders was "intended to send a false and misleading pricing signal to the market in order to 'trick' or 'bait' market participants into executing their own sell orders"), 68 ("Defendants' Baiting Orders were intended to function as part of a scheme to defraud the market in Quantum securities rather than be executed."). It is black-letter New York law that "a promise to confer a benefit in the future" may constitute fraud where "the defendant had no intention of fulfilling the promise at the time it was given." *Braddock v. Braddock*, 871 N.Y.S.2d 68, 72–73 (App. Div. 2009). It is similarly well established that "conduct, even without speech, may be 'tantamount to a false representation.'" *Minpeco, S.A. v. ContiCommodity Servs., Inc.*, 552 F. Supp. 332, 336 (S.D.N.Y. 1982); *accord* MISREPRESENTATION, Black's Law Dictionary (12th ed. 2024) ("The word denotes not just written or spoken words but also any other conduct that amounts to a false assertion.").

42

Defendants' Baiting Orders, like other manipulative trading practices, thus constitute fraud. *See, e.g.*, *In re Blech Sec. Litig.*, 961 F. Supp. 569, 587 (S.D.N.Y. 1997) ("Plaintiffs have adequately alleged . . . direct and knowing participation in a market manipulation scheme that injured the Plaintiffs. These allegations are also sufficient to state a fraud claim under the New York common law."); *Minpeco*, 552 F. Supp. at 336-37 (defendants' effort to artificially raise price of silver through a conspiracy to monopolize that market amounted to the creation of "price mirage" actionable as common law fraud).

## CONCLUSION

For the foregoing reasons, Quantum respectfully requests that Defendants' motions to dismiss be denied. To the extent that the Court disagrees, Quantum respectfully requests leave to amend its complaint.


Dated:  July 31, 2025                                  Respectfully submitted,
       New York, NY

                                                       */s/ Velvel (Devin) Freedman*
                                                       Velvel (Devin) Freedman
                                                       Kyle W. Roche
Stephen Lagos
**FREEDMAN NORMAND FRIEDLAND LLP**
10 Grand Central
155 E. 44th Street, Suite 915
New York, New York 10017
vel@fnf.law
kroche@fnf.law
slagos@fnf.law
Tel: (646) 494-2900

James W. Christian
**CHRISTIAN ATTAR**
1177 West Loop South, Suite 1175
Houston, Texas 77027
jchristian@christianattarlaw.com
Tel.: (713) 659-7617

## CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(C)

Pursuant to Local Civil Rule 7.1(c), I hereby certify that this Memorandum contains 13,991 words, which complies with the word-count limitation that the Court granted on March 14, 2025.

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman