UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

QUANTUM BIOPHARMA LTD.,

                Plaintiff,

    – *against* –

CIBC WORLD MARKETS, INC., RBC
DOMINION SECURITIES INC., and
JOHN DOES 1 through 10,

                Defendants.

**OPINION & ORDER**

24-cv-07972 (ER)

RAMOS, D.J.:

Quantum BioPharma Ltd., formerly known as FSD Pharma ("Quantum") filed this suit against CIBC World Markets, Inc. ("CIBC"), RBC Dominion Securities Inc. ("RBC"), and John Does 1 through 10 (together with CIBC and RBC, "Defendants"), alleging violations of Section 9(a), Section 10(b) and Rule 10(b)(5)(a) and (c) of the Securities Exchange Act of 1934 (the "Exchange Act") and New York common law. Specifically, the Amended Complaint ("AC")[1] alleges that Defendants engaged in a trading practice called "spoofing"[2] to manipulate the market price of Quantum's shares between January 1, 2020, and August 15, 2024 (the "Relevant Period").[3]  Quantum asserts that, during the Relevant Period, Defendants placed thousands of spoofing sales to create the illusion that Quantum's share price was declining, and consequently, to bait other investors into selling their shares, further driving Quantum's share price down.  ¶ 3. Quantum alleges that Defendants then "swooped in and purchased shares at artificially depressed prices, and positioned themselves to profit as long as they were either short or

---

[1] Unless otherwise noted, citations to "¶ _" refer to the AC, Doc. 32.

[2] Spoofing is "the submission and cancellation of buy and sell orders without the intention to trade in order to manipulate other traders."  ¶ 2 (quotation marks omitted).

[3] Until August 15, 2024, the ticker symbol for Quantum was "HUGE."  Doc. 1 at 2 n.1.

long Quantum's stock and the market price of Quantum's shares rebounded to some extent." *Id.* (internation quotation marks omitted).

Before the Court is Defendants' joint motion to dismiss the AC. Doc. 35. For the reasons below, the motion is GRANTED in part and DENIED in part.

## I.    BACKGROUND

### A.  Factual Background

The following facts are based on allegations in the AC, which the Court accepts as true for purposes of the instant motion. *See*, *e.g.*, *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Quantum is biopharmaceutical company founded in 1994 and based in Toronto, Ontario, with a registered office in Wilmington, Delaware. ¶¶ 7, 40. Quantum's business includes a portfolio of biotech solutions for the treatment of neurodegenerative and metabolic disorders and alcohol misuse disorders. ¶ 40. Quantum has been publicly traded since May 2018, and its securities have been listed on the Nasdaq and Canadian Stock Exchange ("CSE") since 2020, making it an "interlisted security."[4] ¶¶ 7, 18, 41. In 2019, Quantum lost approximately $39 million, but its losses have decreased in almost every subsequent year.[5] ¶ 42.

Defendants CIBC and RBC are Canadian broker-dealers that primarily execute securities transactions for its customers in Canada, including on the CSE, and routes orders to intermediary broker-dealers in the United States to be executed for its customers. ¶¶ 8, 10. Both CIBC and RBC employ high-speed algorithmic computer systems to disseminate and/or effect orders and execute trades of Quantum shares throughout the U.S. ¶¶ 9, 11.

---

[4] The trading of interlisted securities is facilitated by means of a security identifier known as a CUSIP. ¶ 19. Quantum's CUSIP is 35954B404 on both the U.S. and Canadian exchanges. *Id.*

[5] From 2020–2024, Quantum lost $31.8 USD million, $35.3 USD million, $23.6 USD million, $18.2 USD million, and $14.9 USD million, respectively. Doc. 36 at 14.

Defendants John Does 1 through 10 are entities—including but not limited to market makers, broker-dealers, subsidiaries, affiliates, and sister companies of CIBC and RBC, as well as their customers—whose identities are currently unknown, that unlawfully participated in the scheme to manipulate the trading and market price of Quantum securities through spoofing during the Relevant Period.  ¶ 12.

Plaintiff alleges that "Defendants engaged in manipulative trading practices, with the intent to manipulate the price of Quantum, [in] both the United States and Canadian markets" and that they "engaged in cross-border spoofing schemes that were intended to manipulate, and did in fact manipulate, the price of Quantum stock in the United States and Canada." ¶¶ 14, 16.

### 1.  Defendants' "Direct Market Access" Trading

Defendants, acting in their capacity as brokers, place orders and execute trades on their customers' behalf—by directly placing their customers' orders on exchanges pursuant to their customer's instructions with either (i) Direct Market Access ("DMA") under SEC Rule 15c3-5,[6] the Market Access Rule (for U.S. trades), or (ii) Direct Electronic Access ("DEA") under Rule 7.13 of the Universal Market Integrity Rules ("UMIR"), which pertains to Direct Electronic Access and Routing Arrangements (for Canadian trades). ¶ 22.  Defendants provide their customers with access to the exchanges through DMA and DEA systems, and they receive transaction fees for completed trades. ¶ 23.  When Defendants' customers use the DMA or DEA system, they do not place orders on exchanges under their own names; instead, these orders appear to the world as coming from Defendants because they bear Defendants' broker-dealer marketplace participant identifier ("MPID"). *Id.*

Quantum alleges that "[w]hen broker-dealers … either provide DMA or DEA systems access to customers, it is the broker-dealers' continuing responsibility to ensure

---

[6] SEC Rule 15c3-5 "is intended to address the risks that can arise as a result of the automated, rapid electronic trading strategies."  SEC Rule 15c3-5.

that the customers' order flow … complies with all applicable rules, regulations, and laws." ¶ 26.   SEC Market Access Rule 15c3-5 requires broker-dealers to implement a "system of risk management controls and supervisory procedures that … are reasonably designed to:  (1) systematically limit the financial exposure of the broker or dealer that could arise as a result of market access, and (2) ensure compliance with all regulatory requirements that are applicable in connection with market access." [7]  SEC Rule 15c3-5. Specifically, the risk management controls must be designed to:

- prevent the entry of orders that exceed appropriate pre-set credit or capital thresholds, or that appear to be erroneous;

- prevent the entry of orders unless there has been compliance with all regulatory requirements that must be satisfied on a pre-order entry basis; and

- prevent the entry of orders that the broker-dealer or customer is restricted from trading, restrict market access technology and systems to authorized persons, and assure appropriate surveillance personnel receive immediate post-trade execution reports.

*Id.*  According to Quantum, Defendants, as market "gatekeepers," knew and nevertheless disregarded the responsibilities outlined above.  ¶ 32.

### 2.  How Spoofing Schemes Work

Spoofing is the practice of "create[ing] a false impression of excess supply or demand by placing 'Baiting Orders' into the [] Market Order Book." [8]  ¶ 35.  These baiting orders are placed to induce other market participants to follow the artificial selling or buying trend created by the baiting orders.  *Id.*  Once other market participants follow the trend, the spoofer cancels the baiting orders and takes advantage of the price change

---

[7] The AC alleges that, while there is not a national securities regulator comparable to the SEC in Canada, all exchanges and Alternative Trading Systems ("ATSs") adhere to UMIR, which like the SEC and FINRA require that broker-dealers maintain written policies and procedures to be followed by officers, employees, and customers.  ¶ 29.  UMIR 7.1 specifically requires broker-dealers to supervise their customers' trading activity through automated order systems like the DMA or DEA systems.  ¶ 30.  FINRA Rule 5210, Supplementary Material .01, and NASDAQ Exchange Rule 575, Disruptive Practices Prohibited, require that broker-dealers detect and prevent manipulative or fraudulent trading that originated from algorithmic high-speed trading under the supervision and control of their firm.  ¶ 31.

[8] A market order book is a digital record of all buy and sell orders for a security, organized by price and listing the quantity at each price point.  Doc. 1 at 12 n.4.  By revealing the balance between bids and offers, it indicates whether prices are trending up or down, and it is accessible to all traders on the exchange.  *Id.*

they caused—either by buying shares at an artificially-deflated price or selling shares at an artificially-inflated price. *Id.* The AC alleges that spoofing orders have no legitimate economic purpose, and that their sole objective is to distort publicly available information about the supply and demand of a security. ¶¶ 34–35.

According to Quantum, one sign that spoofing is taking place is a rapid reversal of trading direction. ¶ 37. For example, if a market participant places several sell orders, followed by a buy order, followed by the cancellation of the initial sell orders, then spoofing is likely taking place. *Id.* On the other hand, if the goal is to drive the price up, a market participant allegedly engaging in spoofing will submit baiting orders to buy to trick other market participants to also buy. ¶ 38.

3. *Defendants' Alleged Spoofing Schemes*

Quantum alleges that even though news about its operations was generally positive during the Relevant Period, the stock price fell significantly during this period. ¶¶ 43–46. For example, Quantum announced that the FDA had granted it permission to submit an Investigational New Drug Application for the use of FSD-201 to treat COVID-19. ¶ 44. Quantum then announced favorable Phase 1 results for that drug on June 22, 2020. *Id.* On August 31, 2020, it announced that it had submitted its Investigational New Drug Application for FSD-201; and on September 28, 2020, it announced that the FDA had authorized Phase 2 clinical trials for FSD-201. *Id.* However, the price of Quantum shares in the U.S. fell from $7.39 to $2.76 over this period. *Id.*

Likewise, on March 16, 2021, Quantum announced that it had entered into a license agreement to develop veterinary drugs, and on May 10, 2021, it announced that it had submitted an Investigational New Animal Drug Application to the FDA regarding those drugs. ¶ 45. Yet, again, the price of Quantum shares in the U.S. fell from $2.07 to $1.58 over this period. *Id.*

As another example, Quantum alleges that on February 14, 2023, it announced a new research and development program called Unbuzzd, which focused on medical needs

5

in the alcohol misuse space.  ¶ 47.  Quantum subsequently announced, on June 20, 2023, an exclusive license agreement with Celly Nutrition Inc. for recreational applications of its alcohol misuse technology and then announced the launch of Unbuzzd on August 25, 2023.  *Id.*  The price of Quantum shares in the U.S. fell from $1.74 to $1.25 during this period.  *Id.*

Quantum asserts that these decreases in the price of its shares were not explained by unfavorable news, industry trends, or macroeconomic trends given that the price continued to drop notwithstanding the fact that markets received good news about its prospects during the Relevant Period.  ¶ 48.  Instead, Quantum alleges that the decrease is a result of Defendants' manipulation of the price of its shares through spoofing.  ¶ 49. Defendants note that during the Relevant Period, Quantum disclosed in its Form 20-F for the fiscal year ending December 31, 2025 that it had "no pharmaceutical products approved for commercial sale and [has] not generated any revenue from pharmaceutical product sales."  Doc. 37-2 at 13 (Form 20-F dated April 2, 2024).

Quantum asserts that it is difficult to identify manipulative schemes in listed securities on the basis of publicly available data because (1) those who participate in market manipulation schemes often employ a variety of tactics to hide their unlawful conduct, and (2) most order flow in listed securities is publicly available only in anonymized form.  ¶ 50.  However, with the help of an expert, Quantum alleges it used "detailed market by order data" available for Canadian markets to determine which identifiers were associated with suspicious trading activity and concluded that CIBC, RBC, and John Doe 1 each engaged in spoofing over the Relevant Period.[9]  ¶ 51.

According to Quantum, during the Relevant Period, Defendants engaged in spoofing through their own traders using proprietary or principal accounts and through customers who placed orders via Defendants' DMA or DEA systems under Defendants'

---

[9] Plaintiff alleges that John Does 2 through 10 "*may* have also participated."  ⁋ 51 (emphasis added).

accounts. ¶ 53. As market "gatekeepers," Defendants were required—but failed to—design, document, and implement supervisory controls, policies, and procedures to manage risk and prevent fraudulent trading. *Id.* As a result, Quantum asserts that Defendants are fully responsible for placing or allowing thousands of baiting orders designed to falsely signal that Quantum shares were declining due to natural market forces. *Id.*

Specifically, Quantum alleges that Defendants' "spoofing cycles" were completed by the following three steps:

- Following the instructions of either their customers or their own proprietary traders, Defendants flooded exchanges' Limit Order Books with large quantities of baiting orders to sell. The sole purpose for the placement of these baiting orders was to deceive and mislead other market participants into believing that the market price of Quantum securities was moving downward based on the natural forces of supply and demand;

- Almost simultaneously, when the baiting orders were being placed in the Limit Order Books, Defendants also placed their Executing Purchase Orders on the opposite side of the Limit Order Books to purchase Quantum shares at the lower stock prices caused by their baiting orders; and

- Immediately after the completion of their Executing Purchase Orders to buy Quantum shares at the lower prices, Defendants cancelled and removed all of their baiting orders to sell from the Limit Order Books.

¶¶ 55–56. The spoofing cycles were completed sometimes within seconds or milliseconds and were repeated multiple times a day and continuously throughout the Relevant Period. ¶ 56.

Quantum alleges that Defendants' activities thus operated as a fraud on the market and created a "pile-on" effect which drove its share price down even further, thereby enabling Defendants to purchase Quantum's shares at artificially manipulated lower prices for either their customers' accounts or their own proprietary accounts. ¶ 57.

a.      *Defendants' Alleged Manipulation of Quantum Shares*

Quantum asserts that during the Relevant Period, Defendants engaged in spoofing on at least 159 out of 1,129—or 14%—trading days. ¶ 201. According to Quantum,

based on the limited available data , during the Relevant Period, Defendants submitted baiting orders totaling at least 16,212,300 shares on Canadian stock exchanges—12,213,000 for CIBC, 267,800 for RBC, and 3,731,500 for John Doe 1.  ¶ 58.  In addition, based on the even more limited data available for U.S. exchanges, and further limiting that data to one-hour windows before Quantum sold shares in the Relevant Period, Quantum alleges that Defendants submitted at least 298,886 baiting orders (including 188,120 by CIBC) on U.S. stock exchanges simultaneously with Baiting Orders that they submitted on Canadian stock exchanges.  *Id.*

Relying on "probabilistic imputation,"[10] Quantum consequently infers that orders and trades placed on U.S. exchanges ten milliseconds or less before Defendants' orders and trades on Canadian exchanges were also placed by Defendants, on the grounds that (1) the trades were placed simultaneously or near-simultaneously, and (2) the likelihood of trades being placed by independent actors at such close temporal proximity is exceedingly low.  ¶¶ 60–61.

In total, CIBC allegedly orchestrated 747 spoofing cycles, RBC orchestrated 38, and John Doe 1 orchestrated 618.  ¶ 69.  Defendants' orders led to a "pile-on" effect, where artificial selling pressure was created, which induced other market participants to submit additional sell orders and artificially drove down the price of Quantum shares.  ¶ 65.  Specifically, Quantum claims that over the course of each spoofing cycle, the baiting orders successfully induced the entry of sell orders from other market participants, driving down the price of Quantum shares by an average of 90.52 basis points per cycle

---

[10] Probabilistic imputation, as defined in *Mullen Automotive, Inc. v. IMC Financial Markets*—a case cited in the AC—refers to a methodology that "imputes deanonymized activity to anonymized activity, attributing orders sent by a Nasdaq market maker only if they were placed within the same nanosecond or millisecond of each other, with roughly 90% accuracy."  No. 23-cv-10637 (LLS), 2025 WL 951501, at *4 (S.D.N.Y. Mar. 28, 2025) (internal quotation marks omitted).  In other words, probabilistic imputation "entails an assumption that orders placed closely in time are more likely to have been placed by the same party."  Doc. 36 at 19.  Defendants characterize this methodology as a "a wholly speculative theory that posits that any orders placed in the U.S. by unknown market participants around the same time that Defendants placed orders in Canada should be attributed to Defendants."  *Id.* at 10.

(86.38 for CIBC, 78.85 for RBC, and 96.25 for John Doe 1) on Canadian exchanges and an average of 68 basis points per cycle on U.S. exchanges. *Id.* Almost simultaneously, Defendants executed Executing Purchase Orders to purchase a total of 357,997 shares on Canadian exchanges at these depressed prices (240,710 for CIBC, 11,465 for RBC, and 105,822 for John Doe 1), which were below the prevailing best offer prior to Defendants placing the baiting orders. ¶ 66. Soon after, Defendants cancelled the initial baiting orders. ¶ 67.

According to Quantum, Defendants' alleged intent to defraud the market in Quantum securities can be inferred from, *inter alia*: (1) the short time period between the continuous and repeated placement and cancellation of the baiting orders; (2) the concentration of cancelled baiting orders during the limited period when each spoofing event occurred; (3) the average size of the baiting orders that were cancelled, in comparison to the average size of the bona-fide sell orders that were executed; (4) the ratio of cancelled baiting orders to sell compared to the executed bona-fide orders to buy that existed; and (5) the reoccurrence of the same trading patterns over an extended period of time. ¶ 68.

Importantly, Quantum asserts that, although U.S. trading data is anonymized, statistical analysis of that data indicates that Defendants also engaged in spoofing in U.S. markets. ¶ 70. To reach this conclusion, Quantum compared trading patterns in the U.S. at times where they allege Defendants were engaged in spoofing in the Canadian Market, with trading patterns in the U.S. at times where they allege Defendants were not engaged in spoofing in the Canadian market. ¶ 71.

Specifically, Quantum relies on several data markers to suggest that Defendants were engaged in spoofing at specific times. Two of the data markers are as follows: one, Quantum relies on Net New Size data, which measures the difference between the total size of buy orders and the total size of sell orders placed during a particular period, divided by the average order size for a given day. ¶ 72. Two, Quantum asserts that Net

New Size in the U.S. was -44.44 when Defendants were allegedly engaged in spoofing, and -0.48 when Defendants were not engaged in spoofing. *Id.* Similarly, Quantum relies on Pre-Trade Short Order Life Percent, which measures the percentage of newly submitted sell orders whose order lifetimes fall within the bottom quartile to argue that while Defendants were allegedly engaged in spoofing in the Canadian market, Pre-Trade Short Order Life Percent in the U.S. market was 47.52%, and 27.70% in the U.S. market when Defendants were allegedly not engaged in spoofing. ¶ 73. According to Quantum, these data points show that (1) anomalously large new sell order volume was created in the U.S. market while Defendants were engaged in spoofing in the Canadian market; (2) an abnormally large number of sell orders were cancelled relative to buy orders in the U.S. market while Defendants were engaged in spoofing in the Canadian market; and (3) those orders were canceled unusually quickly. ¶ 75.

    *b. Scienter Allegations*

Quantum points to several independent factors that they argue, when considered collectively, offer strong circumstantial evidence that Defendants either knew or recklessly ignored that their conduct or their customers' conduct was designed to and did unlawfully manipulate the market in violation of federal securities laws, industry regulations and their own compliance manuals. ¶ 94.

First, during the Relevant Period, Defendants submitted orders for a median of 5,100 sell-side shares per purchase that were subsequently canceled. ¶ 79. For comparison, Quantum alleges that, over the same period, other market participants submitted orders on median for only 1,300 sell-side shares, which were subsequently canceled—a difference of 392%. *Id.* Over the five minutes after the when the alleged spoofing occurred, Defendants purchased an average of 2,863 shares while other market participants purchased an average of 1,394 shares over those same time frames. ¶ 80. During each alleged spoofing cycle, Defendants placed and subsequently cancelled a median of 5,100 shares (5,900 for CIBC, 7,000 for RBC, and 4,300 for John Doe 1),

while executing a median of zero sell-side orders. ¶ 81. Quantum asserts that the ratio of canceled baiting orders compared to executed sell orders strongly indicates that Defendants never intended to execute their baiting offers. *Id.*

Second, Quantum also alleges that the size of Defendants' executed sell-side orders compared to their orders to buy, or "Executing Purchase Orders," is also indicative of scienter. ¶ 82. In the median spoofing cycle, Defendants executed 100 shares each in executing purchase order, while in contrast executing zero sell-side orders. *Id.* This stark contrast, Quantum alleges, further indicates that Defendants were manipulating the market by using baiting orders to generate artificial prices. *Id.*

Third, Defendants placed significantly more sell-side order flow than non-spoofed orders prior to buying shares, as measured by (1) the volume of sell-side order flow and (2) the cancellation of that order flow. ¶ 83. Specifically, Quantum alleges that, during the Relevant Period, Defendants submitted sell-side orders that were canceled for an average of 11,555 shares per executed purchase, but their sell-side orders only averaged 828 shares per purchase. *Id.* In addition, during the Cancellation Period following non-spoofed purchases, Defendants canceled an average of 1,296 sell-side orders. *Id.* According to Quantum, Defendants' behavior was inconsistent with "bona fide market-making" because they cancelled 88 percent of the sell-side orders created during "baiting periods," but only 69 percent of the buy-side orders created during the same periods. ¶ 84.

Fourth, Quantum claims that each Defendant (or their customers) specifically designed and implemented algorithmic trading programs that executed 75% of all trades in the spoofing schemes. ¶ 85. Therefore, according to Quantum, Defendants knew or were required to know that it was unlawful to place baiting orders to sell that were never intended to be executed in order to trick market participants into selling shares of Quantum stock, Defendants should have had internal policies, procedures, and systems

11

that detected and prohibited manipulative or fraudulent trading devices or schemes, but nevertheless these trading activities were approved by corporate officials. ¶¶ 86–88.

Fifth, Quantum also alleges that Defendants CIBC and RBC engaged in other potentially problematic trading practices with respect to Quantum shares during the Relevant Period, including naked short selling, which involved selling Quantum shares short without owning, borrowing, or securing the right to borrow those shares. ¶ 92. To support this allegation, Quantum points to the following: (1) the remarkably high ratio of trading volume in Quantum to the float of the stock, which is generally indicative of significant short selling; (2) lending data, which, combined with short selling data, suggests that many short sales were "naked"; (3) significant imbalances between Quantum shares reflected in broker position reports and shares held in U.S. and Canadian depositories, especially for Defendants; and (4) the surplus of net shares of Quantum sold by CIBC (as measured with CSE market data) over a given period above the decrease in CIBC's inventory of Quantum's shares over that same period (as measured by Depository Trust Company data). *Id.*

Lastly, in March 2023, almost immediately after Quantum's CEO expressed concerns to CIBC that he believed CIBC may be engaged in manipulative trading practices with respect to Quantum's stock, CIBC allegedly "aggressively and repeatedly shorted Quantum's stock." ¶ 93.

    c. *Illustrative Examples of Alleged Spoofing Cycles*

The AC contains several examples of alleged spoofing cycles for each Defendant. ¶¶ 96–197. Below are a few illustrative examples excerpted from the AC.

    i. *CIBC – June 3, 2020*

Quantum alleges that CIBC orchestrated 27 spoofing cycles on June 3, 2020. ¶ 102. On that day, at 3:03:58 p.m. and 406 milliseconds, the best bid and offer for Quantum on the U.S. markets was $8.09 USD and $8.10 USD, respectively. ¶ 97. In the

span of 4.937 seconds,[11] CIBC and/or its clients allegedly submitted 37 baiting orders to sell on the Canadian market, totaling 11,800 shares, at prices ranging from $11.27 Canadian dollars ("CAD") down to $10.77 CAD. *Id.* Over the baiting period, CIBC and/or its clients placed mostly sell-side orders, resulting in sell-side imbalances in Canada. ¶ 98. Similarly, in the U.S., there were 61,723 shares in the first twenty levels of the order book[12] on the ask side, and 30,616 shares on the bid side, resulting in a sell-side imbalance ratio of 2.01, meaning that there were about 2 times more shares for sale than to buy. *Id.*

Quantum alleges that CIBC's baiting orders to sell induced the entry of sell orders from other market participants, driving the price of Quantum shares down. ¶ 99. As a result, between 3:04:03 p.m. and 925 milliseconds and 3:04:05 p.m. and 602 milliseconds, CIBC and/or its clients executed seventeen orders on the Canadian market to buy a total of 1,700 shares at lower prices ranging from $10.69 CAD to $10.74 CAD. *Id.* Quantum adds that a similar pattern can be seen in the U.S. ¶ 100.

Quantum repeats similar allegations for CIBC for trades that occurred on November 30, 2020, February 10, 2021, March 19, 2021, February 1, 2022, June 5, 2024, and June 14, 2024. ¶¶ 103–143.

   ii. *RBC – August 10, 2020*

On August 10, 2020, at 11:08:07 a.m. and 444 milliseconds, the best bid and offer for Quantum on the U.S. markets were $2.99 USD and $3.02 USD, respectively. Between 11:09:38 a.m. and 111 milliseconds and 11:09:40 a.m. and 741 milliseconds, Defendant RBC and/or its clients allegedly submitted 9 baiting orders to sell on the Canadian market, totaling 3,700 shares at prices ranging from $4.09 CAD down to $4.05 CAD. ¶ 144. Over this period, RBC and/or its clients placed more sell-side orders than

---

[11] Quantum alleges that this took place between 3:03:58 p.m. and 997 milliseconds and 3:04:03 p.m. and 934 milliseconds on June 3, 2020. ¶ 97.

[12] "Levels of the order book" refers to the price tiers in the order book, each showing the quantity of shares available at a specific price.

buy-side orders, resulting in a significant sell-side imbalance in Canada.  Similarly, in the U.S., there were 43,721 shares in the first twenty levels of the order book on the ask side, and 33,255 shares on the bid side, a significant sell-side imbalance ratio of 1.31.  ¶ 145. These orders, according to Quantum, successfully induced the entry of sell orders from other market participants, driving the price of Quantum shares down.  ¶ 146.  In the U.S., the ask price declined from $3.02 USD to $2.99 USD.  ¶ 147.

Through the executed orders, RBC and/or its clients were able to purchase shares at prices below the prevailing best offer in Canada of $4.05 CAD, which was the natural price before RBC and/or its clients entered the alleged baiting orders.  ¶ 148.  Without these orders, RBC and/or its clients would have been required to pay the prevailing best offer price (or higher) to buy Quantum shares.  *Id.*  In the two seconds following the execution of the orders, RBC and/or its clients canceled all 3,700 of the shares posted at or above the best ask price.  *Id.*

Quantum repeats similar allegations for RBC for trades that occurred on March 17, 2021, May 3, 2021, and September 2, 2021.  ¶¶ 149–164.

*iii. John Doe 1 – June 4, 2020*

Quantum alleges that one or more brokers using Anonymous ID # 1—John Doe 1—engaged in spoofing during the Relevant Period.  According to Quantum, on one particular day, John Doe 1 orchestrated 158 spoofing cycles.  ¶ 172.  Specifically, Quantum alleges that on June 4, 2020, at 10:28:47 a.m. and 164 milliseconds, the best bid and offer for Quantum on the U.S. markets were $6.46 USD and $6.55 USD, respectively.  ¶ 166.  Between 10:28:46 a.m. and 621 milliseconds and 10:28:57 a.m. and 131 milliseconds, John Doe 1 and/or its clients submitted 269 baiting orders to sell on the Canadian market, totaling 56,100 shares at prices ranging from $8.95 CAD down to $8.63 CAD.  *Id.*

During this period, John Doe 1 and/or its clients placed more sell-side orders than buy-side orders, resulting in a significant sell-side imbalance in Canada.  ¶ 167.  Quantum

14

asserts that there was no significant imbalance in the U.S. during this time, but that starting at 10:28:45 a.m. and 74 milliseconds, waves of 100-share orders were repeatedly placed and canceled within milliseconds on TWO stock exchange operators— BATS Global Market and Nasdaq.  *Id.*  According to Quantum, these orders successfully induced the entry of sell orders from other market participants, driving the price of Quantum shares down.  ¶ 169.  As a result, starting at 10:28:51 a.m. and 618 milliseconds, John Doe 1 and/or its clients executed fourteen executing orders on the Canadian market to buy a total of 1,400 shares at prices ranging from $8.76 CAD to $8.62 CAD.  *Id.*  Quantum adds that, similarly, in the U.S., 979 shares traded at the bid, while zero shares traded at the ask price during the pre-trade period, resulting in a decline of the U.S. ask price from $6.55 USD to $6.46 USD.  ¶ 170.  Through the executed orders, John Doe 1 and/or its clients purchased shares at prices below the prevailing best offer in Canada of $8.81 CAD, which Quantum alleges was the price prior to John Doe 1's baiting orders.  ¶ 171.

Quantum repeats similar allegations for John Doe 1 for trades that occurred on July 22, 2020, November 30, 2020, February 1, 2021, February 9, 2021, and February 11, 2021.  ¶¶ 173–197.

### 4.  *Spoofing Schemes Resulted in Significant Losses for Quantum*

During the Relevant Period, Quantum sold or issued for value approximately 90 million shares.  ¶ 198.  Many of the Defendants' alleged spoofing cycles occurred immediately prior to Quantum's sales or issuances.  *Id.*  Thus, according to Quantum, because it sold or issued shares during the Relevant Period at times when the prices of those shares were artificially deflated due to Defendants' spoofing, it was directly damaged by Defendants' conduct.  *Id.*

In fact, according to Quantum, available evidence indicates that Defendants' alleged spoofing had a persistent and long-lasting price impact on the share price of Quantum, even when adjusted for market-wide price movements.  ¶ 203.  Quantum

asserts that the precise amount of time that the impact of Defendants' spoofing cycles lasted is an empirical question that will be resolved after discovery. ¶ 205. Quantum provides a list of spoofing cycles that took place immediately prior (i.e., within five minutes) to Quantum's sales or issuances for value of shares at artificially depressed prices, ¶ 209, and another list of dates and quantity of shares sold where the spoofing occurred within one hour before Quantum's sales or issuances for value of shares, ¶ 211.

Quantum alleges that the sharp price decreases in its share prices correlate with Defendants' alleged spoofing activities. ¶ 206. For example, from June 3, 2020, to June 12, 2020, the price of Quantum dropped from $910 to $273; over that period, there were 550 spoofing cycles. *Id.* From February 9, 2021, to February 26, 2021, the price of Quantum dropped by over 29%; over that period, there were 136 spoofing cycles. *Id.* From March 16, 2021, to April 6, 2021, the price of Quantum dropped by over 10 percent; over that period, there were 304 spoofing cycles. *Id.* From April 10, 2023, to April 19, 2023, the price of Quantum dropped by nearly 20%; over that period, there were 21 spoofing cycles. *Id.*

Lastly, Quantum asserts that Defendants intentionally hid their spoofing schemes in order to depress the price of Quantum shares. ¶ 215. Quantum alleges that "Defendants' scheme to manipulate was structured in a manner that concealed Defendants' unlawful intentions and made it extremely difficult for a reasonably diligent market participant—like Quantum—to discover the [] facts constituting the market manipulation scheme, much less the identities of the perpetrators of these schemes." ¶ 221. In fact, according to Quantum, despite its diligence, it did not discover "the facts constituting the market manipulation claims or the identities of the perpetrators of these market manipulation schemes" during the Relevant Period. ¶ 222.

## B. Procedural Background

Quantum filed the complaint on October 20, 2024.  Doc. 1.[13]  On May 1, 2025, Quantum filed an AC, which includes three claims for relief:  (1) violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c); (2) a violation of Section 9(a)(2) of the Exchange Act; and (3) New York common law fraud.  Doc. 32.

On June 16, 2025, Defendants filed a joint motion to dismiss the AC pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.  Doc. 35. Defendants argue that Quantum relies almost entirely on "cherry-picked 'order data,' available only for Canadian markets" to allege that Defendants engaged in spoofing without being able to "plausibly allege that any Defendant placed any particular order." Doc. 36 at 9–10.  Additionally, Defendants allege that the case should be dismissed for at least five independent reasons:  (1) the facts and circumstances of the case are "overwhelmingly foreign," so this Court cannot reach the Defendants through personal jurisdiction, extraterritoriality, or *forum non conveniens*; (2) Quantum does not adequately allege that CIBC or RBC engaged in manipulation in violation of the Exchange Act; (3) Quantum does not plead a strong inference of scienter; (4) Quantum does not plead loss causation as to CIBC or RBC; and (5) Quantum's Exchange Act claims are time-barred.  Doc. 36 at 11–13.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Plaintiffs "opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction ha[ve] the burden of establishing that the court has jurisdiction over the defendant."  *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02-cv-4695 (LTS) (HBP), 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels*

---

[13] On January 31, 2025, defendants CIBC and RBC, Inc. jointly filed a motion to dismiss the complaint. Doc. 27.  On May 1, 2025, Quantum filed the AC.  Doc. 32.  Accordingly, as the original complaint was no longer the operative pleading, the Court issued an order terminating the original motion to dismiss as moot. Doc. 34.

*Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).  Plaintiffs "must establish the court's jurisdiction with respect to each claim asserted." *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

To meet this burden, plaintiffs must plead facts sufficient for a prima facie showing of jurisdiction.  *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).  The Court construes all of plaintiffs' allegations as true and resolves all doubts in plaintiffs' favor.  *Casville Investments, Ltd. v. Kates*, No. 12-cv-6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008); *Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 513 (S.D.N.Y. 2012)).  "However, [plaintiffs] may not rely on conclusory statements without any supporting facts, as such allegations would lack the factual specificity necessary to confer jurisdiction." *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14-cv-3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (internal quotation marks and citation omitted).  The Court may rely on additional materials outside the pleading when ruling on 12(b)(2) motions.  *John Hancock Property & Casualty Insurance Co. v. Universale Reinsurance Co.*, No. 91-cv-3644 (CES), 1992 WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5, 1992); *Darby Trading Inc. v. Shell Intern*ational *Trading and Shipping Co. Ltd.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008) (citations omitted).

## B.  Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Koch*, 699 F.3d at 145.  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint

18

must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id*. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The question in a Rule 12(b)(6) motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir. 2006)). Furthermore, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## C. Rule 9(b)

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder sound in fraud, they are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (the

"PSLRA"). *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

## III. DISCUSSION

### A. Quantum's Claims Are Not Dismissed on Jurisdictional Grounds.

Defendants argue that the AC should be dismissed on personal jurisdiction, extraterritoriality, and *forum non conveniens* grounds. Doc. 36 at 17. For reasons set forth below, these arguments fail.

#### 1. Specific Personal Jurisdiction

Quantum has established personal jurisdiction as to CIBC and RBC. In diversity or federal question cases, personal jurisdiction is determined in accordance with the law of the forum in which the federal court sits. *Whitaker*, 261 F.3d at 208 (citing *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997)). This determination involves a two-step analysis. *Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). In New York, the Court must first determine whether personal jurisdiction is appropriate pursuant to the state's general jurisdiction statute, Civil Practice Law and Rules ("C.P.L.R.") § 301, or its long-arm jurisdiction statute, C.P.L.R. § 302(a), known as specific jurisdiction.

If and only if the Court's exercise of personal jurisdiction is deemed appropriate according to New York law, the second step is an evaluation of whether the Court's exercise of personal jurisdiction comports with the Fifth Amendment Due Process Clause

of the United States Constitution. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007). Where, as here, the court does not conduct an evidentiary hearing, a plaintiff need only allege facts sufficient for a prima facie showing of jurisdiction. *See M. Shanken Communications, Inc. v. Variant Events, LLC*, No. 10-cv-4747 (CM), 2010 WL 4159476, at *3 (S.D.N.Y. Oct. 7, 2010) (citing *DiStefano v. Carozzi N.A., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)).

Here, Defendants argue that "[t]here is no basis to assert general jurisdiction over CIBC or RBC" and that "Quantum also cannot establish specific jurisdiction because none of the alleged misconduct arose out of Defendants' contacts with this District." Doc. 36 at 18. However, as Quantum argues, the court in *Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets. Corp.* addressed this exact issue for Canadian entities allegedly engaging in spoofing in U.S. markets and concluded that it had specific personal jurisdiction over the Canadian defendants. No. 21-cv-761 (LGS), 2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023).

When analyzing specific personal jurisdiction, "'[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit, and the plaintiff's claim must in some way arise from the defendant's purposeful contacts with the forum.'" *Harrington*, 2023 WL 6316252, at *3 (quoting *Charles Schwab*, 883 F.3d at 84). In *Harrington*, the plaintiff alleged that "the Canadian [d]efendants 'conducted continuous activity in New York state … by employing high speed algorithmic computer systems to disseminate and/or effect orders and execute trades of [a non-party health company's] shares throughout the U.S.,'" and that those defendants "routed orders to intermediary broker-dealers in the U.S. to be executed for their customers." *Id.* at *3. There, the Court held that "these allegations are sufficient to make out a prima facie case for a causal relationship between the Canadian [d]efendant's

21

U.S. contacts and [p]laintiff's claims," and denied the defendants' motion to dismiss the spoofing claims on personal jurisdiction grounds. *Id.*

Here, the AC makes almost identical allegations for both CIBC and RBC:  that Defendants "engaged in manipulative trading practices, with the intent to manipulate the price of Quantum, on both the United States and Canadian markets " and that they "engaged in cross-border spoofing schemes that were intended to manipulate, and did in fact manipulate, the price of Quantum stock in the United States and Canada." ¶¶ 14, 16. Quantum also alleges that CIBC and RBC "conducted continuous activity in New York, directly related to [Quantum's] claims, by employing high-speed algorithmic computer systems to disseminate and/or effect orders and execute trades of Quantum shares throughout the United States," and "route[d] to intermediary broker-dealers in the United States orders to be executed for [their] customers." ¶¶ 8–9.  Quantum has therefore met its burden of sufficiently alleging facts to make out a prima facie case for a causal relationship between Defendants' U.S. contacts and Quantum's claims.

Defendants also argue that "the AC does not plead a single trade placed by any Defendant that occurred in or was 'directed' at this District." Doc. 36 at 19.  Specifically, Defendants take issue with Quantum's invocation of "probabilistic imputation." Defendants note that "[p]robabilistic imputation … entails an assumption that orders placed closely in time are more likely to have been placed by the same party." Doc. 36 at 19.  They argue that Quantum's use of this methodology to attribute anonymous trades of Quantum stock in the United States—occurring around the same time as Defendants' trades in Canada—to Defendants fails to account for the speed at which financial markets operate.  Defendants argue that it cannot be ignored that "modern financial markets operate at extremely high speeds, with unrelated market participants constantly reacting to each other's trading" such that "[a] later-in-time order placed shortly after (within 'ten milliseconds' of) an earlier-in-time order is just as likely, if not more likely, to have been

22

placed by independent market participants *in reaction* to the earlier-in-time order." Doc. 36 at 20 (emphasis in original).

However, as the *Harrington* Court held in adjudicating this exact argument, "'until an evidentiary hearing is held, a prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion.'" 2023 WL 6316252, at *3 (citing *Dorchester Financial Securities, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013)). For purposes of the requirements at the motion to dismiss stage, the Court finds that Quantum's allegations suffice: Defendants' "cross-border spoofing schemes" were "intended to manipulate" the price of Quantum "in the United States and Canada" and "had a significant immediate impact on the price of Quantum's shares simultaneously in the United States and Canadian markets." ¶ 16; *see also Harrington*, 2023 WL 6316252, at *3 (discussing similar allegations).

The Court concludes that the allegations in the AC are sufficient to make out a prima facie case for specific personal jurisdiction over CIBC and RBC. Accordingly, the motion to dismiss for lack of personal jurisdiction is denied.

### 2. *Extraterritoriality*

Defendants also argue that "Quantum's Exchange Act claims are impermissibly extraterritorial" under *Morrison v. National Australian Bank Ltd.*, 561 U.S. 247 (2010). Doc. 36 at 23. As *Morrison* held, Section 10(b) reaches "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." 561 U.S. at 267. Quantum is a an "interlisted security" listed and traded on both the Nasdaq—a domestic exchange—and the CSE. ¶ 18. While Quantum concedes that the U.S. and Canada order data it relies on does not distinguish between orders placed by Defendants' traders for their own book and orders placed by or on behalf of Defendants' customers, *see* ¶¶ 23, 51, 60, 77, Quantum does otherwise allege sufficient facts that weigh against finding that its allegations predominantly pertain to foreign activities. In fact, Quantum broadly alleges that Defendants engaged in trading in the U.S. market in furtherance of the

spoofing schemes, which the *Harrington* Court found sufficed "to bring the Canadian Defendants within the reach of the Exchange Act." *Harrington*, 2023 WL 6316252, at *4.

Defendants also argue that "even if transactions could be considered 'domestic' under this analysis, Quantum must allege facts demonstrating that its claims are not 'predominantly foreign.' Doc. 36 at 24 (citing *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198, 215-16 (2d Cir. 2014) (*per curiam*)). According to Defendants "Quantum cannot meet these strict thresholds" because "the only placed orders that Quantum identifies are on a Canadian exchange, and the only alleged spoofing examples involve Canadian transactions." Doc. 36 at 23, 25.

However, *Parkcentral*, which Defendants rely on, has been construed narrowly. *See, e.g.*, *In re Poseidon Concepts Securities Litigation*, No. 13-cv-1213 (DLC), 2016 WL 3017395, at *13 (S.D.N.Y. May 24, 2016) (noting that *Parkcentral* "was tied to the derivative security it addressed" and that the Court "do[es] not suggest that the presence of some foreign element in a transaction necessarily means that Congress did not intend to include it in the coverage of § 10(b)."). In *Harrington*, the court rejected the defendants' *Parkcentral* argument on the grounds that the plaintiffs alleged that the "Canadian [s]poofing [d]efendants engaged in at least some conduct in the United States in their purported effort to manipulate Concordia's stock on U.S. exchanges," and that "[i]t would require an inference in favor of Canadian [d]efendants to view the [c]omplaint as alleging the predominance of foreign conduct over conduct within the United States by the Canadian Defendants." *Harrington Global Opportunity Fund, Ltd. v. CIBC World Markets Corp.*, 585 F. Supp. 3d 405, 421 (S.D.N.Y. 2022). The same is true here. Accordingly, the motion to dismiss as it relates to Defendants' extraterritoriality argument is denied.

24

3. *Forum Non Conveniens*

The doctrine of *forum non conveniens* allows a court to dismiss an action "even if the court is a permissible venue with proper jurisdiction over the claim." *LaSala v. Bank of Cyprus Public Co. Ltd.*, 510 F. Supp. 2d 246, 254 (S.D.N.Y. 2007) (quoting *Carey v. Bayerische Hypound Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004)). "A decision to grant or deny a motion to dismiss a cause of action under the doctrine of *forum non conveniens* lies wholly within the broad discretion of the district court." *Scottish Air International, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996).

Moreover, a defendant who invokes *forum non conveniens* generally bears "a heavy burden" in opposing plaintiff's chosen forum. *Villella v. Chemical & Mining Co. of Chile Inc.*, No. 15-cv-2106 (ER), 2017 WL 1169629, at \*5 (S.D.N.Y. Mar. 28, 2017) (quoting *Sinochem International Co. Ltd. v. Malaysia International Shipping Corp.*, 549 U.S. 422, 430 (2007)). When reviewing a *forum non conveniens* motion, courts start with "a strong presumption" in favor of the plaintiff's forum choice. *Norex Petroleum Ltd. v. Access Industries, Inc.*, 416 F.3d 146, 154 (2d. Cir. 2005) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)). "Usually, the greatest deference is afforded a plaintiff's choice of its home forum, while 'less deference' is afforded a foreign plaintiff's choice of a United States forum." *Id.* (internal citations and quotations omitted). However, "the degree of deference assigned to plaintiff's choice depends on the specific facts of the case and may be viewed as operating along a 'sliding scale.'" *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003).

> [T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens* … On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons ... the less deference the plaintiff's choice commands[.]

*Iragorri v. United Technologies Corp.*, 274 F.3d 65, 71–72 (2d Cir. 2001) (en banc)).

25

The Second Circuit has "outlined a three-step process to guide the exercise of that discretion." *Norex*, 416 F.3d at 153 (citing *Iragorri*, 274 F.3d at 73). First, "a court determines the degree of deference properly accorded the plaintiff's choice of forum." *Id.* Second, "it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute." *Id.* And third, "a court balances the private and public interests implicated in the choice of forum." *Id.*

First, some deference is owed to Quantum's chosen forum. Quantum asserts claims under the Exchange Act in connection with Defendants' alleged spoofing activity in U.S. markets, including Nasdaq. ¶¶ 14–16; *DiRienzo v. Philip Services Corp.*, 294 F.3d 21, 28 (2d Cir. 2002) ("In fact, plaintiffs offered a quite valid reason for litigating in federal court: this country's interest in having United States courts enforce United States securities laws.").

Second, Defendants are correct that "the Second Circuit has concluded that Ontario, Canada is an adequate forum to try class actions based on violations of federal securities laws." *In re Royal Group Technologies Securities Litigation*, No. 04-cv- 9809 (HB), 2005 WL 3105341, at *2 (S.D.N.Y. Nov. 21, 2005).

However, as to the third factor, private and public factors do not tilt "'strongly in favor of the foreign forum.'" Doc. 38 at 22 (citing *Poseidon*, 2016 WL 3017395, at *9). As Quantum points out it would not be burdensome for Defendants to litigate this matter in New York given that both CIBC and RBC are already litigating other matters in New York, so litigating this case in New York would not be unduly burdensome. Doc. 38 at 22. Additionally, while Defendants' argument that "[a]ll parties are Canadian and most or all of the relevant witnesses and evidence (*i.e.*, employees and records) are in Canada as well," Doc. 41 at 12, weighs in favor of the foreign forum, other courts in this jurisdiction have still found against dismissing a case for *forum non conveniens* where the "balance of the private interest factors is close." *DiRienzo*, 294 F.3d at 30 (declining to disrupt the plaintiff's choice of forum even though "most of the potential witnesses with direct

26

knowledge of the alleged fraud are located in Ontario.").  And, as Quantum argues, "many potential non-party witnesses and subpoena targets are likely located in New York, not Canada, including exchanges that possess trading data and 'intermediary broker-dealers' through which Defendants routed orders in the United States."  Doc. 38 at 23 (citing ¶¶ 8, 10).

As for public interest factors, "[a] strong public interest favors access to American courts for those who use American securities markets."  *DiRienzo*, 294 F.3d at 33.

For the reasons set forth above, on balance, the Court finds that some deference should be given to Plaintiff's choice of forum and therefore declines to dismiss the case on *forum non conveniens* grounds.

### B.  Defendants' Exchange Act Arguments Fail.

"Market manipulation requires a plaintiff to allege (1) manipulative acts; (2) damage[s]; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."  *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).  Since a claim for market manipulation sounds in fraud, it must be pled with particularity in accordance with Rule 9(b).  *Id.*

Here, Defendants raise three primary arguments:  that Quantum fails to establish manipulative conduct by CIBC or RBC; that Quantum fails to plead a strong inference of scienter; and that Quantum fails to plead loss causation.  The Court addresses each in turn below.

#### 1.  *Manipulative Conduct by CIBC or RBC*

First, the AC adequately pleads a manipulative act.  Defendants argue that Quantum fails to establish manipulative conduct by CIBC or RBC because it fails to plead, with particularity, what the manipulative conduct was and instead "attaches conclusory labels to ordinary market-making activity; lumps Defendants together without

identifying which orders were placed by which Defendant; and aggregates those orders with others placed by unidentified customers and clients—all in an attempt to plead a single spoofing scheme." Doc. 36 at 29. In short, Defendants boil down the allegations to "ordinary market-making activity, which comes nowhere close to pleading manipulative acts." *Id.* at 32.

However, Courts have made it clear that "[a] claim of manipulation … can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI*, 493 F.3d at 102. "Accordingly, a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *Id.* Here, the AC has done so.

The purported spoofing scheme, as alleged in the AC, is as follows: Defendants repeatedly placed baiting orders to artificially drive down the price of Quantum stock, purchased Quantum stock at those artificially-deflated prices, and then cancelled the baiting orders. ¶¶ 53–57. Quantum likewise provides examples of each Defendant's spoofing cycles. Doc. 38 at 35; *see also* ¶¶ 97–102 (describing CIBC's purported spoofing activities), ¶¶ 144–48 (describing RBC's purported spoofing trades). Quantum also includes aggregate information concerning each Defendant's spoofing trades during the Relevant Period. ¶¶ 58, 65, 66, 69. Lastly, the AC includes a chart detailing each Defendant's purported spoofing activity that occurred in close temporal proximity to Quantum's own share sales. ¶¶ 209, 211. These allegations suffice. *See Phunware, Inc. v. UBS Sec. LLC*, No. 23-cv-6426 (DEH), 2024 WL 1465244, at *4–5 (S.D.N.Y. Apr. 4, 2024) (granting motion to dismiss on other grounds, but rejecting argument that plaintiff failed to adequately plead a manipulative act in spoofing case, where plaintiff alleged "that [d]efendant engaged in a spoofing scheme to artificially depress the price of [plaintiff's shares], which had the effect of lowering [plaintiff's shares'] trading price[s],"

and provided specific examples of six cycles of defendant engaging in spoofing behavior).

Defendants' arguments to the contrary are unpersuasive. *First*, Defendants argue that Quantum asks the Court to "infer[]" from factors such as "the short time period between the continuous and repeated placement and cancellation of the [b]aiting [o]rders," that "Defendants' [b]aiting [o]rders were intended to function as part of a scheme to defraud the market in Quantum securities." Doc. 36 at 29–30 (citing ¶ 68). Defendants contend that this is insufficient to satisfy Rule 9(b). Doc. 36 at 29. However, as Quantum points out, Defendants rely on out-of-circuit authority to argue that rapidly placing and cancelling orders, by itself, is insufficient to plead market manipulation under Rule 9(b). Doc. 36 at 29–30 (citing *Kessev Tov, LLC v. Doe(s)*, No. 20-cv-04947, 2023 WL 4825110, at *2–4 (N.D. Ill. July 27, 2023) (concluding that plaintiff adequately pled manipulative acts because the allegations included "something more" than placing and cancelling orders). Here, too, the AC includes allegations that the "indicia" of spoofing—including, *inter alia*, side-sell imbalances, price impact, comparisons of sell-side and buy-side activity, comparisons to other market participants' activity, comparisons to Defendants' non-spoofing activity—are present. ¶¶ 63, 65, 69, 79–80, 81–83.

*Second*, Defendants take issue with Quantum's failure to identify which defendants performed each allegedly manipulative act. Doc. 36 at 30. The *Harrington* court addressed a similar argument. There, defendants argues that the plaintiff did not associate any order with any specific defendant, but the court determined that the complaint provided "seven illustrative examples of specific [d]efendants engaged in spoofing cycles involving [the relevant] shares." *Harrington*, 2023 WL 6316252, at *6. Each illustrative example in *Harrington* included "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI*, 493 F.3d at 102. The *Harrington* court determined that these illustrative examples,

29

coupled with the additional thirty spoofing cycles in the form of a chart specifying key information,[14] was sufficient, especially given that it would be unreasonable to require that plaintiff provide detailed descriptions of the 900+ spoofing e cycles alleged in the complaint. *Harrington*, 2023 WL 6316252, at *6.

Here, Quantum provides illustrative examples identifying which Defendant executed each allegedly manipulative trade and includes the precise date and time of those trades and the identity of the responsible Defendant.[15] ¶¶ 96–164. Specifically, Quantum provides 7 illustrative examples for CIBC and 4 illustrative examples for RBC, as well as a table detailing 18 additional spoofing cycles. ¶¶ 96–164, 211. Accordingly, just as this argument failed in *Harrington*, it does here for the same reasons. 2023 WL 6316252, at *6.

*Third*, Defendants argue that Quantum's reliance on aggregate buy and sell orders without matching those orders to any individual Defendant is "speculative" and insufficient to satisfy Rule 9(b). Doc. 36 at 31. It is true that Both Defendants and Quantum agree that "the order flow data on which the AC relies combines all orders placed under a broker-dealer's 'unique identifier,' and does not distinguish between orders placed by Defendants for their own book, and orders placed by or on behalf of customers." Doc. 36 at 31 (quoting ¶¶ 23, 51). However, this argument has too been rejected by Courts in this district. *See Harrington*, 585 F. Supp. 3d at 416 ("That the [c]omplaint mentions that [d]efendants trade for their own proprietary accounts and the accounts of their customers does not undercut the [c]omplaint's numerous allegations that

---

[14] The information contained in the chat was "the date and time of each spoofing [cycle], the involved [d]efendants, the price decline in [the relevant] shares attributed to each [cycle], and the number of shares [plaintiff] sold in reliance on the market manipulations generated by [d]efendants' sham baiting orders." *Harrington*, 2023 WL 6316252, at *6.

[15] In their reply, Defendants argue that the fact that Quantum only provided eleven examples of alleged spoofing cycles by RBC and CIBC weighs against finding in Quantum's favor given that all the cases Quantum relies on are ones in which the Plaintiff provided over 30 illustrative examples. Doc. 41 at 14. Defendants, however, fail to provide any authority suggesting that the complaint must contain a certain number of illustrative examples of the allegedly manipulative acts to meet the pleading threshold.

30

Defendants designed and operated the algorithms that spoofed Concordia stock.”); *Mullen*, 2025 WL 951501, at *3 (“Defendants also argue that ‘[p]laintiffs improperly aggregate the trading of each broker-dealer and its many customers’ … However, [p]laintiffs separate their list of spoofing [cycles] by each individual [d]efendant.” (internal citations omitted)); *Northwest Biotherapeutics, Inc. v. Canaccord Genuity LLC*, No. 22-cv-10185 (GHW) (GS), 2023 WL 9102400, at *26 (S.D.N.Y. Dec. 29, 2023), *report and recommendation adopted sub nom. Northwest Biotherpeutics, Inc. v. Canaccord Genuity LLC*, No. 1:22-cv-10185 (GHW) (GS), 2024 WL 620648 (S.D.N.Y. Feb. 14, 2024) (“As in *Harrington*, the possibility that [d]efendants may have traded for clients does not undercut the [complaint’s] numerous allegations that [d]efendants designed and operated the algorithms that spoofed [p]laintiff’s stock.” (internal quotation marks omitted)); *Phunware*, 2024 WL 1465244, at *6 (“Defendant also argues that its trading activity should not be aggregated to determine a pattern from which to infer scienter.  This fails for the reasons discussed above—namely, that the [c]omplaint alleges a course of conduct by [d]efendant and does not include allegations suggesting [d]efendant was acting on the instructions of clients.” (internal citations omitted)).

And, as Quantum points out, the AC “alleges that the manipulative trades were executed by Defendants’ algorithms and that Defendants had an obligation to monitor trading through their platforms.”  Doc. 38 at 28.  Accordingly, this argument, too, is unpersuasive.

*Lastly*, Defendants take issue with the AC’s use of the “probabilistic imputation” theory.  Doc. 36 at 32.  However, as held above, the Court will not rule on argument at this stage.

Accordingly, the Court concludes that Quantum has met the pleading standard for manipulative acts.

## 2. *Scienter*

The AC sufficiently alleges scienter.  To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts with particularity that would give rise "to a strong inference that the defendant acted with the required state of mind." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  A "strong inference" that a defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

This inquiry goes beyond the ordinary Rule 9(b) framework and requires courts to consider "not only inferences urged by the plaintiff ... but also competing inferences rationally drawn from the facts alleged." *Id.*  "The relevant inquiry for the Court 'is whether *all* of the facts alleged, taken collectively, give rise to a *strong* inference of scienter, not whether any *individual* allegation, scrutinized in isolation, meets that standard.'" *In re Magnum Hunter Resources Corp. Securities Litigation*, No. 13-cv-2668 (KBF), 2014 WL 2840152, at *17 (S.D.N.Y. June 23, 2014) (emphases in original) (citing *Tellabs*, 551 U.S. at 322–23, 127).

A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006).  Quantum fails to establish motive and opportunity but has sufficiently alleged strong circumstantial evidence of conscious misbehavior or recklessness.

### a. *Motive or Opportunity*

"A complaint has sufficiently alleged motive and opportunity to commit fraud if it pleads facts showing that the defendant benefited in some concrete and personal way from the purported fraud." *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y.2013) (internal quotation marks omitted).  Defendants argue that Quantum

"comes nowhere close" to meeting this standard because the AC merely includes "conclusory" allegations that Defendants had a "'strong motive'" to spoof in order to "'purchase hundreds of thousands of Quantum shares at depressed prices.'" Doc. 36 at 33 (quoting ¶ 95).

Here, the Court finds that Quantum fails to allege that CIBC or RBC "benefitted in some concrete and personal way from the purported fraud." *Police & Fire Retirement System City of Detroit v. Argo Group International Holdings, Ltd.*, No. 22-cv-8971 (LAK), 2024 WL 5089970, at *11 (S.D.N.Y. Dec. 12, 2024). As Defendants note, Quantum fails to explain how they could have profited from spoofing when it allegedly placed "continuous downward pressure on Quantum's share price." ¶¶ 102, 143, 172, 183, 193. Defendants add that "Quantum provides no plausible explanation for why CIBC and RBC in their broker-dealer capacities would be motivated to drive down Quantum's stock price, particularly when a broker-dealer does not take directional positions on individual stocks." Doc. 36 at 33. According to Defendants, the AC does not contain allegations that they "bought and held Quantum's stock at depressed prices and sold it after the price rebounded." Doc. 36 at 34. In fact, the AC alleges that "[t]he spoofing party *may profit* when the market share price partially reverts to pre-spoofing levels and he or she unwinds his or her position," ¶ 35 (emphasis added), but this allegation is too general and does not sufficiently plead motive and opportunity.

However, Defendants' *de minimis* argument is unconvincing. Defendants argue that even if the AC had properly plead net profits, using the numbers Quantum provided, the benefit obtained from "spoofing would have been *de minimis* at best—shaving off a few *pennies* per share." Doc. 36 at 34 (emphasis in original). Specifically, the total benefit would have been $614 CAD for RBC and $12,891 CAD for CIBC over the more-than-four-year Relevant Period. Doc. 36 at 35. The total alleged benefit for all Defendants, including John Doe 1, in the U.S. would have been $146 USD over the four-year period. *Id.* However, this argument has been rejected by courts in this District.

33

*Northwest Biotherapeutics*, 2023 WL 9102400, at \*25 ("While profits from any single [spoofing cycle] may be miniscule, spoofers can generate substantial returns by repeating the scheme thousands of times across the same and different issuers' securities."). Additionally, Quantum does not concede that the profits from the spoofing alleged in the AC are as modest as Defendants calculated.  Doc. 38 at 34.  This is in part due to the fact that the spoofing cycles Quantum has identified thus far "does not reflect all of the [s]poofing [cycles] that existed during the Relevant Period."  ¶ 69 n. 7.  Such can only be determined after discovery is complete.  Accordingly, the Court finds Defendants' *de minimis* benefit argument unconvincing at this juncture.

Nevertheless, because it is not evident from the facts alleged that the Defendants bought Quantum's stock at depressed prices and then sold it after the price rebounded, the Court cannot determine that they "benefited in some concrete and personal way from the purported fraud."  *See Van Dongen*, 951 F. Supp. 2d at 468.  Therefore, Plaintiff has not made a sufficient showing that Defendants had a motive to engage in spoofing.

### b.  *Misbehavior or Recklessness*

The Court finds that Quantum has met the standard for pleading a theory of scienter based on conscious behavior or recklessness.  An inference of scienter may arise where a complaint sufficiently alleges that the defendants "engaged in deliberately illegal behavior … knew facts or had access to information suggesting that their public statements were not accurate … or … failed to check information they had a duty to monitor."  *Novak,* 216 F.3d at 311.  When a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's recklessness "must be correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal citations omitted).  To establish scienter under the conscious misbehavior theory, a plaintiff  "must show conduct by defendants that is at the least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must

have been aware of it." *In re Initial Public Offering Securities Litigation*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) (quoting *Kalnit*, 264 F. 3d at 142) (internal quotation marks omitted). Courts in this District have held that "[i]n a market manipulation case, the scienter and manipulative acts inquiries overlap." *Northwest Biotherapeutics*, 2023 WL 9102400, at *26.

"In the context of spoofing, which consists of otherwise permissible market activity, courts look[] to various indicia differentiating market manipulation from legitimate trading for purposes of scienter, including (1) a short period of time, often milliseconds, between placing and cancelling orders and between executing transactions and cancelling orders on the other side of the market, (2) the cancellation of orders when some orders on the same side of the market are partially or completely fulfilled, (3) 'parking' baiting orders behind legitimate orders placed by other traders to ensure they are not fulfilled, (4) large disparities between volume of alleged baiting orders on one side of the market and executed orders on the other, and (5) other conduct unlike ordinary market making activity." *Phunware*, No. 23-cv-6426 (DEH), 2024 WL 1465244, at *5.

Here, the AC includes allegations of the five indicia outlined above: (1) Defendants placed and cancelled sell-side baiting orders within seconds or milliseconds and placed buy-side purchase orders and cancelled sell-side baiting orders within a similar time frame, ¶¶ 55–56; (2) Defendants cancelled their sell-side baiting orders immediately after their buy-side orders were fulfilled, ¶ 55; (3) Defendants priced their sell-side orders above the prevailing best offer, effectively "parking" them behind legitimate orders in the queue, ¶¶ 97–112 (CIBC), 144–46 (RBC); (4) Defendants placed significantly more sell-side baiting orders than executed buy-side orders, ¶ 69; and, as established above, (5) Quantum includes other allegations that distinguish Defendants' trading from ordinary market making activity, including imbalances in the order books, ¶ 63. Accordingly, the Court finds that Quantum's allegations, as set forth in the AC, are sufficient to plead conscious misbehavior or recklessness.

35

Defendants argue that Quantum selectively used statistics and ratios to attempt to bolster its speculations that Defendants placed orders with an intent to defraud. Doc. 36 at 37 (citing ¶¶ 79–84, 89–91). Specifically, Defendants point out that "Quantum does not even attempt to allege that any individual traders employed by CIBC or RBC—let alone their customers—worked in concert to further any coordinated spoofing strategy." Doc. 36 at 37. In other words, Defendants allege that Quantum lumps all of the orders together and relies on "average[s]" and "median[s]", ¶¶ 79–81, 83, "obscur[ing] the actions and intentions of dozens if not hundreds of independent decision makers." Doc. 36 at 37. However, just as this argument was unpersuasive in the manipulative-act context, it too is here.

Defendants also assert that Quantum's allegation that Defendants were "heavily engaged in algorithmic trading," ¶ 85, is not sufficient to meet the standard because it is an ordinary course activity of both CIBC and RBC. Doc. 36 at 38 (citing *ATSI*, 493 F.3d at 104 (finding no scienter where the plaintiff alleged nothing more than "a legitimate investment vehicle")). Defendants also argue that Quantum's allegations that the "trading activities" of Defendants' customers "were approved by" unidentified "corporate officials" of the Defendants who "knew or recklessly ignored" alleged spoofing, ¶ 86, likewise are too vague to meet the pleading standard. Doc. 36 at 38–39. However, as Quantum points out, the *Harrington* Court rejected this exact argument:

> Defendants argue that the [c]omplaint needs to plead additional facts regarding [d]efendants' algorithmic trading programs and the corporate officials who designed or oversaw those programs. [d]efendants' argument is unfounded because "[a] claim of manipulation … can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI*, 493 F.3d at 102 … If [d]efendants' argument were correct, it is hard to fathom how any plaintiff could plead a market manipulation claim based on spoofing through high-frequency trading algorithms.

*Harrington*, 585 F. Supp. 3d at 418. Defendants' argument also fails here.

36

### 3. Loss Causation

"Loss causation is the 'causal connection between the material misrepresentation and the loss.'" *In re E-House Securities Litigation*, No. 20-cv-2943 (ER), 2021 WL 4461777, at *16 n. 11 (S.D.N.Y. Sept. 29, 2021), *aff'd sub nom. Maso Capital Investments Ltd. v. E-House (China) Holdings Ltd.*, No. 22-355, 2024 WL 2890968 (2d Cir. June 10, 2024) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).  To plead loss causation, the plaintiff must "link the defendant's purported material misstatements or omissions with the harm ultimately suffered." *ODS Capital LLC v. JA Solar Holdings Co.*, No. 18-cv-12083 (ALC), 2020 WL 7028639, at *14 (S.D.N.Y. Nov. 30, 2020) (quoting *In re Bristol Myers Squibb Co. Securities Litigation*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008)).

### a. Temporal Proximity

Quantum has sufficiently plead loss causation under the theory of temporal proximity.  Under this theory, a plaintiff's "trades [must have] occurred so close in time to [defendants'] spoofing as to permit [the court] to infer as a matter of common sense that the market prices were artificial when [plaintiff] traded." *Phunware, Inc. v. UBS Securities LLC*, No. 23-cv-6426 (DEH), 2024 WL 4891891, at *2 (S.D.N.Y. Nov. 26, 2024).  "[T]here is no bright-line rule for temporal proximity in this district." *Mullen*, 2025 WL 951501, at *5.

Defendants argue that Quantum's trades were not "close in time" and that it failed to plead that it sold or issued stock within seconds, minutes, hour, or within the day after any of the example of spoofing cycles it provided.  Doc. 36 at 41.  However, the AC identifies sales Quantum made at what it alleges are artificially depressed prices within minutes of the purported spoofing cycles. *See* ¶¶ 116–17 (identifying sales within 10 minutes of CIBC's alleged spoofing, ¶ 209 (identifying sales within between 181 and 284 seconds of CIBC's alleged spoofing, and within between 64 and 270 seconds of RBC's purported spoofing).  The Court finds that these allegations suffice. *Mullen*, 2025 WL

37

951501, at *5 (describing trades made within times ranging from three minutes to over 2 hours as "temporally proximate").

Defendants also argue that the tables Quantum provides to list the sales and stock issuances that Quantum made within five minutes and within one hour of the alleged spoofing cycles, ¶¶ 209, 211, are "vague and opaque," as they do not include, *inter alia*, information about how many orders and how many shares Defendants placed on the sell- and buy-sides during each alleged spoofing cycle, how long those orders were in the market, and what each Defendants' order imbalance was during the alleged spoofing cycle, Doc. 36 at 41–42. However, the Court finds that these tables are sufficient at this stage to plead loss causation. *Mullen*, 2025 WL 951501, at *5 (noting that "the effects of spoofing pose questions of fact," so allegations akin to the ones in the AC are "sufficient at this stage to allege loss causation.").

### b.  Long-Term Impact

The Court finds that because Quantum sufficiently plead loss causation under the theory of temporal proximity, it need not address loss causation under a theory of long-term impact at this stage. *Mullen*, 2025 WL 951501, at *6 ("Whether these spoofing events actually had a long-term price impact is a factual question better left for later stages of litigation.").

### C.  Quantum's Claims are Not Time-Barred.

Defendants argue that Quantum's Exchange Act claims are time-barred because even though they had consultants and contractors who had begun analyzing the relevant data on a daily basis at least as early as 2022, Quantum nonetheless waited until October 2024 to file the case. Doc. 36 at 48–51.

"Securities fraud claims brought under Section 10(b) of the Securities Exchange Act of 1934 are subject to the earlier of a two-year statute of limitations or a five-year statute of repose." *Moon Joo Yu v. Premiere Power LLC*, No. 14-cv-7588 (KPF), 2018 WL 456244, at *5 (S.D.N.Y. Jan. 17, 2018) (citing 28 U.S.C. § 1658(b)). The Second

38

Circuit has made it clear that the "limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting [the] violation." *City of Pontiac General Employees' Retirement System v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011). A "fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint … with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id.* at 175.

Here, the AC alleges that "[t]he case arises from Defendants' use of 'spoofing,' an unlawful trading practice, to manipulate the market price of Quantum's shares between January 1, 2020, and August 15, 2024." ¶ 1. Quantum commenced this action on October 20, 2024, and asserts that this is well within the five-year statute of repose in accordance with 28 U.S.C. § 1658(b). The Court agrees given that the AC explicitly alleges that: (1) Defendants intentionally hid their spoofing schemes in order to depress the price of Quantum shares; (2) "Defendants' scheme to manipulate was structured in a manner that concealed Defendants' unlawful intentions and made it extremely difficult for a reasonably diligent market participant—like Quantum—to discover the operative facts constituting the market manipulation scheme, much less the identities of the perpetrators of these schemes"; and (3) despite its diligence, it did not discover, nor could a reasonably diligent plaintiff have discovered, "the facts constituting the market manipulation claims or the identities of the perpetrators of these market manipulation scheme" during the Relevant Period. ¶¶ 215, 221–22.

Moreover, although the parties devote considerable space to arguing about whether and when Quantum was aware, reasonably should have been aware of, or was on inquiry notice of Defendants' alleged spoofing schemes, courts in this jurisdiction have allowed spoofing cases to advance past the pleading stage when the complaint details that plaintiff pursued lengthy investigations prior to filing the complaint, even if they were

39

concerned about manipulation years prior.  *Harrington*, 585 F. Supp. 3d at 421 (noting that the complaint alleges plaintiff conducted a diligent, multi-step investigation— including court applications, regulatory requests, and extensive data analysis—before filing the complaint once sufficient evidence was obtained).

Accordingly, Defendant's motion to dismiss based on the statute of limitations is denied.

### D.  Common Law Fraud

Lastly, Defendants argue that Quantum failed to plead common law fraud.  "The elements of common-law fraud are 'essentially the same' as those for a violation of Section 10(b) of the Exchange Act."  *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 436 (S.D.N.Y. 2010).  Defendants' only additional argument specific to the common law claim is that it "fails for the separate and independent reason that Quantum does not allege that Defendants made any material misstatements or omissions.  Quantum alleges that Defendants placed orders that 'sen[t] false and misleading pricing signals to the market.'"  Doc. 36 at 51 (quoting ¶¶ 16, 232).  However, according to Defendants, "such trading activity does not constitute a misrepresentation or omission under New York law" in accordance with *Harrington*, 585 F. Supp. 3d at 424.  Doc. 36 at 51.  While it is true that the *Harrington* court dismissed the common law fraud claim because the complaint failed to sufficiently plead the underlying short selling § 10(b) claim, the Court nevertheless finds that "Plaintiff provides no case law to suggest that under New York law, trading activity can constitute a misstatement for purposes of fraud."  *Harrington*, 585 F. Supp. 3d at 424.  The cases Quantum provides to support its common law claim are inapposite and, as Defendants argue "involve identifiable misrepresentations or omissions" that are not present here.  Doc. 41 at 26.  Accordingly, Defendants' motion to dismiss the common law fraud claim is granted.

## IV.    LEAVE TO AMEND

The Second Circuit has instructed Courts not to dismiss a complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Shabazz v. Bezio*, 511 F. App'x. 28, 30 (2d Cir. 2013) (quoting *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009)) (internal quotation marks omitted).  Here, Quantum requested leave to amend the AC if the Court granted Defendants' motion to dismiss.  While the Court has already granted Quantum the opportunity to amend the original complaint, it was not in the context of a motion to dismiss, and the Court has therefore not provided guidance as to how their claims may be adequately made.  *In Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities*, LLC, 797 F.3d 160 (2d Cir. 2015), the Second Circuit reaffirmed that the "liberal spirit" of the Federal Rule of Civil Procedure 15 embodies a "strong preference for resolving disputes on the merits."  *See id.* at 190–91 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011)).  *Loreley* thus counsels strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims.  *Id.* at 190–91.  Accordingly, Quantum is granted leave to amend the AC.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Specifically, Quantum's common law claim is dismissed without prejudice.  Quantum may file a Second Amended Complaint, if at all, by April 20, 2026.  If Quantum fails to file an amended complaint by that date, its common law fraud claims will be dismissed with prejudice.  The parties are directed to appear for a status

conference on April 22, 2026, at 11:00 a.m. at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, Courtroom 619.

The Clerk of the Court is respectfully directed to terminate the motions, Docs. 35 and 43.

It is SO ORDERED.

Dated:    March 30, 2026
          New York, New York

 

_____
EDGARDO RAMOS, U.S.D.J.